# EXHIBIT 5

# Oxford English Dictionary | The definitive record of the English language

# facilitate, *v.*

**Pronunciation:**  Brit.   /fəˈsɪlɪteɪt/, U.S.   /fəˈsɪləˌteɪt/

**Forms:**  15–16 facillitate, 15– facilitate, 16 facilletate.

**Frequency (in current use):**

**Origin:** Probably a borrowing from French, combined with an English element. Etymons: French *faciliter* , -ATE *suffix*[3].

**Etymology:** Probably < Middle French, French *faciliter* to make easy (mid 15th cent.; < Italian *facilitare* (*c*1304) < *facilità* FACILITY *n.*) + -ATE *suffix*[3]. Compare post-classical Latin *facilitare* (from 14th cent. in British and continental sources), Catalan *facilitar* (*a*1575), Spanish *facilitar* (1535), Portuguese *facilitar* (1539). Compare slightly earlier FACILITE *v.* and slightly later FACILIZE *v.*

**1.** *trans.*

**a.** To make (an action, process, etc.) easy or easier; to promote, help forward; to assist in bringing about (a particular end or result).

1599  R. PARSONS *Temperate Ward-word* viii. 121  The persons also and qualities of the parties with whome this atonement is or were to be treated, are such as do greatly facilitate the enterprise.

1621  SIR G. CALVERT in S. R. Gardiner *Fortescue Papers* (1871) 155  It will..facilitate the present negotiation.

1670  C. COTTON tr. G. Girard *Hist. Life Duke of Espernon* I. II. 64  It..much facilitated the Duke of Guise his Victories, to have an Enemy reduc'd to such streights before he came to engage them.

1714  LADY M. W. MONTAGU *Let.* 5 Oct. (1965) I. 228  It will..facilitate your Election.

1755  T. SMOLLETT tr. Cervantes *Don Quixote* IV. ii. 209  In making you subservient in facilitating our success.

1789  G. WHITE *Jrnl.* 4 Jan. (1970) xxii. 324  The great speckled Diver, or Loon… The thighs [are] quite at the podex,..to facilitate diving.

1801  W. TAYLOR in *Monthly Mag.* 2 645  This machine may facilitate the admixture and accension of the airs.

1831  J. A. LATROBE *Music of Church* vi. 198  The indistinct and unintelligible manner in which the words are too frequently mumbled, does not greatly facilitate the meaning.

1883  *Stubbs' Mercantile Circular* 27 Sept. 861/2  The reformed procedure..has not appreciably facilitated the progress of public business.

1922  *Flight* 14 126/2  Landplanes designed so as to facilitate their landing on a ship's deck will ordinarily be known as Ship Planes.

1960  *Which?* Feb. 39/2  *Angora*..a fabric made from Angora rabbits' hair with the addition of up to 5 per cent wool to facilitate spinning.

2002  P. THOMAS *What works, what Doesn't* iv. 46  Some evidence exists to show that acupuncture can be used to turn a breech baby and thus facilitate an easier birth.

**†b.** To make simpler or less difficult to understand; to simplify. *Obs.*

1605  R. VERSTEGAN *Restit. Decayed Intelligence* 239,  I could..haue much pleasured some of our English poets, with great choice of our own ancient woords, which as occasion requyred they might..bring in vse again (By som-what facillitating yf need were the ortographie).

*a*1656   J. Hᴀʟᴇs *Tracts* (1677) iii. 89,   I thank you for..facilitating to my Understanding the scope and purpose of the XI. of Sᵗ. Matthew.

1797   tr. J. Necker *On French Revol*. II. 363   Great pictures inspire us with the love of order, and instruct us in its importance; we perceive that they facilitate to our understanding the knowledge of immensity.

1812   J. Nᴏᴛᴛ in T. Dekker *Guls Horne-bk.* (new ed.) 129   If the word *vis*. or *namely*, were inserted after *commodities*, it would greatly facilitate the sense, which is now subject to misinterpretation.


2. *trans*. To assist (a person); to enable or allow (a person) to do something, achieve a particular result, etc., more easily.

1640   W. Hᴀʙɪɴɢᴛᴏɴ *Hist. Edward IV* 158   King Lewys..having wrought himselfe into the Kings good liking and as he thought facilitated him to grant any request, urged that the Duke of Brittaine might not remaine in the protection of the English.

1646   H. Lᴀᴡʀᴇɴᴄᴇ *Of Communion & Warre with Angels* 77   Which may more easily leade and facilitate us, to the consenting to such a lust.

1650   T. Fᴜʟʟᴇʀ *Pisgah-sight of Palestine* ɪɪ. i. 64   Here lived the Emims, shrowdly smote by Chederlaomer, which probably did facilitate the Moabites in their victory over them.

1769   *May-day* Pref. p. iv,   The ancient method of writing Prefaces, was generally intended..to facilitate the reader in his perusal of the work.

1773   C. Vᴀʟʟᴀɴᴄᴇʏ *Gram. Irish Lang*. iii. 27   These remarks being premised will facilitate the reader in the pronunciation which we shall commit to rule in the next chapter.

1825   *Let*. 19 Feb. in *Hansard Commons* (1836) 18 Feb. 594/2   Your advice and immediate attention to this matter will materially facilitate me in my duty.

1860   *Amer. Law Reg*. 8 763   It is a most useful aid to the practitioner, and will facilitate him in one of the most toilsome and responsible parts of his professional duties.

1890   *Sat. Rev.* 6 Sept. 303/2   The author seems to aim solely at facilitating the pupil in his dealings with everyday French.

1922   *Jrnl. Hygiene* 21 122,   I wish to place on record the fact that the authorities..facilitated me in every way.

1979   *Irish Times* 28 Sept. 28/8 (*advt*.)   To facilitate our clients during the Papal Visit, our restaurant and coffee shop will remain open as usual.

2007   *Jakarta Post* (Nexis) 14 Aug.   A bridging programme like the Introductory Academic Program..is also designed to facilitate us to develop various study skills.


3. *trans. Physiol.* To enhance or strengthen (a reflex or other neuromuscular or neural activity), or increase the ease of transmission of (a nerve impulse), by prior excitation. Cf. ꜰᴀᴄɪʟɪᴛᴀᴛɪᴏɴ *n*. 3.

1894   *Amer. Jrnl. Psychol*. 6 263   A reflex produced by the stimulation of a given sensory nerve will be facilitated or strengthened if, shortly before, a contraction of the muscle has been produced by the stimulation of this or any other sensory nerve.

1934   E. S. Rᴏʙɪɴsᴏɴ in C. Murchison *Handbk. Gen. Exper. Psychol*. xii. 632   Extraneous, or unessential, stimuli can facilitate a given reaction as well as interfere with it.

2008   *Jrnl. Pain* 9 125/1   It [*sc*. the dorsal horn] produces spinal reflexes..and modulates to either inhibit or facilitate nociceptive transmission.

This entry has been updated (OED Third Edition, September 2009).

**Oxford University Press**
Copyright © 2017 Oxford University Press . All rights reserved.

Your access is brought to you by:
Warren Lex LLP

# EXHIBIT 6

# Oxford English Dictionary | The definitive record of the English language

# share, *v.2*

**Pronunciation:**   Brit.   /ʃɛː/, U.S.   /ʃɛ(ə)r/
**Forms:**   Also 15 shaire, shayre, 16 *Sc.* shair.
**Frequency (in current use):**
**Etymology:** < SHARE *n.3*

### 1.

**a.** *trans.* **To divide and apportion in shares between two or more recipients.**
*Obs.* **or** *arch.*

1590   SPENSER *Faerie Queene* II. x. sig. X8,   In his crown he counted her no hayre, But twixt the other twain his kingdom whole did shayre.

1610   P. HOLLAND tr. W. Camden *Brit.* I. 641   He..shared the Country among his companions.

*a*1616   SHAKESPEARE *Timon of Athens* (1623) IV. ii. 23   Good Fellowes all, The latest of my wealth Ile share among'st you.

1624   F. QUARLES *Iob Militant* Med. ix. 43   To Good and Bad, both Fortunes Heauen doth share, That both, an after-change, may hope, and feare.

1709   SWIFT *Let. conc. Sacramental Test* 21   Suppose I share my Fortune equally between my own Children, and a Stranger, whom I take into my Protection; will that be a Method to unite them?

1711   W. SUTHERLAND *Ship-builders Assistant* 48   The But Ends, which are shared with as much Indifference as possible, that every Part of the Ship may be of equal Strength.

1743   J. BULKELEY & J. CUMMINS *Voy. to South-seas* 160   We shar'd all the Provisions among the Company.

1839   H. HALLAM *Introd. Lit. Europe* III. v. 456   Their parental love forbids all preference, and an impartial law of gavelkind shares their page among all the offspring of their brain.

1863   J. M. NEALE *Mediæval Hymns* (ed. 2) 197   Midst his people thus the Clerk Scripture nurture shareth.

### b. Now chiefly with *out.*

1644–52   J. SMITH *Select Disc.* (1821) VII. iv. 347   Those immortal inheritances which he shares out amongst his spiritual sons and subjects in heaven.

1723   tr. F. C. Weber *Present State Russia* I. 52   The Senate shares that Service out among the several Governments.

1761   D. HUME *Hist. Eng.* I. xiii. 314   The landed property was gradually shared out into more hands.

1761   D. HUME *Hist. Eng.* III. liii. 135   Worldly glory had been shared out to them with a sparing hand.

1898   BRABROOK *Provid. Societies* 57   The funds..diminish so rapidly that the old men share out what there is and close the society.

1901   T. J. ALLDRIDGE *Sherbro* xxiii. 242   When there is 'flesh kind' for the carriers, it is given to the head-man, who shares it out most carefully.

### c. To apportion to an individual as his share. Also with *out. arch.*

*c*1586  Countess of Pembroke *Psalmes* LVIII. iv,   There is a God that shares to each his own.

1596  Spenser *Second Pt. Faerie Queene* IV. VIII. sig. G7,   And euery day for guerdon of her song, He part of his small feast to her would share .

1602  R. Carew *Surv. Cornwall* I. f. 13,   In Wastrell, it is lawfull for any man to make triall of his fortune that way, prouided, that hee acknowledge the Lordes right, by sharing out vnto him a certaine part, which they can toll.

1633  P. Fletcher *Purple Island* VI. xxxii. 72  He all in all..Does share to each his due, and equall dole impart.

1893  R. L. Stevenson *Catriona* VI. 62  And here I am with my foot in the stirrup again and some of the responsibility shared into my hand of prosecuting King George's enemies.

## d. To divide (what one has or receives) into portions, and give shares to others as well as one's self. Const. *with.*

1592  *Arden of Feversham* II. i. 35   Were it not that I see more company comming down the hill, I would be fellowes with you once more, and share Crownes with you to.

1636  R. Freeman tr. Seneca *Shortn. Life* (1663) 4   To share his money no man can abide; Their lives 'twixt many all men will diuide.

1771  O. Goldsmith *Hist. Eng.* I. 149  These had a power of sharing their grants to inferior tenants.

*a*1822  Shelley *Cyclops* in *Posthumous Poems* (1824) 352   *Cyclops.* Should I not share this liquor with my brothers? *Ulysses.* Keep it yourself, and be more honoured so.

1901  D. B. Hall & A. Osborne *Sunshine & Surf* xxiii. 297  The natives had only brought enough [water] for themselves..which, however, they generously shared with us.

## e. To divide *into* parts or shares. *rare.*

1595  Spenser *Colin Clouts come Home Againe* sig. B,   First into many parts his streame he shar'd.

1719  D. Defoe *Life Robinson Crusoe* 363,  I shar'd the Island into Parts with 'em.

1847  C. Bronte *Jane Eyre* I. v. 74  A thin oaten cake, shared into fragments.

1847  C. Bronte *Jane Eyre* II. vi. 172  Take one day; share it into sections; to each section apportion its task.

## †f. *refl.* To divide one's service, devotion, etc. between (two different objects). *Obs.*

1680  C. Ness *Compl. Church-hist.* 164  Solomon had been sharing himself betwixt God and idols.

## 2. Of two or more persons: To divide into shares and take each a portion. Also *absol.*

1597  Shakespeare *Richard III* I. iii. 159  You wrangling Pyrats that fall out, In sharing that which you haue pild from me.

1598  Shakespeare *Henry IV, Pt. 1* II. iii. 6  Come my maisters, let vs share and then to horse.

1660  T. Stanley *Hist. Philos.* III. v. 106  The two thousand Citizens, whom the Athenians sent to Samus, to share the land by lots.

**3.**

**a.** To grant or give another or others a share in. Also const. *with*.

1662  DRYDEN *To Ld. Chancellor* 2  Well may he then to you his Cares impart And share his burden where he shares his heart.

1717  POPE *Eloisa to Abelard* in *Wks*. 419  Then share thy pain, allow that sad relief; Ah more than share it! give me all thy grief.

1818  SHELLEY *Marenghi* xii,  There was set A penalty of blood on all who shared So much of water with him as might wet His lips.

1847  TENNYSON *Princess* vi. 133  Now had you got a friend of your own age, Now could you share your thought.

1860  E. WASHBURN *Amer. Law Real Property* I. 364 (Funk)  A mode of letting lands..where the tenant is to cultivate them, and share the crops with his landlord.

1913  *N.E.D.* at *Share*,  *Mod.* I will share my room with you for to-night if you cannot get a bed anywhere else.

**b.** *nonce-use.* To cause (one thing) to share its place *with* another.

1813  SCOTT *Rokeby* i. 12  A scorching clime, And toil, had done the work of time,..And sable hairs with silver shared.

**4.**

**a.** To receive, possess, or occupy together with others.

1599  SHAKESPEARE *Romeo & Juliet* i. iii. 95  So shall you share all that he doth possesse.

1610  *Histrio-mastix* vi. i. H 1 b,  *Cun*[*stable*]. Soft sirs, I must talke with you for taxe mony, To releeue the poore, not a penny paid yet. *Post.* Sir, at few words we shar'd but xv. pence last weeke.

*a*1634  J. DAY *Peregrinatio Scholastica* (Sloane 3150) f. 32ᵛ,  Lookeing downe I might perceive a white mowse, and a blacke mowse, shareinge the roote of the tree.

1697  DRYDEN tr. Virgil *Georgics* iv, in tr. Virgil *Wks*. 143  Longing the common Light again to share .

1762  O. GOLDSMITH *Citizen of World* I. 52  He was born to share the bounties of heaven, but he has monopolized them.

1804  J. GRAHAME *Sabbath* 3  He shares the frugal meal with those he loves.

1825  T. HOOK *Sayings & Doings* 2nd Ser. I. 283  She quitted the sofa she had been unwillingly sharing with the self-pleased beau.

**b.** *fig.* (with a thing as subject.)

*a*1674  MILTON *To Ld. Fairfax* in *Lett. of State* (1694) p. xlvi,  In vain doth Valour bleed, While Avarice and Rapine shares the Land.

1743  E. YOUNG *Complaint: Night the Fifth* 8  We wear the Chains of Pleasure, and of Pride; These share the Man; and these distract him too.

**†c.** To receive or possess (a portion allotted to one); to take or receive as one's share. *poet. Obs.*

**1597** SHAKESPEARE *Richard III* v. v. 222  But if I thriue, the gaine of my attempt, The least of you, shall share his part thereof.

**1609** SHAKESPEARE *Sonnets* xlvii. sig. D2ᵛ,  An other time mine eye is my hearts guest, And in his thoughts of loue doth share a part.

**1618** S. ROWLANDS *Sacred Memorie* (1876) 37  Who seeing now her sorrowes cause to liue, Had such a fulnesse of a ioyfull heart, That neuer woman sharde a greater part.

†**d.** *to share from*: to gain at the expense of.

**1609** SHAKESPEARE *Troilus & Cressida* I. iii. 360  What glory our Achilles shares from Hector.

*a*1616 SHAKESPEARE *Henry V* (1623) IV. iii. 32,  I would not loose so great an Honor, As one man more me thinkes would share from me, For the best hope I haue.

**e.** *to share alone*: incorrectly, to possess unshared.

**1629** P. MASSINGER *Roman Actor* v. ii. sig. K3,  You shall not share alone The glorie of a deed that will endure To all posteritie.

**f.** *Chem.* Of an atom, orbital, etc.: to hold (one or more electrons) in common with another atom or orbital, so as to form a covalent bond. (See also *shared adj.* at Derivatives.)

**1919** *Jrnl. Amer. Chem. Soc.* 41 888  An octet may share an even number of its electrons with 1, 2, 3, or 4 other octets.

**1923** *Trans. Faraday Soc.* 19 461  In chemically stable molecules we have only to consider atoms sharing pairs of electrons. It is well known that such structures do not exhibit any signs of electrical polarity. One must therefore suppose that the net charge on both atoms is zero, *i.e.* that the two shared electrons are in general so distributed that when one is in one atom the other is in the other.

**1964** J. W. LINNETT *Electronic Struct. Molecules* ii. 29  The two electrons may be regarded as being shared between the $1s$ orbital of the hydrogen and one of the $2p$ orbitals of the fluorine.

**5. To participate in** (an action, activity, opinion, feeling, or condition); to perform, enjoy, or suffer in common with others; to possess (a quality) which other persons or things also have. Const. *with*.

**1600** SHAKESPEARE *Midsummer Night's Dream* III. ii. 199  Is all the counsell that we two haue shar'd, The sisters vowes,..O, is all forgot?

*a*1616 SHAKESPEARE *Othello* (1622) III. iv. 94  A man that all his time, Hath..Shar'd dangers with you.

**1667** DRYDEN *Indian Emperour* v. ii. 62,  I am content in Death to share your Fate.

**1768** T. GRAY *Fatal Sisters* in *Poems* 81  Where our Friends the conflict share.

**1815** SCOTT *Guy Mannering* I. xvi. 257  That love of admiration which all pretty women share less or more.

**1847** THACKERAY *Vanity Fair* (1848) xxix. 251  How could we, with our means, live at all, but for a friend to share expenses?

1847   Thackeray *Vanity Fair* (1848) xlii. 382   His dinner, which he and his daughter took in silence..or which they shared..with a party of dismal friends.

1856   J. A. Froude *Hist. Eng.* (1858) I. iii. 267   The bribery was equally shared between both parties.

1860   J. Tyndall *Glaciers of Alps* i. xviii. 131   Their willingness to share my fate whatever that might be.

1874   J. R. Green *Short Hist. Eng. People* iv. §3. 177   He [Edward I] shared to the full his people's love of hard fighting.

1885   T. H. Eagles *Constructive Geom. Plane Curves* 99   The ellipse shares with the hyperbola the property of satisfying five geometrical conditions.

1895   *Law Times* 1OO 4/1   Lord Macnaghten's satisfaction with things as they are will not be shared by anyone.

**6.**

**a.** *intr.* **To have a share (** *in* **something)** ; **to participate** *in*, **to take part** *in.*

1602   Shakespeare *Merry Wives of Windsor* ii. ii. 15   Didst thou not share? hadst thou not fifteene pence?

*a*1616   Shakespeare *Macbeth* (1623) iv. i. 40,   I commend your paines, And euery one shall share i'th' gaines.

1669   N. Morton *New-Englands Mem.* (1910) 35   In which sickness the seamen shared also deeply, and many died.

1690   J. Locke *Two Treat. Govt.* §91 (1692) 91   A Right of Inheritance gave every one..a Title to share in the Goods of his Father.

1781   W. Cowper *Hope* 686   Good-breeding..if in masculine debate he shar'd, Ensur'd him mute attention and regard.

1849   Macaulay *Hist. Eng.* I. ii. 156   Was it not enough..that he shared, with the rest of the nation, in the blessings of that mild government of which he had long been the foe?

1912   *Eng. Hist. Rev.* Jan. 53   The king would not share in the expense of raising opposition to the candidature of the electoral prince of Saxony.

**b.** **To participate** *with* **(a person)** *in* **something. (?** *Obs.* **)** *rare.*

1598   Shakespeare *Henry IV, Pt. 1* v. iv. 63,   I am the Prince of Wales, and thinke not Percy To share with me in glory any more.

1677   Milton *Paradise Lost* ix. 831   Adam shall share with me in bliss or woe.

1709   F. Atterbury *Serm. St. Brigit's* 24   We cannot, surely, think it beneath us, to share with those glorious Beings, in such an Administration!

1771   O. Goldsmith *Hist. Eng.* II. 281   They had shared with him in all his former dangers and distresses.

**†c.** **To partake** *of. Obs. rare.*

1649   Earl of Monmouth tr. J. F. Senault *Use of Passions* 6   The one and the other shares of servitude.

1720   *Humourist* 71   Those deplorable Wretches, who, as they share of our Likeness and Nature, ought to share of our Compassion.

1736   L. Welsted *Scheme & Conduct Providence* vii. 69   Any other people..must have shar'd, more or less, of the same frailty.

**†d. To be equal with.** *Obs. rare*$^{-1}$.

> *a*1616 Sʜᴀᴋᴇsᴘᴇᴀʀᴇ *All's Well that ends Well* (1623) ɪ. i. 61 Succeed thy father In manners as in shape: thy blood and vertue Contend for Empire in thee, and thy goodnesse Share with thy birth-right.

**e. Used in reduplicated form** *share and share (alike*, etc.*)*: **the phrase in** sʜᴀʀᴇ *n.*$^3$ **being misapprehended grammatically.**

> 1821 Sᴄᴏᴛᴛ *Pirate* II. iv. 72 They say that a' men share and share equals-aquals in the creature's ulzie.
> 1841 E. Bᴜʟᴡᴇʀ-Lʏᴛᴛᴏɴ *Night & Morning* ɪ. vi, And a pretty boy is always a help in a linen-draper's shop. He shall share and share with my own young folks.
> 1841 Mᴀᴄᴀᴜʟᴀʏ *Lit. Copyright* Sp. (1853) I. 286 In Kent the sons share and share alike.
> 1906 'M. Cᴏʀᴇʟʟɪ' *Treasure of Heaven* x, I've no money—we all share and share alike in camp.

**7.** *intr.* **and** *trans.* **In the language of Moral Rearmament: to confess one's sins openly; to impart to others one's spiritual experiences. Also const.** *with.* **Also in wider use.**

> 1932 [implied in: A. J. Rᴜssᴇʟʟ *For Sinners Only* ii. 25 They [*sc.* The Oxford Group] defined Sharing as meaning two distinct things—further definable as Confession and Witness. (at sʜᴀʀɪɴɢ *n.*² 2)].
> 1933 S. A. Kɪɴɢ *Challenge to Oxf. Groups* v. 48 What does the Bishop think a man feels when he has 'shared' for 'witness' and finds that God has used that 'sharing' to bring a brother out of..bondage?
> 1934 R. Mᴀᴄᴀᴜʟᴀʏ *Going Abroad* xiv. 111 She would, thought he, be able to share with another girl in a way she could not with him.
> 1934 R. Mᴀᴄᴀᴜʟᴀʏ *Going Abroad* xvii. 135, I must say, I did annoy my father a bit by sharing with him a few things I'd thought about him.
> 1940 R. Gʀᴀᴠᴇs & A. Hᴏᴅɢᴇ *Long Week-end* xii. 205 One of their practices was to 'share' confessions of their sins.
> 1949 A. Wɪʟsᴏɴ *Wrong Set* 19, I do believe you're trying to get me to 'share'. And I never even guessed that you were a Grouper.
> 1981 B. Pᴀᴜʟ *Your Eyelids are growing Heavy* (1982) ix. 121 She 'shared' with the group the fact that she'd begun to have severe bouts of depression.

---

Cᴏᴍᴘᴏᴜɴᴅs

*Comb.*: **share-out** *n.* **[subst. use of the verbal phrase in 1b] the act of distributing in shares. Occas.** *attrib.* **in** *share-out club* **or** *society.* **Also that which is distributed; a portion or share (of profits, interest, etc.), a 'cut'.**

> 1902 *Daily Chron.* 7 Jan. 7/1 A share-out club.
> 1906 *Westm. Gaz.* 24 Dec. 10/1 There was disappointment for a very large number of members of the Church Institute Slate Club..when it was found that the expected 'share-out' would not take place.
> 1909 *Daily Chron.* 17 Dec. 1/3 'Share-out night' is a very big event..in the Sick and Provident Club.

1941  *Sun (*Baltimor*e)* 27 Jan. 4/1   It could be 'well in at the head of the table for the shareout' when the war ended.

1951  A. L. Rowse *Eng. of Elizabeth* viii. 325   The new nobility around the young king helped themselves to a vast share-out of Crown and Church lands.

1963  *Times* 7 May 18/2   No, a share-out it may be—and each shareholder may have his own private, affectionate name for it—but in..the businesslike print of The Birmingham Post, 'dividend' is the better term.

1976  *Scottish Daily Express* 23 Dec. 6/2   Kilkerr was forced to accept his share-out from Soho vice bosses on Friday nights.

## DERIVATIVES

## shared *adj.*

1884  *Lit. World (*Boston, U.S.*)* 19 Apr. 134/2   Hopes and plans for a shared life, a household which should be his own.

1897  *Westm. Gaz.* 30 June 1/3   The boy is a shared property: he has to serve two masters.

1923 [see sense 4f].

1927  N. V. Sidgwick *Electronic Theory of Valency* 98   Orbits of Shared Electrons.

1939  L. Pauling *Nature Chem. Bond* i. 6   In methane the carbon atom, with its two inner electrons and its outer shell of eight shared electrons, has assumed the stable ten-electron configuration of neon.

1977  H. S. Pickering *Covalent Bond* ii. 17   A variant of the covalent bond occurs in which the two shared electrons of the bond come originally from one of the two atoms.

## DRAFT ADDITIONS  1993

## Also *absol.*

1932  W. Faulkner *Light in August* i. 25   'I'd take it kind for you to share.' 'I wouldn't care to. You go ahead and eat.'

1981  'M. Underwood' *Double Jeopardy* xiv. 115   Rosa..glanced round the room. 'It reminds me of the days when I used to share,' she said. 'Except there were five of us.'

## DRAFT ADDITIONS  1993

 shareware  *n. Computing* (orig. *U.S.*) software, often distributed informally, which is available free of charge for evaluation, after which a fee is usually requested for continued use.

1983  *InfoWorld* 15 Aug. 64/1   It certainly was a different bag of mail I received in response to the last shareware installment. Usually..the ratio of downloaders requesting programs to the uploaders donating them is about 20 to 1.

1989  *Daily Tel.* 19 Jan. 27/5   As some of the best value software..is available to anybody who can dial the right telephone number, the field of shareware and public domain software is a seam worth mining.

---

DRAFT ADDITIONS 1993

ˈsharedness  *n.* the quality or fact of being shared.

1947  L. MacNeice *Dark Tower* 13   That feeling of *sharedness*..given to a play by every fresh production.

1977  Douglas & Johnson *Existential Sociol.* p. xiv,   We have tried to show that any such ideas of sharedness (or patterns) must be seen in the context of the pluralistic, conflictual, and necessarily problematic nature of our lives.

1986  *Word* 37 50   If we are to regard cultural representations as conceptually real to members of the culture, their sharedness cannot merely be assumed.

---

This entry has not yet been fully updated (first published 1913).

**Oxford University Press**
Copyright © 2017 Oxford University Press . All rights reserved.

Your access is brought to you by:
Warren Lex LLP

# EXHIBIT 7

# Oxford English Dictionary | The definitive record of the English language

# provide, *v.*

**Pronunciation:** Brit. /prəˈvʌɪd/, U.S. /prəˈvaɪd/, /proʊˈvaɪd/

**Forms:** IME **prouede** (past tense), IME **proviyde**, IME **provyde** (past tense), IME **prowyde** (past tense), IME–15 **prouyde**, IME–16 **prouide**, IME–16 **provyde**, IME– **provide**, 15–16 **provyd**, 16 **preuide** (*nonstandard*), 18– **purvide** (*regional* and *nonstandard*); *Sc.* pre-17 **prouid**, pre-17 **prouide**, pre-17 **prouyd**, pre-17 **prouyde**, pre-17 **provaid**, pre-17 **provayd**, pre-17 **proveide**, pre-17 **provid**, pre-17 **provide** (past participle), pre-17 **provyd**, pre-17 **provyd** (past participle), pre-17 **provyde** (past participle), pre-17 **provyid**, pre-17 **prowid**, pre-17 **prowide**, pre-17 **prowyd**, pre-17 **prowyde**, pre-17 **prowyid**, pre-17 **proyd**, pre-17 **prvyde**, pre-17 17 **provyde**, pre-17 17– **provide**.

**Frequency (in current use):**

**Origin:** A borrowing from Latin. Etymon: Latin *prōvidēre*.

**Etymology:** < classical Latin *prōvidēre* to see in advance, to see beforehand, to foresee, to provide for, to take precautions, to make available in advance, supply, in post-classical Latin also to appoint (8th cent.), to appoint by papal provision (from 13th cent. in British sources) < *prō-* PRO- *prefix*[1] + *vidēre* to see (see VISION *n.*). Compare Italian *provvedere* (first half of the 13th cent.), and also Anglo-Norman *provider* , *providre* to appoint (an incumbent) to by papal provision (late 14th cent. or earlier; compare sense **7**). Compare earlier PROVIDENCE *n.*, PURVEY *v.*, and the Romance verbs cited at the latter entry. Compare also PREVIDE *v.*[1]

In form *purvide* apparently influenced by PURVEY *v.*

## I. To exercise foresight; to make provision for the future.

**1.** *trans.* with *that*-clause.

**a.** To stipulate in a will, statute, etc.; to lay down as a provision or arrangement. Cf. PROVIDED *conj.*, PROVIDING *conj.*, PROVISION *n.* **4a.**

1423   *Rolls of Parl.* VI. 256/2   Be it ordeigned..that the too half be forfet to the use of the Kyng..Provydyng evir more that thei goeth unto the koyne.

‣*a*1470   MALORY *Morte Darthur* (Winch. Coll.) 360   There was made a provision for the day of maryaige, and by the kynges advyse hit was provyded that hit sholde be at Mychaelmasse.

*a*1500   (‣*c*1477)   T. NORTON *Ordinal of Alchemy* (BL Add.) (1975) 419 (*MED*),   Yerly ye may se For multipliyng of herbis how nature hath prouided That al thing onyd in the seed be diuidede.

1560   J. DAUS tr. J. Sleidane *Commentaries* f. cxiiij\^v,   The Mayers wyfe of the citie prouided in her wyll, that she would be buried without any pompe or noyse.

1596   J. DALRYMPLE tr. J. Leslie *Hist. Scotl.* (1888) I. 116   Q\^n sa our lawis provydes, that the eldest succeides.

1640   H. BURTON *Replie to Relation of Conf. between Laude & Fisher* 99   Therefore as one of your Canons provides, that your Priest that is not able to have a Long Gown, may weare a Short Cloake.

1687   *Boyds of Penkill Family Papers* No. 284 29 Dec.   I dout the lau will provaid that I sal take my mony as it war at a term.

1709   W. NELSON *Rights Clergy Great Brit.* 129   The Statute provides that..it shall continue during the Lease and afterwards.

1768   W. BLACKSTONE *Comm. Laws Eng.* II. 66   By an ordinance in 27 Hen. II. called the assise of arms, it was provided that every man's armour should descend to his heir.

1849   MACAULAY *Hist. Eng.* I. i. 13   Another regulation, providing that every person who was found slain should be supposed to be a Frenchman, unless he were proved to be a Saxon.

Case 1:15-cv-01170-GMS   Document 160-1   Filed 03/31/17   Page 16 of 468 PageID #: 7225

**1891**   *Law Rep.: Weekly Notes* 72/2   This clause did not provide that the costs of references..should be in the discretion of the arbitrators.

**1908**   *Westm Gaz.* 21 July 5/1   The new law provides that all these Seville douros shall be confiscated.

**1946**   *All Eng. Law Rep.* 23 Nov. 577   In that sub-clause it is provided that the wife is to support, maintain and educate the child.

**2000**   *Nation (*N.Y.*)* 9 Oct. 35/1   The Fifth Amendment..provides that private property cannot be taken for public use without just compensation.


†**b.** *gen.* To make provision for beforehand; to take measures to ensure *that* something shall not happen. *Obs.*

*c*1425   Lydgate *Troyyes Bk.* (Augustus A.iv) ii. 8698   Þis kyng knyȝtly gan prouide In his avis þat no þing him eskape.

*a*1500   (▸?a1410)   Lydgate *Churl & Bird* (Lansd.) 191 in *Minor Poems* (1934) ii. 476,   I wole bewar, & a-forn provide, That of no fowler I wole no more be iapid.

**1509**   J. Fisher *Mornynge Remembraunce Countesse of Rychemonde* (de Worde) sig. Av ᵛ,   To..prouyde by her owne commaundement that nothynge sholde lacke.

*a*1538   T. Starkey *Dial. Pole & Lupset* (1989) 120   We must provyd..that by no prerogatyfe he usurpe apon the pepul any such authorysyd tyranny.

**1574**   J. Baret *Aluearie* P 730   To *Prouide* that a thing happen not. *Præcaueo.*

**1642**   J. March *Argument Militia* 4   The King ought..to provide that his Subjects have their passage throughout the Realme by all high wayes in safeguard.

**1698**   J. Norris *Pract. Disc. Divine Subj.* IV. 109   Is not every Man concern'd to provide that neither the Desire of Life may imbitter his Death, nor the Fear of Death discomfort his Life?

**1750–2**   Johnson *Rambler* I. 32   The purpose of these writings is surely not only to show mankind, but to provide that they may be seen hereafter with less hazard.

**1858**   Trollope *Three Clerks* II. xii. 262   It would not be amiss to provide that the man selected should know somewhat of finance.


**2.** *intr.* To take appropriate measures in view of a possible event; to make adequate preparation for the future. Freq. with *against, for.*

*c*1425   Lydgate *Troyyes Bk.* (Augustus A.iv) v. 563 (*MED*),   Lat hym be war & prudently prouide.

?*a*1475   (▸?a1425)   tr. R. Higden *Polychron.* (Harl. 2261) (1871) III. 47 (*MED*),   Men of Lacedemonia provide for [*a*1387 J. Trevisa tr. arayed; L. *instaurant*] a batelle ageyne men of Micena.

**1548**   *Hall's Vnion: Richard III* f. lijᵛ,   To prouyde for after clappes that might happen and chaunce.

**1569**   R. Grafton *Chron.* II. 689   The olde adage, saiyng in tyme of peace, prouide for war, and in tyme of war, prouide for peace.

**1607**   T. Ridley *View of Civile Law* 217   Under pretence of debts unknowen which they make shew they must prouide for.

**1665**   R. Boyle *Occas. Refl.* ii. xi. sig. P8,   We may be often sollicitous to provide against many Evils and Dangers that possibly may never reach us.

**1701**   M. Pix *Czar of Muscovy* iii. ii. 34   To provide against the worst..as no one knows the uncertainty of Events, our provident Foresight will then be useful to us.

**1748**   S. Richardson *Clarissa* III. 189   Every possible objection anticipated! Every accident provided against!

**1796**   E. Burke *Corr.* (1844) IV. 393   The first duty of a state is to provide for its own conservation.

1818 SCOTT *Heart of Mid-Lothian* I. xviii. 340   A paper was slipped into her hand..which..assured her he had provided against interruption.

1878 W. S. JEVONS *Polit. Econ.* i. §2. 10   Suffering from misfortunes which could not have been provided against.

1889 *Pall Mall Gaz.* 13 July 3/1   The bill does not provide for any storage or any compensation water to be sent down the stream.

*a*1901 J. FISKE *Ess. Hist. & Literary* (1902) I. iii. 169   The Constitution..did not provide against the indefinite reëligibility of the President.

1930 *Times* 3 July 10/5   Nature..has not provided against assaults upon the hearing, and we have no 'ear-lid' by which we can shut out noise.

1995 *Harper's Mag.* Mar. 29/1   What need did I have of money?…I didn't care to provide for my old age.

## †3. *trans.* **To foresee.** *Obs.*

*a*1450 (‣?c1421) LYDGATE *Siege Thebes* (Arun.) 2945 (*MED*),   Age provydeth euery thing Or he bygynne to casten the endyng.

*c*1450 (‣1410) J. WALTON tr. Boethius *De Consol. Philos.* (Linc. Cathedral 103) 293 (*MED*),   Thei seien also þat þing þat schall be-falle, In goddes sight provided it is nede.

*c*1500 (‣?a1437) *Kingis Quair* (1939) ix,   So vncouthly hir werdes sche deuidith, Namly In ȝouth, that seildin ought prouidith.

1545 T. RAYNALD tr. E. Roesslin *Byrth of Mankynde* 91   Euident and sufficient signes, whereby maye be prouided & foresene the aborcement before it come.

1607 B. JONSON *Volpone* Ded. sig. ¶3,   Graue, and wiser Patriotes..prouiding the hurts these licentious spirits may do in a State.

1640 J. YORKE *Union of Honour* 137   Of especiall counsell and advice, in providing and fore-seeing the event of any deepe designes.

## II. To prepare, make preparations.

## †4. *trans.* **To prepare, get ready, or arrange beforehand.** *Obs.*

*c*1425 LYDGATE *Troyyes Bk.* (Augustus A.iv) II. 669   Of þe toun þe stretis large & wyde Wer by crafte so prudently prouided, And by werkemen sette so and deuided.

1488 (‣c1478) HARY *Actis & Deidis Schir William Wallace* (Adv.) (1968–9) XI. l. 620   Wallace in haist prouidyt son his ost.

*c*1500 (‣?a1475) *Assembly of Gods* (1896) 216 (*MED*),   What pyne or greef ye for me prouyde, Without any grogyng I shall hit abyde.

1526 W. BONDE *Pylgrimage of Perfection* I. sig. Ciii,   Of certayne benefytes that god hath prouided for vs.

1535 *Bible* (Coverdale) Prov. vi. A,   In the sommer she prouideth hir meate, & gathereth hir foode together in yᵉ haruest.

1563 R. REYNOLDS *Foundacion of Rhetorike* sig. 10ᵛ,   That while age is tender and young, thei maie learne by example of the Ante, to prouide in their grene and lustie youth, some meane of art and science.

1697 DRYDEN tr. Virgil *Georgics* I, in tr. Virgil *Wks.* 57   The wise Ant her wintry Store provides .

1763 R. GOADBY *Universe Displayed* 9   Every one [*sc.* beaver] provides his store for the winter.

1809 B. H. MALKIN tr. A. R. Le Sage *Adventures Gil Blas* II. v. i. 398   He had provided a gown of coarse dark cloth, and a little red horse-hair beard.

**†5.**

**a.** *intr.* **To prepare, make preparation, get ready. Freq. with infinitive.** *Obs.*

> *c*1425   Lydgate *Troyyes Bk.* **(Augustus A.iv)** ii. 1454 (*MED*),   We schal lete liȝtly ouerslyde So þat ȝe beningly prouide To sende hir hom.

> *c*1450   (▸?c1408)   Lydgate *Reson & Sensuallyte* 3556 (*MED*),   Ther koude no man hym provyde To save him that he was brent.

> ?1495   Lydgate *St. Petronilla* **(Pynson)** l. 105 in *Minor Poems* (1911) i. 158   Felliculla gan afore prouyde Maugre Flaccus to lyue in maydynhede.

> 1569   R. Grafton *Chron.* II. 165   He prouyded to sende men and victualles to strengthen the castels of Flynt and Rutlande.

> 1601   R. Johnson tr. G. Botero *Trauellers Breuiat* 134   Let them not thinke to begin any long warre, much lesse to continue it, vnlesse they throughly prouide aforehand.

> 1631   B. Jonson *Staple of Newes* iv. i. 58 in *Wks.* II   But stay, my Princesse comes, prouide the while, I'll call for't anone.

> 1692   tr. Sallust *Wks.* 116   He toyls, provides, and..sets all his Trains and Engines at work by Treachery to ruine Hiempsal.

> 1733   Swift *Thoughts on Var. Subj.* in Swift et al. *Misc.* I. 308   Very few Men..live at present, but are providing to live another Time.

> 1753   P. Gordon *Hist. Renown'd & Valiant Prince Robert* 139   Back to Angus he his Army guides, And to reduce that Pleasant Land provides.

**b.** *trans.* **With possessive and verbal noun. To prepare for.** *Obs. rare.*

> *a*1616   Shakespeare *Antony & Cleopatra* (1623) iii. iv. 36   Prouide your going, Choose your owne company, and command what cost Your heart he's mind too.

**6.** *trans.* **To supply (something) for use; to make available; to yield, afford. Freq. with** *for*, *to*, **indicating the beneficiary. Also occas. with indirect object without** *to*.

> *c*1425   Lydgate *Troyyes Bk.* **(Augustus A.iv)** iv. 5598 (*MED*),   It was..a relik..prouided to þe same place, Þer tabide for a proteccioun.

> 1447   O. Bokenham *Lives of Saints* 1253 (*MED*),   Al that longyth to thy necessyte Shal be prouydyd be god and me.

> *a*1500   *Craft of Dying* **(Rawl.)** in C. Horstmann *Yorkshire Writers* (1896) II. 408 (*MED*),   Almyȝty god..disposith euer finally for oure profete..& more prouideth..þan we oure-selfe may.

> *a*1538   T. Starkey *Dial. Pole & Lupset* (1989) 7   Al thyng that god & nature hath provydyd to hym.

> 1552   *Bk. Common Prayer* **(STC 16279)** Administr. Lordes Supper sig. O.iv,   The bread and wyne for the Communion shall be prouyded by the Curate, & the churchwardens, at the charges of the Parishe.

> 1581   in *Confer.* (1584) iii. sig. R iv,   Prouide me ynke and paper, and I will write.

> 1637   Milton *Comus* 7   Such cooling fruit As the kind hospitable woods provide.

> *a*1640   J. Fletcher et al. *Beggers Bush* ii. i, in F. Beaumont & J. Fletcher *Comedies & Trag.* (1647) sig. Kk3v/2,   Except you do provide me hum enough and Lour to bouze with.

**1666–7** Sɪʀ R. Pʀᴀᴛᴛ in R. T. Gunther *Archit. Sir R. Pratt* (1928) 155   Sollicite ye Paver to provide suffitient stone.

**1694** E. Cʜᴀᴍʙᴇʀʟᴀʏɴᴇ *Angliæ Notitia* (ed. 18) ɪ. ɪɪɪ. xv. 249   George Shipway, Gentleman-Harbinger to provide Lodging for them.

**1756** G. G. Bᴇᴇᴋᴍᴀɴ *Let.* 8 Apr. in *Beekman Mercantile Papers* (1956) I. 278   You are to provide a passage for them to this place per the first Vessell.

**1772** 'Jᴜɴɪᴜs' *Stat Nominis Umbra* II. lxviii. 325   This very act provides a remedy for such persons.

**1800** *Philos. Mag.* 7 291,   I provide a few dozens of small round plates or disks of copper, brass.

**1847** C. G. Aᴅᴅɪsᴏɴ *Treat. Law Contracts* ɪ. i. §2   The directors must provide funds by making calls on the shareholders.

**1899** W. Bᴇsᴀɴᴛ *Orange Girl* ɪɪ. xxvi. 431   The contractors..do honestly provide the convicts the rations prescribed by the Government.

**1910** *Encycl. Brit.* I. 108/1   A further sum was allotted to provide pensions for necessitous members of the Academy.

**1942** Lᴅ. Aʟᴀɴʙʀᴏᴏᴋᴇ *Diary* 26 May in *War Diaries* (2001) 260   He is trying to stop deliveries of aircraft to us in order to provide sufficient aircraft to USA pilots!

**1987** P. Fᴀʀᴍᴇʀ *Away from Home* (1988) 12,   I pulled down the blind on my window, looping the cords round the little hooks provided for that purpose.

**2006** *Gardens Monthly* Apr. 33/1   The diminutive *Oxalis* enjoys the good drainage provided by a rockery or raised bed.


 **7.** *trans. Christian Church.* To appoint (an incumbent) *to* a vacant benefice; *esp.* (of the Pope) to appoint (a successor) *to* a benefice not yet vacant. Cf. ᴘʀᴏᴠɪsɪᴏɴ *n.* 2, ᴘʀᴏᴠɪsᴏʀ *n.* 1. Now *hist.*

 In quot. **1580**: to appoint (a person) *to* a pension.


**1426** W. Pᴀsᴛᴏɴ in *Paston Lett. & Papers* (2004) I. 7   Ther arn ij other persones prouided to þe same bysshopriche yet lyuyng beforn my seyd aduersarie.

**1580** in D. Masson *Reg. Privy Council Scotl.* (1880) 1st Ser. III. 324   His brother german, being lauchfullie providit to ane yeirlie pensioun..wes slane..in quhais place the said Alexander, being providit to the said pensioun, bruikit the samin peciabillie.

**1593–4** in G. P. McNeill *Exchequer Rolls Scotl.* (1903) XXII. 393   Johnne Balfour, providit of auld to the chapellanie of Sanct Thomas.

*a***1639**  J. Sᴘᴏᴛᴛɪsᴡᴏᴏᴅ *Hist. Church Scotl.* (1677) ɪɪ. 59   Shevez posted to Rome..and was himself provided to the Archbishoprick.

**1693** A. Hᴀʀᴍᴇʀ *Specim. Errors Hist. Reformation Church of Eng.* ɪ. 4   Wolsey therefore being provided to the Bishoprick of Lincoln by the Pope on the 6th of Febr.

**1711** J. Aɴᴅᴇʀsᴏɴ *Countrey-man's Let. to Curat* 51   John Rough..fled to England..and was afterwards Provided to a Benefice by the Archbishop of York.

**1771** E. Kɪᴍʙᴇʀ & R. Jᴏʜɴsᴏɴ *Wotton's Baronetage of Eng.* III. 85   Provided to the bishopric of Chichester, by the pope, and consecrated by the holy father himself, on the first Sunday in Lent, anno 1247.

**1887** J. H. Lᴜᴘᴛᴏɴ *Life Colet* 121   He was provided, in 1504, to the vacant see of St. David's.

**1899** G. M. Tʀᴇᴠᴇʟʏᴀɴ *Eng. Age Wycliffe* 120   The Papal power of 'providing' to benefices.

**1953** E. F. Jᴀᴄᴏʙ *Ess. in Conciliar Epoch* 234   Thomas de Bingham..was provided to a benefice in the gift of the prior and convent of Spalding.

**1987** R. R. Dᴀᴠɪᴇs *Age of Conquest* (2000) vii. 192   In 1219..Pandulf, the papal legate, provided William, prior of Goldcliff, to the see of Llandaff.

Case 1:15-cv-01170-GMS   Document 160-1   Filed 03/31/17   Page 20 of 468 PageID #: 7229

**III. To supply someone; to equip with the necessary resources.**

**8.** *intr.*

**a. To make provision** *for* **a person or animal, esp. with regard to maintenance; to supply the necessary resources. Freq. in prepositional passive.**

*c*1425   Lydgate *Troyyes Bk.* (Augustus A.iv) v. 2640 (*MED*),   I wil now for my self prouide.

▸*a*1470   Malory *Morte Darthur* (Winch. Coll.) 1171,   I was there nerehonde slayne, but as Jesu provyded for me.

1535   *Bible (Coverdale)* 1 Chron. xxiii. A,   Therfore wyl I prouyde for him.

1577   B. Googe tr. C. Heresbach *Foure Bks. Husbandry* f. 138ᵛ,   Sheepe..must be well prouided for in winter.

1600   Shakespeare *Henry IV, Pt. 2* v. v. 97   His wonted followers Shall all be very well prouided for.

1632   J. Hayward tr. G. F. Biondi *Eromena* 194   The old King seeing his sonnes thus well match'd, and Polimero so well provided for and setled.

1697   Dryden tr. Virgil *Georgics* iii, in tr. Virgil *Wks.* 103   When she has calv'd, then set the Dam aside; And for the tender Progeny provide .

*a*1715   Bp. G. Burnet *Hist. Own Time* (1724) I. 19   Lady Margaret Dowglas was the child so provided for.

1748   S. Richardson *Clarissa* V. xxxviii. 283,   I will provide for Dorcas Martindale in a gentlewoman-like manner.

1764   R. Burn *Hist. Poor Laws* 202   Thus hath the wisdom of the nation..been employed for ages, in providing properly for the poor, and yet they are not properly provided for.

1801   S. T. Coleridge *Coll. Lett.* (1956) II. 767,   I do it in the earnest desire to provide for her..that while I live, she may enjoy the comforts of life.

1856   J. A. Froude *Hist. Eng.* I. i. 44   The essential duty of every man being to provide honestly for himself and his family.

1883   M. Oliphant *Hester* (1984) xxi. 208   It was good of her brother..to take upon himself the responsibility of providing for Emma.

1909   T. Johnston *Our Scots Noble Families* 90   King Robert..looked well after his fly-by-night progeny, and to provide for this son of his.., he erected in 1385 the Islands of Bute, Arran, and Cumbrae.

1949   M. Mead *Male & Female* ix. 190   Man, the heir of tradition, provides for women and children.

1991   *Moneywise* Sept. 67/1   Accumulation and maintenance trusts..are designed to provide for children or grandchildren under 25.

**b. To supply the necessary resources** *for* **a thing to happen or exist.**

1550   R. Crowley *One & Thyrtye Epigrammes* sig. Av,   What occasion was here, To provide for learninge and make pouertye chere?

1583   B. Melbancke *Philotimus* (new ed.) sig. P4ᵛ,   Your father in his life time did not meanely provide for your marriage.

1653   E. Waterhouse *Humble Apol. Learning* Pref.,   Nothing..is so great a security to the main-guard of Religion, as well to provide for her out-ports & lines of learning.

*a*1677   I. Barrow *Of Love of God* (1680) 50   The..bounty and munificence with which this great paterfamilias hath provided for the necessary sustenance..of his creatures.

1702   C. Mather *Magnalia Christi* v. ii. vii. 28/1   The..Work of a Deacon is..to serve the tables, which the Church is to provide for; as the Lord's-Table, the Table of the Ministers.

1865  G. Meredith *Rhoda Fleming* xxix,  There was something desperately amusing to him in the thought that he had not even money enough to..provide for a repast.

1919  J. L. Garvin *Econ. Found. Peace* 145  Government..has to provide for re-absorbing most of the disbanded munition workers into civil occupations.

1975  *Countryman* Autumn 79  She was supposed to provide for the housekeeping from the egg money.

2000  *N.Y. Rev. Bks.* 15 June 18/1  Harry..darts away and will return with money which will provide for an astonishing trip to London.

†**9.** *trans.*

 **a.** To equip or fit out (a person, nation, etc.) with what is necessary for a certain purpose; to supply with something implied. *Obs.*

In quot. 1628: to furnish with a lodging.

1465  in J. Stuart & G. Burnett *Exchequer Rolls Scotl.* (1884) VII. 321  Gevin..in parte of sustentacione of him unto the tyme that he be bettir providit, ten poundis.

1536  *Accts. St. John's Hosp., Canterbury* (Canterbury Cathedral Archives: CCA-U13/4)  Payd to Colney for to provide hym selfe away xij*d*.

1588  R. Parke tr. J. G. de Mendoza *Hist. Kingdome of China* 121  They do take so much fish, that they do prouide the whole kingdome for all the yeare.

1628  Earl of Manchester in *Buccleuch MSS* (Hist. MSS Comm.) (1899) I. 268  Werden tells me he hath provided you not far from the Parliament.

1656  H. Phillippes *Purchasers Pattern* (1676) B ix b,  The first Builder is sufficiently provided by his workman to testifie his cost.

1672  Dryden *Conquest Granada* I. v. i. 53  We are not provided for a siege... The foe is strong without, we weak within.

1701  C. Davenant *Ess.* 146  When he should be fully provided for the Expedition, That he would not put a stop to it, till all was ended one way or other.

 **b.** *refl.* To equip or prepare oneself; to make oneself ready. Occas. with *against*, or with infinitive. Cf. senses **4**, **5**. *Obs.*

1490  *Caxton's Blanchardyn & Eglantine* (1962) xlvii. 182  [They] ordeyned & prouyded theym self soo, that they fered but lytyl Subyon or nou3te.

1591  *Protocol Bk. J. Inglis* 9 Apr.  James protestit that he meycht ramane in the said tak..to the effect he meycht prouid hym self.

*c*1595  Capt. Wyatt in G. F. Warner *Voy. R. Dudley to W. Indies* (1899) 2  A speciall commaundement..that they should generallie provide themselves to goe with him the Sonday followinge..to the church.

1604  Shakespeare *Hamlet* III. iii. 7  *King*... Therefore prepare you... *Guyl.* We will our selues prouide.

1650  T. Fuller *Pisgah-sight of Palestine* II. x. 212  Hence the sea running southward provides it self to entertain a nameless brook.

*a*1652  J. Smith *Select Disc.* (1660) x. ii. 461  If we will provide our selves against the Devil, who never misseth any opportunity..to tempt us.

1721  C. Cibber *Refusal* III. 50  As for my Lady, the Devil would not live with her; and so, Madam, I desire you will provide yourself.

1776  S. Foote *Bankrupt* III. 69,  I shall quit the mortality walk, so provide yourself as soon as you can.

1839 DICKENS *Nicholas Nickleby* xliii. 423, I..mean to look out for another situation; so provide yourselves, gentlemen, if you please.

1847 DICKENS *Dombey & Son* (1848) xxxix. 389 If you could be so good as provide yourself soon, Captain, it would be a great convenience to me.

**1O.** *trans.* **To supply (a person, animal, place, etc.) with something. Freq. in** *pass.*

**†a. With** *of. Obs.*

*c*1485 (▸1456) G. HAY *Bk. Gouernaunce of Princis* (1993) xii. 77 And se yat thou ger thy providouris..be ay..providit of cornis and othir prouisiouns nedefull.

*a*1549 A. BORDE *Fyrst Bk. Introd. Knowl.* (1870) xiv. 160 Howbeit the good townes be prouyded of vitels.

1556 tr. J. de Flores *Histoire de Aurelio & Isabelle* sig. P8, Prouyde you of trew contricion and patience.

1577 B. GOOGE tr. C. Heresbach *Foure Bks. Husbandry* f. 129, You must prouide them of warme pastures for the winter, and in sommer, very coole.

1618 W. LAWSON *New Orchard & Garden* i. 1 Whosoever desireth..to haue a pleasant, and profitable Orchard, must..prouide himselfe of a Fruiterer..Skilfull in that facultie.

1657 W. RAND tr. P. Gassendi *Mirrour of Nobility* III. 172 Viassius..providing him of a ship, sent him away.

1671 J. CARYLL *Sir Salomon* v. 84 I'm already provided of a wiser Governor then your Worship.

1723 E. CHAMBERS tr. S. Le Clerc *Treat. Archit.* I. 142 When an Architect is not provided of an able Painter fit to manage a Work of this kind.

1728 J. MORGAN *Compl. Hist. Algiers* I. iv. 260 Provided of all requisite Entertainment for at least a Twelvemonth.

1819 SCOTT *Legend of Montrose* p. xv. in *Waverley Novels* XV. Being provided of more [boots] of the same kind, I made myselfe reddie, and rode to the head-quarters.

**b. With** *with.*

*a*1500 (▸?a1422) LYDGATE *Life Our Lady* (Adv.) in W. B. D. D. Turnbull *Visions of Tundale* (1843) 98 With help of her..So prudently with vertu hus to provyde.

1568 (▸?a1513) W. DUNBAR in W. T. Ritchie *Bannatyne MS* (1928) II. 147 How þat this realme, with nobillis owt of nummer gydit, provydit, sa mony ჳeiris hes bene.

1605 W. CAMDEN *Remaines* I. 1 Prouided with all complete provisions of Warre.

1675 in M. Wood *Extracts Rec. Burgh Edinb.* (1950) X. 253 The masters..to proyd him with a chamber haveing a fyre.

1707 G. FARQUHAR *Beaux Stratagem* I. 7 We are an inland Town, and indifferently provided with Fish.

1753 J. HANWAY *Hist. Acct. Brit. Trade Caspian Sea* I. xi. 78, I provided myself with a sleeping waggon, and..took post for St. Petersburg.

1798 S. LEE *Young Lady's Tale* in H. Lee *Canterbury Tales* II. 167 His valet [was] provided with phosphoric matches, by which he had now lit a taper.

1841 E. W. LANE tr. *Thousand & One Nights* I. 71 They..provide themselves with sweet cakes, bread, dates.

1860 J. TYNDALL *Glaciers of Alps* I. xxii. 151 The waiter then provided me with a ham sandwich.

1892 *Daily News* 13 May 5/4 It is the object of the League to provide them with a place in which to spend this off-time.

1913 C. GRAHAME-WHITE *Aviation* 214 The pilot and his passenger are provided with a completely covered body, which they enter through a small door.

**1954** J. Corbett *Temple Tiger* 115,   I have repeatedly asserted that tigers have no sense of smell, and the cubs were providing me with ample proof of that assertion.

**1990** S. Fraser in M. Kurc *That reminds Me* xi. 45   Since we were all so famous, no one had provided us with namecards.

## †c. *Sc.* **With** *in. Obs.*

**1586–7** in G. P. McNeill *Exchequer Rolls Scotl.* (1901) XXI. 61   [He] sall..provyid and furneis his majesteis hous and haill tabillis..in naiprie, fyireweschell, and tyneveschell.

**1786** R. Burns *Tam o' Shanter* 107 in *Poems & Songs* (1968) I. 141   Chance an' fortune are sae guided, They're ay in less or mair provided.

This entry has been updated (OED Third Edition, September 2007).

**Oxford University Press**

Copyright © 2017 Oxford University Press . All rights reserved.

Your access is brought to you by:
Warren Lex LLP

# EXHIBIT 8

# Smart Certificates: Extending X.509 for Secure Attribute Services on the Web

*Joon S. Park and Ravi Sandhu*
*The Laboratory for Information Security Technology*
*Information and Software Engineering Department*
*George Mason University*
*{jpark, sandhu} @list.gmu.edu*

**ABSTRACT:** An attribute is a particular property of an entity, such as a role, access identity, group, or clearance. If attributes are provided integrity, authentication, and confidentiality, Web servers can then trust these secure attributes and use them for many purposes, such as access control, authorization, authentication, and electronic transactions. In this paper, we present a comprehensive approach to secure attribute services on the Web. We identify the user-pull and server-pull models and analyze their advantages and disadvantages. To support these models on the Web, we extend X.509 certificates, which are already in widespread current use. We name these extended X.509 certificates *smart certificates*. Smart certificates have several sophisticated features: they support short-lived lifetime and multiple CAs, contain attributes, provide postdated and renewable certificates, and provide confidentiality. This paper also discusses possible applications of smart certificates on the Web.

**KEYWORDS:** X.509, Certificates, Attributes, WWW Security

## 1   Introduction

The World-Wide-Web (WWW) is a critical enabling technology for electronic commerce and business on the Internet. Its underlying protocol, HTTP (HyperText Transfer Protocol), has been widely used to support synthesis of technologies and composition of different constituents for great effect in Web environments. WWW is commonplace. Increased integration of Web, operating system, and database system technologies will lead to continued reliance on Web technology for enterprise computing. However, there have been, at best, rather feeble attempts to provide effective access control on Web-based environments. Current approaches to access control on Web servers are mostly based on individual users; therefore, they do not scale to enterprise-wide systems.

An attribute is a particular property of an entity, such as a role [San98], access identity, group, or clearance. If the attributes of individual users are provided securely on the Web by security services - such as authentication, integrity, and confidentiality - we can use those attributes for many purposes, including attribute-based access control [PSG99, PS99], authorization, authentication, and electronic transactions. A successful marriage of the Web and secure attribute services has potential for considerable impact on and deployment of effective enterprise-wide security in large-scale systems.

Our goal is to build upon the mature technology of X.509 certificates and extend them for secure attribute services on the Web. The basic purpose of X.509 certificates is simply the binding of users to keys. Even though X.509 has the ability to be extended, the application of the extensions of X.509 for secure attributes has yet not been precisely defined.

In this paper, we identify the user-pull and server-pull models, in which each model has user-based and host-based modes, for a comprehensive approach to secure attribute services on the Web. We will descibe how to make the *smart certificates* by extending X.509v3 [HFPS98] - which is an ISO (International Organization for Standardization) and IETF (International Engineering Task Force) standard - since public-key infrastructure (PKI) has been recognized as a crucial enabling technology for security in large-scale networks. Furthermore, we will discuss possible applications of smart certificates for electronic commerce and business later in this paper.

## 2   Related Technologies

### 2.1   Secure Socket Layer (SSL)

SSL (Secure Socket Layer [WS96]) was introduced with the Netscape Navigator browser in 1994, and rapidly became the predominant security protocol on the Web. Since the protocol operates at the transport layer, any program that uses TCP (Transmission Control Protocol) is ready to use SSL connections. The SSL protocol provides a secure means for establishing an encrypted communication between Web servers and browsers.[1] SSL also supports the authentication service between Web servers and browsers.

SSL uses X.509 certificates. Server certificates provide a way for users to authenticate the identity of a Web server. The Web browser uses the server's public key to negotiate a secure TCP connection with the Web server. Optionally, the Web server can authenticate users by verifying the contents of their client certificates.

Even though SSL provides secure communications between Web servers and browsers on the Web, it cannot protect against end-system threats. For instance, if a user receives attributes from the server over a secure channel, it does not mean that we can trust the user. In other words, once the user, let's say Alice, receives some attributes from the server over the secure channel, she is able to change the attributes or give them to other people, because SSL does not support the integrity service in the user's end system. Then, Alice (or the person impersonating Alice) can access the servers - which accept the attributes - using those forged attributes. However, as we will see later in this paper, SSL can be used as part of our solution to protect information on the Web.

### 2.2   Public-Key Certificate (X.509)

A public-key certificate is digitally signed by a certificate authority (a person or entity) to confirm that the identity or other information in the certificate belongs to the holder

---

[1]In many cases, due to export restrictions from the United States only weak keys (40 bits) are supported, but SSL technology is intrinsically capable of very strong protection against network threats.

(subject) of the corresponding private key. If a message-sender wishes to use public-key technology for encrypting a message for a recipient, the sender needs a copy of the public key of the recipient. On the other hand, when a party wishes to verify a digital signature generated by another party, the verifying party needs a copy of the public key of the signing party. Both the encrypting message-sender and the digital signature-verifier use the public keys of other parties. Confidentiality, which keeps the value of a public key secret, is not important to the service. However, integrity is critical to the service, as it assures public-key users that the public key used is the correct public key for the other party. For instance, if an attacker is able to substitute his or her public key for the valid one, encrypted messages can be disclosed to the attacker and a digital signature can be forged by the attacker.

ITU (International Telecommunication Union) and ISO (International Organization for Standardization) published the X.509 standard in 1988 [ITU93], which has been adopted by IETF (International Engineering Task Force). X.509 is the most widely used data format for public-key certificates today and it is based on the use of designated certificate authorities (CAs) that verify that the entity is the holder of a certain public-key by signing public-key certificates. An X.509 certificate has been used to bind a public-key to a particular individual or entity, and it is digitally signed by the issuer of the certificate (certificate authority) that has confirmed the binding between the public-key and the holder (subject) of the certificate. An X.509 certificate consists of the following:

- version of certificate format

- certificate serial number

- subject's X.500 name (assigned by a naming authority)

- subject's public key and algorithm information

- validity period (beginning and end date)

- issuer's X.500 name (certificate authority)

- optional fields to provide unique identifiers for subject and issuer (Version 2)

- extensions (Version 3)

- digital signature of the certificate authority

The optional fields are available from Version 2 to make the subject name or the issuing certificate authority name unambiguous in the event the same name has been reassigned to different entities through time. Version 3 provides the extensions field for the incorporation of any number of additional fields into the certificate. These extensions make X.509v3 a truly open-ended standard with room to support diverse needs. It is possible for certificate issuers of interest to define their own extension types and use them to satisfy their own particular needs.

## 2.3   Attribute Certificate

The U.S. financial industry through the ANSI X9 committee developed attribute certificates [Far98b, Far98a], which have now been incorporated into both the ANSI X9.57 standard and X.509. An attribute certificate binds attribute information to the certificate's subject. Anyone can define and register attribute types and use them for his or her purposes. The certificate is digitally signed and issued by an attribute authority; furthermore, an attribute certificate is managed in the same way as an X.509 certificate. However, an attribute certificate does not contain a public key. Therefore, an attribute certificate needs to be used in conjunction with authentication services, such as another certificate (X.509) and SSL to verify the subject of the attributes.

# 3   Operational Architecture

We have different approaches for obtaining a user's attributes on the Web, especially with respect to user-pull and server-pull models, in which each model has user-based and host-based modes. Each approach can be made to work, and we will provide an analysis of their relative advantages and disadvantages. Basically, there are three components in both models: client, Web server, and attribute server. These components are already being used on the Web. Clients connect to Web servers via HTTP using browsers. The attribute server is maintained by an attribute authority and issues attributes for the users in the domain.

In this section, we will focus on identifying the operational models for secure attribute services on the Web with tradeoffs between them. To support these models on the Web, we will extend X.509 certificates - already in widespread current use - as described in Section 4.

## 3.1   User-Pull Architecture

In user-pull architecture, the user pulls appropriate attributes from the attribute server and then presents them to the Web servers, as depicted in a collaborational diagram in Figure 1. We call this a user-pull architecture, since the user pulls appropriate attributes from the attribute server, in which attributes are issued for the users in the domain. HTTP (Hyper-Text Transfer Protocol) is used for user-server interaction with standard Web browsers and Web servers.

In user-pull-host-based mode, a user, Alice, needs to download her attributes from the attribute server and store them in her machine (which has her host-based authentication information, such as a client certificate[2].) Later, when Alice wants to access the Web server, which requires proper authentication information and attributes, her machine presents that information to the Web server. After client authentication and attribute verification, the Web server uses the attributes for its purposes, such as access control, authorization, and electronic transactions. However, since this mode is host-based, it cannot support high user mobility, although it may support more convenient service than the user-based mode - which requires user's cooperation (e.g., typing in passwords).

---

[2]Optionally, we can use other host-based authentication information, such as IP numbers and Kerberos tickets.



Figure 1: Collaborational Diagram for User-Pull Model

On the other hand, the user-pull-user-based mode supports high user mobility. A user, Alice, can download her attributes to her current machine from the attribute server. Then, Alice presents those attributes to the Web server along with her user-based authentication information, such as her passwords. After user authentication and attribute verification, the Web server uses the attributes for its purposes.

In this user-pull architecture, we must support the binding of attributes and identification for each user. For instance, if Alice presents Bob's attributes with her authentication information to the Web server, she must be rejected. There may be different mechanisms for binding attributes and user identifications. We will describe in Section 4 how to solve this problem efficiently by means of smart certificates between existing Web servers and Web browsers.

## 3.2   Server-Pull Architecture

In server-pull architecture, each Web server pulls appropriate attributes from the attribute server as needed and uses them for its purposes as depicted in a collaborational diagram in Figure 2. We call this a server-pull architecture, since the server pulls appropriate attributes from the attribute server. HTTP (HyperText Transfer Protocol) is used for user-server interaction with standard Web browsers and Web servers. If the attribute server provides attributes securely, the Web server can trust those attributes and uses them for its purposes.

In this architecture, a user, Alice, does not need access to her attributes. Instead, she needs only her authentication information. In server-pull-host-based mode, she presents host-based authentication information (e.g., her client certificate) to the Web server. Attribute obtaining mechanism is transparent to the user, while limiting the user portability.



*Authentication Information can be either user-based or host-based.

Figure 2: Collaborational Diagram for Server-Pull Model

However, in server-pull-user-based mode, Alice presents user-based authentication information, such as her passwords to the Web server. This supports high user portability, while it requires the user's cooperation (e.g., typing in passwords). After client(user) authentication, the Web server downloads the corresponding attributes from the attribute server and uses them for its purposes, such as access control, authorization, and electronic transactions.

## 4   Extending X.509 for Secure Attribute Services

Extension types of X.509 can be defined by anyone. Therefore, it is possible for certificate authorities to define and use their own extension types to satisfy their own particular needs. Each extension type needs to be registered by having an object identifier assigned to it.

It is strongly recommended that public-key pairs used for any purpose be updated periodically. This is an effective way to restrict cryptographic attacks, such as a key compromise. Furthermore, the lifetime of a public-key in a certificate may be different from that of other information in it. Namely, it is not a good solution to issue a currently existing certificate, such as X.509, that contain attribute information as well as public-key information. Even though the bundled certificate increases performance because of its simple mechanism, it cannot support effective certificate management. Adding, deleting, or changing attributes involves replacing and sometimes revoking X.509 certificates. This creates very large CRLs (Certificate Revocation Lists); therefore, it overburdens certificate management infrastructures. Furthermore, usually an organizational policy requires different authorities for maintaining attributes and public-keys. Since the current X.509 certificate cannot satisfy all the above requirements, we were motivated to design the *smart certificates*, described in the following subsections, to solve those problems. Note that a smart certificate



Figure 3: Attributes Signed by Multiple CAs in a Smart Certificate

is compatible with an X.509, since it keeps the same data format as an X.509.

## 4.1   Smart Certificates

*Smart certificates* extend X.509 certificates by adding the following features. Selection of these new features depends on the applications or policies.

### 4.1.1   Support for Short-Lived Certificates

Typical validity periods for X.509 certificates are several months or even years. To support user mobility, users should be able to download both the certificate and the private key to the software in different environments. This service may leave copies of private keys behind; therefore, the longer-lived certificates have a higher probability of being attacked. If, however, the validity periods for certificates are measured in hours, the user portability can be provided securely, since the copies of the corresponding private key expire automatically. Additionally, we do not need a revocation scheme (CRL) for the certificates, which is responsible for the complexity and cost of the public key infrastructure. The detailed description of short-lived certificates is available in [HS98].

### 4.1.2   Containing Attributes

If we use the extension fields in an X.509 certificate effectively, as depicted in Figure 3, we can separate the authority for attribute-issuing from the one for public-key-issuing. In other words, after a public-key authority (basic CA) issues an X.509 basic certificate for a user,

Alice, as usual, an attribute authority (for instance, Att_1_CA) adds attributes for Alice to an extension field of the basic certificate (which contains public-key information). Consequently, the attribute authority (Att_1_CA) signs on the basic certificate and the attributes he added, and puts the signature to another extension field in the basic certificate. This can happen multiple times on a basic certificate by different attribute authorities. Later, the identity verification should precede the attribute verification. For instance, another party, say Bob, verifies Alice's identity first by the basic CA's signature in the smart certificate. If the authentication is successful, Bob verifies Alice's attributes by the corresponding attribute authority's signature in the extension field. If the attributes are valid, then Bob uses those attributes for his purposes. The contents of the attribute information in a smart certificate depend on applications.

The public-key and the attributes can be maintained independently. For instance, even though Alice's attributes issued by her school-attribute authority are expired (revoked) in the certificate, the rest of the attributes, such as attributes issued by her company-attribute authority, and public-key information in her basic certificate, are still valid. Each attribute authority has independent control over the attributes he issued. For example, the school-attribute authority for Alice can change, revoke, or re-issue the school attributes in Alice's certificate. Intuitively, if her basic certificate is expired (revoked), then all the attributes are meaningless. Even though a smart certificate can support independent management for the public key information and attributes, if there is one authority who has controls both sets of information, the system management becomes simpler.

Furthermore, if we use the short-lived certificate mechanism, we do not need to consider about revoking the bundled certificates. As a result, a smart certificate supports high performance by bundling public-key information and attributes in a certificate without causing overhead to certificate management infrastructures.

### 4.1.3   Support for Postdated and Renewable Certificates

Postdated certificates are used to run a job at some time in the future. Suppose a security officer wants to issue a certificate for a user starting a week from now and valid for 10 hours of use. He may issue a certificate with an expiration time of one week plus 10 hours from the present time. This is not a proper solution, since the certificate would be valid from the time it was issued until it expires. However, if we allow a certificate to become valid at some point in the future, we can satisfy the requirement.

Furthermore, if Alice needs a long-lived certificate, say, lasting for one year, it is more secure and efficient to issue a certificate that will be valid for that full 12 months, only if Alice keeps renewing it for a much shorter period, say, every day. To support this, we need to set the time (in the extension field), which specifies the certificate cannot be renewed. Since the certificate is renewed every day, we do not need CRLs. If there is some reason to revoke Alice's certificate, the CA does not renew the certificates.

These concepts are adopted from postdated and renewable tickets of Kerberos [SNS88, Neu94].

### 4.1.4   Encrypting Sensitive Information in Certificates

The smart certificates will support the encryption of some, or all, attributes, such as passwords, roles, or credit card numbers. Such an encrypted attribute in the certificate can be decrypted by an appropriate server using the corresponding key (the server's shared secret key or its private key).

## 4.2   Discussion

In this subsection, we want to compare smart certificates with existing certificates, such as X.509 and attribute certificates, in terms of the certificate life-time and authentication of the owner of the attributes.

Usually, an X.509 certificate has a long life-time, which requires an additional revocation mechanism (e.g., CRLs). Therefore, it has a relatively higher probability of being attacked, since the corresponding private key can be left in a system without the owner's knowledge, especially if the private key is stored in multiple machines. On the contrary, when we use a smart certificate, the short life-time eliminates the additional revocation mechanism (e.g., CRL for X.509), and makes the system more secure, since the remaining private keys expire shortly and automatically.

Currently, existing attribute certificates refer to another type of basic certificates, such as X.509, for authentication service. This mechanism brings complexities for the protocol itself and for certificate administration. For instance, an attribute certificate and the corresponding X.509 are issued in different entities and managed separately. Even the revocation mechanism is separate. The idea was brought to support separate authorities for attributes and authentication services.

However, if we use a smart certificate, both the attributes and public-key information can be bundled in a single certificate. This provides simplicity for both the protocol itself and for certificate administration. When we need separate authorities for attributes and authentication services, each authority signs separately on the same basic certificate and corresponding extension field, which contains attribute information. This can happen multiple times on a basic certificate by different attribute authorities. Each attribute authority has independent control over the attributes he issued. Even though a smart certificate can support independent management for the public key information and attributes, if there is one authority who controls both sets of information, the system management becomes simpler.

## 5   Applications of Smart Certificates

In this section, we introduce some applications of smart certificates. Many other applications can be similarly configured. Selection of the new features of smart certificates depends on applications and a given situation. Using the bundled (attributes and identifications) certificates is a good solution for the user-pull model, since the model requires the binding of this information. On the other hand, it is not a good idea to use the bundled certificates for the server-pull model, since users do not need access to their attributes.

## 5.1   On-Duty Control

Suppose an employee, Alice, needs to receive a certificate at 9:00 A.M. every morning and use it until 5:00 P.M. Monday through Friday. This certificate contains her sensitive attributes, such as clearance or access control information, Current X.509 cannot satisfy the requirements. It does not support confidentiality service (by encryption) for some sensitive information in the certificate. If the validity period for the certificate is longer than that of Alice's on-duty hours, the privilege based on the certificate still remains even after her on-duty hours.

If we use the smart certificate, the above requirements can be securely satisfied. First of all, the sensitive information in the certificate is encrypted which provides the confidentiality service. By using the short-lived certificate feature, we can set the validity of the certificate only from 9:00 A.M. to 5:00 P.M. every day. Furthermore, the postdated-certificate feature allows the employee to receive a set of certificates on a certain day, for instance, five certificates for individual days (Monday through Friday). Alice can then use the corresponding certificate each day during her on-duty hours. In this case, Alice does not need to receive the certificate every morning, and does not have the privilege based on the certificates after her on-duty hours. Alternatively, if we make the certificate valid for a set period of duration, for instance, from 9:00 A.M. to 5:00 P.M., but not between 5:00 P.M. and 9:00 A.M., the employee needs only one certificate for a week. However, this approach has a higher probability of compromise and possibly requires using CRLs.

### 5.1.1   Attribute-Based Access Control

When a user, let's say Alice, using a Web browser contacts a Web server that has been configured to request smart certificates, which contain users' attributes, the browser is required to present Alice's smart certificate and prove that she is the rightful owner. After client authentication, the Web server makes access control decisions based on attributes [PSG99, PS99], such as roles [San98], clearance, and group membership, contained within the smart certificate itself.

### 5.1.2   Electronic Transactions

If a merchant site uses smart certificates (which contain customers' encrypted credit card numbers) customers do not need to key their credit card numbers in for every transaction. For more convenient service, the merchant can issue a smart certificate containing special tokens for customers, such as electronic coupons (which have the coupon's ID number and discount information). For instance, if Alice received an electronic coupon contained within her smart certificate, she can use it before the coupon's expiration date at the merchant site. In this case, the merchant site needs to keep a record of the coupon to protect replay usages of the same coupon.

### 5.1.3   Eliminating Single-Point Failure

Usually, a merchant site has a customer-information database maintained on a server. One of the disadvantages of this method is that if the server keeping customers' information is penetrated by an attacker, all the customers' information, such as credit card numbers, preferences, addresses, and other sensitive information in the server, are open to the attacker. Furthermore, if a domain has multiple servers with multiple customer-information databases, maintenance and synchronization of this information is burdensome. There are also significant privacy concerns about data stored by servers, since such data can easily be misused. Users may feel more comfortable with servers that pledge not to maintain such data.

Smart certificates can solve these problems especially in the electronic commerce field. If a merchant site issues and uses smart certificates, the site does not need to have a customer-information database unless the site needs to track customers' access histories, since each customer's sensitive information is distributed and stored securely in the customer's smart certificates. Using smart certificates provides a more secure environment by eliminating customer-information databases, which can cause a single-point failure. Furthermore, the merchant can reduce the cost for the maintenance of customer-information databases.

### 5.1.4   Replace X.509

Besides using the extension fields in an X.509 certificate, a smart certificate provides new features, including containing attributes, eliminating CRLs by short-lived certificates, providing multiple CAs, supporting postdated and renewable services, and encrypting sensitive information in the certificates. However, it is still compatible with X.509, since a smart certificate keeps the same data format as the X.509. For instance, as the original X.509 supports the Secure Socket Layer (SSL) protocol for secure communications between clients and servers, the smart certificates can also be used as server certificates and client certificates for SSL without modifying the protocol.

## 6   Conclusions

In this paper, we have identified two operational models for attribute services on the Web: user-pull model and server-pull model. To support these models, we have extended an existing digital certificate, X.509, with several new features. The extended certificates, *smart certificates*, provide short-lived lifetime, attributes, multiple CAs, postdated and renewable services, and confidentiality services in PKI. According to the requirements of applications, some of these new features can be selectively used in conjunction with currently existing technologies.

# References

[Far98a]   Stephen Farrell. *An Internet AttributeCertificate profile for Authorization*, August 1998. draft-ietf-tls-ac509prof-00.txt.

[Far98b]   Stephen Farrell. *TLS extensions for AttributeCertificate based authorization*, February 1998. draft-ietf-tls-attr-cert-00.txt.

[HFPS98]   R. Housley, W. Ford, W. Polk, and D. Solo. *Internet X.509 public key infrastructure certificate and CRL profile*, September 1998. draft-ietf-pkix-ipki-part1-11.txt.

[HS98]   Yung-Kao Hsu and Stephen P. Seymour. An internet security framework based on short-lived certificates. *IEEE Internet Computing*, pages 73–79, March/April 1998.

[ITU93]   ITU-T Recommendation X.509. *Information technology - Open systems Interconnection - The Directory: Authentication Framework*, 1993. ISO/IEC 9594-8:1993.

[Neu94]   B. Clifford Neuman. Using Kerberos for authentication on computer networks. *IEEE Communications*, 32(9), 1994.

[PS99]   Joon S. Park and Ravi Sandhu. RBAC on the web by smart certificates. In *Proceedings of 4th ACM Workshop on Role-Based Access Control*. ACM, Fairfax, VA, October 28-29 1999.

[PSG99]   Joon S. Park, Ravi Sandhu, and SreeLatha Ghanta. RBAC on the Web by secure cookies. In *Proceedings of the IFIP WG11.3 Workshop on Database Security*. Chapman & Hall, July, 1999.

[San98]   Ravi Sandhu. Role-based access control. *Advances in Computers*, 46, 1998.

[SNS88]   J.F. Steiner, C. Neuman, and J.I. Schiller. Kerberos: An authentication service for open network systems. In *Proc. Winter USENIX Conference*, 1988.

[WS96]   D. Wagner and B. Schneier. Analysis of the SSL 3.0 protocol. In *Proceedings of the Second UNIX Workshop on Electronic Commerce*, November 1996.

# EXHIBIT 9

Network Working Group                                          R. Housley
Request for Comments: 2459                                        SPYRUS
Category: Standards Track                                        W. Ford
                                                               VeriSign
                                                                W. Polk
                                                                   NIST
                                                               D. Solo
                                                               Citicorp
                                                          January 1999

                    Internet X.509 Public Key Infrastructure
                          Certificate and CRL Profile

Status of this Memo

   This document specifies an Internet standards track protocol for the
   Internet community, and requests discussion and suggestions for
   improvements.  Please refer to the current edition of the "Internet
   Official Protocol Standards" (STD 1) for the standardization state
   and status of this protocol.  Distribution of this memo is unlimited.

Copyright Notice

   Copyright (C) The Internet Society (1999).  All Rights Reserved.

Abstract

   This memo profiles the X.509 v3 certificate and X.509 v2 CRL for use
   in the Internet.  An overview of the approach and model are provided
   as an introduction.  The X.509 v3 certificate format is described in
   detail, with additional information regarding the format and
   semantics of Internet name forms (e.g., IP addresses).  Standard
   certificate extensions are described and one new Internet-specific
   extension is defined.  A required set of certificate extensions is
   specified.  The X.509 v2 CRL format is described and a required
   extension set is defined as well.  An algorithm for X.509 certificate
   path validation is described.  Supplemental information is provided
   describing the format of public keys and digital signatures in X.509
   certificates for common Internet public key encryption algorithms
   (i.e., RSA, DSA, and Diffie-Hellman).  ASN.1 modules and examples are
   provided in the appendices.

   The key words "MUST", "MUST NOT", "REQUIRED", "SHALL", "SHALL NOT",
   "SHOULD", "SHOULD NOT", "RECOMMENDED", "MAY", and "OPTIONAL" in this
   document are to be interpreted as described in RFC 2119.

RFC 2459        Internet X.509 Public Key Infrastructure     January 1999


Please send comments on this document to the ietf-pkix@imc.org mail
list.



Table of Contents

1  Introduction ................................................   5
2  Requirements and Assumptions ................................   6
2.1  Communication and Topology ................................   6
2.2  Acceptability Criteria ....................................   7
2.3  User Expectations .........................................   7
2.4  Administrator Expectations ................................   7
3  Overview of Approach ........................................   7
3.1  X.509 Version 3 Certificate ...............................   9
3.2  Certification Paths and Trust .............................  10
3.3  Revocation ................................................  12
3.4  Operational Protocols .....................................  13
3.5  Management Protocols ......................................  13
4  Certificate and Certificate Extensions Profile .............  15
4.1  Basic Certificate Fields ..................................  15
4.1.1  Certificate Fields ......................................  16
4.1.1.1  tbsCertificate ........................................  16
4.1.1.2  signatureAlgorithm ....................................  16
4.1.1.3  signatureValue ........................................  17
4.1.2  TBSCertificate ..........................................  17
4.1.2.1  Version ...............................................  17
4.1.2.2  Serial number .........................................  18
4.1.2.3  Signature .............................................  18
4.1.2.4  Issuer ................................................  18
4.1.2.5  Validity ..............................................  21
4.1.2.5.1  UTCTime .............................................  22
4.1.2.5.2  GeneralizedTime .....................................  22
4.1.2.6  Subject ...............................................  22
4.1.2.7  Subject Public Key Info ...............................  23
4.1.2.8  Unique Identifiers ....................................  24
4.1.2.9 Extensions .............................................  24
4.2  Certificate Extensions ....................................  24
4.2.1  Standard Extensions .....................................  25
4.2.1.1  Authority Key Identifier ..............................  25
4.2.1.2  Subject Key Identifier ................................  26
4.2.1.3  Key Usage .............................................  27
4.2.1.4  Private Key Usage Period ..............................  29
4.2.1.5  Certificate Policies ..................................  29
4.2.1.6  Policy Mappings .......................................  31
4.2.1.7  Subject Alternative Name ..............................  32

```
4.2.1.8  Issuer Alternative Name ...............................  34
4.2.1.9  Subject Directory Attributes .........................  34
4.2.1.10  Basic Constraints ...................................  35
4.2.1.11  Name Constraints ....................................  35
4.2.1.12  Policy Constraints ..................................  37
4.2.1.13  Extended key usage field ............................  38
4.2.1.14  CRL Distribution Points .............................  39
4.2.2  Private Internet Extensions ............................  40
4.2.2.1  Authority Information Access .........................  41
5  CRL and CRL Extensions Profile ............................  42
5.1  CRL Fields ...............................................  43
5.1.1  CertificateList Fields .................................  43
5.1.1.1  tbsCertList .........................................  44
5.1.1.2  signatureAlgorithm ..................................  44
5.1.1.3  signatureValue ......................................  44
5.1.2  Certificate List "To Be Signed" .......................  44
5.1.2.1  Version .............................................  45
5.1.2.2  Signature ...........................................  45
5.1.2.3  Issuer Name .........................................  45
5.1.2.4  This Update .........................................  45
5.1.2.5  Next Update .........................................  45
5.1.2.6  Revoked Certificates ................................  46
5.1.2.7  Extensions ..........................................  46
5.2  CRL Extensions ...........................................  46
5.2.1  Authority Key Identifier ...............................  47
5.2.2  Issuer Alternative Name ................................  47
5.2.3  CRL Number .............................................  47
5.2.4  Delta CRL Indicator ....................................  48
5.2.5  Issuing Distribution Point .............................  48
5.3  CRL Entry Extensions .....................................  49
5.3.1  Reason Code ............................................  50
5.3.2  Hold Instruction Code ..................................  50
5.3.3  Invalidity Date ........................................  51
5.3.4  Certificate Issuer .....................................  51
6  Certificate Path Validation ...............................  52
6.1  Basic Path Validation ....................................  52
6.2  Extending Path Validation ................................  56
7  Algorithm Support .........................................  57
7.1  One-way Hash Functions ...................................  57
7.1.1  MD2 One-way Hash Function ..............................  57
7.1.2  MD5 One-way Hash Function ..............................  58
7.1.3  SHA-1 One-way Hash Function ............................  58
7.2  Signature Algorithms .....................................  58
7.2.1  RSA Signature Algorithm ................................  59
7.2.2  DSA Signature Algorithm ................................  60
7.3  Subject Public Key Algorithms ............................  60
7.3.1  RSA Keys ...............................................  61
7.3.2  Diffie-Hellman Key Exchange Key ........................  61
```

7.3.3  DSA Signature Keys ...................................... 63
8   References .................................................. 64
9   Intellectual Property Rights ............................... 66
10  Security Considerations .................................... 67
Appendix A.   ASN.1 Structures and OIDs ........................ 70
A.1 Explicitly Tagged Module, 1988 Syntax ..................... 70
A.2 Implicitly Tagged Module, 1988 Syntax ..................... 84
Appendix B.   1993 ASN.1 Structures and OIDs ................... 91
B.1 Explicitly Tagged Module, 1993 Syntax ..................... 91
B.2 Implicitly Tagged Module, 1993 Syntax ..................... 108
Appendix C.   ASN.1 Notes ...................................... 116
Appendix D.   Examples ......................................... 117
D.1   Certificate .............................................. 117
D.2   Certificate .............................................. 120
D.3   End-Entity Certificate Using RSA ........................ 123
D.4   Certificate Revocation List ............................. 126
Appendix E.   Authors' Addresses ............................... 128
Appendix F.   Full Copyright Statement ......................... 129

1  Introduction

   This specification is one part of a family of standards for the X.509
   Public Key Infrastructure (PKI) for the Internet.  This specification
   is a standalone document; implementations of this standard may
   proceed independent from the other parts.

   This specification profiles the format and semantics of certificates
   and certificate revocation lists for the Internet PKI.  Procedures
   are described for processing of certification paths in the Internet
   environment.  Encoding rules are provided for popular cryptographic
   algorithms.  Finally, ASN.1 modules are provided in the appendices
   for all data structures defined or referenced.

   The specification describes the requirements which inspire the
   creation of this document and the assumptions which affect its scope
   in Section 2.  Section 3 presents an architectural model and
   describes its relationship to previous IETF and ISO/IEC/ITU
   standards.  In particular, this document's relationship with the IETF
   PEM specifications and the ISO/IEC/ITU X.509 documents are described.

   The specification profiles the X.509 version 3 certificate in Section
   4, and the X.509 version 2 certificate revocation list (CRL) in
   Section 5. The profiles include the identification of ISO/IEC/ITU and
   ANSI extensions which may be useful in the Internet PKI. The profiles
   are presented in the 1988 Abstract Syntax Notation One (ASN.1) rather
   than the 1994 syntax used in the ISO/IEC/ITU standards.

   This specification also includes path validation procedures in
   Section 6.  These procedures are based upon the ISO/IEC/ITU
   definition, but the presentation assumes one or more self-signed
   trusted CA certificates.  Implementations are required to derive the
   same results but are not required to use the specified procedures.

   Section 7 of the specification describes procedures for
   identification and encoding of public key materials and digital
   signatures.  Implementations are not required to use any particular
   cryptographic algorithms.  However, conforming implementations which
   use the identified algorithms are required to identify and encode the
   public key materials and digital signatures as described.

   Finally, four appendices are provided to aid implementers.  Appendix
   A contains all ASN.1 structures defined or referenced within this
   specification.  As above, the material is presented in the 1988
   Abstract Syntax Notation One (ASN.1) rather than the 1994 syntax.
   Appendix B contains the same information in the 1994 ASN.1 notation
   as a service to implementers using updated toolsets.  However,
   Appendix A takes precedence in case of conflict.  Appendix C contains

notes on less familiar features of the ASN.1 notation used within
this specification.  Appendix D contains examples of a conforming
certificate and a conforming CRL.

2  Requirements and Assumptions

The goal of this specification is to develop a profile to facilitate
the use of X.509 certificates within Internet applications for those
communities wishing to make use of X.509 technology. Such
applications may include WWW, electronic mail, user authentication,
and IPsec.  In order to relieve some of the obstacles to using X.509
certificates, this document defines a profile to promote the
development of certificate management systems; development of
application tools; and interoperability determined by policy.

Some communities will need to supplement, or possibly replace, this
profile in order to meet the requirements of specialized application
domains or environments with additional authorization, assurance, or
operational requirements.  However, for basic applications, common
representations of frequently used attributes are defined so that
application developers can obtain necessary information without
regard to the issuer of a particular certificate or certificate
revocation list (CRL).

A certificate user should review the certificate policy generated by
the certification authority (CA) before relying on the authentication
or non-repudiation services associated with the public key in a
particular certificate.  To this end, this standard does not
prescribe legally binding rules or duties.

As supplemental authorization and attribute management tools emerge,
such as attribute certificates, it may be appropriate to limit the
authenticated attributes that are included in a certificate.  These
other management tools may provide more appropriate methods of
conveying many authenticated attributes.

2.1  Communication and Topology

The users of certificates will operate in a wide range of
environments with respect to their communication topology, especially
users of secure electronic mail.  This profile supports users without
high bandwidth, real-time IP connectivity, or high connection
availability.  In addition, the profile allows for the presence of
firewall or other filtered communication.

This profile does not assume the deployment of an X.500 Directory system.  The profile does not prohibit the use of an X.500 Directory, but other means of distributing certificates and certificate revocation lists (CRLs) may be used.

## 2.2  Acceptability Criteria

The goal of the Internet Public Key Infrastructure (PKI) is to meet the needs of deterministic, automated identification, authentication, access control, and authorization functions. Support for these services determines the attributes contained in the certificate as well as the ancillary control information in the certificate such as policy data and certification path constraints.

## 2.3  User Expectations

Users of the Internet PKI are people and processes who use client software and are the subjects named in certificates.  These uses include readers and writers of electronic mail, the clients for WWW browsers, WWW servers, and the key manager for IPsec within a router. This profile recognizes the limitations of the platforms these users employ and the limitations in sophistication and attentiveness of the users themselves.  This manifests itself in minimal user configuration responsibility (e.g., trusted CA keys, rules), explicit platform usage constraints within the certificate, certification path constraints which shield the user from many malicious actions, and applications which sensibly automate validation functions.

## 2.4  Administrator Expectations

As with user expectations, the Internet PKI profile is structured to support the individuals who generally operate CAs.  Providing administrators with unbounded choices increases the chances that a subtle CA administrator mistake will result in broad compromise. Also, unbounded choices greatly complicate the software that shall process and validate the certificates created by the CA.

## 3  Overview of Approach

Following is a simplified view of the architectural model assumed by the PKIX specifications.



Figure 1 - PKI Entities

The components in this model are:

end entity:   user of PKI certificates and/or end user system that
              is the subject of a certificate;
CA:           certification authority;
RA:           registration authority, i.e., an optional system to
              which a CA delegates certain management functions;
repository:   a system or collection of distributed systems that
              store certificates and CRLs and serves as a means of
              distributing these certificates and CRLs to end
              entities.

3.1  X.509 Version 3 Certificate

   Users of a public key shall be confident that the associated private
   key is owned by the correct remote subject (person or system) with
   which an encryption or digital signature mechanism will be used.
   This confidence is obtained through the use of public key
   certificates, which are data structures that bind public key values
   to subjects.  The binding is asserted by having a trusted CA
   digitally sign each certificate. The CA may base this assertion upon
   technical means (a.k.a., proof of posession through a challenge-
   response protocol), presentation of the private key, or on an
   assertion by the subject.  A certificate has a limited valid lifetime
   which is indicated in its signed contents.  Because a certificate's
   signature and timeliness can be independently checked by a
   certificate-using client, certificates can be distributed via
   untrusted communications and server systems, and can be cached in
   unsecured storage in certificate-using systems.

   ITU-T X.509 (formerly CCITT X.509) or ISO/IEC/ITU 9594-8, which was
   first published in 1988 as part of the X.500 Directory
   recommendations, defines a standard certificate format [X.509]. The
   certificate format in the 1988 standard is called the version 1 (v1)
   format.  When X.500 was revised in 1993, two more fields were added,
   resulting in the version 2 (v2) format. These two fields may be used
   to support directory access control.

   The Internet Privacy Enhanced Mail (PEM) RFCs, published in 1993,
   include specifications for a public key infrastructure based on X.509
   v1 certificates [RFC 1422].  The experience gained in attempts to
   deploy RFC 1422 made it clear that the v1 and v2 certificate formats
   are deficient in several respects.  Most importantly, more fields
   were needed to carry information which PEM design and implementation
   experience has proven necessary.  In response to these new
   requirements, ISO/IEC/ITU and ANSI X9 developed the X.509 version 3
   (v3) certificate format.  The v3 format extends the v2 format by
   adding provision for additional extension fields.  Particular
   extension field types may be specified in standards or may be defined
   and registered by any organization or community. In June 1996,
   standardization of the basic v3 format was completed [X.509].

   ISO/IEC/ITU and ANSI X9 have also developed standard extensions for
   use in the v3 extensions field [X.509][X9.55].  These extensions can
   convey such data as additional subject identification information,
   key attribute information, policy information, and certification path
   constraints.

However, the ISO/IEC/ITU and ANSI X9 standard extensions are very broad in their applicability.  In order to develop interoperable implementations of X.509 v3 systems for Internet use, it is necessary to specify a profile for use of the X.509 v3 extensions tailored for the Internet.  It is one goal of this document to specify a profile for Internet WWW, electronic mail, and IPsec applications. Environments with additional requirements may build on this profile or may replace it.

3.2  Certification Paths and Trust

A user of a security service requiring knowledge of a public key generally needs to obtain and validate a certificate containing the required public key. If the public-key user does not already hold an assured copy of the public key of the CA that signed the certificate, the CA's name, and related information (such as the validity period or name constraints), then it might need an additional certificate to obtain that public key.  In general, a chain of multiple certificates may be needed, comprising a certificate of the public key owner (the end entity) signed by one CA, and zero or more additional certificates of CAs signed by other CAs.  Such chains, called certification paths, are required because a public key user is only initialized with a limited number of assured CA public keys.

There are different ways in which CAs might be configured in order for public key users to be able to find certification paths.  For PEM, RFC 1422 defined a rigid hierarchical structure of CAs.  There are three types of PEM certification authority:

   (a)  Internet Policy Registration Authority (IPRA):  This authority, operated under the auspices of the Internet Society, acts as the root of the PEM certification hierarchy at level 1. It issues certificates only for the next level of authorities, PCAs.  All certification paths start with the IPRA.

   (b)  Policy Certification Authorities (PCAs):  PCAs are at level 2 of the hierarchy, each PCA being certified by the IPRA.  A PCA shall establish and publish a statement of its policy with respect to certifying users or subordinate certification authorities. Distinct PCAs aim to satisfy different user needs. For example, one PCA (an organizational PCA) might support the general electronic mail needs of commercial organizations, and another PCA (a high-assurance PCA) might have a more stringent policy designed for satisfying legally binding digital signature requirements.

   (c)  Certification Authorities (CAs):  CAs are at level 3 of the
hierarchy and can also be at lower levels. Those at level 3 are
certified by PCAs.  CAs represent, for example, particular
organizations, particular organizational units (e.g., departments,
groups, sections), or particular geographical areas.

RFC 1422 furthermore has a name subordination rule which requires
that a CA can only issue certificates for entities whose names are
subordinate (in the X.500 naming tree) to the name of the CA itself.
The trust associated with a PEM certification path is implied by the
PCA name. The name subordination rule ensures that CAs below the PCA
are sensibly constrained as to the set of subordinate entities they
can certify (e.g., a CA for an organization can only certify entities
in that organization's name tree). Certificate user systems are able
to mechanically check that the name subordination rule has been
followed.

The RFC 1422 uses the X.509 v1 certificate formats. The limitations
of X.509 v1 required imposition of several structural restrictions to
clearly associate policy information or restrict the utility of
certificates.  These restrictions included:

   (a) a pure top-down hierarchy, with all certification paths
starting from IPRA;

   (b) a naming subordination rule restricting the names of a CA's
subjects; and

   (c) use of the PCA concept, which requires knowledge of individual
PCAs to be built into certificate chain verification logic.
Knowledge of individual PCAs was required to determine if a chain
could be accepted.

With X.509 v3, most of the requirements addressed by RFC 1422 can be
addressed using certificate extensions, without a need to restrict
the CA structures used.  In particular, the certificate extensions
relating to certificate policies obviate the need for PCAs and the
constraint extensions obviate the need for the name subordination
rule.  As a result, this document supports a more flexible
architecture, including:

   (a) Certification paths may start with a public key of a CA in a
user's own domain, or with the public key of the top of a
hierarchy.  Starting with the public key of a CA in a user's own
domain has certain advantages.  In some environments, the local
domain is the most trusted.

(b)  Name constraints may be imposed through explicit inclusion of a name constraints extension in a certificate, but are not required.

(c)  Policy extensions and policy mappings replace the PCA concept, which permits a greater degree of automation.  The application can determine if the certification path is acceptable based on the contents of the certificates instead of a priori knowledge of PCAs. This permits automation of certificate chain processing.

3.3  Revocation

When a certificate is issued, it is expected to be in use for its entire validity period.  However, various circumstances may cause a certificate to become invalid prior to the expiration of the validity period. Such circumstances include change of name, change of association between subject and CA (e.g., an employee terminates employment with an organization), and compromise or suspected compromise of the corresponding private key.  Under such circumstances, the CA needs to revoke the certificate.

X.509 defines one method of certificate revocation.  This method involves each CA periodically issuing a signed data structure called a certificate revocation list (CRL).  A CRL is a time stamped list identifying revoked certificates which is signed by a CA and made freely available in a public repository.  Each revoked certificate is identified in a CRL by its certificate serial number. When a certificate-using system uses a certificate (e.g., for verifying a remote user's digital signature), that system not only checks the certificate signature and validity but also acquires a suitably-recent CRL and checks that the certificate serial number is not on that CRL.  The meaning of "suitably-recent" may vary with local policy, but it usually means the most recently-issued CRL.  A CA issues a new CRL on a regular periodic basis (e.g., hourly, daily, or weekly).  An entry is added to the CRL as part of the next update following notification of revocation. An entry may be removed from the CRL after appearing on one regularly scheduled CRL issued beyond the revoked certificate's validity period.

An advantage of this revocation method is that CRLs may be distributed by exactly the same means as certificates themselves, namely, via untrusted communications and server systems.

One limitation of the CRL revocation method, using untrusted communications and servers, is that the time granularity of revocation is limited to the CRL issue period.  For example, if a revocation is reported now, that revocation will not be reliably

notified to certificate-using systems until the next periodic CRL is
issued -- this may be up to one hour, one day, or one week depending
on the frequency that the CA issues CRLs.

As with the X.509 v3 certificate format, in order to facilitate
interoperable implementations from multiple vendors, the X.509 v2 CRL
format needs to be profiled for Internet use.  It is one goal of this
document to specify that profile.  However, this profile does not
require CAs to issue CRLs. Message formats and protocols supporting
on-line revocation notification may be defined in other PKIX
specifications.  On-line methods of revocation notification may be
applicable in some environments as an alternative to the X.509 CRL.
On-line revocation checking may significantly reduce the latency
between a revocation report and the distribution of the information
to relying parties.  Once the CA accepts the report as authentic and
valid, any query to the on-line service will correctly reflect the
certificate validation impacts of the revocation.  However, these
methods impose new security requirements; the certificate validator
shall trust the on-line validation service while the repository does
not need to be trusted.

3.4  Operational Protocols

Operational protocols are required to deliver certificates and CRLs
(or status information) to certificate using client systems.
Provision is needed for a variety of different means of certificate
and CRL delivery, including distribution procedures based on LDAP,
HTTP, FTP, and X.500.  Operational protocols supporting these
functions are defined in other PKIX specifications.  These
specifications may include definitions of message formats and
procedures for supporting all of the above operational environments,
including definitions of or references to appropriate MIME content
types.

3.5  Management Protocols

Management protocols are required to support on-line interactions
between PKI user and management entities.  For example, a management
protocol might be used between a CA and a client system with which a
key pair is associated, or between two CAs which cross-certify each
other.  The set of functions which potentially need to be supported
by management protocols include:

   (a)  registration:  This is the process whereby a user first makes
   itself known to a CA (directly, or through an RA), prior to that
   CA issuing  a certificate or certificates for that user.

(b)  initialization:  Before a client system can operate securely
it is necessary to install key materials which have the
appropriate relationship with keys stored elsewhere in the
infrastructure.  For example, the client needs to be securely
initialized with the public key and other assured information of
the trusted CA(s), to be used in validating certificate paths.
Furthermore, a client typically needs to be initialized with its
own key pair(s).

(c)  certification:  This  is the process in which a CA issues a
certificate for a user's public key, and returns that certificate
to the user's client system and/or posts that certificate in a
repository.

(d)  key pair recovery:  As an option, user client key materials
(e.g., a user's private key used for encryption purposes) may be
backed up by a CA or a key backup system.  If a user needs to
recover these backed up key materials (e.g., as a result of a
forgotten password or a lost key chain file), an on-line protocol
exchange may be needed to support such recovery.

(e)  key pair update:  All key pairs need to be updated regularly,
i.e., replaced with a new key pair, and new certificates issued.

(f)  revocation request:  An authorized person advises a CA of an
abnormal situation requiring certificate revocation.

(g)  cross-certification:  Two CAs exchange information used in
establishing a cross-certificate. A cross-certificate is a
certificate issued by one CA to another CA which contains a CA
signature key used for issuing certificates.

Note that on-line protocols are not the only way of implementing the
above functions.  For all functions there are off-line methods of
achieving the same result, and this specification does not mandate
use of on-line protocols.  For example, when hardware tokens are
used, many of the functions may be achieved as part of the physical
token delivery.  Furthermore, some of the above functions may be
combined into one protocol exchange.  In particular, two or more of
the registration, initialization, and certification functions can be
combined into one protocol exchange.

The PKIX series of specifications may define a set of standard
message formats supporting the above functions in future
specifications.  In that case, the protocols for conveying these
messages in different environments (e.g., on-line, file transfer, e-
mail, and WWW) will also be described in those specifications.

4  Certificate and Certificate Extensions Profile

   This section presents a profile for public key certificates that will
   foster interoperability and a reusable PKI.  This section is based
   upon the X.509 v3 certificate format and the standard certificate
   extensions defined in [X.509].  The ISO/IEC/ITU documents use the
   1993 version of ASN.1; while this document uses the 1988 ASN.1
   syntax, the encoded certificate and standard extensions are
   equivalent.  This section also defines private extensions required to
   support a PKI for the Internet community.

   Certificates may be used in a wide range of applications and
   environments covering a broad spectrum of interoperability goals and
   a broader spectrum of operational and assurance requirements.  The
   goal of this document is to establish a common baseline for generic
   applications requiring broad interoperability and limited special
   purpose requirements.  In particular, the emphasis will be on
   supporting the use of X.509 v3 certificates for informal Internet
   electronic mail, IPsec, and WWW applications.

4.1  Basic Certificate Fields

   The X.509 v3 certificate basic syntax is as follows.  For signature
   calculation, the certificate is encoded using the ASN.1 distinguished
   encoding rules (DER) [X.208].  ASN.1 DER encoding is a tag, length,
   value encoding system for each element.

   Certificate  ::=  SEQUENCE  {
        tbsCertificate        TBSCertificate,
        signatureAlgorithm    AlgorithmIdentifier,
        signatureValue        BIT STRING  }

   TBSCertificate  ::=  SEQUENCE  {
        version         [0]  EXPLICIT Version DEFAULT v1,
        serialNumber         CertificateSerialNumber,
        signature            AlgorithmIdentifier,
        issuer               Name,
        validity             Validity,
        subject              Name,
        subjectPublicKeyInfo SubjectPublicKeyInfo,
        issuerUniqueID  [1]  IMPLICIT UniqueIdentifier OPTIONAL,
                             -- If present, version shall be v2 or v3
        subjectUniqueID [2]  IMPLICIT UniqueIdentifier OPTIONAL,
                             -- If present, version shall be v2 or v3
        extensions      [3]  EXPLICIT Extensions OPTIONAL
                             -- If present, version shall be v3
        }

```
   Version  ::=  INTEGER  {  v1(0), v2(1), v3(2)  }

   CertificateSerialNumber  ::=  INTEGER

   Validity ::= SEQUENCE {
        notBefore       Time,
        notAfter        Time }

   Time ::= CHOICE {
        utcTime         UTCTime,
        generalTime     GeneralizedTime }

   UniqueIdentifier  ::=  BIT STRING

   SubjectPublicKeyInfo  ::=  SEQUENCE  {
        algorithm           AlgorithmIdentifier,
        subjectPublicKey    BIT STRING  }

   Extensions  ::=  SEQUENCE SIZE (1..MAX) OF Extension

   Extension  ::=  SEQUENCE  {
        extnID    OBJECT IDENTIFIER,
        critical  BOOLEAN DEFAULT FALSE,
        extnValue OCTET STRING  }
```

   The following items describe the X.509 v3 certificate for use in the
   Internet.

4.1.1  Certificate Fields

   The Certificate is a SEQUENCE of three required fields. The fields
   are described in detail in the following subsections.

4.1.1.1  tbsCertificate

   The field contains the names of the subject and issuer, a public key
   associated with the subject, a validity period, and other associated
   information.  The fields are described in detail in section 4.1.2;
   the tbscertificate may also include extensions which are described in
   section 4.2.

4.1.1.2  signatureAlgorithm

   The signatureAlgorithm field contains the identifier for the
   cryptographic algorithm used by the CA to sign this certificate.
   Section 7.2 lists the supported signature algorithms.

   An algorithm identifier is defined by the following ASN.1 structure:

```
AlgorithmIdentifier  ::=  SEQUENCE  {
     algorithm                OBJECT IDENTIFIER,
     parameters               ANY DEFINED BY algorithm OPTIONAL  }
```

The algorithm identifier is used to identify a cryptographic algorithm.  The OBJECT IDENTIFIER component identifies the algorithm (such as DSA with SHA-1).  The contents of the optional parameters field will vary according to the algorithm identified. Section 7.2 lists the supported algorithms for this specification.

This field MUST contain the same algorithm identifier as the signature field in the sequence tbsCertificate (see sec. 4.1.2.3).

4.1.1.3  signatureValue

The signatureValue field contains a digital signature computed upon the ASN.1 DER encoded tbsCertificate.  The ASN.1 DER encoded tbsCertificate is used as the input to the signature function. This signature value is then ASN.1 encoded as a BIT STRING and included in the Certificate's signature field. The details of this process are specified for each of the supported algorithms in Section 7.2.

By generating this signature, a CA certifies the validity of the information in the tbsCertificate field.  In particular, the CA certifies the binding between the public key material and the subject of the certificate.

4.1.2  TBSCertificate

The sequence TBSCertificate contains information associated with the subject of the certificate and the CA who issued it.  Every TBSCertificate contains the names of the subject and issuer, a public key associated with the subject, a validity period, a version number, and a serial number; some may contain optional unique identifier fields.  The remainder of this section describes the syntax and semantics of these fields.  A TBSCertificate may also include extensions.  Extensions for the Internet PKI are described in Section 4.2.

4.1.2.1  Version

This field describes the version of the encoded certificate.  When extensions are used, as expected in this profile, use X.509 version 3 (value is 2).  If no extensions are present, but a UniqueIdentifier is present, use version 2 (value is 1).  If only basic fields are present, use version 1 (the value is omitted from the certificate as the default value).

   Implementations SHOULD be prepared to accept any version certificate.
   At a minimum, conforming implementations MUST recognize version 3
   certificates.

   Generation of version 2 certificates is not expected by
   implementations based on this profile.

4.1.2.2  Serial number

   The serial number is an integer assigned by the CA to each
   certificate.  It MUST be unique for each certificate issued by a
   given CA (i.e., the issuer name and serial number identify a unique
   certificate).

4.1.2.3  Signature

   This field contains the algorithm identifier for the algorithm used
   by the CA to sign the certificate.

   This field MUST contain the same algorithm identifier as the
   signatureAlgorithm field in the sequence Certificate (see sec.
   4.1.1.2).  The contents of the optional parameters field will vary
   according to the algorithm identified.  Section 7.2 lists the
   supported signature algorithms.

4.1.2.4  Issuer

   The issuer field identifies the entity who has signed and issued the
   certificate.  The issuer field MUST contain a non-empty distinguished
   name (DN).  The issuer field is defined as the X.501 type Name.
   [X.501] Name is defined by the following ASN.1 structures:

   Name ::= CHOICE {
     RDNSequence }

   RDNSequence ::= SEQUENCE OF RelativeDistinguishedName

   RelativeDistinguishedName ::=
     SET OF AttributeTypeAndValue

   AttributeTypeAndValue ::= SEQUENCE {
     type      AttributeType,
     value     AttributeValue }

   AttributeType ::= OBJECT IDENTIFIER

   AttributeValue ::= ANY DEFINED BY AttributeType

```
DirectoryString ::= CHOICE {
      teletexString            TeletexString (SIZE (1..MAX)),
      printableString          PrintableString (SIZE (1..MAX)),
      universalString          UniversalString (SIZE (1..MAX)),
      utf8String               UTF8String (SIZE (1.. MAX)),
      bmpString                BMPString (SIZE (1..MAX)) }
```

The Name describes a hierarchical name composed of attributes, such
as country name, and corresponding values, such as US.  The type of
the component AttributeValue is determined by the AttributeType; in
general it will be a DirectoryString.

The DirectoryString type is defined as a choice of PrintableString,
TeletexString, BMPString, UTF8String, and UniversalString.  The
UTF8String encoding is the preferred encoding, and all certificates
issued after December 31, 2003 MUST use the UTF8String encoding of
DirectoryString (except as noted below).  Until that date, conforming
CAs MUST choose from the following options when creating a
distinguished name, including their own:

    (a) if the character set is sufficient, the string MAY be
    represented as a PrintableString;

    (b) failing (a), if the BMPString character set is sufficient the
    string MAY be represented as a BMPString; and

    (c) failing (a) and (b), the string MUST be represented as a
    UTF8String.  If (a) or (b) is satisfied, the CA MAY still choose
    to represent the string as a UTF8String.

Exceptions to the December 31, 2003 UTF8 encoding requirements are as
follows:

    (a) CAs MAY issue "name rollover" certificates to support an
    orderly migration to UTF8String encoding.  Such certificates would
    include the CA's UTF8String encoded name as issuer and and the old
    name encoding as subject, or vice-versa.

    (b) As stated in section 4.1.2.6, the subject field MUST be
    populated with a non-empty distinguished name matching the
    contents of the issuer field in all certificates issued by the
    subject CA regardless of encoding.

The TeletexString and UniversalString are included for backward
compatibility, and should not be used for certificates for new
subjects.  However, these types may be used in certificates where the
name was previously established.  Certificate users SHOULD be
prepared to receive certificates with these types.

In addition, many legacy implementations support names encoded in the ISO 8859-1 character set (Latin1String) but tag them as TeletexString.  The Latin1String includes characters used in Western European countries which are not part of the TeletexString charcter set.  Implementations that process TeletexString SHOULD be prepared to handle the entire ISO 8859-1 character set.[ISO 8859-1]

As noted above, distinguished names are composed of attributes.  This specification does not restrict the set of attribute types that may appear in names.  However, conforming implementations MUST be prepared to receive certificates with issuer names containing the set of attribute types defined below.  This specification also recommends support for additional attribute types.

Standard sets of attributes have been defined in the X.500 series of specifications.[X.520]  Implementations of this specification MUST be prepared to receive the following standard attribute types in issuer names: country, organization, organizational-unit, distinguished name qualifier, state or province name,  and common name (e.g., "Susan Housley").  In addition, implementations of this specification SHOULD be prepared to receive the following standard attribute types in issuer names: locality, title,  surname, given name, initials, and generation qualifier (e.g., "Jr.", "3rd", or "IV").  The syntax and associated object identifiers (OIDs) for these attribute types are provided in the ASN.1 modules in Appendices A and B.

In addition, implementations of this specification MUST be prepared to receive the domainComponent attribute, as defined in [RFC 2247]. The Domain (Nameserver) System (DNS) provides a hierarchical resource labeling system.  This attribute provides a convenient mechanism for organizations that wish to use DNs that parallel their DNS names. This is not a replacement for the dNSName component of the alternative name field. Implementations are not required to convert such names into DNS names. The syntax and associated OID for this attribute type is provided in the ASN.1 modules in Appendices A and B.

Certificate users MUST be prepared to process the issuer distinguished name and subject distinguished name (see sec. 4.1.2.6) fields to perform name chaining for certification path validation (see section 6). Name chaining is performed by matching the issuer distinguished name in one certificate with the subject name in a CA certificate.

This specification requires only a subset of the name comparison functionality specified in the X.500 series of specifications.  The requirements for conforming implementations are as follows:

   (a) attribute values encoded in different types (e.g.,
   PrintableString and BMPString) may be assumed to represent
   different strings;

   (b) attribute values in types other than PrintableString are case
   sensitive (this permits matching of attribute values as binary
   objects);

   (c) attribute values in PrintableString are not case sensitive
   (e.g., "Marianne Swanson" is the same as "MARIANNE SWANSON"); and

   (d) attribute values in PrintableString are compared after
   removing leading and trailing white space and converting internal
   substrings of one or more consecutive white space characters to a
   single space.

These name comparison rules permit a certificate user to validate
certificates issued using languages or encodings unfamiliar to the
certificate user.

In addition, implementations of this specification MAY use these
comparison rules to process unfamiliar attribute types for name
chaining. This allows implementations to process certificates with
unfamiliar attributes in the issuer name.

Note that the comparison rules defined in the X.500 series of
specifications indicate that the character sets used to encode data
in distinguished names are irrelevant.  The characters themselves are
compared without regard to encoding. Implementations of the profile
are permitted to use the comparison algorithm defined in the X.500
series.  Such an implementation will recognize a superset of name
matches recognized by the algorithm specified above.

4.1.2.5  Validity

The certificate validity period is the time interval during which the
CA warrants that it will maintain information about the status of the
certificate. The field is represented as a SEQUENCE of two dates:
the date on which the certificate validity period begins (notBefore)
and the date on which the certificate validity period ends
(notAfter).  Both notBefore and notAfter may be encoded as UTCTime or
GeneralizedTime.

CAs conforming to this profile MUST always encode certificate
validity dates through the year 2049 as UTCTime; certificate validity
dates in 2050 or later MUST be encoded as GeneralizedTime.

4.1.2.5.1  UTCTime

    The universal time type, UTCTime, is a standard ASN.1 type intended
    for international applications where local time alone is not
    adequate.  UTCTime specifies the year through the two low order
    digits and time is specified to the precision of one minute or one
    second.  UTCTime includes either Z (for Zulu, or Greenwich Mean Time)
    or a time differential.

    For the purposes of this profile, UTCTime values MUST be expressed
    Greenwich Mean Time (Zulu) and MUST include seconds (i.e., times are
    YYMMDDHHMMSSZ), even where the number of seconds is zero.  Conforming
    systems MUST interpret the year field (YY) as follows:

        Where YY is greater than or equal to 50, the year shall be
        interpreted as 19YY; and

        Where YY is less than 50, the year shall be interpreted as 20YY.

4.1.2.5.2  GeneralizedTime

    The generalized time type, GeneralizedTime, is a standard ASN.1 type
    for variable precision representation of time.  Optionally, the
    GeneralizedTime field can include a representation of the time
    differential between local and Greenwich Mean Time.

    For the purposes of this profile, GeneralizedTime values MUST be
    expressed Greenwich Mean Time (Zulu) and MUST include seconds (i.e.,
    times are YYYYMMDDHHMMSSZ), even where the number of seconds is zero.
    GeneralizedTime values MUST NOT include fractional seconds.

4.1.2.6  Subject

    The subject field identifies the entity associated with the public
    key stored in the subject public key field.  The subject name may be
    carried in the subject field and/or the subjectAltName extension.  If
    the subject is a CA (e.g., the basic constraints extension, as
    discussed in 4.2.1.10, is present and the value of cA is TRUE,) then
    the subject field MUST be populated with a non-empty distinguished
    name matching the contents of the issuer field (see sec. 4.1.2.4) in
    all certificates issued by the subject CA.  If subject naming
    information is present only in the subjectAltName extension (e.g., a
    key bound only to an email address or URI), then the subject name
    MUST be an empty sequence and the subjectAltName extension MUST be
    critical.

Where it is non-empty, the subject field MUST contain an X.500
distinguished name (DN). The DN MUST be unique for each subject
entity certified by the one CA as defined by the issuer name field. A
CA may issue more than one certificate with the same DN to the same
subject entity.

The subject name field is defined as the X.501 type Name.
Implementation requirements for this field are those defined for the
issuer field (see sec.  4.1.2.4).  When encoding attribute values of
type DirectoryString, the encoding rules for the issuer field MUST be
implemented.  Implementations of this specification MUST be prepared
to receive subject names containing the attribute types required for
the issuer field.  Implementations of this specification SHOULD be
prepared to receive subject names containing the recommended
attribute types for the issuer field.  The syntax and associated
object identifiers (OIDs) for these attribute types are provided in
the ASN.1 modules in Appendices A and B.  Implementations of this
specification MAY use these comparison rules to process unfamiliar
attribute types (i.e., for name chaining). This allows
implementations to process certificates with unfamiliar attributes in
the subject name.

In addition, legacy implementations exist where an RFC 822 name is
embedded in the subject distinguished name as an EmailAddress
attribute.  The attribute value for EmailAddress is of type IA5String
to permit inclusion of the character '@', which is not part of the
PrintableString character set.  EmailAddress attribute values are not
case sensitive (e.g., "fanfeedback@redsox.com" is the same as
"FANFEEDBACK@REDSOX.COM").

Conforming implementations generating new certificates with
electronic mail addresses MUST use the rfc822Name in the subject
alternative name field (see sec. 4.2.1.7) to describe such
identities.  Simultaneous inclusion of the EmailAddress attribute in
the subject distinguished name to support legacy implementations is
deprecated but permitted.

4.1.2.7  Subject Public Key Info

This field is used to carry the public key and identify the algorithm
with which the key is used. The algorithm is identified using the
AlgorithmIdentifier structure specified in section 4.1.1.2. The
object identifiers for the supported algorithms and the methods for
encoding the public key materials (public key and parameters) are
specified in section 7.3.

4.1.2.8  Unique Identifiers

   These fields may only appear if the version is 2 or 3 (see sec.
   4.1.2.1).  The subject and issuer unique identifiers are present in
   the certificate to handle the possibility of reuse of subject and/or
   issuer names over time.  This profile recommends that names not be
   reused for different entities and that Internet certificates not make
   use of unique identifiers.  CAs conforming to this profile SHOULD NOT
   generate certificates with unique identifiers.  Applications
   conforming to this profile SHOULD be capable of parsing unique
   identifiers and making comparisons.

4.1.2.9  Extensions

   This field may only appear if the version is 3 (see sec. 4.1.2.1).
   If present, this field is a SEQUENCE of one or more certificate
   extensions. The format and content of certificate extensions in the
   Internet PKI is defined in section 4.2.

4.2  Standard Certificate Extensions

   The extensions defined for X.509 v3 certificates provide methods for
   associating additional attributes with users or public keys and for
   managing the certification hierarchy.  The X.509 v3 certificate
   format also allows communities to define private extensions to carry
   information unique to those communities.  Each extension in a
   certificate may be designated as critical or non-critical.  A
   certificate using system MUST reject the certificate if it encounters
   a critical extension it does not recognize; however, a non-critical
   extension may be ignored if it is not recognized.  The following
   sections present recommended extensions used within Internet
   certificates and standard locations for information.  Communities may
   elect to use additional extensions; however, caution should be
   exercised in adopting any critical extensions in certificates which
   might prevent use in a general context.

   Each extension includes an OID and an ASN.1 structure.  When an
   extension appears in a certificate, the OID appears as the field
   extnID and the corresponding ASN.1 encoded structure is the value of
   the octet string extnValue.  Only one instance of a particular
   extension may appear in a particular certificate. For example, a
   certificate may contain only one authority key identifier extension
   (see sec. 4.2.1.1).  An extension includes the boolean critical, with
   a default value of FALSE.  The text for each extension specifies the
   acceptable values for the critical field.

Conforming CAs MUST support key identifiers (see sec. 4.2.1.1 and
4.2.1.2), basic constraints (see sec. 4.2.1.10), key usage (see sec.
4.2.1.3), and certificate policies (see sec. 4.2.1.5) extensions. If
the CA issues certificates with an empty sequence for the subject
field, the CA MUST support the subject alternative name extension
(see sec. 4.2.1.7).  Support for the remaining extensions is
OPTIONAL. Conforming CAs may support extensions that are not
identified within this specification; certificate issuers are
cautioned that marking such extensions as critical may inhibit
interoperability.

At a minimum, applications conforming to this profile MUST recognize
the extensions which must or may be critical in this specification.
These extensions are:  key usage (see sec. 4.2.1.3), certificate
policies (see sec. 4.2.1.5), the subject alternative name (see sec.
4.2.1.7), basic constraints (see sec. 4.2.1.10), name constraints
(see sec. 4.2.1.11), policy constraints (see sec. 4.2.1.12), and
extended key usage (see sec. 4.2.1.13).

In addition, this profile RECOMMENDS application support for the
authority and subject key identifier (see sec. 4.2.1.1 and 4.2.1.2)
extensions.

## 4.2.1  Standard Extensions

This section identifies standard certificate extensions defined in
[X.509] for use in the Internet PKI.  Each extension is associated
with an OID defined in [X.509].  These OIDs are members of the id-ce
arc, which is defined by the following:

id-ce   OBJECT IDENTIFIER ::=  {joint-iso-ccitt(2) ds(5) 29}

## 4.2.1.1  Authority Key Identifier

The authority key identifier extension provides a means of
identifying the public key corresponding to the private key used to
sign a certificate. This extension is used where an issuer has
multiple signing keys (either due to multiple concurrent key pairs or
due to changeover).  The identification may be based on either the
key identifier (the subject key identifier in the issuer's
certificate) or on the issuer name and serial number.

The keyIdentifier field of the authorityKeyIdentifier extension MUST
be included in all certificates generated by conforming CAs to
facilitate chain building.  There is one exception; where a CA
distributes its public key in the form of a "self-signed"
certificate, the authority key identifier may be omitted.  In this
case, the subject and authority key identifiers would be identical.

The value of the keyIdentifier field SHOULD be derived from the
public key used to verify the certificate's signature or a method
that generates unique values.  Two common methods for generating key
identifiers from the public key are described in (sec. 4.2.1.2). One
common method for generating unique values isdescribed in (sec.
4.2.1.2).  Where a key identifier has not been previously
established, this specification recommends use of one of these
methods for generating keyIdentifiers.

This profile recommends support for the key identifier method by all
certificate users.

This extension MUST NOT be marked critical.

id-ce-authorityKeyIdentifier OBJECT IDENTIFIER ::=  { id-ce 35 }

AuthorityKeyIdentifier ::= SEQUENCE {
    keyIdentifier             [0] KeyIdentifier           OPTIONAL,
    authorityCertIssuer       [1] GeneralNames            OPTIONAL,
    authorityCertSerialNumber [2] CertificateSerialNumber OPTIONAL  }

KeyIdentifier ::= OCTET STRING

4.2.1.2  Subject Key Identifier

The subject key identifier extension provides a means of identifying
certificates that contain a particular public key.

To facilitate chain building, this extension MUST appear in all con-
forming CA certificates, that is, all certificates including the
basic constraints extension (see sec. 4.2.1.10) where the value of cA
is TRUE.  The value of the subject key identifier MUST be the value
placed in the key identifier field of the Authority Key Identifier
extension (see sec. 4.2.1.1) of certificates issued by the subject of
this certificate.

For CA certificates, subject key identifiers SHOULD be derived from
the public key or a method that generates unique values.  Two common
methods for generating key identifiers from the public key are:

    (1) The keyIdentifier is composed of the 160-bit SHA-1 hash of the
    value of the BIT STRING subjectPublicKey (excluding the tag,
    length, and number of unused bits).

    (2) The keyIdentifier is composed of a four bit type field with
    the value 0100 followed by the least significant 60 bits of the
    SHA-1 hash of the value of the BIT STRING subjectPublicKey.

RFC 2459        Internet X.509 Public Key Infrastructure    January 1999

   One common method for generating unique values is a monotomically
   increasing sequence of integers.

   For end entity certificates, the subject key identifier extension
   provides a means for identifying certificates containing the
   particular public key used in an application. Where an end entity has
   obtained multiple certificates, especially from multiple CAs, the
   subject key identifier provides a means to quickly identify the set
   of certificates containing a particular public key. To assist
   applications in identificiation the appropriate end entity
   certificate, this extension SHOULD be included in all end entity
   certificates.

   For end entity certificates, subject key identifiers SHOULD be
   derived from the public key.  Two common methods for generating key
   identifiers from the public key are identifed above.

   Where a key identifier has not been previously established, this
   specification recommends use of one of these methods for generating
   keyIdentifiers.

   This extension MUST NOT be marked critical.

   id-ce-subjectKeyIdentifier OBJECT IDENTIFIER ::=  { id-ce 14 }

   SubjectKeyIdentifier ::= KeyIdentifier

4.2.1.3  Key Usage

   The key usage extension defines the purpose (e.g., encipherment,
   signature, certificate signing) of the key contained in the
   certificate.  The usage restriction might be employed when a key that
   could be used for more than one operation is to be restricted.  For
   example, when an RSA key should be used only for signing, the
   digitalSignature and/or nonRepudiation bits would be asserted.
   Likewise, when an RSA key should be used only for key management, the
   keyEncipherment bit would be asserted. When used, this extension
   SHOULD be marked critical.

      id-ce-keyUsage OBJECT IDENTIFIER ::=  { id-ce 15 }

      KeyUsage ::= BIT STRING {
           digitalSignature        (0),
           nonRepudiation          (1),
           keyEncipherment         (2),
           dataEncipherment        (3),
           keyAgreement            (4),
           keyCertSign             (5),

Housley, et. al.            Standards Track                 [Page 27]

```
            cRLSign                (6),
            encipherOnly           (7),
            decipherOnly           (8) }
```

Bits in the KeyUsage type are used as follows:

The digitalSignature bit is asserted when the subject public key
is used with a digital signature mechanism to support security
services other than non-repudiation (bit 1), certificate signing
(bit 5), or revocation information signing (bit 6). Digital
signature mechanisms are often used for entity authentication and
data origin authentication with integrity.

The nonRepudiation bit is asserted when the subject public key is
used to verify digital signatures used to provide a non-
repudiation service which protects against the signing entity
falsely denying some action, excluding certificate or CRL signing.

The keyEncipherment bit is asserted when the subject public key is
used for key transport.  For example, when an RSA key is to be
used for key management, then this bit shall asserted.

The dataEncipherment bit is asserted when the subject public key
is used for enciphering user data, other than cryptographic keys.

The keyAgreement bit is asserted when the subject public key is
used for key agreement.  For example, when a Diffie-Hellman key is
to be used for key management, then this bit shall asserted.

The keyCertSign bit is asserted when the subject public key is
used for verifying a signature on certificates.  This bit may only
be asserted in CA certificates.

The cRLSign bit is asserted when the subject public key is used
for verifying a signature on revocation information (e.g., a CRL).

The meaning of the encipherOnly bit is undefined in the absence of
the keyAgreement bit.  When the encipherOnly bit is asserted and
the keyAgreement bit is also set, the subject public key may be
used only for enciphering data while performing key agreement.

The meaning of the decipherOnly bit is undefined in the absence of
the keyAgreement bit.  When the decipherOnly bit is asserted and
the keyAgreement bit is also set, the subject public key may be
used only for deciphering data while performing key agreement.

This profile does not restrict the combinations of bits that may be
set in an instantiation of the keyUsage extension.  However,
appropriate values for keyUsage extensions for particular algorithms
are specified in section 7.3.

4.2.1.4  Private Key Usage Period

This profile recommends against the use of this extension.  CAs
conforming to this profile MUST NOT generate certificates with
critical private key usage period extensions.

The private key usage period extension allows the certificate issuer
to specify a different validity period for the private key than the
certificate. This extension is intended for use with digital
signature keys.  This extension consists of two optional components,
notBefore and notAfter.  The private key associated with the
certificate should not be used to sign objects before or after the
times specified by the two components, respectively. CAs conforming
to this profile MUST NOT generate certificates with private key usage
period extensions unless at least one of the two components is
present.

Where used, notBefore and notAfter are represented as GeneralizedTime
and MUST be specified and interpreted as defined in section
4.1.2.5.2.

id-ce-privateKeyUsagePeriod OBJECT IDENTIFIER ::=  { id-ce 16 }

PrivateKeyUsagePeriod ::= SEQUENCE {
     notBefore       [0]     GeneralizedTime OPTIONAL,
     notAfter        [1]     GeneralizedTime OPTIONAL }

4.2.1.5  Certificate Policies

The certificate policies extension contains a sequence of one or more
policy information terms, each of which consists of an object
identifier (OID) and optional qualifiers.  These policy information
terms indicate the policy under which the certificate has been issued
and the purposes for which the certificate may be used.  Optional
qualifiers, which may be present, are not expected to change the
definition of the policy.

Applications with specific policy requirements are expected to have a
list of those policies which they will accept and to compare the
policy OIDs in the certificate to that list.  If this extension is
critical, the path validation software MUST be able to interpret this
extension (including the optional qualifier), or MUST reject the
certificate.

To promote interoperability, this profile RECOMMENDS that policy
information terms consist of only an OID.  Where an OID alone is
insufficient, this profile strongly recommends that use of qualifiers
be limited to those identified in this section.

This specification defines two policy qualifier types for use by
certificate policy writers and certificate issuers. The qualifier
types are the CPS Pointer and User Notice qualifiers.

The CPS Pointer qualifier contains a pointer to a Certification
Practice Statement (CPS) published by the CA.  The pointer is in the
form of a URI.

User notice is intended for display to a relying party when a
certificate is used.  The application software SHOULD display all
user notices in all certificates of the certification path used,
except that if a notice is duplicated only one copy need be
displayed.  To prevent such duplication, this qualifier SHOULD only
be present in end-entity certificates and CA certificates issued to
other organizations.

The user notice has two optional fields: the noticeRef field and the
explicitText field.

    The noticeRef field, if used, names an organization and
    identifies, by number, a particular textual statement prepared by
    that organization.  For example, it might identify the
    organization "CertsRUs" and notice number 1.  In a typical
    implementation, the application software will have a notice file
    containing the current set of notices for CertsRUs; the
    application will extract the notice text from the file and display
    it.  Messages may be multilingual, allowing the software to select
    the particular language message for its own environment.

    An explicitText field includes the textual statement directly in
    the certificate.  The explicitText field is a string with a
    maximum size of 200 characters.

If both the noticeRef and explicitText options are included in the
one qualifier and if the application software can locate the notice
text indicated by the noticeRef option then that text should be
displayed; otherwise, the explicitText string should be displayed.

id-ce-certificatePolicies OBJECT IDENTIFIER ::=  { id-ce 32 }

certificatePolicies ::= SEQUENCE SIZE (1..MAX) OF PolicyInformation

```
PolicyInformation ::= SEQUENCE {
     policyIdentifier   CertPolicyId,
     policyQualifiers   SEQUENCE SIZE (1..MAX) OF
                             PolicyQualifierInfo OPTIONAL }

CertPolicyId ::= OBJECT IDENTIFIER

PolicyQualifierInfo ::= SEQUENCE {
     policyQualifierId  PolicyQualifierId,
     qualifier          ANY DEFINED BY policyQualifierId }

-- policyQualifierIds for Internet policy qualifiers

id-qt        OBJECT IDENTIFIER ::=  { id-pkix 2 }
id-qt-cps    OBJECT IDENTIFIER ::=  { id-qt 1 }
id-qt-unotice OBJECT IDENTIFIER ::=  { id-qt 2 }

PolicyQualifierId ::=
     OBJECT IDENTIFIER ( id-qt-cps | id-qt-unotice )

Qualifier ::= CHOICE {
     cPSuri            CPSuri,
     userNotice        UserNotice }

CPSuri ::= IA5String

UserNotice ::= SEQUENCE {
     noticeRef         NoticeReference OPTIONAL,
     explicitText      DisplayText OPTIONAL}

NoticeReference ::= SEQUENCE {
     organization      DisplayText,
     noticeNumbers     SEQUENCE OF INTEGER }

DisplayText ::= CHOICE {
     visibleString     VisibleString  (SIZE (1..200)),
     bmpString         BMPString      (SIZE (1..200)),
     utf8String        UTF8String     (SIZE (1..200)) }
```

4.2.1.6  Policy Mappings

   This extension is used in CA certificates.  It lists one or more
   pairs of OIDs; each pair includes an issuerDomainPolicy and a
   subjectDomainPolicy. The pairing indicates the issuing CA considers
   its issuerDomainPolicy equivalent to the subject CA's
   subjectDomainPolicy.

The issuing CA's users may accept an issuerDomainPolicy for certain
applications. The policy mapping tells the issuing CA's users which
policies associated with the subject CA are comparable to the policy
they accept.

This extension may be supported by CAs and/or applications, and it
MUST be non-critical.

```
id-ce-policyMappings OBJECT IDENTIFIER ::=  { id-ce 33 }

PolicyMappings ::= SEQUENCE SIZE (1..MAX) OF SEQUENCE {
     issuerDomainPolicy      CertPolicyId,
     subjectDomainPolicy     CertPolicyId }
```

4.2.1.7  Subject Alternative Name

The subject alternative names extension allows additional identities
to be bound to the subject of the certificate.  Defined options
include an Internet electronic mail address, a DNS name, an IP
address, and a uniform resource identifier (URI).  Other options
exist, including completely local definitions.  Multiple name forms,
and multiple instances of each name form, may be included.  Whenever
such identities are to be bound into a certificate, the subject
alternative name (or issuer alternative name) extension MUST be used.

Because the subject alternative name is considered to be
definitiviely bound to the public key, all parts of the subject
alternative name MUST be verified by the CA.

Further, if the only subject identity included in the certificate is
an alternative name form (e.g., an electronic mail address), then the
subject distinguished name MUST be empty (an empty sequence), and the
subjectAltName extension MUST be present. If the subject field
contains an empty sequence, the subjectAltName extension MUST be
marked critical.

When the subjectAltName extension contains an Internet mail address,
the address MUST be included as an rfc822Name. The format of an
rfc822Name is an "addr-spec" as defined in RFC 822 [RFC 822]. An
addr-spec has the form "local-part@domain". Note that an addr-spec
has no phrase (such as a common name) before it, has no comment (text
surrounded in parentheses) after it, and is not surrounded by "<" and
">". Note that while upper and lower case letters are allowed in an
RFC 822 addr-spec, no significance is attached to the case.

When the subjectAltName extension contains a iPAddress, the address
MUST be stored in the octet string in "network byte order," as
specified in RFC 791 [RFC 791]. The least significant bit (LSB) of

each octet is the LSB of the corresponding byte in the network
address. For IP Version 4, as specified in RFC 791, the octet string
MUST contain exactly four octets.  For IP Version 6, as specified in
RFC 1883, the octet string MUST contain exactly sixteen octets [RFC
1883].

When the subjectAltName extension contains a domain name service
label, the domain name MUST be stored in the dNSName (an IA5String).
The name MUST be in the "preferred name syntax," as specified by RFC
1034 [RFC 1034]. Note that while upper and lower case letters are
allowed in domain names, no significance is attached to the case.  In
addition, while the string " " is a legal domain name, subjectAltName
extensions with a dNSName " " are not permitted.  Finally, the use of
the DNS representation for Internet mail addresses (wpolk.nist.gov
instead of wpolk@nist.gov) is not permitted; such identities are to
be encoded as rfc822Name.

When the subjectAltName extension contains a URI, the name MUST be
stored in the uniformResourceIdentifier (an IA5String). The name MUST
be a non-relative URL, and MUST follow the URL syntax and encoding
rules specified in [RFC 1738].  The name must include both a scheme
(e.g., "http" or "ftp") and a scheme-specific-part.  The scheme-
specific-part must include a fully qualified domain name or IP
address as the host.

As specified in [RFC 1738], the scheme name is not case-sensitive
(e.g., "http" is equivalent to "HTTP").  The host part is also not
case-sensitive, but other components of the scheme-specific-part may
be case-sensitive. When comparing URIs, conforming implementations
MUST compare the scheme and host without regard to case, but assume
the remainder of the scheme-specific-part is case sensitive.

Subject alternative names may be constrained in the same manner as
subject distinguished names using the name constraints extension as
described in section 4.2.1.11.

If the subjectAltName extension is present, the sequence MUST contain
at least one entry.  Unlike the subject field, conforming CAs MUST
NOT issue certificates with subjectAltNames containing empty
GeneralName fields. For example, an rfc822Name is represented as an
IA5String. While an empty string is a valid IA5String, such an
rfc822Name is not permitted by this profile.  The behavior of clients
that encounter such a certificate when processing a certificication
path is not defined by this profile.

Finally, the semantics of subject alternative names that include
wildcard characters (e.g., as a placeholder for a set of names) are
not addressed by this specification.  Applications with specific
requirements may use such names but shall define the semantics.


    id-ce-subjectAltName OBJECT IDENTIFIER ::=  { id-ce 17 }

    SubjectAltName ::= GeneralNames

    GeneralNames ::= SEQUENCE SIZE (1..MAX) OF GeneralName

    GeneralName ::= CHOICE {
        otherName                   [0]     OtherName,
        rfc822Name                  [1]     IA5String,
        dNSName                     [2]     IA5String,
        x400Address                 [3]     ORAddress,
        directoryName               [4]     Name,
        ediPartyName                [5]     EDIPartyName,
        uniformResourceIdentifier   [6]     IA5String,
        iPAddress                   [7]     OCTET STRING,
        registeredID                [8]     OBJECT IDENTIFIER}

    OtherName ::= SEQUENCE {
        type-id    OBJECT IDENTIFIER,
        value      [0] EXPLICIT ANY DEFINED BY type-id }

    EDIPartyName ::= SEQUENCE {
        nameAssigner            [0]     DirectoryString OPTIONAL,
        partyName               [1]     DirectoryString }

4.2.1.8  Issuer Alternative Names

   As with 4.2.1.7, this extension is used to associate Internet style
   identities with the certificate issuer. Issuer alternative names MUST
   be encoded as in 4.2.1.7.

   Where present, this extension SHOULD NOT be marked critical.

    id-ce-issuerAltName OBJECT IDENTIFIER ::=  { id-ce 18 }

    IssuerAltName ::= GeneralNames

4.2.1.9  Subject Directory Attributes

   The subject directory attributes extension is not recommended as an
   essential part of this profile, but it may be used in local
   environments.  This extension MUST be non-critical.

```
    id-ce-subjectDirectoryAttributes OBJECT IDENTIFIER ::=  { id-ce 9 }

    SubjectDirectoryAttributes ::= SEQUENCE SIZE (1..MAX) OF Attribute
```

4.2.1.10  Basic Constraints

   The basic constraints extension identifies whether the subject of the
   certificate is a CA and how deep a certification path may exist
   through that CA.

   The pathLenConstraint field is meaningful only if cA is set to TRUE.
   In this case, it gives the maximum number of CA certificates that may
   follow this certificate in a certification path. A value of zero
   indicates that only an end-entity certificate may follow in the path.
   Where it appears, the pathLenConstraint field MUST be greater than or
   equal to zero. Where pathLenConstraint does not appear, there is no
   limit to the allowed length of the certification path.

   This extension MUST appear as a critical extension in all CA
   certificates.  This extension SHOULD NOT appear in end entity
   certificates.

```
    id-ce-basicConstraints OBJECT IDENTIFIER ::=  { id-ce 19 }

    BasicConstraints ::= SEQUENCE {
         cA                      BOOLEAN DEFAULT FALSE,
         pathLenConstraint       INTEGER (0..MAX) OPTIONAL }
```

4.2.1.11  Name Constraints

   The name constraints extension, which MUST be used only in a CA
   certificate, indicates a name space within which all subject names in
   subsequent certificates in a certification path shall be located.
   Restrictions may apply to the subject distinguished name or subject
   alternative names.  Restrictions apply only when the specified name
   form is present. If no name of the type is in the certificate, the
   certificate is acceptable.

   Restrictions are defined in terms of permitted or excluded name
   subtrees.  Any name matching a restriction in the excludedSubtrees
   field is invalid regardless of information appearing in the
   permittedSubtrees.  This extension MUST be critical.

   Within this profile, the minimum and maximum fields are not used with
   any name forms, thus minimum is always zero, and maximum is always
   absent.

For URIs, the constraint applies to the host part of the name. The
constraint may specify a host or a domain.  Examples would be
"foo.bar.com";  and ".xyz.com".  When the the constraint begins with
a period, it may be expanded with one or more subdomains.  That is,
the constraint ".xyz.com" is satisfied by both abc.xyz.com and
abc.def.xyz.com.  However, the constraint ".xyz.com" is not satisfied
by "xyz.com".  When the constraint does not begin with a period, it
specifies a host.

A name constraint for Internat mail addresses may specify a
particular mailbox, all addresses at a particular host, or all
mailboxes in a domain.  To indicate a particular mailbox, the
constraint is the complete mail address.  For example, "root@xyz.com"
indicates the root mailbox on the host "xyz.com". To indicate all
Internet mail addresses on a particular host, the constraint is
specified as the host name.  For example, the constraint "xyz.com" is
satisfied by any mail address at the host "xyz.com". To specify any
address within a domain, the constraint is specified with a leading
period (as with URIs).  For example, ".xyz.com" indicates all the
Internet mail addresses in the domain "xyz.com", but Internet mail
addresses on the host "xyz.com".

DNS name restrictions are expressed as foo.bar.com. Any subdomain
satisfies the name constraint. For example, www.foo.bar.com would
satisfy the constraint but bigfoo.bar.com would not.

Legacy implementations exist where an RFC 822 name is embedded in the
subject distinguished name in an attribute of type EmailAddress (see
sec. 4.1.2.6). When rfc822 names are constrained, but the certificate
does not include a subject alternative name, the rfc822 name
constraint MUST be applied to the attribute of type EmailAddress in
the subject distinguished name.  The ASN.1 syntax for EmailAddress
and the corresponding OID are supplied in Appendix A and B.

Restrictions of the form directoryName MUST be applied to the subject
field in the certificate and to the subjectAltName extensions of type
directoryName. Restrictions of the form x400Address MUST be applied
to subjectAltName extensions of type x400Address.

When applying restrictions of the form directoryName, an
implementation MUST compare DN attributes.  At a minimum,
implementations MUST perform the DN comparison rules specified in
Section 4.1.2.4.  CAs issuing certificates with a restriction of the
form directoryName SHOULD NOT rely on implementation of the full ISO
DN name comparison algorithm.  This implies name restrictions shall
be stated identically to the encoding used in the subject field or
subjectAltName extension.

The syntax of iPAddress MUST be as described in section 4.2.1.7 with
the following additions specifically for Name Constraints.  For IPv4
addresses, the ipAddress field of generalName MUST contain eight (8)
octets, encoded in the style of RFC 1519 (CIDR) to represent an
address range.[RFC 1519]  For IPv6 addresses, the ipAddress field
MUST contain 32 octets similarly encoded.  For example, a name
constraint for "class C" subnet 10.9.8.0 shall be represented as the
octets 0A 09 08 00 FF FF FF 00, representing the CIDR notation
10.9.8.0/255.255.255.0.

The syntax and semantics for name constraints for otherName,
ediPartyName, and registeredID are not defined by this specification.

```
id-ce-nameConstraints OBJECT IDENTIFIER ::=  { id-ce 30 }

NameConstraints ::= SEQUENCE {
     permittedSubtrees       [0]     GeneralSubtrees OPTIONAL,
     excludedSubtrees        [1]     GeneralSubtrees OPTIONAL }

GeneralSubtrees ::= SEQUENCE SIZE (1..MAX) OF GeneralSubtree

GeneralSubtree ::= SEQUENCE {
     base                    GeneralName,
     minimum         [0]     BaseDistance DEFAULT 0,
     maximum         [1]     BaseDistance OPTIONAL }

BaseDistance ::= INTEGER (0..MAX)
```

4.2.1.12  Policy Constraints

The policy constraints extension can be used in certificates issued
to CAs. The policy constraints extension constrains path validation
in two ways. It can be used to prohibit policy mapping or require
that each certificate in a path contain an acceptable policy
identifier.

If the inhibitPolicyMapping field is present, the value indicates the
number of additional certificates that may appear in the path before
policy mapping is no longer permitted.  For example, a value of one
indicates that policy mapping may be processed in certificates issued
by the subject of this certificate, but not in additional
certificates in the path.

If the requireExplicitPolicy field is present, subsequent
certificates shall include an acceptable policy identifier. The value
of requireExplicitPolicy indicates the number of additional
certificates that may appear in the path before an explicit policy is
required.  An acceptable policy identifier is the identifier of a

policy required by the user of the certification path or the
identifier of a policy which has been declared equivalent through
policy mapping.

Conforming CAs MUST NOT issue certificates where policy constraints
is a null sequence. That is, at least one of the inhibitPolicyMapping
field or the requireExplicitPolicy field MUST be present. The
behavior of clients that encounter a null policy constraints field is
not addressed in this profile.

This extension may be critical or non-critical.

id-ce-policyConstraints OBJECT IDENTIFIER ::= { id-ce 36 }

PolicyConstraints ::= SEQUENCE {
     requireExplicitPolicy          [0] SkipCerts OPTIONAL,
     inhibitPolicyMapping           [1] SkipCerts OPTIONAL }

SkipCerts ::= INTEGER (0..MAX)

4.2.1.13  Extended key usage field

This field indicates one or more purposes for which the certified
public key may be used, in addition to or in place of the basic
purposes indicated in the key usage extension field.  This field is
defined as follows:

id-ce-extKeyUsage OBJECT IDENTIFIER ::= {id-ce 37}

ExtKeyUsageSyntax ::= SEQUENCE SIZE (1..MAX) OF KeyPurposeId

KeyPurposeId ::= OBJECT IDENTIFIER

Key purposes may be defined by any organization with a need. Object
identifiers used to identify key purposes shall be assigned in
accordance with IANA or ITU-T Rec. X.660 | ISO/IEC/ITU 9834-1.

This extension may, at the option of the certificate issuer, be
either critical or non-critical.

If the extension is flagged critical, then the certificate MUST be
used only for one of the purposes indicated.

If the extension is flagged non-critical, then it indicates the
intended purpose or purposes of the key, and may be used in finding
the correct key/certificate of an entity that has multiple
keys/certificates. It is an advisory field and does not imply that
usage of the key is restricted by the certification authority to the

purpose indicated. Certificate using applications may nevertheless
require that a particular purpose be indicated in order for the
certificate to be acceptable to that application.

If a certificate contains both a critical key usage field and a
critical extended key usage field, then both fields MUST be processed
independently and the certificate MUST only be used for a purpose
consistent with both fields.  If there is no purpose consistent with
both fields, then the certificate MUST NOT be used for any purpose.

The following key usage purposes are defined by this profile:

```
id-kp OBJECT IDENTIFIER ::= { id-pkix 3 }

id-kp-serverAuth            OBJECT IDENTIFIER ::=   {id-kp 1}
-- TLS Web server authentication
-- Key usage bits that may be consistent: digitalSignature,
--                      keyEncipherment or keyAgreement
--
id-kp-clientAuth            OBJECT IDENTIFIER ::=   {id-kp 2}
-- TLS Web client authentication
-- Key usage bits that may be consistent: digitalSignature and/or
--                      keyAgreement
--
id-kp-codeSigning           OBJECT IDENTIFIER ::=   {id-kp 3}
-- Signing of downloadable executable code
-- Key usage bits that may be consistent: digitalSignature
--
id-kp-emailProtection       OBJECT IDENTIFIER ::=   {id-kp 4}
-- E-mail protection
-- Key usage bits that may be consistent: digitalSignature,
--                      nonRepudiation, and/or (keyEncipherment
--                      or keyAgreement)
--
id-kp-timeStamping    OBJECT IDENTIFIER ::= { id-kp 8 }
-- Binding the hash of an object to a time from an agreed-upon time
-- source. Key usage bits that may be consistent: digitalSignature,
--                      nonRepudiation
```

4.2.1.14  CRL Distribution Points

   The CRL distribution points extension identifies how CRL information
   is obtained.  The extension SHOULD be non-critical, but this profile
   recommends support for this extension by CAs and applications.
   Further discussion of CRL management is contained in section 5.

   If the cRLDistributionPoints extension contains a
   DistributionPointName of type URI, the following semantics MUST be
   assumed: the URI is a pointer to the current CRL for the associated
   reasons and will be issued by the associated cRLIssuer.  The expected
   values for the URI are those defined in 4.2.1.7. Processing rules for
   other values are not defined by this specification.  If the
   distributionPoint omits reasons, the CRL MUST include revocations for
   all reasons. If the distributionPoint omits cRLIssuer, the CRL MUST
   be issued by the CA that issued the certificate.

   id-ce-cRLDistributionPoints OBJECT IDENTIFIER ::=  { id-ce 31 }

   cRLDistributionPoints ::= {
        CRLDistPointsSyntax }

   CRLDistPointsSyntax ::= SEQUENCE SIZE (1..MAX) OF DistributionPoint

   DistributionPoint ::= SEQUENCE {
        distributionPoint       [0]     DistributionPointName OPTIONAL,
        reasons                 [1]     ReasonFlags OPTIONAL,
        cRLIssuer               [2]     GeneralNames OPTIONAL }

   DistributionPointName ::= CHOICE {
        fullName                [0]     GeneralNames,
        nameRelativeToCRLIssuer [1]     RelativeDistinguishedName }

   ReasonFlags ::= BIT STRING {
        unused                  (0),
        keyCompromise           (1),
        cACompromise            (2),
        affiliationChanged      (3),
        superseded              (4),
        cessationOfOperation    (5),
        certificateHold         (6) }

4.2.2  Private Internet Extensions

   This section defines one new extension for use in the Internet Public
   Key Infrastructure.  This extension may be used to direct
   applications to identify an on-line validation service supporting the
   issuing CA.  As the information may be available in multiple forms,
   each extension is a sequence of IA5String values, each of which
   represents a URI.  The URI implicitly specifies the location and
   format of the information and the method for obtaining the
   information.

An object identifier is defined for the private extension.  The
object identifier associated with the private extension is defined
under the arc id-pe within the id-pkix name space.  Any future
extensions defined for the Internet PKI will also be defined under
the arc id-pe.

```
    id-pkix  OBJECT IDENTIFIER  ::=
             { iso(1) identified-organization(3) dod(6) internet(1)
                  security(5) mechanisms(5) pkix(7) }

    id-pe  OBJECT IDENTIFIER  ::=  { id-pkix 1 }
```

4.2.2.1  Authority Information Access

The authority information access extension indicates how to access CA
information and services for the issuer of the certificate in which
the extension appears. Information and services may include on-line
validation services and CA policy data.  (The location of CRLs is not
specified in this extension; that information is provided by the
cRLDistributionPoints extension.)  This extension may be included in
subject or CA certificates, and it MUST be non-critical.

```
id-pe-authorityInfoAccess OBJECT IDENTIFIER ::= { id-pe 1 }

AuthorityInfoAccessSyntax  ::=
        SEQUENCE SIZE (1..MAX) OF AccessDescription

AccessDescription  ::=  SEQUENCE {
        accessMethod         OBJECT IDENTIFIER,
        accessLocation       GeneralName   }

id-ad OBJECT IDENTIFIER ::= { id-pkix 48 }

id-ad-caIssuers OBJECT IDENTIFIER ::= { id-ad 2 }
```

Each entry in the sequence AuthorityInfoAccessSyntax describes the
format and location of additional information about the CA who issued
the certificate in which this extension appears.  The type and format
of the information is specified by the accessMethod field; the
accessLocation field specifies the location of the information.  The
retrieval mechanism may be implied by the accessMethod or specified
by accessLocation.

This profile defines one OID for accessMethod. The id-ad-caIssuers
OID is used when the additional information lists CAs that have
issued certificates superior to the CA that issued the certificate

containing this extension.  The referenced CA Issuers description is
intended to aid certificate users in the selection of a certification
path that terminates at a point trusted by the certificate user.

When id-ad-caIssuers appears as accessInfoType, the accessLocation
field describes the referenced description server and the access
protocol to obtain the referenced description.  The accessLocation
field is defined as a GeneralName, which can take several forms.
Where the information is available via http, ftp, or ldap,
accessLocation MUST be a uniformResourceIdentifier.  Where the
information is available via the directory access protocol (dap),
accessLocation MUST be a directoryName. When the information is
available via electronic mail, accessLocation MUST be an rfc822Name.
The semantics of other name forms of accessLocation (when
accessMethod is id-ad-caIssuers) are not defined by this
specification.

Additional access descriptors may be defined in other PKIX
specifications.

5   CRL and CRL Extensions Profile

As described above, one goal of this X.509 v2 CRL profile is to
foster the creation of an interoperable and reusable Internet PKI.
To achieve this goal, guidelines for the use of extensions are
specified, and some assumptions are made about the nature of
information included in the CRL.

CRLs may be used in a wide range of applications and environments
covering a broad spectrum of interoperability goals and an even
broader spectrum of operational and assurance requirements.  This
profile establishes a common baseline for generic applications
requiring broad interoperability.  The profile defines a baseline set
of information that can be expected in every CRL.  Also, the profile
defines common locations within the CRL for frequently used
attributes as well as common representations for these attributes.

This profile does not define any private Internet CRL extensions or
CRL entry extensions.

Environments with additional or special purpose requirements may
build on this profile or may replace it.

Conforming CAs are not required to issue CRLs if other revocation or
certificate status mechanisms are provided.  Conforming CAs that
issue CRLs MUST issue version 2 CRLs, and CAs MUST include the date
by which the next CRL will be issued in the nextUpdate field (see

```
    sec. 5.1.2.5), the CRL number extension (see sec. 5.2.3) and the
    authority key identifier extension (see sec. 5.2.1).  Conforming
    applications are required to process version 1 and 2 CRLs.
```

5.1  CRL Fields

```
    The X.509 v2 CRL syntax is as follows.  For signature calculation,
    the data that is to be signed is ASN.1 DER encoded.  ASN.1 DER
    encoding is a tag, length, value encoding system for each element.

    CertificateList  ::=  SEQUENCE  {
         tbsCertList          TBSCertList,
         signatureAlgorithm   AlgorithmIdentifier,
         signatureValue       BIT STRING  }

    TBSCertList  ::=  SEQUENCE  {
         version                 Version OPTIONAL,
                                      -- if present, shall be v2
         signature               AlgorithmIdentifier,
         issuer                  Name,
         thisUpdate              Time,
         nextUpdate              Time OPTIONAL,
         revokedCertificates     SEQUENCE OF SEQUENCE  {
              userCertificate         CertificateSerialNumber,
              revocationDate          Time,
              crlEntryExtensions      Extensions OPTIONAL
                                           -- if present, shall be v2
                                 }  OPTIONAL,
         crlExtensions           [0]  EXPLICIT Extensions OPTIONAL
                                           -- if present, shall be v2
                                 }

    -- Version, Time, CertificateSerialNumber, and Extensions
    -- are all defined in the ASN.1 in section 4.1

    -- AlgorithmIdentifier is defined in section 4.1.1.2
```

```
    The following items describe the use of the X.509 v2 CRL in the
    Internet PKI.
```

5.1.1  CertificateList Fields

```
    The CertificateList is a SEQUENCE of three required fields. The
    fields are described in detail in the following subsections.
```

5.1.1.1  tbsCertList

     The first field in the sequence is the tbsCertList.  This field is
     itself a sequence containing the name of the issuer, issue date,
     issue date of the next list, the list of revoked certificates, and
     optional CRL extensions.  Further, each entry on the revoked
     certificate list is defined by a sequence of user certificate serial
     number, revocation date, and optional CRL entry extensions.

5.1.1.2  signatureAlgorithm

     The signatureAlgorithm field contains the algorithm identifier for
     the algorithm used by the CA to sign the CertificateList.  The field
     is of type AlgorithmIdentifier, which is defined in section 4.1.1.2.
     Section 7.2 lists the supported algorithms for this specification.
     Conforming CAs MUST use the algorithm identifiers presented in
     section 7.2 when signing with a supported signature algorithm.

     This field MUST contain the same algorithm identifier as the
     signature field in the sequence tbsCertList (see sec. 5.1.2.2).

5.1.1.3  signatureValue

     The signatureValue field contains a digital signature computed upon
     the ASN.1 DER encoded tbsCertList.  The ASN.1 DER encoded tbsCertList
     is used as the input to the signature function. This signature value
     is then ASN.1 encoded as a BIT STRING and included in the CRL's
     signatureValue field. The details of this process are specified for
     each of the supported algorithms in section 7.2.

5.1.2  Certificate List "To Be Signed"

     The certificate list to be signed, or TBSCertList, is a SEQUENCE of
     required and optional fields.  The required fields identify the CRL
     issuer, the algorithm used to sign the CRL, the date and time the CRL
     was issued, and the date and time by which the CA will issue the next
     CRL.

     Optional fields include lists of revoked certificates and CRL
     extensions.  The revoked certificate list is optional to support the
     case where a CA has not revoked any unexpired certificates that it
     has issued.  The profile requires conforming CAs to use the CRL
     extension cRLNumber in all CRLs issued.

5.1.2.1  Version

   This optional field describes the version of the encoded CRL.  When
   extensions are used, as required by this profile, this field MUST be
   present and MUST specify version 2 (the integer value is 1).

5.1.2.2  Signature

   This field contains the algorithm identifier for the algorithm used
   to sign the CRL.  Section 7.2 lists OIDs for the most popular
   signature algorithms used in the Internet PKI.

   This field MUST contain the same algorithm identifier as the
   signatureAlgorithm field in the sequence CertificateList (see section
   5.1.1.2).

5.1.2.3  Issuer Name

   The issuer name identifies the entity who has signed and issued the
   CRL.  The issuer identity is carried in the issuer name field.
   Alternative name forms may also appear in the issuerAltName extension
   (see sec. 5.2.2).  The issuer name field MUST contain an X.500
   distinguished name (DN).  The issuer name field is defined as the
   X.501 type Name, and MUST follow the encoding rules for the issuer
   name field in the certificate (see sec. 4.1.2.4).

5.1.2.4  This Update

   This field indicates the issue date of this CRL. ThisUpdate may be
   encoded as UTCTime or GeneralizedTime.

   CAs conforming to this profile that issue CRLs MUST encode thisUpdate
   as UTCTime for dates through the year 2049. CAs conforming to this
   profile that issue CRLs MUST encode thisUpdate as GeneralizedTime for
   dates in the year 2050 or later.

   Where encoded as UTCTime, thisUpdate MUST be specified and
   interpreted as defined in section 4.1.2.5.1.  Where encoded as
   GeneralizedTime, thisUpdate MUST be specified and interpreted as
   defined in section 4.1.2.5.2.

5.1.2.5  Next Update

   This field indicates the date by which the next CRL will be issued.
   The next CRL could be issued before the indicated date, but it will
   not be issued any later than the indicated date. CAs SHOULD issue
   CRLs with a nextUpdate time equal to or later than all previous CRLs.
   nextUpdate may be encoded as UTCTime or GeneralizedTime.

This profile requires inclusion of nextUpdate in all CRLs issued by
conforming CAs. Note that the ASN.1 syntax of TBSCertList describes
this field as OPTIONAL, which is consistent with the ASN.1 structure
defined in [X.509]. The behavior of clients processing CRLs which
omit nextUpdate is not specified by this profile.

CAs conforming to this profile that issue CRLs MUST encode nextUpdate
as UTCTime for dates through the year 2049. CAs conforming to this
profile that issue CRLs MUST encode nextUpdate as GeneralizedTime for
dates in the year 2050 or later.

Where encoded as UTCTime, nextUpdate MUST be specified and
interpreted as defined in section 4.1.2.5.1.  Where encoded as
GeneralizedTime, nextUpdate MUST be specified and interpreted as
defined in section 4.1.2.5.2.

5.1.2.6  Revoked Certificates

Revoked certificates are listed.  The revoked certificates are named
by their serial numbers.  Certificates revoked by the CA are uniquely
identified by the certificate serial number.  The date on which the
revocation occurred is specified.  The time for revocationDate MUST
be expressed as described in section 5.1.2.4. Additional information
may be supplied in CRL entry extensions; CRL entry extensions are
discussed in section 5.3.

5.1.2.7  Extensions

This field may only appear if the version is 2 (see sec. 5.1.2.1).
If present, this field is a SEQUENCE of one or more CRL extensions.
CRL extensions are discussed in section 5.2.

5.2  CRL Extensions

The extensions defined by ANSI X9 and ISO/IEC/ITU for X.509 v2 CRLs
[X.509] [X9.55] provide methods for associating additional attributes
with CRLs.  The X.509 v2 CRL format also allows communities to define
private extensions to carry information unique to those communities.
Each extension in a CRL may be designated as critical or non-
critical.  A CRL validation MUST fail if it encounters a critical
extension which it does not know how to process.  However, an
unrecognized non-critical extension may be ignored.  The following
subsections present those extensions used within Internet CRLs.
Communities may elect to include extensions in CRLs which are not
defined in this specification. However, caution should be exercised
in adopting any critical extensions in CRLs which might be used in a
general context.

Conforming CAs that issue CRLs are required to include the authority
key identifier (see sec. 5.2.1) and the CRL number (see sec. 5.2.3)
extensions in all CRLs issued.

5.2.1  Authority Key Identifier

The authority key identifier extension provides a means of
identifying the public key corresponding to the private key used to
sign a CRL.  The identification can be based on either the key
identifier (the subject key identifier in the CRL signer's
certificate) or on the issuer name and serial number. This extension
is especially useful where an issuer has more than one signing key,
either due to multiple concurrent key pairs or due to changeover.

Conforming CAs MUST use the key identifier method, and MUST include
this extension in all CRLs issued.

The syntax for this CRL extension is defined in section 4.2.1.1.

5.2.2  Issuer Alternative Name

The issuer alternative names extension allows additional identities
to be associated with the issuer of the CRL.  Defined options include
an rfc822 name (electronic mail address), a DNS name, an IP address,
and a URI.  Multiple instances of a name and multiple name forms may
be included.  Whenever such identities are used, the issuer
alternative name extension MUST be used.

The issuerAltName extension SHOULD NOT be marked critical.

The OID and syntax for this CRL extension are defined in section
4.2.1.8.

5.2.3  CRL Number

The CRL number is a non-critical CRL extension which conveys a
monotonically increasing sequence number for each CRL issued by a CA.
This extension allows users to easily determine when a particular CRL
supersedes another CRL.  CAs conforming to this profile MUST include
this extension in all CRLs.

    id-ce-cRLNumber OBJECT IDENTIFIER ::= { id-ce 20 }

    cRLNumber ::= INTEGER (0..MAX)

5.2.4  Delta CRL Indicator

   The delta CRL indicator is a critical CRL extension that identifies a
   delta-CRL.  The use of delta-CRLs can significantly improve
   processing time for applications which store revocation information
   in a format other than the CRL structure.  This allows changes to be
   added to the local database while ignoring unchanged information that
   is already in the local database.

   When a delta-CRL is issued, the CAs MUST also issue a complete CRL.

   The value of BaseCRLNumber identifies the CRL number of the base CRL
   that was used as the starting point in the generation of this delta-
   CRL.  The delta-CRL contains the changes between the base CRL and the
   current CRL issued along with the delta-CRL.  It is the decision of a
   CA as to whether to provide delta-CRLs.  Again, a delta-CRL MUST NOT
   be issued without a corresponding complete CRL.  The value of
   CRLNumber for both the delta-CRL and the corresponding complete CRL
   MUST be identical.

   A CRL user constructing a locally held CRL from delta-CRLs MUST
   consider the constructed CRL incomplete and unusable if the CRLNumber
   of the received delta-CRL is more than one greater than the CRLnumber
   of the delta-CRL last processed.

   id-ce-deltaCRLIndicator OBJECT IDENTIFIER ::= { id-ce 27 }

   deltaCRLIndicator ::= BaseCRLNumber

   BaseCRLNumber ::= CRLNumber

5.2.5  Issuing Distribution Point

   The issuing distribution point is a critical CRL extension that
   identifies the CRL distribution point for a particular CRL, and it
   indicates whether the CRL covers revocation for end entity
   certificates only, CA  certificates only, or a limited set of reason
   codes.  Although the extension is critical, conforming
   implementations are not required to support this extension.

   The CRL is signed using the CA's private key.  CRL Distribution
   Points do not have their own key pairs.  If the CRL is stored in the
   X.500 Directory, it is stored in the Directory entry corresponding to
   the CRL distribution point, which may be different than the Directory
   entry of the CA.

The reason codes associated with a distribution point shall be
specified in onlySomeReasons. If onlySomeReasons does not appear, the
distribution point shall contain revocations for all reason codes.
CAs may use CRL distribution points to partition the CRL on the basis
of compromise and routine revocation.  In this case, the revocations
with reason code keyCompromise (1) and cACompromise (2) appear in one
distribution point, and the revocations with other reason codes
appear in another distribution point.

Where the issuingDistributionPoint extension contains a URL, the
following semantics MUST be assumed: the object is a pointer to the
most current CRL issued by this CA.  The URI schemes ftp, http,
mailto [RFC1738] and ldap [RFC1778] are defined for this purpose.
The URI MUST be an absolute, not relative, pathname and MUST specify
the host.

id-ce-issuingDistributionPoint OBJECT IDENTIFIER ::= { id-ce 28 }

issuingDistributionPoint ::= SEQUENCE {
     distributionPoint       [0] DistributionPointName OPTIONAL,
     onlyContainsUserCerts   [1] BOOLEAN DEFAULT FALSE,
     onlyContainsCACerts     [2] BOOLEAN DEFAULT FALSE,
     onlySomeReasons         [3] ReasonFlags OPTIONAL,
     indirectCRL             [4] BOOLEAN DEFAULT FALSE }

## 5.3  CRL Entry Extensions

The CRL entry extensions already defined by ANSI X9 and ISO/IEC/ITU
for X.509 v2 CRLs provide methods for associating additional
attributes with CRL entries [X.509] [X9.55].  The X.509 v2 CRL format
also allows communities to define private CRL entry extensions to
carry information unique to those communities.  Each extension in a
CRL entry may be designated as critical or non-critical.  A CRL
validation MUST fail if it encounters a critical CRL entry extension
which it does not know how to process.  However, an unrecognized
non-critical CRL entry extension may be ignored.  The following
subsections present recommended extensions used within Internet CRL
entries and standard locations for information.  Communities may
elect to use additional CRL entry extensions; however, caution should
be exercised in adopting any critical extensions in CRL entries which
might be used in a general context.

All CRL entry extensions used in this specification are non-critical.
Support for these extensions is optional for conforming CAs and
applications.  However, CAs that issue CRLs SHOULD include reason
codes (see sec. 5.3.1) and invalidity dates (see sec. 5.3.3) whenever
this information is available.

5.3.1  Reason Code

    The reasonCode is a non-critical CRL entry extension that identifies
    the reason for the certificate revocation. CAs are strongly
    encouraged to include meaningful reason codes in CRL entries;
    however, the reason code CRL entry extension SHOULD be absent instead
    of using the unspecified (0) reasonCode value.

    id-ce-cRLReason OBJECT IDENTIFIER ::= { id-ce 21 }

    -- reasonCode ::= { CRLReason }

    CRLReason ::= ENUMERATED {
          unspecified             (0),
          keyCompromise           (1),
          cACompromise            (2),
          affiliationChanged      (3),
          superseded              (4),
          cessationOfOperation    (5),
          certificateHold         (6),
          removeFromCRL           (8) }

5.3.2  Hold Instruction Code

    The hold instruction code is a non-critical CRL entry extension that
    provides a registered instruction identifier which indicates the
    action to be taken after encountering a certificate that has been
    placed on hold.

    id-ce-holdInstructionCode OBJECT IDENTIFIER ::= { id-ce 23 }

    holdInstructionCode ::= OBJECT IDENTIFIER

    The following instruction codes have been defined.  Conforming
    applications that process this extension MUST recognize the following
    instruction codes.

    holdInstruction    OBJECT IDENTIFIER ::=
                    { iso(1) member-body(2) us(840) x9-57(10040) 2 }

    id-holdinstruction-none   OBJECT IDENTIFIER ::= {holdInstruction 1}
    id-holdinstruction-callissuer
                         OBJECT IDENTIFIER ::= {holdInstruction 2}
    id-holdinstruction-reject OBJECT IDENTIFIER ::= {holdInstruction 3}

    Conforming applications which encounter an id-holdinstruction-
    callissuer MUST call the certificate issuer or reject the
    certificate.  Conforming applications which encounter an id-

holdinstruction-reject MUST reject the certificate. The hold
instruction id-holdinstruction-none is semantically equivalent to the
absence of a holdInstructionCode, and its use is strongly deprecated
for the Internet PKI.

5.3.3  Invalidity Date

The invalidity date is a non-critical CRL entry extension that
provides the date on which it is known or suspected that the private
key was compromised or that the certificate otherwise became invalid.
This date may be earlier than the revocation date in the CRL entry,
which is the date at which the CA processed the revocation. When a
revocation is first posted by a CA in a CRL, the invalidity date may
precede the date of issue of earlier CRLs, but the revocation date
SHOULD NOT precede the date of issue of earlier CRLs.  Whenever this
information is available, CAs are strongly encouraged to share it
with CRL users.

The GeneralizedTime values included in this field MUST be expressed
in Greenwich Mean Time (Zulu), and MUST be specified and interpreted
as defined in section 4.1.2.5.2.

    id-ce-invalidityDate OBJECT IDENTIFIER ::= { id-ce 24 }

    invalidityDate ::=  GeneralizedTime

5.3.4  Certificate Issuer

This CRL entry extension identifies the certificate issuer associated
with an entry in an indirect CRL, i.e. a CRL that has the indirectCRL
indicator set in its issuing distribution point extension. If this
extension is not present on the first entry in an indirect CRL, the
certificate issuer defaults to the CRL issuer. On subsequent entries
in an indirect CRL, if this extension is not present, the certificate
issuer for the entry is the same as that for the preceding entry.
This field is defined as follows:

    id-ce-certificateIssuer   OBJECT IDENTIFIER ::= { id-ce 29 }

    certificateIssuer ::=     GeneralNames

If used by conforming CAs that issue CRLs, this extension is always
critical.  If an implementation ignored this extension it could not
correctly attribute CRL entries to certificates.  This specification
RECOMMENDS that implementations recognize this extension.

6  Certification Path Validation

   Certification path validation procedures for the Internet PKI are
   based on section 12.4.3 of [X.509].  Certification path processing
   verifies the binding between the subject distinguished name and/or
   subject alternative name and subject public key.  The binding is
   limited by constraints which are specified in the certificates which
   comprise the path. The basic constraints and policy constraints
   extensions allow the certification path processing logic to automate
   the decision making process.

   This section describes an algorithm for validating certification
   paths.  Conforming implementations of this specification are not
   required to implement this algorithm, but MUST be functionally
   equivalent to the external behavior resulting from this procedure.
   Any algorithm may be used by a particular implementation so long as
   it derives the correct result.

   In section 6.1, the text describes basic path validation. This text
   assumes that all valid paths begin with certificates issued by a
   single "most-trusted CA". The algorithm requires the public key of
   the CA, the CA's name, the validity period of the public key, and any
   constraints upon the set of paths which may be validated using this
   key.

   The "most-trusted CA" is a matter of policy: it could be a root CA in
   a hierarchical PKI; the CA that issued the verifier's own
   certificate(s); or any other CA in a network PKI.  The path
   validation procedure is the same regardless of the choice of "most-
   trusted CA."

   section 6.2 describes extensions to the basic path validation
   algorithm. Two specific cases are discussed: the case where paths may
   begin with one of several trusted CAs; and where compatibility with
   the PEM architecture is required.

6.1 Basic Path Validation

   The text assumes that the trusted public key (and related
   information) is contained in a "self-signed" certificate. This
   simplifies the description of the path processing procedure.  Note
   that the signature on the self-signed certificate does not provide
   any security services.  The trusted public key (and related
   information) may be obtained in other formats; the information is
   trusted because of other procedures used to obtain and protect it.

The goal of path validation is to verify the binding between a
subject distinguished name or subject alternative name and subject
public key, as represented in the "end entity" certificate, based on
the public key of the "most-trusted CA".  This requires obtaining a
sequence of certificates that support that binding.  The procedures
performed to obtain this sequence is outside the scope of this
section.

The following text also assumes that certificates do not use subject
or unique identifier fields or private critical extensions, as
recommended within this profile.  However, if these components appear
in certificates, they MUST be processed.  Finally, policy qualifiers
are also neglected for the sake of clarity.

A certification path is a sequence of n certificates where:

    * for all x in {1,(n-1)}, the subject of certificate x is the
    issuer of certificate x+1.
    * certificate x=1 is the the self-signed certificate, and
    * certificate x=n is the end entity certificate.

This section assumes the following inputs are provided to the path
processing logic:

    (a)  a certification path of length n;

    (b)  a set of initial policy identifiers (each comprising a
    sequence of policy element identifiers), which identifies one or
    more certificate policies, any one of which would be acceptable
    for the purposes of certification path processing, or the special
    value "any-policy";

    (c)  the current date/time (if not available internally to the
    certification path processing module); and

    (d)  the time, T, for which the validity of the path should be
    determined.  (This may be the current date/time, or some point in
    the past.)

From the inputs, the procedure intializes five state variables:

    (a)  acceptable policy set:  A set of certificate policy
    identifiers comprising the policy or policies recognized by the
    public key user together with policies deemed equivalent through
    policy mapping. The initial value of the acceptable policy set is
    the special value "any-policy".

(b)  constrained subtrees:  A set of root names defining a set of
subtrees within which all subject names in subsequent certificates
in the certification path shall fall. The initial value is
"unbounded".

(c)  excluded subtrees:  A set of root names defining a set of
subtrees within which no subject name in subsequent certificates
in the certification path may fall. The initial value is "empty".

(d)  explicit policy: an integer which indicates if an explicit
policy identifier is required. The integer indicates the first
certificate in the path where this requirement is imposed. Once
set, this variable may be decreased, but may not be increased.
(That is, if a certificate in the path requires explicit policy
identifiers, a later certificate can not remove this requirement.)
The initial value is n+1.

(e)  policy mapping: an integer which indicates if policy mapping
is permitted.  The integer indicates the last certificate on which
policy mapping may be applied.  Once set, this variable may be
decreased, but may not be increased. (That is, if a certificate in
the path specifies policy mapping is not permitted, it can not be
overriden by a later certificate.) The initial value is n+1.


The actions performed by the path processing software for each
certificate i=1 through n are described below.  The self-signed
certificate is certificate i=1, the end entity certificate is i=n.
The processing is performed sequentially, so that processing
certificate i affects the state variables for processing certificate
(i+1). Note that actions (h) through (m) are not applied to the end
entity certificate (certificate n).

The path processing actions to be performed are:

(a)  Verify the basic certificate information, including:

   (1) the certificate was signed using the subject public key
   from certificate i-1 (in the special case i=1, this step may be
   omitted; if not, use the subject public key from the same
   certificate),

   (2) the certificate validity period includes time T,

   (3) the certificate had not been revoked at time T and is not
   currently on hold status that commenced before time T, (this
   may be determined by obtaining the appropriate CRL or status
   information, or by out-of-band mechanisms), and

(4) the subject and issuer names chain correctly (that is, the
issuer of this certificate was the subject of the previous
certificate.)

(b)   Verify that the subject name and subjectAltName extension
(critical or noncritical) is consistent with the constrained
subtrees state variables.

(c)   Verify that the subject name and subjectAltName extension
(critical or noncritical) is consistent with the excluded subtrees
state variables.

(d)   Verify that policy information is consistent with the initial
policy set:

   (1) if the explicit policy state variable is less than or equal
   to i, a policy identifier in the certificate shall be in the
   initial policy set; and

   (2) if the policy mapping variable is less than or equal to i,
   the policy identifier may not be mapped.

(e)   Verify that policy information is consistent with the
acceptable policy set:

   (1) if the certificate policies extension is marked critical,
   the intersection of the policies extension and the acceptable
   policy set shall be non-null;

   (2) the acceptable policy set is assigned the resulting
   intersection as its new value.

(g) Verify that the intersection of the acceptable policy set and
the initial policy set is non-null.

(h)   Recognize and process any other critical extension present in
the certificate.

(i) Verify that the certificate is a CA certificate (as specified
in a basicConstraints extension or as verified out-of-band).

(j)   If permittedSubtrees is present in the certificate, set the
constrained subtrees state variable to the intersection of its
previous value and the value indicated in the extension field.

(k)   If excludedSubtrees is present in the certificate, set the
excluded subtrees state variable to the union of its previous
value and the value indicated in the extension field.

(1)  If a policy constraints extension is included in the
certificate, modify the explicit policy and policy mapping state
variables as follows:

  (1) If requireExplicitPolicy is present and has value r, the
  explicit policy state variable is set to the minimum of its
  current value and the sum of r and i (the current certificate
  in the sequence).

  (2) If inhibitPolicyMapping is present and has value q, the
  policy mapping state variable is set to the minimum of its
  current value and the sum of q and i (the current certificate
  in the sequence).

(m) If a key usage extension is marked critical, ensure the
keyCertSign bit is set.

If any one of the above checks fail, the procedure terminates,
returning a failure indication and an appropriate reason.  If none of
the above checks fail on the end-entity certificate, the procedure
terminates, returning a success indication together with the set of
all policy qualifier values encountered in the set of certificates.

6.2 Extending Path Validation

The path validation algorithm presented in 6.1 is based on several
simplifying assumptions (e.g., a single trusted CA that starts all
valid paths). This algorithm may be extended for cases where the
assumptions do not hold.

This procedure may be extended for multiple trusted CAs by providing
a set of self-signed certificates to the validation module.  In this
case, a valid path could begin with any one of the self-signed
certificates.  Limitations in the trust paths for any particular key
may be incorporated into the self-signed certificate's extensions. In
this way, the self-signed certificates permit the path validation
module to automatically incorporate local security policy and
requirements.

It is also possible to specify an extended version of the above
certification path processing procedure which results in default
behavior identical to the rules of PEM [RFC 1422].  In this extended
version, additional inputs to the procedure are a list of one or more
Policy Certification Authorities (PCAs) names and an indicator of the
position in the certification path where the PCA is expected.  At the
nominated PCA position, the CA name is compared against this list.
If a recognized PCA name is found, then a constraint of
SubordinateToCA is implicitly assumed for the remainder of the

certification path and processing continues.  If no valid PCA name is
found, and if the certification path cannot be validated on the basis
of identified policies, then the certification path is considered
invalid.

7  Algorithm Support

This section describes cryptographic algorithms which may be used
with this profile.  The section describes one-way hash functions and
digital signature algorithms which may be used to sign certificates
and CRLs, and identifies OIDs for public keys contained in a
certificate.

Conforming CAs and applications are not required to support the
algorithms or algorithm identifiers described in this section.
However, conforming CAs and applications that use the algorithms
identified here MUST support them as specified.

7.1  One-way Hash Functions

This section identifies one-way hash functions for use in the
Internet PKI.  One-way hash functions are also called message digest
algorithms. SHA-1 is the preferred one-way hash function for the
Internet PKI.  However, PEM uses MD2 for certificates [RFC 1422] [RFC
1423] and MD5 is used in other legacy applications.  For this reason,
MD2 and MD5 are included in this profile.

7.1.1  MD2 One-way Hash Function

MD2 was developed by Ron Rivest for RSA Data Security. RSA Data
Security has not placed the MD2 algorithm in the public domain.
Rather, RSA Data Security has granted license to use MD2 for non-
commercial Internet Privacy-Enhanced Mail.  For this reason, MD2 may
continue to be used with PEM certificates, but SHA-1 is preferred.
MD2 produces a 128-bit "hash" of the input.  MD2 is fully described
in RFC 1319 [RFC 1319].

At the Selected Areas in Cryptography '95 conference in May 1995,
Rogier and Chauvaud presented an attack on MD2 that can nearly find
collisions [RC95].  Collisions occur when one can find two different
messages that generate the same message digest.  A checksum operation
in MD2 is the only remaining obstacle to the success of the attack.
For this reason, the use of MD2 for new applications is discouraged.
It is still reasonable to use MD2 to verify existing signatures, as
the ability to find collisions in MD2 does not enable an attacker to
find new messages having a previously computed hash value.

7.1.2  MD5 One-way Hash Function

   MD5 was developed by Ron Rivest for RSA Data Security. RSA Data
   Security has placed the MD5 algorithm in the public domain.  MD5
   produces a 128-bit "hash" of the input.  MD5 is fully described in
   RFC 1321 [RFC 1321].

   Den Boer and Bosselaers [DB94] have found pseudo-collisions for MD5,
   but there are no other known cryptanalytic results.  The use of MD5
   for new applications is discouraged.  It is still reasonable to use
   MD5 to verify existing signatures.

7.1.3  SHA-1 One-way Hash Function

   SHA-1 was developed by the U.S. Government.  SHA-1 produces a 160-bit
   "hash" of the input. SHA-1 is fully described in FIPS 180-1 [FIPS
   180-1].

   SHA-1 is the one-way hash function of choice for use with both the
   RSA and DSA signature algorithms (see sec. 7.2).

7.2  Signature Algorithms

   Certificates and CRLs described by this standard may be signed with
   any public key signature algorithm.  The certificate or CRL indicates
   the algorithm through an algorithm identifier which appears in the
   signatureAlgorithm field in a Certificate or CertificateList.  This
   algorithm identifier is an OID and has optionally associated
   parameters.  This section identifies algorithm identifiers and
   parameters that shall be used in the signatureAlgorithm field in a
   Certificate or CertificateList.

   RSA and DSA are the most popular signature algorithms used in the
   Internet.  Signature algorithms are always used in conjunction with a
   one-way hash function identified in section 7.1.

   The signature algorithm and one-way hash function used to sign a
   certificate or CRL is indicated by use of an algorithm identifier.
   An algorithm identifier is an OID, and may include associated
   parameters.  This section identifies OIDS for RSA and DSA.  The
   contents of the parameters component for each algorithm vary; details
   are provided for each algorithm.

   The data to be signed (e.g., the one-way hash function output value)
   is formatted for the signature algorithm to be used.  Then, a private
   key operation (e.g., RSA encryption) is performed to generate the

signature value.  This signature value is then ASN.1 encoded as a BIT
STRING and included in the Certificate or CertificateList in the
signature field.

7.2.1  RSA Signature Algorithm

   A patent statement regarding the RSA algorithm can be found at the
   end of this profile.

   The RSA algorithm is named for its inventors: Rivest, Shamir, and
   Adleman.  This profile includes three signature algorithms based on
   the RSA asymmetric encryption algorithm. The signature algorithms
   combine RSA with either the MD2, MD5, or the SHA-1 one-way hash
   functions.

   The signature algorithm with MD2 and the RSA encryption algorithm is
   defined in PKCS #1 [RFC 2313].  As defined in RFC 2313, the ASN.1 OID
   used to identify this signature algorithm is:

        md2WithRSAEncryption OBJECT IDENTIFIER  ::=  {
            iso(1) member-body(2) us(840) rsadsi(113549) pkcs(1)
            pkcs-1(1) 2  }

   The signature algorithm with MD5 and the RSA encryption algorithm is
   defined in PKCS #1 [RFC 2313].  As defined in RFC 2313, the ASN.1 OID
   used to identify this signature algorithm is:

        md5WithRSAEncryption OBJECT IDENTIFIER  ::=  {
            iso(1) member-body(2) us(840) rsadsi(113549) pkcs(1)
            pkcs-1(1) 4  }

   The signature algorithm with SHA-1 and the RSA encryption algorithm
   is implemented using the padding and encoding conventions described
   in PKCS #1 [RFC 2313]. The message digest is computed using the SHA-1
   hash algorithm.   The ASN.1 object identifier used to identify this
   signature algorithm is:

        sha-1WithRSAEncryption OBJECT IDENTIFIER  ::=  {
            iso(1) member-body(2) us(840) rsadsi(113549) pkcs(1)
            pkcs-1(1) 5  }

   When any of these three OIDs appears within the ASN.1 type
   AlgorithmIdentifier, the parameters component of that type shall be
   the ASN.1 type NULL.

   The RSA signature generation process and the encoding of the result
   is described in detail in RFC 2313.

7.2.2  DSA Signature Algorithm

   A patent statement regarding the DSA can be found at the end of this
   profile.

   The Digital Signature Algorithm (DSA) is also called the Digital
   Signature Standard (DSS).  DSA was developed by the U.S. Government,
   and DSA is used in conjunction with the the SHA-1 one-way hash
   function.  DSA is fully described in FIPS 186 [FIPS 186].  The ASN.1
   OIDs used to identify this signature algorithm are:

            id-dsa-with-sha1 ID  ::=  {
                    iso(1) member-body(2) us(840) x9-57 (10040)
                    x9cm(4) 3 }

   Where the id-dsa-with-sha1 algorithm identifier appears as the
   algorithm field in an AlgorithmIdentifier, the encoding shall omit
   the parameters field.  That is, the AlgorithmIdentifier shall be a
   SEQUENCE of one component - the OBJECT IDENTIFIER id-dsa-with-sha1.

   The DSA parameters in the subjectPublicKeyInfo field of the
   certificate of the issuer shall apply to the verification of the
   signature.

   When signing, the DSA algorithm generates two values.  These values
   are commonly referred to as r and s.  To easily transfer these two
   values as one signature, they shall be ASN.1 encoded using the
   following ASN.1 structure:

            Dss-Sig-Value  ::=  SEQUENCE  {
                    r         INTEGER,
                    s         INTEGER  }

7.3  Subject Public Key Algorithms

   Certificates described by this profile may convey a public key for
   any public key algorithm. The certificate indicates the algorithm
   through an algorithm identifier.  This algorithm identifier is an OID
   and optionally associated parameters.

   This section identifies preferred OIDs and parameters for the RSA,
   DSA, and Diffie-Hellman algorithms.  Conforming CAs shall use the
   identified OIDs when issuing certificates containing public keys for
   these algorithms. Conforming applications supporting any of these
   algorithms shall, at a minimum, recognize the OID identified in this
   section.

7.3.1  RSA Keys

    The OID rsaEncryption identifies RSA public keys.

        pkcs-1 OBJECT IDENTIFIER ::= { iso(1) member-body(2) us(840)
                    rsadsi(113549) pkcs(1) 1 }

        rsaEncryption OBJECT IDENTIFIER ::=  { pkcs-1 1 }

    The rsaEncryption OID is intended to be used in the algorithm field
    of a value of type AlgorithmIdentifier. The parameters field shall
    have ASN.1 type NULL for this algorithm identifier.

    The RSA public key shall be encoded using the ASN.1 type
    RSAPublicKey:

        RSAPublicKey ::= SEQUENCE {
            modulus            INTEGER, -- n
            publicExponent     INTEGER  -- e -- }

    where modulus is the modulus n, and publicExponent is the public
    exponent e.  The DER encoded RSAPublicKey is the value of the BIT
    STRING subjectPublicKey.

    This OID is used in public key certificates for both RSA signature
    keys and RSA encryption keys. The intended application for the key
    may be indicated in the key usage field (see sec. 4.2.1.3).  The use
    of a single key for both signature and encryption purposes is not
    recommended, but is not forbidden.

    If the keyUsage extension is present in an end entity certificate
    which conveys an RSA public key, any combination of the following
    values may be present:  digitalSignature; nonRepudiation;
    keyEncipherment; and dataEncipherment.  If the keyUsage extension is
    present in a CA certificate which conveys an RSA public key, any
    combination of the following values may be present:
    digitalSignature; nonRepudiation; keyEncipherment; dataEncipherment;
    keyCertSign; and cRLSign.  However, this specification RECOMMENDS
    that if keyCertSign or cRLSign is present, both keyEncipherment and
    dataEncipherment should not be present.

7.3.2  Diffie-Hellman Key Exchange Key

    The Diffie-Hellman OID supported by this profile is defined by ANSI
    X9.42 [X9.42].

        dhpublicnumber OBJECT IDENTIFIER ::= { iso(1) member-body(2)
                us(840) ansi-x942(10046) number-type(2) 1 }

The dhpublicnumber OID is intended to be used in the algorithm field
of a value of type AlgorithmIdentifier. The parameters field of that
type, which has the algorithm-specific syntax ANY DEFINED BY
algorithm, have the ASN.1 type DomainParameters for this algorithm.

```
DomainParameters ::= SEQUENCE {
        p         INTEGER, -- odd prime, p=jq +1
        g         INTEGER, -- generator, g
        q         INTEGER, -- factor of p-1
        j         INTEGER OPTIONAL, -- subgroup factor
        validationParms  ValidationParms OPTIONAL }

ValidationParms ::= SEQUENCE {
        seed            BIT STRING,
        pgenCounter     INTEGER }
```

The fields of type DomainParameters have the following meanings:

   p identifies the prime p defining the Galois field;

   g specifies the generator of the multiplicative subgroup of order
   g;

   q specifies the prime factor of p-1;

   j optionally specifies the value that satisfies the equation
   p=jq+1 to support the optional verification of group parameters;

   seed optionally specifies the bit string parameter used as the
   seed for the system parameter generation process; and

   pgenCounter optionally specifies the integer value output as part
   of the of the system parameter prime generation process.

If either of the parameter generation components (pgencounter or
seed) is provided, the other shall be present as well.

The Diffie-Hellman public key shall be ASN.1 encoded as an INTEGER;
this encoding shall be used as the contents (i.e., the value) of the
subjectPublicKey component (a BIT STRING) of the subjectPublicKeyInfo
data element.

   DHPublicKey ::= INTEGER -- public key, y = g^x mod p

   If the keyUsage extension is present in a certificate which conveys a
   DH public key, the following values may be present:  keyAgreement;
   encipherOnly; and decipherOnly.  At most one of encipherOnly and
   decipherOnly shall be asserted in keyUsage extension.

7.3.3  DSA Signature Keys

   The Digital Signature Algorithm (DSA) is also known as the Digital
   Signature Standard (DSS). The DSA OID supported by this profile is

        id-dsa ID ::= { iso(1) member-body(2) us(840) x9-57(10040)
                 x9cm(4) 1 }

   The id-dsa algorithm syntax includes optional parameters.  These
   parameters are commonly referred to as p, q, and g.  When omitted,
   the parameters component shall be omitted entirely. That is, the
   AlgorithmIdentifier shall be a SEQUENCE of one component - the OBJECT
   IDENTIFIER id-dsa.

   If the DSA algorithm parameters are present in the
   subjectPublicKeyInfo AlgorithmIdentifier, the parameters are included
   using the following ASN.1 structure:

        Dss-Parms  ::=  SEQUENCE  {
            p               INTEGER,
            q               INTEGER,
            g               INTEGER  }


   If the DSA algorithm parameters are absent from the
   subjectPublicKeyInfo AlgorithmIdentifier and the CA signed the
   subject certificate using DSA, then the certificate issuer's DSA
   parameters apply to the subject's DSA key.  If the DSA algorithm
   parameters are absent from the subjectPublicKeyInfo
   AlgorithmIdentifier and the CA signed the subject certificate using a
   signature algorithm other than DSA, then the subject's DSA parameters
   are distributed by other means.  If the subjectPublicKeyInfo
   AlgorithmIdentifier field omits the parameters component and the CA
   signed the subject with a signature algorithm other than DSA, then
   clients shall reject the certificate.

   When signing, DSA algorithm generates two values.  These values are
   commonly referred to as r and s.  To easily transfer these two values
   as one signature, they are ASN.1 encoded using the following ASN.1
   structure:

```
Dss-Sig-Value  ::=  SEQUENCE  {
     r              INTEGER,
     s              INTEGER  }
```

The encoded signature is conveyed as the value of the BIT STRING
signature in a Certificate or CertificateList.

The DSA public key shall be ASN.1 DER encoded as an INTEGER; this
encoding shall be used as the contents (i.e., the value) of the
subjectPublicKey component (a BIT STRING) of the SubjectPublicKeyInfo
data element.

```
DSAPublicKey ::= INTEGER -- public key, Y
```

If the keyUsage extension is present in an end entity certificate
which conveys a DSA public key, any combination of the following
values may be present:  digitalSignature; and nonRepudiation.

If the keyUsage extension is present in an CA certificate which
conveys a DSA public key, any combination of the following values may
be present:  digitalSignature; nonRepudiation; keyCertSign; and
cRLSign.

8 References

   [FIPS 180-1]  Federal Information Processing Standards Publication
                 (FIPS PUB) 180-1, Secure Hash Standard, 17 April 1995.
                 [Supersedes FIPS PUB 180 dated 11 May 1993.]

   [FIPS 186]    Federal Information Processing Standards Publication
                 (FIPS PUB) 186, Digital Signature Standard, 18 May
                 1994.

   [RC95]        Rogier, N. and Chauvaud, P., "The compression function
                 of MD2 is not collision free," Presented at Selected
                 Areas in Cryptography '95, May 1995.

   [RFC 791]     Postel, J., "Internet Protocol", STD 5, RFC 791,
                 September 1981.

   [RFC 822]     Crocker, D., "Standard for the format of ARPA Internet
                 text messages", STD 11, RFC 822, August 1982.

   [RFC 1034]    Mockapetris, P., "Domain names - concepts and
                 facilities", STD 13, RFC 1034, November 1987.

   [RFC 1319]    Kaliski, B., "The MD2 Message-Digest Algorithm," RFC
                 1319, April 1992.

[RFC 1321]    Rivest, R., "The MD5 Message-Digest Algorithm," RFC
              1321, April 1992.

[RFC 1422]    Kent, S.,  "Privacy Enhancement for Internet Electronic
              Mail: Part II: Certificate-Based Key Management," RFC
              1422, February 1993.

[RFC 1423]    Balenson, D., "Privacy Enhancement for Internet
              Electronic Mail: Part III: Algorithms, Modes, and
              Identifiers," RFC 1423, February 1993.

[RFC 1519]    Fuller, V., Li, T., Yu, J. and K. Varadhan. "Classless
              Inter-Domain Routing (CIDR): an Address Assignment and
              Aggregation Strategy", RFC 1519, September 1993.

[RFC 1738]    Berners-Lee, T., Masinter L., and M. McCahill.
              "Uniform Resource Locators (URL)", RFC 1738, December
              1994.

[RFC 1778]    Howes, T., Kille S., Yeong, W. and C. Robbins. "The
              String Representation of Standard Attribute Syntaxes,"
              RFC 1778, March 1995.

[RFC 1883]    Deering, S. and R. Hinden. "Internet Protocol, Version
              6 (IPv6) Specification", RFC 1883, December 1995.

[RFC 2119]    Bradner, S., "Key words for use in RFCs to Indicate
              Requirement Levels", BCP 14, RFC 2119, March 1997.

[RFC 2247]    Kille, S., Wahl, M., Grimstad, A., Huber, R. and S.
              Sataluri. "Using Domains in LDAP/X.500 Distinguished
              Names", RFC 2247, January 1998.

[RFC 2277]    Alvestrand, H., "IETF Policy on Character Sets and
              Languages", RFC 2277, January 1998.

[RFC 2279]    Yergeau, F., "UTF-8, a transformation format of ISO
              10646", RFC 2279, January 1998.

[RFC 2313]    Kaliski, B., "PKCS #1: RSA Encryption Version 1.5", RFC
              2313, March 1998.

[SDN.701]     SDN.701, "Message Security Protocol 4.0", Revision A
              1997-02-06.

[X.208]       CCITT Recommendation X.208: Specification of Abstract
              Syntax Notation One (ASN.1), 1988.

[X.501]         ITU-T Recommendation X.501: Information Technology -
                Open Systems Interconnection - The Directory: Models,
                1993.

[X.509]         ITU-T Recommendation X.509 (1997 E): Information
                Technology - Open Systems Interconnection - The
                Directory: Authentication Framework, June 1997.

[X.520]         ITU-T Recommendation X.520: Information Technology -
                Open Systems Interconnection - The Directory: Selected
                Attribute Types, 1993.

[X9.42]         ANSI X9.42-199x, Public Key Cryptography for The
                Financial Services Industry: Agreement of Symmetric
                Algorithm Keys Using Diffie-Hellman (Working Draft),
                December 1997.

[X9.55]         ANSI X9.55-1995, Public Key Cryptography For The
                Financial Services Industry: Extensions To Public Key
                Certificates And Certificate Revocation Lists, 8
                December, 1995.

[X9.57]          ANSI X9.57-199x, Public Key Cryptography For The
                Financial Services Industry: Certificate Management
                (Working Draft), 21 June, 1996.

9  Intellectual Property Rights

   The IETF has been notified of intellectual property rights claimed in
   regard to some or all of the specification contained in this
   document.  For more information consult the online list of claimed
   rights.

   The IETF takes no position regarding the validity or scope of any
   intellectual property or other rights that might be claimed to
   pertain to the implementation or use of the technology described in
   this document or the extent to which any license under such rights
   might or might not be available; neither does it represent that it
   has made any effort to identify any such rights. Information on the
   IETF's procedures with respect to rights in standards-track and
   standards-related documentation can be found in BCP-11. Copies of
   claims of rights made available for publication and any assurances of
   licenses to be made available, or the result of an attempt made to

obtain a general license or permission for the use of such
proprietary rights by implementors or users of this specification can
be obtained from the IETF Secretariat.

10  Security Considerations

The majority of this specification is devoted to the format and
content of certificates and CRLs.  Since certificates and CRLs are
digitally signed, no additional integrity service is necessary.
Neither certificates nor CRLs need be kept secret, and unrestricted
and anonymous access to certificates and CRLs has no security
implications.

However, security factors outside the scope of this specification
will affect the assurance provided to certificate users.  This
section highlights critical issues that should be considered by
implementors, administrators, and users.

The procedures performed by CAs and RAs to validate the binding of
the subject's identity of their public key greatly affect the
assurance that should be placed in the certificate.  Relying parties
may wish to review the CA's certificate practice statement.  This may
be particularly important when issuing certificates to other CAs.

The use of a single key pair for both signature and other purposes is
strongly discouraged. Use of separate key pairs for signature and key
management provides several benefits to the users. The ramifications
associated with loss or disclosure of a signature key are different
from loss or disclosure of a key management key. Using separate key
pairs permits a balanced and flexible response. Similarly, different
validity periods or key lengths for each key pair may be appropriate
in some application environments. Unfortunately, some legacy
applications (e.g., SSL) use a single key pair for signature and key
management.

The protection afforded private keys is a critical factor in
maintaining security.  On a small scale, failure of users to protect
their private keys will permit an attacker to masquerade as them, or
decrypt their personal information. On a larger scale, compromise of
a CA's private signing key may have a catastrophic effect.  If an
attacker obtains the private key unnoticed, the attacker may issue
bogus certificates and CRLs.  Existence of bogus certificates and
CRLs will undermine confidence in the system. If the compromise is
detected, all certificates issued to the CA shall be revoked,
preventing services between its users and users of other CAs.
Rebuilding after such a compromise will be problematic, so CAs are
advised to implement a combination of strong technical measures
(e.g., tamper-resistant cryptographic modules) and appropriate

management procedures (e.g., separation of duties) to avoid such an incident.

Loss of a CA's private signing key may also be problematic.  The CA would not be able to produce CRLs or perform normal key rollover. CAs are advised to maintain secure backup for signing keys.  The security of the key backup procedures is a critical factor in avoiding key compromise.

The availability and freshness of revocation information will affect the degree of assurance that should be placed in a certificate. While certificates expire naturally, events may occur during its natural lifetime which negate the binding between the subject and public key.  If revocation information is untimely or unavailable, the assurance associated with the binding is clearly reduced. Similarly, implementations of the Path Validation mechanism described in section 6 that omit revocation checking provide less assurance than those that support it.

The path validation algorithm depends on the certain knowledge of the public keys (and other information) about one or more trusted CAs. The decision to trust a CA is an important decision as it ultimately determines the trust afforded a certificate. The authenticated distribution of trusted CA public keys (usually in the form of a "self-signed" certificate) is a security critical out of band process that is beyond the scope of this specification.

In addition, where a key compromise or CA failure occurs for a trusted CA, the user will need to modify the information provided to the path validation routine.  Selection of too many trusted CAs will make the trusted CA information difficult to maintain.  On the other hand, selection of only one trusted CA may limit users to a closed community of users until a global PKI emerges.

The quality of implementations that process certificates may also affect the degree of assurance provided.  The path validation algorithm described in section 6 relies upon the integrity of the trusted CA information, and especially the integrity of the public keys associated with the trusted CAs.  By substituting public keys for which an attacker has the private key, an attacker could trick the user into accepting false certificates.

The binding between a key and certificate subject cannot be stronger than the cryptographic module implementation and algorithms used to generate the signature.  Short key lengths or weak hash algorithms will limit the utility of a certificate.  CAs are encouraged to note advances in cryptology so they can employ strong cryptographic techniques.  In addition, CAs should decline to issue certificates to

CAs or end entities that generate weak signatures.

Inconsistent application of name comparison rules may result in acceptance of invalid X.509 certification paths, or rejection of valid ones.  The X.500 series of specifications defines rules for comparing distinguished names require comparison of strings without regard to case, character set, multi-character white space substring, or leading and trailing white space.  This specification relaxes these requirements, requiring support for binary comparison at a minimum.

CAs shall encode the distinguished name in the subject field of a CA certificate identically to the distinguished name in the issuer field in certificates issued by the latter CA.  If CAs use different encodings, implementations of this specification may fail to recognize name chains for paths that include this certificate.  As a consequence, valid paths could be rejected.

In addition, name constraints for distinguished names shall be stated identically to the encoding used in the subject field or subjectAltName extension.  If not, (1) name constraints stated as excludedSubTrees will not match and invalid paths will be accepted and (2) name constraints expressed as permittedSubtrees will not match and valid paths will be rejected.  To avoid acceptance of invalid paths, CAs should state name constraints for distinguished names as permittedSubtrees where ever possible.

Appendix A. Psuedo-ASN.1 Structures and OIDs

   This section describes data objects used by conforming PKI components
   in an "ASN.1-like" syntax.  This syntax is a hybrid of the 1988 and
   1993 ASN.1 syntaxes.  The 1988 ASN.1 syntax is augmented with 1993
   UNIVERSAL Types UniversalString, BMPString and UTF8String.

   The ASN.1 syntax does not permit the inclusion of type statements in
   the ASN.1 module, and the 1993 ASN.1 standard does not permit use of
   the new UNIVERSAL types in modules using the 1988 syntax.  As a
   result, this module does not conform to either version of the ASN.1
   standard.

   This appendix may be converted into 1988 ASN.1 by replacing the
   defintions for the UNIVERSAL Types with the 1988 catch-all "ANY".

A.1 Explicitly Tagged Module, 1988 Syntax

PKIX1Explicit88 {iso(1) identified-organization(3) dod(6) internet(1)
  security(5) mechanisms(5) pkix(7) id-mod(0) id-pkix1-explicit-88(1)}


DEFINITIONS EXPLICIT TAGS ::=

BEGIN

-- EXPORTS ALL --

-- IMPORTS NONE --

-- UNIVERSAL Types defined in '93 and '98 ASN.1
-- but required by this specification

UniversalString ::= [UNIVERSAL 28] IMPLICIT OCTET STRING
      -- UniversalString is defined in ASN.1:1993

BMPString ::= [UNIVERSAL 30] IMPLICIT OCTET STRING
     -- BMPString is the subtype of UniversalString and models
     -- the Basic Multilingual Plane of ISO/IEC/ITU 10646-1

UTF8String ::= [UNIVERSAL 12] IMPLICIT OCTET STRING
      -- The content of this type conforms to RFC 2279.

--
-- PKIX specific OIDs

id-pkix  OBJECT IDENTIFIER  ::=
      { iso(1) identified-organization(3) dod(6) internet(1)

```
                        security(5) mechanisms(5) pkix(7) }
-- PKIX arcs

id-pe OBJECT IDENTIFIER  ::=  { id-pkix 1 }
        -- arc for private certificate extensions
id-qt OBJECT IDENTIFIER ::= { id-pkix 2 }
        -- arc for policy qualifier types
id-kp OBJECT IDENTIFIER ::= { id-pkix 3 }
        -- arc for extended key purpose OIDS
id-ad OBJECT IDENTIFIER ::= { id-pkix 48 }
        -- arc for access descriptors


-- policyQualifierIds for Internet policy qualifiers

id-qt-cps       OBJECT IDENTIFIER ::=  { id-qt 1 }
        -- OID for CPS qualifier
id-qt-unotice  OBJECT IDENTIFIER ::=  { id-qt 2 }
        -- OID for user notice qualifier


-- access descriptor definitions

id-ad-ocsp      OBJECT IDENTIFIER ::= { id-ad 1 }
id-ad-caIssuers OBJECT IDENTIFIER ::= { id-ad 2 }


-- attribute data types --

Attribute       ::=      SEQUENCE {
        type            AttributeType,
        values  SET OF AttributeValue
                -- at least one value is required -- }

AttributeType           ::=   OBJECT IDENTIFIER

AttributeValue          ::=   ANY

AttributeTypeAndValue        ::=      SEQUENCE {
        type   AttributeType,
        value  AttributeValue }

-- suggested naming attributes: Definition of the following
--  information object set may be augmented to meet local
--  requirements.  Note that deleting members of the set may
--  prevent interoperability with conforming implementations.
--  presented in pairs: the AttributeType followed by the
--  type definition for the corresponding AttributeValue

--Arc for standard naming attributes
id-at           OBJECT IDENTIFIER ::= {joint-iso-ccitt(2) ds(5) 4}
```

```
-- Attributes of type NameDirectoryString
id-at-name              AttributeType   ::=    {id-at 41}
id-at-surname           AttributeType   ::=    {id-at 4}
id-at-givenName         AttributeType   ::=    {id-at 42}
id-at-initials          AttributeType   ::=    {id-at 43}
id-at-generationQualifier     AttributeType   ::=    {id-at 44}

X520name       ::= CHOICE {
      teletexString           TeletexString (SIZE (1..ub-name)),
      printableString         PrintableString (SIZE (1..ub-name)),
      universalString         UniversalString (SIZE (1..ub-name)),
      utf8String              UTF8String (SIZE (1..ub-name)),
      bmpString               BMPString (SIZE(1..ub-name))    }

--

id-at-commonName        AttributeType   ::=    {id-at 3}

X520CommonName  ::=      CHOICE {
      teletexString           TeletexString (SIZE (1..ub-common-name)),
      printableString         PrintableString (SIZE (1..ub-common-name)),
      universalString         UniversalString (SIZE (1..ub-common-name)),
      utf8String              UTF8String (SIZE (1..ub-common-name)),
      bmpString               BMPString (SIZE(1..ub-common-name))    }

--

id-at-localityName      AttributeType   ::=    {id-at 7}

X520LocalityName ::= CHOICE {
      teletexString           TeletexString (SIZE (1..ub-locality-name)),
      printableString         PrintableString (SIZE (1..ub-locality-name)),
      universalString         UniversalString (SIZE (1..ub-locality-name)),
      utf8String              UTF8String (SIZE (1..ub-locality-name)),
      bmpString               BMPString (SIZE(1..ub-locality-name))    }

--

id-at-stateOrProvinceName       AttributeType   ::=    {id-at 8}

X520StateOrProvinceName         ::= CHOICE {
      teletexString           TeletexString (SIZE (1..ub-state-name)),
      printableString         PrintableString (SIZE (1..ub-state-name)),
      universalString         UniversalString (SIZE (1..ub-state-name)),
      utf8String              UTF8String (SIZE (1..ub-state-name)),
      bmpString               BMPString (SIZE(1..ub-state-name))    }

--
```

```
id-at-organizationName          AttributeType   ::=     {id-at 10}

X520OrganizationName ::= CHOICE {
  teletexString    TeletexString (SIZE (1..ub-organization-name)),
  printableString  PrintableString (SIZE (1..ub-organization-name)),
  universalString  UniversalString (SIZE (1..ub-organization-name)),
  utf8String       UTF8String (SIZE (1..ub-organization-name)),
  bmpString        BMPString (SIZE(1..ub-organization-name))   }

--

id-at-organizationalUnitName    AttributeType   ::=     {id-at 11}

X520OrganizationalUnitName ::= CHOICE {
 teletexString    TeletexString (SIZE (1..ub-organizational-unit-name)),
 printableString          PrintableString
                    (SIZE (1..ub-organizational-unit-name)),
 universalString          UniversalString
                    (SIZE (1..ub-organizational-unit-name)),
 utf8String       UTF8String (SIZE (1..ub-organizational-unit-name)),
 bmpString        BMPString (SIZE(1..ub-organizational-unit-name))   }

--

id-at-title     AttributeType   ::=     {id-at 12}

X520Title ::=   CHOICE {
      teletexString         TeletexString (SIZE (1..ub-title)),
      printableString       PrintableString (SIZE (1..ub-title)),
      universalString       UniversalString (SIZE (1..ub-title)),
      utf8String            UTF8String (SIZE (1..ub-title)),
      bmpString             BMPString (SIZE(1..ub-title))   }

--

id-at-dnQualifier       AttributeType   ::=     {id-at 46}
X520dnQualifier ::=     PrintableString

id-at-countryName       AttributeType   ::=     {id-at 6}
X520countryName ::=     PrintableString (SIZE (2)) -- IS 3166 codes


 -- Legacy attributes

pkcs-9 OBJECT IDENTIFIER ::=
        { iso(1) member-body(2) us(840) rsadsi(113549) pkcs(1) 9 }

emailAddress AttributeType      ::= { pkcs-9 1 }
```

RFC 2459          Internet X.509 Public Key Infrastructure    January 1999


Pkcs9email ::= IA5String (SIZE (1..ub-emailaddress-length))

-- naming data types --

Name            ::=   CHOICE { -- only one possibility for now --
                          rdnSequence  RDNSequence }

RDNSequence     ::=   SEQUENCE OF RelativeDistinguishedName

DistinguishedName       ::=   RDNSequence

RelativeDistinguishedName  ::=
                 SET SIZE (1 .. MAX) OF AttributeTypeAndValue

-- Directory string type --

DirectoryString ::= CHOICE {
      teletexString          TeletexString (SIZE (1..MAX)),
      printableString        PrintableString (SIZE (1..MAX)),
      universalString        UniversalString (SIZE (1..MAX)),
      utf8String            UTF8String (SIZE (1..MAX)),
      bmpString             BMPString (SIZE(1..MAX))   }

-- certificate and CRL specific structures begin here

Certificate  ::=  SEQUENCE  {
      tbsCertificate       TBSCertificate,
      signatureAlgorithm   AlgorithmIdentifier,
      signature            BIT STRING  }

TBSCertificate  ::=  SEQUENCE  {
      version         [0]  Version DEFAULT v1,
      serialNumber         CertificateSerialNumber,
      signature            AlgorithmIdentifier,
      issuer               Name,
      validity             Validity,
      subject              Name,
      subjectPublicKeyInfo SubjectPublicKeyInfo,
      issuerUniqueID  [1]  IMPLICIT UniqueIdentifier OPTIONAL,
                           -- If present, version shall be v2 or v3
      subjectUniqueID [2]  IMPLICIT UniqueIdentifier OPTIONAL,
                           -- If present, version shall be v2 or v3
      extensions      [3]  Extensions OPTIONAL
                           -- If present, version shall be v3 --  }

Version  ::=  INTEGER  {  v1(0), v2(1), v3(2)   }

CertificateSerialNumber  ::=  INTEGER


Housley, et. al.            Standards Track                  [Page 74]

```
Validity ::= SEQUENCE {
     notBefore      Time,
     notAfter       Time }

Time ::= CHOICE {
     utcTime        UTCTime,
     generalTime    GeneralizedTime }

UniqueIdentifier  ::=  BIT STRING

SubjectPublicKeyInfo  ::=  SEQUENCE  {
     algorithm           AlgorithmIdentifier,
     subjectPublicKey    BIT STRING  }

Extensions  ::=  SEQUENCE SIZE (1..MAX) OF Extension

Extension  ::=  SEQUENCE  {
     extnID     OBJECT IDENTIFIER,
     critical   BOOLEAN DEFAULT FALSE,
     extnValue  OCTET STRING  }

-- CRL structures

CertificateList  ::=  SEQUENCE  {
     tbsCertList          TBSCertList,
     signatureAlgorithm   AlgorithmIdentifier,
     signature            BIT STRING  }

TBSCertList  ::=  SEQUENCE  {
     version                 Version OPTIONAL,
                                  -- if present, shall be v2
     signature               AlgorithmIdentifier,
     issuer                  Name,
     thisUpdate              Time,
     nextUpdate              Time OPTIONAL,
     revokedCertificates     SEQUENCE OF SEQUENCE  {
          userCertificate         CertificateSerialNumber,
          revocationDate          Time,
          crlEntryExtensions      Extensions OPTIONAL
                                       -- if present, shall be v2
                             } OPTIONAL,
     crlExtensions           [0] Extensions OPTIONAL
                                  -- if present, shall be v2 -- }

-- Version, Time, CertificateSerialNumber, and Extensions were
-- defined earlier for use in the certificate structure

AlgorithmIdentifier  ::=  SEQUENCE {
```

```
        algorithm               OBJECT IDENTIFIER,
        parameters              ANY DEFINED BY algorithm OPTIONAL  }
                                -- contains a value of the type
                                -- registered for use with the
                                -- algorithm object identifier value

-- Algorithm OIDs and parameter structures

pkcs-1 OBJECT IDENTIFIER ::= {
     iso(1) member-body(2) us(840) rsadsi(113549) pkcs(1) 1 }

rsaEncryption OBJECT IDENTIFIER ::=  { pkcs-1 1 }

md2WithRSAEncryption OBJECT IDENTIFIER  ::=  { pkcs-1 2 }

md5WithRSAEncryption OBJECT IDENTIFIER  ::=  { pkcs-1 4 }

sha1WithRSAEncryption OBJECT IDENTIFIER  ::=  { pkcs-1 5 }

id-dsa-with-sha1 OBJECT IDENTIFIER ::=  {
     iso(1) member-body(2) us(840) x9-57 (10040) x9algorithm(4) 3 }

Dss-Sig-Value  ::=  SEQUENCE  {
     r         INTEGER,
     s         INTEGER  }

dhpublicnumber OBJECT IDENTIFIER ::= {
     iso(1) member-body(2) us(840) ansi-x942(10046) number-type(2) 1 }

DomainParameters ::= SEQUENCE {
     p         INTEGER, -- odd prime, p=jq +1
     g         INTEGER, -- generator, g
     q         INTEGER, -- factor of p-1
     j         INTEGER OPTIONAL, -- subgroup factor, j>= 2
     validationParms  ValidationParms OPTIONAL }

ValidationParms ::= SEQUENCE {
     seed            BIT STRING,
     pgenCounter     INTEGER }

id-dsa OBJECT IDENTIFIER ::= {
     iso(1) member-body(2) us(840) x9-57(10040) x9algorithm(4) 1 }

Dss-Parms  ::=  SEQUENCE  {
     p              INTEGER,
     q              INTEGER,
     g              INTEGER  }
```

RFC 2459        Internet X.509 Public Key Infrastructure     January 1999

```
-- x400 address syntax starts here
--      OR Names

ORAddress ::= SEQUENCE {
   built-in-standard-attributes BuiltInStandardAttributes,
   built-in-domain-defined-attributes
                     BuiltInDomainDefinedAttributes OPTIONAL,
   -- see also teletex-domain-defined-attributes
   extension-attributes ExtensionAttributes OPTIONAL }
--      The OR-address is semantically absent from the OR-name if the
--      built-in-standard-attribute sequence is empty and the
--      built-in-domain-defined-attributes and extension-attributes are
--      both omitted.

--      Built-in Standard Attributes

BuiltInStandardAttributes ::= SEQUENCE {
   country-name CountryName OPTIONAL,
   administration-domain-name AdministrationDomainName OPTIONAL,
   network-address     [0] NetworkAddress OPTIONAL,
   -- see also extended-network-address
   terminal-identifier [1] TerminalIdentifier OPTIONAL,
   private-domain-name [2] PrivateDomainName OPTIONAL,
   organization-name   [3] OrganizationName OPTIONAL,
   -- see also teletex-organization-name
   numeric-user-identifier    [4] NumericUserIdentifier OPTIONAL,
   personal-name       [5] PersonalName OPTIONAL,
   -- see also teletex-personal-name
   organizational-unit-names   [6] OrganizationalUnitNames OPTIONAL
   -- see also teletex-organizational-unit-names -- }

CountryName ::= [APPLICATION 1] CHOICE {
   x121-dcc-code NumericString
               (SIZE (ub-country-name-numeric-length)),
   iso-3166-alpha2-code PrintableString
               (SIZE (ub-country-name-alpha-length)) }

AdministrationDomainName ::= [APPLICATION 2] CHOICE {
   numeric NumericString (SIZE (0..ub-domain-name-length)),
   printable PrintableString (SIZE (0..ub-domain-name-length)) }

NetworkAddress ::= X121Address  -- see also extended-network-address

X121Address ::= NumericString (SIZE (1..ub-x121-address-length))

TerminalIdentifier ::= PrintableString (SIZE (1..ub-terminal-id-length))

PrivateDomainName ::= CHOICE {
```

```
    numeric NumericString (SIZE (1..ub-domain-name-length)),
    printable PrintableString (SIZE (1..ub-domain-name-length)) }

OrganizationName ::= PrintableString
                         (SIZE (1..ub-organization-name-length))
-- see also teletex-organization-name

NumericUserIdentifier ::= NumericString
                         (SIZE (1..ub-numeric-user-id-length))

PersonalName ::= SET {
    surname [0] PrintableString (SIZE (1..ub-surname-length)),
    given-name [1] PrintableString
                       (SIZE (1..ub-given-name-length)) OPTIONAL,
    initials [2] PrintableString (SIZE (1..ub-initials-length)) OPTIONAL,
    generation-qualifier [3] PrintableString
              (SIZE (1..ub-generation-qualifier-length)) OPTIONAL }
-- see also teletex-personal-name

OrganizationalUnitNames ::= SEQUENCE SIZE (1..ub-organizational-units)
                                 OF OrganizationalUnitName
-- see also teletex-organizational-unit-names

OrganizationalUnitName ::= PrintableString (SIZE
                       (1..ub-organizational-unit-name-length))

--       Built-in Domain-defined Attributes

BuiltInDomainDefinedAttributes ::= SEQUENCE SIZE
                            (1..ub-domain-defined-attributes) OF
                            BuiltInDomainDefinedAttribute

BuiltInDomainDefinedAttribute ::= SEQUENCE {
    type PrintableString (SIZE
                   (1..ub-domain-defined-attribute-type-length)),
    value PrintableString (SIZE
                   (1..ub-domain-defined-attribute-value-length))}

--       Extension Attributes

ExtensionAttributes ::= SET SIZE (1..ub-extension-attributes) OF
                      ExtensionAttribute

ExtensionAttribute ::=  SEQUENCE {
    extension-attribute-type [0] INTEGER (0..ub-extension-attributes),
    extension-attribute-value [1]
                      ANY DEFINED BY extension-attribute-type }
```

```
-- Extension types and attribute values
--

common-name INTEGER ::= 1

CommonName ::= PrintableString (SIZE (1..ub-common-name-length))

teletex-common-name INTEGER ::= 2

TeletexCommonName ::= TeletexString (SIZE (1..ub-common-name-length))

teletex-organization-name INTEGER ::= 3

TeletexOrganizationName ::=
                TeletexString (SIZE (1..ub-organization-name-length))

teletex-personal-name INTEGER ::= 4

TeletexPersonalName ::= SET {
    surname [0] TeletexString (SIZE (1..ub-surname-length)),
    given-name [1] TeletexString
                (SIZE (1..ub-given-name-length)) OPTIONAL,
    initials [2] TeletexString (SIZE (1..ub-initials-length)) OPTIONAL,
    generation-qualifier [3] TeletexString (SIZE
                (1..ub-generation-qualifier-length)) OPTIONAL }

teletex-organizational-unit-names INTEGER ::= 5

TeletexOrganizationalUnitNames ::= SEQUENCE SIZE
        (1..ub-organizational-units) OF TeletexOrganizationalUnitName

TeletexOrganizationalUnitName ::= TeletexString
                        (SIZE (1..ub-organizational-unit-name-length))

pds-name INTEGER ::= 7

PDSName ::= PrintableString (SIZE (1..ub-pds-name-length))

physical-delivery-country-name INTEGER ::= 8

PhysicalDeliveryCountryName ::= CHOICE {
    x121-dcc-code NumericString (SIZE (ub-country-name-numeric-length)),
    iso-3166-alpha2-code PrintableString
                        (SIZE (ub-country-name-alpha-length)) }

postal-code INTEGER ::= 9

PostalCode ::= CHOICE {
```

```
   numeric-code NumericString (SIZE (1..ub-postal-code-length)),
   printable-code PrintableString (SIZE (1..ub-postal-code-length)) }

physical-delivery-office-name INTEGER ::= 10

PhysicalDeliveryOfficeName ::= PDSParameter

physical-delivery-office-number INTEGER ::= 11

PhysicalDeliveryOfficeNumber ::= PDSParameter

extension-OR-address-components INTEGER ::= 12

ExtensionORAddressComponents ::= PDSParameter

physical-delivery-personal-name INTEGER ::= 13

PhysicalDeliveryPersonalName ::= PDSParameter

physical-delivery-organization-name INTEGER ::= 14

PhysicalDeliveryOrganizationName ::= PDSParameter

extension-physical-delivery-address-components INTEGER ::= 15

ExtensionPhysicalDeliveryAddressComponents ::= PDSParameter

unformatted-postal-address INTEGER ::= 16

UnformattedPostalAddress ::= SET {
    printable-address SEQUENCE SIZE (1..ub-pds-physical-address-lines) OF
            PrintableString (SIZE (1..ub-pds-parameter-length)) OPTIONAL,
    teletex-string TeletexString
            (SIZE (1..ub-unformatted-address-length)) OPTIONAL }

street-address INTEGER ::= 17

StreetAddress ::= PDSParameter

post-office-box-address INTEGER ::= 18

PostOfficeBoxAddress ::= PDSParameter

poste-restante-address INTEGER ::= 19

PosteRestanteAddress ::= PDSParameter

unique-postal-name INTEGER ::= 20
```

```
UniquePostalName ::= PDSParameter

local-postal-attributes INTEGER ::= 21

LocalPostalAttributes ::= PDSParameter

PDSParameter ::= SET {
    printable-string PrintableString
                (SIZE(1..ub-pds-parameter-length)) OPTIONAL,
    teletex-string TeletexString
                (SIZE(1..ub-pds-parameter-length)) OPTIONAL }

extended-network-address INTEGER ::= 22

ExtendedNetworkAddress ::= CHOICE {
    e163-4-address SEQUENCE {
        number [0] NumericString (SIZE (1..ub-e163-4-number-length)),
        sub-address [1] NumericString
                (SIZE (1..ub-e163-4-sub-address-length)) OPTIONAL },
    psap-address [0] PresentationAddress }

PresentationAddress ::= SEQUENCE {
        pSelector       [0] EXPLICIT OCTET STRING OPTIONAL,
        sSelector       [1] EXPLICIT OCTET STRING OPTIONAL,
        tSelector       [2] EXPLICIT OCTET STRING OPTIONAL,
        nAddresses      [3] EXPLICIT SET SIZE (1..MAX) OF OCTET STRING }

terminal-type  INTEGER ::= 23

TerminalType ::= INTEGER {
    telex (3),
    teletex (4),
    g3-facsimile (5),
    g4-facsimile (6),
    ia5-terminal (7),
    videotex (8) } (0..ub-integer-options)

--      Extension Domain-defined Attributes

teletex-domain-defined-attributes INTEGER ::= 6

TeletexDomainDefinedAttributes ::= SEQUENCE SIZE
    (1..ub-domain-defined-attributes) OF TeletexDomainDefinedAttribute

TeletexDomainDefinedAttribute ::= SEQUENCE {
        type TeletexString
                (SIZE (1..ub-domain-defined-attribute-type-length)),
        value TeletexString
```

RFC 2459          Internet X.509 Public Key Infrastructure     January 1999

```
                    (SIZE (1..ub-domain-defined-attribute-value-length)) }

--  specifications of Upper Bounds shall be regarded as mandatory
--  from Annex B of ITU-T X.411 Reference Definition of MTS Parameter
--  Upper Bounds

--       Upper Bounds
ub-name INTEGER ::=       32768
ub-common-name  INTEGER ::=     64
ub-locality-name         INTEGER ::=      128
ub-state-name     INTEGER ::=      128
ub-organization-name     INTEGER ::=     64
ub-organizational-unit-name       INTEGER ::=      64
ub-title          INTEGER ::=     64
ub-match          INTEGER ::=     128

ub-emailaddress-length INTEGER ::= 128

ub-common-name-length INTEGER ::= 64
ub-country-name-alpha-length INTEGER ::= 2
ub-country-name-numeric-length INTEGER ::= 3
ub-domain-defined-attributes INTEGER ::= 4
ub-domain-defined-attribute-type-length INTEGER ::= 8
ub-domain-defined-attribute-value-length INTEGER ::= 128
ub-domain-name-length INTEGER ::= 16
ub-extension-attributes INTEGER ::= 256
ub-e163-4-number-length INTEGER ::= 15
ub-e163-4-sub-address-length INTEGER ::= 40
ub-generation-qualifier-length INTEGER ::= 3
ub-given-name-length INTEGER ::= 16
ub-initials-length INTEGER ::= 5
ub-integer-options INTEGER ::= 256
ub-numeric-user-id-length INTEGER ::= 32
ub-organization-name-length INTEGER ::= 64
ub-organizational-unit-name-length INTEGER ::= 32
ub-organizational-units INTEGER ::= 4
ub-pds-name-length INTEGER ::= 16
ub-pds-parameter-length INTEGER ::= 30
ub-pds-physical-address-lines INTEGER ::= 6
ub-postal-code-length INTEGER ::= 16
ub-surname-length INTEGER ::= 40
ub-terminal-id-length INTEGER ::= 24
ub-unformatted-address-length INTEGER ::= 180
ub-x121-address-length INTEGER ::= 16

-- Note - upper bounds on string types, such as TeletexString, are
-- measured in characters.  Excepting PrintableString or IA5String, a
-- significantly greater number of octets will be required to hold
```

```
-- such a value.  As a minimum, 16 octets, or twice the specified upper
-- bound, whichever is the larger, should be allowed for TeletexString.
-- For UTF8String or UniversalString at least four times the upper
-- bound should be allowed.

END
```

A.2 Implicitly Tagged Module, 1988 Syntax

```
PKIX1Implicit88 {iso(1) identified-organization(3) dod(6) internet(1)
  security(5) mechanisms(5) pkix(7) id-mod(0) id-pkix1-implicit-88(2)}

DEFINITIONS IMPLICIT TAGS ::=

BEGIN

-- EXPORTS ALL --

IMPORTS
        id-pkix, id-pe, id-qt, id-kp, id-qt-unotice, id-qt-cps,
            id-ad, id-ad-ocsp, id-ad-caIssuers,
            -- delete following line if "new" types are supported --
            BMPString, UniversalString, UTF8String, -- end "new" types
                ORAddress, Name, RelativeDistinguishedName,
                CertificateSerialNumber,
                CertificateList, AlgorithmIdentifier, ub-name,
                Attribute, DirectoryString
                FROM PKIX1Explicit88 {iso(1) identified-organization(3)
                dod(6) internet(1) security(5) mechanisms(5) pkix(7)
                id-mod(0) id-pkix1-explicit(1)};


-- ISO arc for standard certificate and CRL extensions

id-ce OBJECT IDENTIFIER  ::=  {joint-iso-ccitt(2) ds(5) 29}

-- authority key identifier OID and syntax

id-ce-authorityKeyIdentifier OBJECT IDENTIFIER ::=  { id-ce 35 }

AuthorityKeyIdentifier ::= SEQUENCE {
      keyIdentifier             [0] KeyIdentifier            OPTIONAL,
      authorityCertIssuer       [1] GeneralNames             OPTIONAL,
      authorityCertSerialNumber [2] CertificateSerialNumber  OPTIONAL }
    -- authorityCertIssuer and authorityCertSerialNumber shall both
    -- be present or both be absent

KeyIdentifier ::= OCTET STRING

-- subject key identifier OID and syntax

id-ce-subjectKeyIdentifier OBJECT IDENTIFIER ::=  { id-ce 14 }

SubjectKeyIdentifier ::= KeyIdentifier
```

```
-- key usage extension OID and syntax

id-ce-keyUsage OBJECT IDENTIFIER ::=  { id-ce 15 }

KeyUsage ::= BIT STRING {
     digitalSignature       (0),
     nonRepudiation         (1),
     keyEncipherment        (2),
     dataEncipherment       (3),
     keyAgreement           (4),
     keyCertSign            (5),
     cRLSign                (6),
     encipherOnly           (7),
     decipherOnly           (8) }

-- private key usage period extension OID and syntax

id-ce-privateKeyUsagePeriod OBJECT IDENTIFIER ::=  { id-ce 16 }

PrivateKeyUsagePeriod ::= SEQUENCE {
     notBefore       [0]    GeneralizedTime OPTIONAL,
     notAfter        [1]    GeneralizedTime OPTIONAL }
     -- either notBefore or notAfter shall be present

-- certificate policies extension OID and syntax

id-ce-certificatePolicies OBJECT IDENTIFIER ::=  { id-ce 32 }

CertificatePolicies ::= SEQUENCE SIZE (1..MAX) OF PolicyInformation

PolicyInformation ::= SEQUENCE {
     policyIdentifier   CertPolicyId,
     policyQualifiers   SEQUENCE SIZE (1..MAX) OF
             PolicyQualifierInfo OPTIONAL }

CertPolicyId ::= OBJECT IDENTIFIER

PolicyQualifierInfo ::= SEQUENCE {
       policyQualifierId  PolicyQualifierId,
       qualifier          ANY DEFINED BY policyQualifierId }

-- Implementations that recognize additional policy qualifiers shall
-- augment the following definition for PolicyQualifierId

PolicyQualifierId ::=
     OBJECT IDENTIFIER ( id-qt-cps | id-qt-unotice )

-- CPS pointer qualifier
```

```
CPSuri ::= IA5String

-- user notice qualifier

UserNotice ::= SEQUENCE {
     noticeRef        NoticeReference OPTIONAL,
     explicitText     DisplayText OPTIONAL}

NoticeReference ::= SEQUENCE {
     organization     DisplayText,
     noticeNumbers    SEQUENCE OF INTEGER }

DisplayText ::= CHOICE {
     visibleString    VisibleString  (SIZE (1..200)),
     bmpString        BMPString      (SIZE (1..200)),
     utf8String       UTF8String     (SIZE (1..200)) }

-- policy mapping extension OID and syntax

id-ce-policyMappings OBJECT IDENTIFIER ::=  { id-ce 33 }

PolicyMappings ::= SEQUENCE SIZE (1..MAX) OF SEQUENCE {
     issuerDomainPolicy      CertPolicyId,
     subjectDomainPolicy     CertPolicyId }

-- subject alternative name extension OID and syntax

id-ce-subjectAltName OBJECT IDENTIFIER ::=  { id-ce 17 }

SubjectAltName ::= GeneralNames

GeneralNames ::= SEQUENCE SIZE (1..MAX) OF GeneralName

GeneralName ::= CHOICE {
     otherName                  [0]     AnotherName,
     rfc822Name                 [1]     IA5String,
     dNSName                    [2]     IA5String,
     x400Address                [3]     ORAddress,
     directoryName              [4]     Name,
     ediPartyName               [5]     EDIPartyName,
     uniformResourceIdentifier  [6]     IA5String,
     iPAddress                  [7]     OCTET STRING,
     registeredID               [8]     OBJECT IDENTIFIER }

-- AnotherName replaces OTHER-NAME ::= TYPE-IDENTIFIER, as
-- TYPE-IDENTIFIER is not supported in the '88 ASN.1 syntax

AnotherName ::= SEQUENCE {
```

```
      type-id    OBJECT IDENTIFIER,
      value      [0] EXPLICIT ANY DEFINED BY type-id }

EDIPartyName ::= SEQUENCE {
      nameAssigner             [0]     DirectoryString OPTIONAL,
      partyName                [1]     DirectoryString }

-- issuer alternative name extension OID and syntax

id-ce-issuerAltName OBJECT IDENTIFIER ::=  { id-ce 18 }

IssuerAltName ::= GeneralNames

id-ce-subjectDirectoryAttributes OBJECT IDENTIFIER ::=  { id-ce 9 }

SubjectDirectoryAttributes ::= SEQUENCE SIZE (1..MAX) OF Attribute

-- basic constraints extension OID and syntax

id-ce-basicConstraints OBJECT IDENTIFIER ::=  { id-ce 19 }

BasicConstraints ::= SEQUENCE {
      cA                       BOOLEAN DEFAULT FALSE,
      pathLenConstraint        INTEGER (0..MAX) OPTIONAL }

-- name constraints extension OID and syntax

id-ce-nameConstraints OBJECT IDENTIFIER ::=  { id-ce 30 }

NameConstraints ::= SEQUENCE {
      permittedSubtrees        [0]     GeneralSubtrees OPTIONAL,
      excludedSubtrees         [1]     GeneralSubtrees OPTIONAL }

GeneralSubtrees ::= SEQUENCE SIZE (1..MAX) OF GeneralSubtree

GeneralSubtree ::= SEQUENCE {
      base                     GeneralName,
      minimum         [0]      BaseDistance DEFAULT 0,
      maximum         [1]      BaseDistance OPTIONAL }

BaseDistance ::= INTEGER (0..MAX)

-- policy constraints extension OID and syntax

id-ce-policyConstraints OBJECT IDENTIFIER ::=  { id-ce 36 }

PolicyConstraints ::= SEQUENCE {
      requireExplicitPolicy          [0] SkipCerts OPTIONAL,
```

```
        inhibitPolicyMapping            [1] SkipCerts OPTIONAL }

SkipCerts ::= INTEGER (0..MAX)

-- CRL distribution points extension OID and syntax

id-ce-cRLDistributionPoints     OBJECT IDENTIFIER  ::=  {id-ce 31}

CRLDistPointsSyntax ::= SEQUENCE SIZE (1..MAX) OF DistributionPoint

DistributionPoint ::= SEQUENCE {
     distributionPoint       [0]     DistributionPointName OPTIONAL,
     reasons                 [1]     ReasonFlags OPTIONAL,
     cRLIssuer               [2]     GeneralNames OPTIONAL }

DistributionPointName ::= CHOICE {
     fullName                [0]     GeneralNames,
     nameRelativeToCRLIssuer [1]     RelativeDistinguishedName }

ReasonFlags ::= BIT STRING {
     unused                  (0),
     keyCompromise           (1),
     cACompromise            (2),
     affiliationChanged      (3),
     superseded              (4),
     cessationOfOperation    (5),
     certificateHold         (6) }

-- extended key usage extension OID and syntax

id-ce-extKeyUsage OBJECT IDENTIFIER ::= {id-ce 37}

ExtKeyUsageSyntax ::= SEQUENCE SIZE (1..MAX) OF KeyPurposeId

KeyPurposeId ::= OBJECT IDENTIFIER

-- extended key purpose OIDs
id-kp-serverAuth      OBJECT IDENTIFIER ::= { id-kp 1 }
id-kp-clientAuth      OBJECT IDENTIFIER ::= { id-kp 2 }
id-kp-codeSigning     OBJECT IDENTIFIER ::= { id-kp 3 }
id-kp-emailProtection OBJECT IDENTIFIER ::= { id-kp 4 }
id-kp-ipsecEndSystem  OBJECT IDENTIFIER ::= { id-kp 5 }
id-kp-ipsecTunnel     OBJECT IDENTIFIER ::= { id-kp 6 }
id-kp-ipsecUser       OBJECT IDENTIFIER ::= { id-kp 7 }
id-kp-timeStamping    OBJECT IDENTIFIER ::= { id-kp 8 }

-- authority info access
```

```
id-pe-authorityInfoAccess OBJECT IDENTIFIER ::= { id-pe 1 }

AuthorityInfoAccessSyntax  ::=
        SEQUENCE SIZE (1..MAX) OF AccessDescription

AccessDescription  ::=  SEQUENCE {
        accessMethod          OBJECT IDENTIFIER,
        accessLocation        GeneralName  }

-- CRL number extension OID and syntax

id-ce-cRLNumber OBJECT IDENTIFIER ::= { id-ce 20 }

CRLNumber ::= INTEGER (0..MAX)

-- issuing distribution point extension OID and syntax

id-ce-issuingDistributionPoint OBJECT IDENTIFIER ::= { id-ce 28 }

IssuingDistributionPoint ::= SEQUENCE {
     distributionPoint       [0] DistributionPointName OPTIONAL,
     onlyContainsUserCerts   [1] BOOLEAN DEFAULT FALSE,
     onlyContainsCACerts     [2] BOOLEAN DEFAULT FALSE,
     onlySomeReasons         [3] ReasonFlags OPTIONAL,
     indirectCRL             [4] BOOLEAN DEFAULT FALSE }


id-ce-deltaCRLIndicator OBJECT IDENTIFIER ::= { id-ce 27 }

-- deltaCRLIndicator ::= BaseCRLNumber

BaseCRLNumber ::= CRLNumber

-- CRL reasons extension OID and syntax

id-ce-cRLReasons OBJECT IDENTIFIER ::= { id-ce 21 }

CRLReason ::= ENUMERATED {
     unspecified             (0),
     keyCompromise           (1),
     cACompromise            (2),
     affiliationChanged      (3),
     superseded              (4),
     cessationOfOperation    (5),
     certificateHold         (6),
     removeFromCRL           (8) }

-- certificate issuer CRL entry extension OID and syntax
```

```
id-ce-certificateIssuer OBJECT IDENTIFIER ::= { id-ce 29 }

CertificateIssuer ::= GeneralNames

-- hold instruction extension OID and syntax

id-ce-holdInstructionCode OBJECT IDENTIFIER ::= { id-ce 23 }

HoldInstructionCode ::= OBJECT IDENTIFIER

-- ANSI x9 holdinstructions

-- ANSI x9 arc holdinstruction arc
holdInstruction OBJECT IDENTIFIER ::=
          {joint-iso-itu-t(2) member-body(2) us(840) x9cm(10040) 2}

-- ANSI X9 holdinstructions referenced by this standard
id-holdinstruction-none OBJECT IDENTIFIER  ::=
                {holdInstruction 1} -- deprecated
id-holdinstruction-callissuer OBJECT IDENTIFIER ::=
                {holdInstruction 2}
id-holdinstruction-reject OBJECT IDENTIFIER ::=
                {holdInstruction 3}

-- invalidity date CRL entry extension OID and syntax

id-ce-invalidityDate OBJECT IDENTIFIER ::= { id-ce 24 }

InvalidityDate ::=  GeneralizedTime

END
```

```
RFC 2459          Internet X.509 Public Key Infrastructure     January 1999


Appendix B. 1993 ASN.1 Structures and OIDs


B.1 Explicitly Tagged Module, 1993 Syntax

PKIX1Explicit93 {iso(1) identified-organization(3) dod(6) internet(1)
   security(5) mechanisms(5) pkix(7) id-mod(0) id-pkix1-explicit-93(3)}


DEFINITIONS EXPLICIT TAGS ::=

BEGIN

-- EXPORTS ALL --

IMPORTS
        authorityKeyIdentifier, subjectKeyIdentifier, keyUsage,
           extendedKeyUsage, privateKeyUsagePeriod, certificatePolicies,
           policyMappings, subjectAltName, issuerAltName,
           basicConstraints, nameConstraints, policyConstraints,
           cRLDistributionPoints, subjectDirectoryAttributes,
           cRLNumber, reasonCode, instructionCode, invalidityDate,
           issuingDistributionPoint, certificateIssuer,
           deltaCRLIndicator, authorityInfoAccess, id-ce
           FROM PKIX1Implicit93 {iso(1) identified-organization(3)
           dod(6) internet(1) security(5) mechanisms(5) pkix(7)
           id-mod(0) id-pkix1-implicit-93(4)} ;

--
                -- Locally defined OIDs --


id-pkix  OBJECT IDENTIFIER  ::=
         { iso(1) identified-organization(3) dod(6) internet(1)
                 security(5) mechanisms(5) pkix(7) }

-- PKIX arcs
-- arc for private certificate extensions
id-pe OBJECT IDENTIFIER  ::=  { id-pkix 1 }
 -- arc for policy qualifier types
id-qt OBJECT IDENTIFIER ::= { id-pkix 2 }
-- arc for extended key purpose OIDS
id-kp OBJECT IDENTIFIER ::= { id-pkix 3 }
-- arc for access descriptors
id-ad OBJECT IDENTIFIER ::= { id-pkix 48 }


-- policyQualifierIds for Internet policy qualifiers
id-qt-cps       OBJECT IDENTIFIER ::=  { id-qt 1 }
        -- OID for CPS qualifier
```

```
id-qt-unotice  OBJECT IDENTIFIER ::= { id-qt 2 }
        -- OID for user notice qualifier

-- based on excerpts from AuthenticationFramework
--    {joint-iso-ccitt ds(5) modules(1) authenticationFramework(7) 2}

                -- Public Key Certificate --

Certificate            ::=   SIGNED { SEQUENCE {
    version               [0]   Version DEFAULT v1,
    serialNumber                CertificateSerialNumber,
    signature                   AlgorithmIdentifier,
    issuer                      Name,
    validity                    Validity,
    subject                     Name,
    subjectPublicKeyInfo        SubjectPublicKeyInfo,
    issuerUniqueIdentifier [1]  IMPLICIT UniqueIdentifier OPTIONAL,
                          ---if present, version shall be v2 or v3--
    subjectUniqueIdentifier [2] IMPLICIT UniqueIdentifier OPTIONAL,
                          ---if present, version shall be v2 or v3--
    extensions            [3]   Extensions OPTIONAL
                          --if present, version shall be v3--}  }

UniqueIdentifier       ::=  BIT STRING

Version                ::=  INTEGER { v1(0), v2(1), v3(2) }

CertificateSerialNumber ::=  INTEGER

Validity                     ::=     SEQUENCE {
    notBefore          Time,
    notAfter           Time }

Time ::= CHOICE {
        utcTime        UTCTime,
        generalTime             GeneralizedTime }

SubjectPublicKeyInfo   ::=     SEQUENCE{
    algorithm          AlgorithmIdentifier,
    subjectPublicKey   BIT STRING}

Extensions       ::=  SEQUENCE SIZE (1..MAX) OF Extension

Extension        ::=  SEQUENCE {
    extnId             EXTENSION.&id ({ExtensionSet}),
    critical           BOOLEAN DEFAULT FALSE,
    extnValue          OCTET STRING }
                -- contains a DER encoding of a value of type
```

```
                    -- &ExtnType for the
                    -- extension object identified by extnId --

-- The following information object set is defined to constrain the
-- set of legal certificate extensions.

ExtensionSet     EXTENSION       ::=     { authorityKeyIdentifier |
                                         subjectKeyIdentifier |
                                         keyUsage |
                                         extendedKeyUsage |
                                         privateKeyUsagePeriod |
                                         certificatePolicies |
                                         policyMappings |
                                         subjectAltName |
                                         issuerAltName |
                                         basicConstraints |
                                         nameConstraints |
                                         policyConstraints |
                                         cRLDistributionPoints |
                                         subjectDirectoryAttributes |
                                         authorityInfoAccess }

EXTENSION        ::=     CLASS {
    &id          OBJECT IDENTIFIER UNIQUE,
    &ExtnType }
WITH SYNTAX  {
    SYNTAX              &ExtnType
    IDENTIFIED BY       &id }

                -- Certificate Revocation List --

CertificateList ::=     SIGNED { SEQUENCE {
    version             Version  OPTIONAL, -- if present, shall be v2
    signature           AlgorithmIdentifier,
    issuer              Name,
    thisUpdate          Time,
    nextUpdate          Time OPTIONAL,
    revokedCertificates SEQUENCE OF SEQUENCE {
    userCertificate     CertificateSerialNumber,
    revocationDate      Time,
    crlEntryExtensions   EntryExtensions OPTIONAL } OPTIONAL,
    crlExtensions       [0]   CRLExtensions OPTIONAL }}

CRLExtensions       ::=         SEQUENCE SIZE (1..MAX) OF CRLExtension

CRLExtension        ::=         SEQUENCE {
    extnId          EXTENSION.&id ({CRLExtensionSet}),
    critical        BOOLEAN DEFAULT FALSE,
```

```
      extnValue         OCTET STRING }
                  -- contains a DER encoding of a value of type
                  -- &ExtnType for the
                  -- extension object identified by extnId --

-- The following information object set is defined to constrain the
-- set of legal CRL extensions.

CRLExtensionSet EXTENSION       ::=      { authorityKeyIdentifier |
                                         issuerAltName |
                                         cRLNumber |
                                         deltaCRLIndicator |
                                         issuingDistributionPoint }

-- EXTENSION defined above for certificates

EntryExtensions         ::=      SEQUENCE SIZE (1..MAX) OF EntryExtension

EntryExtension          ::=      SEQUENCE {
    extnId          EXTENSION.&id ({EntryExtensionSet}),
    critical        BOOLEAN DEFAULT FALSE,
    extnValue       OCTET STRING }
                  -- contains a DER encoding of a value of type
                  -- &ExtnType for the
                  -- extension object identified by extnId --

-- The following information object set is defined to constrain the
-- set of legal CRL entry extensions.

EntryExtensionSet       EXTENSION       ::=      { reasonCode |
                                                 instructionCode |
                                                 invalidityDate |
                                                 certificateIssuer }

         -- information object classes used in the defintion --
                    -- of certificates and CRLs --

-- Parameterized Type SIGNED --

  SIGNED { ToBeSigned } ::= SEQUENCE {
     toBeSigned  ToBeSigned,
     algorithm   AlgorithmIdentifier,
     signature   BIT STRING
  }

-- Definition of AlgorithmIdentifier
-- ISO definition was:
--
```

```
-- AlgorithmIdentifier     ::=  SEQUENCE {
--   algorithm          ALGORITHM.&id({SupportedAlgorithms}),
--   parameters         ALGORITHM.&Type({SupportedAlgorithms}
--                                     { @algorithm}) OPTIONAL }
-- Definition of ALGORITHM
-- ALGORITHM    ::=      TYPE-IDENTIFIER

-- The following PKIX definition replaces the X.509 definition
--

AlgorithmIdentifier      ::=  SEQUENCE {
   algorithm             ALGORITHM-ID.&id({SupportedAlgorithms}),
   parameters            ALGORITHM-ID.&Type({SupportedAlgorithms}
                                     { @algorithm}) OPTIONAL }

-- Definition of ALGORITHM-ID

 ALGORITHM-ID ::= CLASS {
      &id    OBJECT IDENTIFIER UNIQUE,
      &Type  OPTIONAL
   }
      WITH SYNTAX { OID &id [PARMS &Type] }

-- The definition of SupportedAlgorithms may be modified as this
-- document does not specify a mandatory algorithm set.  In addition,
-- the set is specified as extensible, since additional algorithms
-- may be supported

SupportedAlgorithms      ALGORITHM-ID  ::=       { ..., -- extensible
                                        rsaPublicKey |
                                        rsaSHA-1  |
                                        rsaMD5 |
                                        rsaMD2 |
                                        dssPublicKey |
                                        dsaSHA-1 |
                                        dhPublicKey }

-- OIDs and parameter structures for ALGORITHM-IDs used
-- in this specification

rsaPublicKey ALGORITHM-ID ::= { OID rsaEncryption PARMS NULL }

rsaSHA-1 ALGORITHM-ID ::= { OID sha1WithRSAEncryption PARMS NULL }

rsaMD5 ALGORITHM-ID ::= { OID md5WithRSAEncryption PARMS NULL  }

rsaMD2 ALGORITHM-ID ::= { OID md2WithRSAEncryption PARMS NULL  }
```

```
dssPublicKey ALGORITHM-ID ::= { OID id-dsa PARMS Dss-Parms }

dsaSHA-1 ALGORITHM-ID ::= { OID id-dsa-with-sha1 }

dhPublicKey ALGORITHM-ID ::= {OID dhpublicnumber PARMS DomainParameters}

-- algorithm identifiers and parameter structures

pkcs-1 OBJECT IDENTIFIER ::= {
     iso(1) member-body(2) us(840) rsadsi(113549) pkcs(1) 1 }

rsaEncryption OBJECT IDENTIFIER ::=  { pkcs-1 1 }

md2WithRSAEncryption OBJECT IDENTIFIER  ::=  { pkcs-1 2 }

md5WithRSAEncryption OBJECT IDENTIFIER  ::=  { pkcs-1 4 }

sha1WithRSAEncryption OBJECT IDENTIFIER  ::=  { pkcs-1 5 }

id-dsa-with-sha1 OBJECT IDENTIFIER ::= {
     iso(1) member-body(2) us(840) x9-57 (10040) x9algorithm(4) 3 }

Dss-Sig-Value  ::=  SEQUENCE  {
     r        INTEGER,
     s        INTEGER  }

dhpublicnumber OBJECT IDENTIFIER ::= {
     iso(1) member-body(2) us(840) ansi-x942(10046) number-type(2) 1 }

DomainParameters ::= SEQUENCE {
     p        INTEGER, -- odd prime, p=jq +1
     g        INTEGER, -- generator, g
     q        INTEGER, -- factor of p-1
     j        INTEGER OPTIONAL, -- subgroup factor, j>= 2
     validationParms  ValidationParms OPTIONAL }

ValidationParms ::= SEQUENCE {
     seed           BIT STRING,
     pgenCounter    INTEGER }

id-dsa OBJECT IDENTIFIER ::= {
     iso(1) member-body(2) us(840) x9-57(10040) x9algorithm(4) 1 }

Dss-Parms  ::=  SEQUENCE  {
     p              INTEGER,
     q              INTEGER,
     g              INTEGER  }
```

```
     -- The ASN.1 in this section supports the Name type
     -- and the directoryAttribute extension

-- attribute data types --

Attribute       ::=         SEQUENCE {
        type                ATTRIBUTE.&id ({SupportedAttributes}),
        values  SET SIZE (1 .. MAX) OF ATTRIBUTE.&Type
                            ({SupportedAttributes}{@type})}

AttributeTypeAndValue          ::=        SEQUENCE {
        type                ATTRIBUTE.&id ({SupportedAttributes}),
        value   ATTRIBUTE.&Type ({SupportedAttributes}{@type})}

-- naming data types --

Name            ::=     CHOICE { -- only one possibility for now --
                                 rdnSequence  RDNSequence }

RDNSequence ::= SEQUENCE OF RelativeDistinguishedName

RelativeDistinguishedName       ::=
                SET SIZE (1 .. MAX) OF AttributeTypeAndValue

ID    ::=    OBJECT IDENTIFIER

-- ATTRIBUTE information object class specification
--  Note: This has been greatly simplified for PKIX !!

ATTRIBUTE               ::=       CLASS {
        &Type,
        &id                       OBJECT IDENTIFIER UNIQUE }
WITH SYNTAX {
        WITH SYNTAX &Type ID &id }

-- suggested naming attributes
--      Definition of the following information object set may be
--      augmented to meet local requirements.  Note that deleting
--      members of the set may prevent interoperability with
--      conforming implementations.

SupportedAttributes     ATTRIBUTE      ::=    {
                name | commonName | surname | givenName | initials |
                generationQualifier | dnQualifier | countryName |
                localityName | stateOrProvinceName | organizationName |
                    organizationalUnitName | title | pkcs9email }

name ATTRIBUTE  ::=      {
```

```
        WITH SYNTAX                   DirectoryString { ub-name }
        ID                            id-at-name }

commonName ATTRIBUTE     ::=     {
        WITH SYNTAX                   DirectoryString {ub-common-name}
        ID                            id-at-commonName }

surname ATTRIBUTE        ::=          {
        WITH SYNTAX                   DirectoryString {ub-name}
        ID                            id-at-surname }

givenName ATTRIBUTE      ::=          {
        WITH SYNTAX                   DirectoryString {ub-name}
        ID                            id-at-givenName }

initials ATTRIBUTE       ::=          {
        WITH SYNTAX                   DirectoryString {ub-name}
        ID                            id-at-initials }

generationQualifier ATTRIBUTE   ::=         {
        WITH SYNTAX                   DirectoryString {ub-name}
        ID                            id-at-generationQualifier}

dnQualifier ATTRIBUTE    ::=     {
        WITH SYNTAX                   PrintableString
        ID                            id-at-dnQualifier }


countryName ATTRIBUTE    ::=     {
        WITH SYNTAX                   PrintableString (SIZE (2))
                                          -- IS 3166 codes only
        ID                            id-at-countryName }

localityName ATTRIBUTE  ::=      {
        WITH SYNTAX             DirectoryString {ub-locality-name}
        ID                      id-at-localityName }

stateOrProvinceName ATTRIBUTE    ::=     {
        WITH SYNTAX             DirectoryString {ub-state-name}
        ID                      id-at-stateOrProvinceName }

organizationName ATTRIBUTE       ::=     {
        WITH SYNTAX             DirectoryString {ub-organization-name}
        ID                      id-at-organizationName }

organizationalUnitName ATTRIBUTE          ::=     {
        WITH SYNTAX  DirectoryString {ub-organizational-unit-name}
        ID                      id-at-organizationalUnitName }
```

```
title ATTRIBUTE ::=                       {
        WITH SYNTAX             DirectoryString {ub-title}
        ID                      id-at-title }

 -- Legacy attributes

pkcs9email ATTRIBUTE ::= {
        WITH SYNTAX                     PHGString,
        ID                              emailAddress }

PHGString ::= IA5String (SIZE(1..ub-emailaddress-length))

pkcs-9 OBJECT IDENTIFIER ::=
        { iso(1) member-body(2) us(840) rsadsi(113549) pkcs(1) 9 }

emailAddress OBJECT IDENTIFIER ::= { pkcs-9 1 }

    -- object identifiers for Name type and directory attribute support

-- Object identifier assignments --

id-at   OBJECT IDENTIFIER        ::=     {joint-iso-ccitt(2) ds(5) 4}

-- Attributes --

id-at-commonName        OBJECT IDENTIFIER       ::=    {id-at 3}
id-at-surname           OBJECT IDENTIFIER       ::=    {id-at 4}
id-at-countryName       OBJECT IDENTIFIER       ::=    {id-at 6}
id-at-localityName      OBJECT IDENTIFIER       ::=    {id-at 7}
id-at-stateOrProvinceName    OBJECT IDENTIFIER ::= {id-at 8}
id-at-organizationName       OBJECT IDENTIFIER ::= {id-at 10}
id-at-organizationalUnitName OBJECT IDENTIFIER ::= {id-at 11}
id-at-title             OBJECT IDENTIFIER       ::=    {id-at 12}
id-at-name              OBJECT IDENTIFIER       ::=    {id-at 41}
id-at-givenName         OBJECT IDENTIFIER       ::=    {id-at 42}
id-at-initials          OBJECT IDENTIFIER       ::=    {id-at 43}
id-at-generationQualifier   OBJECT IDENTIFIER   ::=    {id-at 44}
id-at-dnQualifier       OBJECT IDENTIFIER       ::=    {id-at 46}

-- Directory string type, used extensively in Name types --

DirectoryString { INTEGER:maxSize } ::= CHOICE {
        teletexString           TeletexString (SIZE (1..maxSize)),
        printableString         PrintableString (SIZE (1..maxSize)),
        universalString         UniversalString (SIZE (1..maxSize)),
        bmpString               BMPString (SIZE(1..maxSize)),
        utf8String              UTF8String (SIZE(1..maxSize))
                        }
```

```
     -- End of ASN.1 for Name type and directory attribute support --

     -- The ASN.1 in this section supports X.400 style names   --
     -- for implementations that use the x400Address component --
     -- of GeneralName.                                         --

ORAddress ::= SEQUENCE {
   built-in-standard-attributes BuiltInStandardAttributes,
   built-in-domain-defined-attributes
                     BuiltInDomainDefinedAttributes OPTIONAL,
   -- see also teletex-domain-defined-attributes
   extension-attributes ExtensionAttributes OPTIONAL }

-- The OR-address is semantically absent from the OR-name if the
-- built-in-standard-attribute sequence is empty and the
-- built-in-domain-defined-attributes and extension-attributes are
-- both omitted.

--      Built-in Standard Attributes

BuiltInStandardAttributes ::= SEQUENCE {
   country-name CountryName OPTIONAL,
   administration-domain-name AdministrationDomainName OPTIONAL,
   network-address        [0] NetworkAddress OPTIONAL,
   -- see also extended-network-address
   terminal-identifier [1] TerminalIdentifier OPTIONAL,
   private-domain-name [2] PrivateDomainName OPTIONAL,
   organization-name   [3] OrganizationName OPTIONAL,
   -- see also teletex-organization-name
   numeric-user-identifier     [4] NumericUserIdentifier OPTIONAL,
   personal-name       [5] PersonalName OPTIONAL,
   -- see also teletex-personal-name
   organizational-unit-names    [6] OrganizationalUnitNames OPTIONAL
   -- see also teletex-organizational-unit-names -- }

CountryName ::= [APPLICATION 1] CHOICE {
   x121-dcc-code NumericString
               (SIZE (ub-country-name-numeric-length)),
   iso-3166-alpha2-code PrintableString
               (SIZE (ub-country-name-alpha-length)) }

AdministrationDomainName ::= [APPLICATION 2] CHOICE {
   numeric NumericString (SIZE (0..ub-domain-name-length)),
   printable PrintableString (SIZE (0..ub-domain-name-length)) }

NetworkAddress ::= X121Address
-- see also extended-network-address
```

```
X121Address ::= NumericString (SIZE (1..ub-x121-address-length))

TerminalIdentifier ::= PrintableString (SIZE (1..ub-terminal-id-length))

PrivateDomainName ::= CHOICE {
   numeric NumericString (SIZE (1..ub-domain-name-length)),
   printable PrintableString (SIZE (1..ub-domain-name-length)) }

OrganizationName ::= PrintableString
                          (SIZE (1..ub-organization-name-length))
-- see also teletex-organization-name

NumericUserIdentifier ::= NumericString
                             (SIZE (1..ub-numeric-user-id-length))

PersonalName ::= SET {
   surname    [0] PrintableString (SIZE (1..ub-surname-length)),
   given-name [1] PrintableString
                      (SIZE (1..ub-given-name-length)) OPTIONAL,
   initials   [2] PrintableString
                      (SIZE (1..ub-initials-length)) OPTIONAL,
   generation-qualifier [3] PrintableString
             (SIZE (1..ub-generation-qualifier-length)) OPTIONAL}
-- see also teletex-personal-name

OrganizationalUnitNames ::= SEQUENCE SIZE (1..ub-organizational-units)
                                OF OrganizationalUnitName
-- see also teletex-organizational-unit-names

OrganizationalUnitName ::= PrintableString (SIZE
                      (1..ub-organizational-unit-name-length))

--      Built-in Domain-defined Attributes
BuiltInDomainDefinedAttributes ::= SEQUENCE SIZE
                              (1..ub-domain-defined-attributes) OF
                              BuiltInDomainDefinedAttribute

BuiltInDomainDefinedAttribute ::= SEQUENCE {
   type PrintableString (SIZE
              (1..ub-domain-defined-attribute-type-length)),
   value PrintableString (SIZE
              (1..ub-domain-defined-attribute-value-length)) }

--      Extension Attributes

ExtensionAttributes ::= SET SIZE (1..ub-extension-attributes)
                                OF ExtensionAttribute
ExtensionAttribute ::= SEQUENCE {
```

```
        extension-attribute-type [0] EXTENSION-ATTRIBUTE.&id
                                        ({ExtensionAttributeTable}),
        extension-attribute-value [1] EXTENSION-ATTRIBUTE.&Type
             ({ExtensionAttributeTable} {@extension-attribute-type}) }

EXTENSION-ATTRIBUTE ::= CLASS {
        &id      INTEGER (0..ub-extension-attributes) UNIQUE,
        &Type }
WITH SYNTAX {&Type IDENTIFIED BY &id}

ExtensionAttributeTable EXTENSION-ATTRIBUTE ::= {
        common-name |
        teletex-common-name |
        teletex-organization-name |
        teletex-personal-name |
        teletex-organizational-unit-names |
        teletex-domain-defined-attributes |
        pds-name |
        physical-delivery-country-name |
        postal-code |
        physical-delivery-office-name |
        physical-delivery-office-number |
        extension-OR-address-components |
        physical-delivery-personal-name |
        physical-delivery-organization-name |
        extension-physical-delivery-address-components |
        unformatted-postal-address |
        street-address |
        post-office-box-address |
        poste-restante-address |
        unique-postal-name |
        local-postal-attributes |
        extended-network-address |
        terminal-type }

--      Extension Standard Attributes

common-name EXTENSION-ATTRIBUTE ::= {CommonName IDENTIFIED BY 1}

CommonName ::= PrintableString (SIZE (1..ub-common-name-length))

teletex-common-name EXTENSION-ATTRIBUTE ::=
             {TeletexCommonName IDENTIFIED BY 2}

TeletexCommonName ::= TeletexString (SIZE (1..ub-common-name-length))

teletex-organization-name EXTENSION-ATTRIBUTE ::=
             {TeletexOrganizationName IDENTIFIED BY 3}
```

```
TeletexOrganizationName ::=
                TeletexString (SIZE (1..ub-organization-name-length))

teletex-personal-name EXTENSION-ATTRIBUTE ::=
                {TeletexPersonalName IDENTIFIED BY 4}

TeletexPersonalName ::= SET {
    surname [0] TeletexString (SIZE (1..ub-surname-length)),
    given-name [1] TeletexString
                (SIZE (1..ub-given-name-length)) OPTIONAL,
    initials [2] TeletexString (SIZE (1..ub-initials-length)) OPTIONAL,
    generation-qualifier [3] TeletexString (SIZE
                (1..ub-generation-qualifier-length)) OPTIONAL }

teletex-organizational-unit-names EXTENSION-ATTRIBUTE ::=
    {TeletexOrganizationalUnitNames IDENTIFIED BY 5}

TeletexOrganizationalUnitNames ::= SEQUENCE SIZE
        (1..ub-organizational-units) OF TeletexOrganizationalUnitName

TeletexOrganizationalUnitName ::= TeletexString
                        (SIZE (1..ub-organizational-unit-name-length))

pds-name EXTENSION-ATTRIBUTE ::= {PDSName IDENTIFIED BY 7}

PDSName ::= PrintableString (SIZE (1..ub-pds-name-length))

physical-delivery-country-name EXTENSION-ATTRIBUTE ::=
    {PhysicalDeliveryCountryName IDENTIFIED BY 8}

PhysicalDeliveryCountryName ::= CHOICE {
    x121-dcc-code NumericString (SIZE (ub-country-name-numeric-length)),
    iso-3166-alpha2-code PrintableString
                        (SIZE (ub-country-name-alpha-length)) }

postal-code EXTENSION-ATTRIBUTE ::= {PostalCode IDENTIFIED BY 9}

PostalCode ::= CHOICE {
    numeric-code NumericString (SIZE (1..ub-postal-code-length)),
    printable-code PrintableString (SIZE (1..ub-postal-code-length)) }

physical-delivery-office-name EXTENSION-ATTRIBUTE ::=
                        {PhysicalDeliveryOfficeName IDENTIFIED BY 10}

PhysicalDeliveryOfficeName ::= PDSParameter

physical-delivery-office-number EXTENSION-ATTRIBUTE ::=
    {PhysicalDeliveryOfficeNumber IDENTIFIED BY 11}
```

```
PhysicalDeliveryOfficeNumber ::= PDSParameter

extension-OR-address-components EXTENSION-ATTRIBUTE ::=
    {ExtensionORAddressComponents IDENTIFIED BY 12}

ExtensionORAddressComponents ::= PDSParameter

physical-delivery-personal-name EXTENSION-ATTRIBUTE ::=
    {PhysicalDeliveryPersonalName IDENTIFIED BY 13}

PhysicalDeliveryPersonalName ::= PDSParameter

physical-delivery-organization-name EXTENSION-ATTRIBUTE ::=
    {PhysicalDeliveryOrganizationName IDENTIFIED BY 14}

PhysicalDeliveryOrganizationName ::= PDSParameter

extension-physical-delivery-address-components EXTENSION-ATTRIBUTE ::=
    {ExtensionPhysicalDeliveryAddressComponents IDENTIFIED BY 15}

ExtensionPhysicalDeliveryAddressComponents ::= PDSParameter

unformatted-postal-address EXTENSION-ATTRIBUTE ::=
                     {UnformattedPostalAddress IDENTIFIED BY 16}

UnformattedPostalAddress ::= SET {
    printable-address SEQUENCE SIZE (1..ub-pds-physical-address-lines) OF
            PrintableString (SIZE (1..ub-pds-parameter-length)) OPTIONAL,
    teletex-string TeletexString (SIZE
                     (1..ub-unformatted-address-length)) OPTIONAL }

street-address EXTENSION-ATTRIBUTE ::=
               {StreetAddress IDENTIFIED BY 17}

StreetAddress ::= PDSParameter

post-office-box-address EXTENSION-ATTRIBUTE ::=
               {PostOfficeBoxAddress IDENTIFIED BY 18}

PostOfficeBoxAddress ::= PDSParameter

poste-restante-address EXTENSION-ATTRIBUTE ::=
               {PosteRestanteAddress IDENTIFIED BY 19}

PosteRestanteAddress ::= PDSParameter

unique-postal-name EXTENSION-ATTRIBUTE ::=
               {UniquePostalName IDENTIFIED BY 20}
```

```
UniquePostalName ::= PDSParameter

local-postal-attributes EXTENSION-ATTRIBUTE ::=
                {LocalPostalAttributes IDENTIFIED BY 21}

LocalPostalAttributes ::= PDSParameter

PDSParameter ::= SET {
    printable-string PrintableString
            (SIZE(1..ub-pds-parameter-length)) OPTIONAL,
    teletex-string TeletexString
            (SIZE(1..ub-pds-parameter-length)) OPTIONAL }

extended-network-address EXTENSION-ATTRIBUTE ::=
                {ExtendedNetworkAddress IDENTIFIED BY 22}

ExtendedNetworkAddress ::= CHOICE {
        e163-4-address SEQUENCE {
                number [0] NumericString
                    (SIZE (1..ub-e163-4-number-length)),
                sub-address [1] NumericString
                    (SIZE (1..ub-e163-4-sub-address-length)) OPTIONAL},
        psap-address [0] PresentationAddress }

PresentationAddress ::= SEQUENCE {
        pSelector       [0] EXPLICIT OCTET STRING OPTIONAL,
        sSelector       [1] EXPLICIT OCTET STRING OPTIONAL,
        tSelector       [2] EXPLICIT OCTET STRING OPTIONAL,
        nAddresses      [3] EXPLICIT SET SIZE (1..MAX) OF OCTET STRING}


terminal-type EXTENSION-ATTRIBUTE ::= {TerminalType IDENTIFIED BY 23}

TerminalType ::= INTEGER {
    telex (3),
    teletex (4),
    g3-facsimile (5),
    g4-facsimile (6),
    ia5-terminal (7),
    videotex (8) } (0..ub-integer-options)

--      Extension Domain-defined Attributes

teletex-domain-defined-attributes EXTENSION-ATTRIBUTE ::=
    {TeletexDomainDefinedAttributes IDENTIFIED BY 6}

TeletexDomainDefinedAttributes ::= SEQUENCE SIZE
    (1..ub-domain-defined-attributes) OF TeletexDomainDefinedAttribute
```

```
TeletexDomainDefinedAttribute ::= SEQUENCE {
    type TeletexString
        (SIZE (1..ub-domain-defined-attribute-type-length)),
    value TeletexString
        (SIZE (1..ub-domain-defined-attribute-value-length)) }

-- specifications of Upper Bounds
-- shall be regarded as mandatory
-- from Annex B of ITU-T X.411
-- Reference Definition of MTS Parameter Upper Bounds

--      Upper Bounds
ub-name INTEGER ::=      32768
ub-common-name INTEGER ::=   64
ub-locality-name        INTEGER ::=     128
ub-state-name    INTEGER ::=     128
ub-organization-name    INTEGER ::=     64
ub-organizational-unit-name     INTEGER ::=     64
ub-title        INTEGER ::=     64
ub-match        INTEGER ::=     128

ub-emailaddress-length INTEGER ::= 128

ub-common-name-length INTEGER ::= 64
ub-country-name-alpha-length INTEGER ::= 2
ub-country-name-numeric-length INTEGER ::= 3
ub-domain-defined-attributes INTEGER ::= 4
ub-domain-defined-attribute-type-length INTEGER ::= 8
ub-domain-defined-attribute-value-length INTEGER ::= 128
ub-domain-name-length INTEGER ::= 16
ub-extension-attributes INTEGER ::= 256
ub-e163-4-number-length INTEGER ::= 15
ub-e163-4-sub-address-length INTEGER ::= 40
ub-generation-qualifier-length INTEGER ::= 3
ub-given-name-length INTEGER ::= 16
ub-initials-length INTEGER ::= 5
ub-integer-options INTEGER ::= 256
ub-numeric-user-id-length INTEGER ::= 32
ub-organization-name-length INTEGER ::= 64
ub-organizational-unit-name-length INTEGER ::= 32
ub-organizational-units INTEGER ::= 4
ub-pds-name-length INTEGER ::= 16
ub-pds-parameter-length INTEGER ::= 30
ub-pds-physical-address-lines INTEGER ::= 6
ub-postal-code-length INTEGER ::= 16
ub-surname-length INTEGER ::= 40
ub-terminal-id-length INTEGER ::= 24
ub-unformatted-address-length INTEGER ::= 180
```

```
ub-x121-address-length INTEGER ::= 16

-- Note - upper bounds on TeletexString are measured in characters.
-- A significantly greater number of octets will be required to hold
-- such a value.  As a minimum, 16 octets, or twice the specified upper
-- bound, whichever is the larger, should be allowed.

END
```

B.2 Implicitly Tagged Module, 1993 Syntax


```
PKIX1Implicit93  {iso(1) identified-organization(3) dod(6) internet(1)
    security(5) mechanisms(5) pkix(7) id-mod(0) id-pkix1-implicit-93(4)}

DEFINITIONS IMPLICIT TAGS::=

BEGIN

--EXPORTS ALL --

IMPORTS
        id-pe, id-qt, id-kp, id-ad, id-qt-unotice,
                ORAddress, Name, RelativeDistinguishedName,
                CertificateSerialNumber, CertificateList,
                AlgorithmIdentifier, ub-name, DirectoryString,
                Attribute, EXTENSION
                FROM PKIX1Explicit93 {iso(1) identified-organization(3)
                dod(6) internet(1) security(5) mechanisms(5) pkix(7)
                id-mod(0) id-pkix1-explicit-93(3)};

-- Key and policy information extensions --

authorityKeyIdentifier EXTENSION ::= {
        SYNTAX          AuthorityKeyIdentifier
        IDENTIFIED BY   id-ce-authorityKeyIdentifier }

AuthorityKeyIdentifier ::= SEQUENCE {
    keyIdentifier               [0] KeyIdentifier            OPTIONAL,
    authorityCertIssuer         [1] GeneralNames             OPTIONAL,
    authorityCertSerialNumber   [2] CertificateSerialNumber  OPTIONAL }
        ( WITH COMPONENTS       {..., authorityCertIssuer PRESENT,
                                authorityCertSerialNumber PRESENT} |
         WITH COMPONENTS        {..., authorityCertIssuer ABSENT,
                                authorityCertSerialNumber ABSENT} )

KeyIdentifier ::= OCTET STRING

subjectKeyIdentifier EXTENSION ::= {
        SYNTAX          SubjectKeyIdentifier
        IDENTIFIED BY   id-ce-subjectKeyIdentifier }

SubjectKeyIdentifier ::= KeyIdentifier

keyUsage EXTENSION ::= {
        SYNTAX  KeyUsage
        IDENTIFIED BY id-ce-keyUsage }
```

```
KeyUsage ::= BIT STRING {
        digitalSignature      (0),
        nonRepudiation        (1),
        keyEncipherment       (2),
        dataEncipherment      (3),
        keyAgreement          (4),
        keyCertSign           (5),
        cRLSign               (6),
     encipherOnly           (7),
     decipherOnly           (8) }


extendedKeyUsage EXTENSION ::= {
        SYNTAX SEQUENCE SIZE (1..MAX) OF KeyPurposeId
        IDENTIFIED BY id-ce-extKeyUsage }


KeyPurposeId ::= OBJECT IDENTIFIER

-- PKIX-defined extended key purpose OIDs
id-kp-serverAuth      OBJECT IDENTIFIER ::= { id-kp 1 }
id-kp-clientAuth      OBJECT IDENTIFIER ::= { id-kp 2 }
id-kp-codeSigning     OBJECT IDENTIFIER ::= { id-kp 3 }
id-kp-emailProtection OBJECT IDENTIFIER ::= { id-kp 4 }
id-kp-ipsecEndSystem  OBJECT IDENTIFIER ::= { id-kp 5 }
id-kp-ipsecTunnel     OBJECT IDENTIFIER ::= { id-kp 6 }
id-kp-ipsecUser       OBJECT IDENTIFIER ::= { id-kp 7 }
id-kp-timeStamping    OBJECT IDENTIFIER ::= { id-kp 8 }


privateKeyUsagePeriod EXTENSION ::= {
        SYNTAX  PrivateKeyUsagePeriod
        IDENTIFIED BY { id-ce-privateKeyUsagePeriod } }


PrivateKeyUsagePeriod ::= SEQUENCE {
        notBefore       [0]     GeneralizedTime OPTIONAL,
        notAfter        [1]     GeneralizedTime OPTIONAL }
        ( WITH COMPONENTS       {..., notBefore PRESENT} |
        WITH COMPONENTS         {..., notAfter PRESENT} )


certificatePolicies EXTENSION ::= {
        SYNTAX  CertificatePoliciesSyntax
        IDENTIFIED BY id-ce-certificatePolicies }


CertificatePoliciesSyntax ::=
                SEQUENCE SIZE (1..MAX) OF PolicyInformation


PolicyInformation ::= SEQUENCE {
        policyIdentifier   CertPolicyId,
        policyQualifiers   SEQUENCE SIZE (1..MAX) OF
                PolicyQualifierInfo OPTIONAL }
```

```
CertPolicyId ::= OBJECT IDENTIFIER

PolicyQualifierInfo ::= SEQUENCE {
        policyQualifierId       CERT-POLICY-QUALIFIER.&id
                                ({SupportedPolicyQualifiers}),
        qualifier               CERT-POLICY-QUALIFIER.&Qualifier
                                ({SupportedPolicyQualifiers}
                                {@policyQualifierId})OPTIONAL }

SupportedPolicyQualifiers CERT-POLICY-QUALIFIER ::= { noticeToUser |
                                                      pointerToCPS }

CERT-POLICY-QUALIFIER ::= CLASS {
        &id             OBJECT IDENTIFIER UNIQUE,
        &Qualifier      OPTIONAL }
WITH SYNTAX {
        POLICY-QUALIFIER-ID     &id
        [QUALIFIER-TYPE &Qualifier] }

policyMappings EXTENSION ::= {
        SYNTAX  PolicyMappingsSyntax
        IDENTIFIED BY id-ce-policyMappings }

PolicyMappingsSyntax ::= SEQUENCE SIZE (1..MAX) OF SEQUENCE {
        issuerDomainPolicy      CertPolicyId,
        subjectDomainPolicy     CertPolicyId }

-- Certificate subject and certificate issuer attributes extensions --

subjectAltName EXTENSION ::= {
        SYNTAX  GeneralNames
        IDENTIFIED BY id-ce-subjectAltName }

GeneralNames ::= SEQUENCE SIZE (1..MAX) OF GeneralName

GeneralName ::= CHOICE {
        otherName               [0] INSTANCE OF OTHER-NAME,
        rfc822Name              [1] IA5String,
        dNSName                 [2] IA5String,
        x400Address             [3] ORAddress,
        directoryName           [4] Name,
        ediPartyName            [5] EDIPartyName,
        uniformResourceIdentifier [6] IA5String,
        iPAddress               [7] OCTET STRING,
        registeredID            [8] OBJECT IDENTIFIER }

OTHER-NAME ::= TYPE-IDENTIFIER
```

```
EDIPartyName ::= SEQUENCE {
        nameAssigner          [0] DirectoryString {ub-name} OPTIONAL,
        partyName             [1] DirectoryString {ub-name} }

issuerAltName EXTENSION ::= {
        SYNTAX  GeneralNames
        IDENTIFIED BY id-ce-issuerAltName }

subjectDirectoryAttributes EXTENSION ::= {
        SYNTAX  AttributesSyntax
        IDENTIFIED BY id-ce-subjectDirectoryAttributes }

AttributesSyntax ::= SEQUENCE SIZE (1..MAX) OF Attribute

-- Certification path constraints extensions --

basicConstraints EXTENSION ::= {
        SYNTAX  BasicConstraintsSyntax
        IDENTIFIED BY id-ce-basicConstraints }

BasicConstraintsSyntax ::= SEQUENCE {
        cA                    BOOLEAN DEFAULT FALSE,
        pathLenConstraint     INTEGER (0..MAX) OPTIONAL }

nameConstraints EXTENSION ::= {
        SYNTAX  NameConstraintsSyntax
        IDENTIFIED BY id-ce-nameConstraints }

NameConstraintsSyntax ::= SEQUENCE {
        permittedSubtrees     [0]     GeneralSubtrees OPTIONAL,
        excludedSubtrees      [1]     GeneralSubtrees OPTIONAL }

GeneralSubtrees ::= SEQUENCE SIZE (1..MAX) OF GeneralSubtree

GeneralSubtree ::= SEQUENCE {
        base                  GeneralName,
        minimum        [0]    BaseDistance DEFAULT 0,
        maximum        [1]    BaseDistance OPTIONAL }

BaseDistance ::= INTEGER (0..MAX)

policyConstraints EXTENSION ::= {
        SYNTAX  PolicyConstraintsSyntax
        IDENTIFIED BY id-ce-policyConstraints }

PolicyConstraintsSyntax ::= SEQUENCE {
        requireExplicitPolicy [0] SkipCerts OPTIONAL,
        inhibitPolicyMapping  [1] SkipCerts OPTIONAL }
```

```
SkipCerts ::= INTEGER (0..MAX)

-- Basic CRL extensions --

cRLNumber EXTENSION ::= {
        SYNTAX   CRLNumber
        IDENTIFIED BY id-ce-cRLNumber }

CRLNumber ::= INTEGER (0..MAX)

reasonCode EXTENSION ::= {
        SYNTAX   CRLReason
        IDENTIFIED BY id-ce-reasonCode }

CRLReason ::= ENUMERATED {
        unspecified             (0),
        keyCompromise           (1),
        cACompromise            (2),
        affiliationChanged      (3),
        superseded              (4),
        cessationOfOperation    (5),
        certificateHold         (6),
        removeFromCRL           (8) }

instructionCode EXTENSION ::= {
        SYNTAX   HoldInstruction
        IDENTIFIED BY id-ce-instructionCode }

HoldInstruction ::= OBJECT IDENTIFIER

-- holdinstructions described in this specification, from ANSI x9

-- ANSI x9 arc holdinstruction arc
holdInstruction OBJECT IDENTIFIER ::= {
     joint-iso-ccitt(2) member-body(2) us(840) x9cm(10040) 2}

-- ANSI X9 holdinstructions referenced by this standard
id-holdinstruction-none OBJECT IDENTIFIER ::= {holdInstruction 1}
id-holdinstruction-callissuer OBJECT IDENTIFIER ::= {holdInstruction 2}
id-holdinstruction-reject OBJECT IDENTIFIER ::= {holdInstruction 3}

invalidityDate EXTENSION ::= {
        SYNTAX   GeneralizedTime
        IDENTIFIED BY id-ce-invalidityDate }

-- CRL distribution points and delta-CRL extensions --

cRLDistributionPoints EXTENSION ::= {
```

```
        SYNTAX  CRLDistPointsSyntax
        IDENTIFIED BY id-ce-cRLDistributionPoints }

CRLDistPointsSyntax ::= SEQUENCE SIZE (1..MAX) OF DistributionPoint

DistributionPoint ::= SEQUENCE {
        distributionPoint       [0]     DistributionPointName OPTIONAL,
        reasons         [1]     ReasonFlags OPTIONAL,
        cRLIssuer       [2]     GeneralNames OPTIONAL }

DistributionPointName ::= CHOICE {
        fullName        [0]     GeneralNames,
        nameRelativeToCRLIssuer [1]     RelativeDistinguishedName }

ReasonFlags ::= BIT STRING {
        unused          (0),
        keyCompromise   (1),
        caCompromise    (2),
        affiliationChanged   (3),
        superseded      (4),
        cessationOfOperation  (5),
        certificateHold (6) }

issuingDistributionPoint EXTENSION ::= {
        SYNTAX  IssuingDistPointSyntax
        IDENTIFIED BY id-ce-issuingDistributionPoint }

IssuingDistPointSyntax ::= SEQUENCE {
        distributionPoint       [0] DistributionPointName OPTIONAL,
        onlyContainsUserCerts   [1] BOOLEAN DEFAULT FALSE,
        onlyContainsCACerts     [2] BOOLEAN DEFAULT FALSE,
        onlySomeReasons         [3] ReasonFlags OPTIONAL,
        indirectCRL             [4] BOOLEAN DEFAULT FALSE }

certificateIssuer EXTENSION ::= {
        SYNTAX          GeneralNames
        IDENTIFIED BY id-ce-certificateIssuer }

deltaCRLIndicator EXTENSION ::= {
        SYNTAX          BaseCRLNumber
        IDENTIFIED BY id-ce-deltaCRLIndicator }

BaseCRLNumber ::= CRLNumber

-- Object identifier assignments for ISO certificate extensions --
id-ce   OBJECT IDENTIFIER       ::=     {joint-iso-ccitt(2) ds(5) 29}

id-ce-subjectDirectoryAttributes   OBJECT IDENTIFIER ::= {id-ce 9}
```

```
id-ce-subjectKeyIdentifier       OBJECT IDENTIFIER ::= {id-ce 14}
id-ce-keyUsage                   OBJECT IDENTIFIER ::= {id-ce 15}
id-ce-privateKeyUsagePeriod      OBJECT IDENTIFIER ::= {id-ce 16}
id-ce-subjectAltName             OBJECT IDENTIFIER ::= {id-ce 17}
id-ce-issuerAltName              OBJECT IDENTIFIER ::= {id-ce 18}
id-ce-basicConstraints           OBJECT IDENTIFIER ::= {id-ce 19}
id-ce-cRLNumber                  OBJECT IDENTIFIER ::= {id-ce 20}
id-ce-reasonCode                 OBJECT IDENTIFIER ::= {id-ce 21}
id-ce-instructionCode            OBJECT IDENTIFIER ::= {id-ce 23}
id-ce-invalidityDate             OBJECT IDENTIFIER ::= {id-ce 24}
id-ce-deltaCRLIndicator          OBJECT IDENTIFIER ::= {id-ce 27}
id-ce-issuingDistributionPoint   OBJECT IDENTIFIER ::= {id-ce 28}
id-ce-certificateIssuer          OBJECT IDENTIFIER ::= {id-ce 29}
id-ce-nameConstraints            OBJECT IDENTIFIER ::= {id-ce 30}
id-ce-cRLDistributionPoints      OBJECT IDENTIFIER ::= {id-ce 31}
id-ce-certificatePolicies        OBJECT IDENTIFIER ::= {id-ce 32}
id-ce-policyMappings             OBJECT IDENTIFIER ::= {id-ce 33}
id-ce-policyConstraints          OBJECT IDENTIFIER ::= {id-ce 36}
id-ce-authorityKeyIdentifier     OBJECT IDENTIFIER ::= {id-ce 35}
id-ce-extKeyUsage                OBJECT IDENTIFIER ::= {id-ce 37}

-- PKIX 1 extensions

authorityInfoAccess EXTENSION ::= {
        SYNTAX  AuthorityInfoAccessSyntax
        IDENTIFIED BY id-pe-authorityInfoAccess }

AuthorityInfoAccessSyntax  ::=
        SEQUENCE SIZE (1..MAX) OF AccessDescription

AccessDescription  ::=  SEQUENCE {
        accessMethod       OBJECT IDENTIFIER,
        accessLocation     GeneralName  }

id-pe-authorityInfoAccess OBJECT IDENTIFIER ::= { id-pe 1 }

id-ad-ocsp     OBJECT IDENTIFIER ::= { id-ad 1 }
id-ad-caIssuers OBJECT IDENTIFIER ::= { id-ad 2 }

-- PKIX policy qualifier definitions

noticeToUser CERT-POLICY-QUALIFIER ::= {
     POLICY-QUALIFIER-ID    id-qt-cps QUALIFIER-TYPE      CPSuri}

pointerToCPS CERT-POLICY-QUALIFIER ::= {
     POLICY-QUALIFIER-ID    id-qt-unotice QUALIFIER-TYPE   UserNotice}

id-qt-cps      OBJECT IDENTIFIER ::=  { id-qt 1 }
```

```
id-qt-unotice  OBJECT IDENTIFIER ::=  { id-qt 2 }

CPSuri ::= IA5String

UserNotice ::= SEQUENCE {
     noticeRef         NoticeReference OPTIONAL,
     explicitText      DisplayText OPTIONAL}

NoticeReference ::= SEQUENCE {
     organization      DisplayText,
     noticeNumbers     SEQUENCE OF INTEGER }

DisplayText ::= CHOICE {
     visibleString     VisibleString   (SIZE (1..200)),
     bmpString         BMPString       (SIZE (1..200)),
     utf8String        UTF8String      (SIZE (1..200)) }


END
```

Appendix C. ASN.1 Notes

The construct "SEQUENCE SIZE (1..MAX) OF" appears in several ASN.1
constructs. A valid ASN.1 sequence will have zero or more entries.
The SIZE (1..MAX) construct constrains the sequence to have at least
one entry. MAX indicates the upper bound is unspecified.
Implementations are free to choose an upper bound that suits their
environment.

The construct "positiveInt ::= INTEGER (0..MAX)" defines positiveInt
as a subtype of INTEGER containing integers greater than or equal to
zero.  The upper bound is unspecified. Implementations are free to
select an upper bound that suits their environment.

The character string type PrintableString supports a very basic Latin
character set: the lower case letters 'a' through 'z', upper case
letters 'A' through 'Z', the digits '0' through '9', eleven special
characters ' " ( ) + , - . / : ? and space.

The character string type TeletexString is a superset of
PrintableString.  TeletexString supports a fairly standard (ascii-
like) Latin character set, Latin characters with non-spacing accents
and Japanese characters.

The character string type UniversalString supports any of the
characters allowed by ISO 10646-1. ISO 10646 is the Universal
multiple-octet coded Character Set (UCS).  ISO 10646-1 specifes the
architecture and the "basic multilingual plane" - a large standard
character set which includes all major world character standards.

The character string type UTF8String will be introduced in the 1998
version of ASN.1.  UTF8String is a universal type and has been
assigned tag number 12.  The content of UTF8String was defined by RFC
2044 and updated in RFC 2279, "UTF-8, a transformation Format of ISP
10646."  ISO is expected to formally add UTF8String to the list of
choices for DirectoryString in 1998 as well.

In anticipation of these changes, and in conformance with IETF Best
Practices codified in RFC 2277, IETF Policy on Character Sets and
Languages, this document includes UTF8String as a choice in
DirectoryString and the CPS qualifier extensions.

Appendix D. Examples

   This section contains four examples: three certificates and a CRL.
   The first two certificates and the CRL comprise a minimal
   certification path.

   Section D.1 contains an annotated hex dump of a "self-signed"
   certificate issued by a CA whose distinguished name is
   cn=us,o=gov,ou=nist.  The certificate contains a DSA public key with
   parameters, and is signed by the corresponding DSA private key.

   Section D.2 contains an annotated hex dump of an end-entity
   certificate.  The end entity certificate contains a DSA public key,
   and is signed by the private key corresponding to the "self-signed"
   certificate in section D.1.

   Section D.3 contains a dump of an end entity certificate which
   contains an RSA public key and is signed with RSA and MD5.  This
   certificate is not part of the minimal certification path.

   Section D.4 contains an annotated hex dump of a CRL.  The CRL is
   issued by the CA whose distinguished name is cn=us,o=gov,ou=nist and
   the list of revoked certificates includes the end entity certificate
   presented in D.2.

D.1 Certificate

   This section contains an annotated hex dump of a 699 byte version 3
   certificate.  The certificate contains the following information:
   (a) the serial number is 17 (11 hex);
   (b) the certificate is signed with DSA and the SHA-1 hash algorithm;
   (c) the issuer's distinguished name is OU=nist; O=gov; C=US
   (d) and the subject's distinguished name is OU=nist; O=gov; C=US
   (e) the certificate was issued on June 30, 1997 and will expire on
   December 31, 1997;
   (f) the certificate contains a 1024 bit DSA public key with
   parameters;
   (g) the certificate contains a subject key identifier extension; and
   (h) the certificate is a CA certificate (as indicated through the
   basic constraints extension.)

```
0000 30 82 02 b7  695: SEQUENCE
0004 30 82 02 77  631: . SEQUENCE    tbscertificate
0008 a0 03          3: . . [0]
0010 02 01          1: . . . INTEGER 2
                     : 02
0013 02 01          1: . . INTEGER 17
                     : 11
```

```
0016 30 09          9: . . SEQUENCE
0018 06 07          7: . . . OID 1.2.840.10040.4.3: dsa-with-sha
                     : 2a 86 48 ce 38 04 03
0027 30 2a         42: . . SEQUENCE
0029 31 0b         11: . . . SET
0031 30 09          9: . . . . SEQUENCE
0033 06 03          3: . . . . . OID 2.5.4.6: C
                     : 55 04 06
0038 13 02          2: . . . . . PrintableString  'US'
                     : 55 53
0042 31 0c         12: . . . SET
0044 30 0a         10: . . . . SEQUENCE
0046 06 03          3: . . . . . OID 2.5.4.10: O
                     : 55 04 0a
0051 13 03          3: . . . . . PrintableString  'gov'
                     : 67 6f 76
0056 31 0d         13: . . . SET
0058 30 0b         11: . . . . SEQUENCE
0060 06 03          3: . . . . . OID 2.5.4.11: OU
                     : 55 04 0b
0065 13 04          4: . . . . . PrintableString  'nist'
                     : 6e 69 73 74
0071 30 1e         30: . . SEQUENCE
0073 17 0d         13: . . . UTCTime  '970630000000Z'
                     : 39 37 30 36 33 30 30 30 30 30 30 30 5a
0088 17 0d         13: . . . UTCTime  '971231000000Z'
                     : 39 37 31 32 33 31 30 30 30 30 30 30 5a
0103 30 2a         42: . . SEQUENCE
0105 31 0b         11: . . . SET
0107 30 09          9: . . . . SEQUENCE
0109 06 03          3: . . . . . OID 2.5.4.6: C
                     : 55 04 06
0114 13 02          2: . . . . . PrintableString  'US'
                     : 55 53
0118 31 0c         12: . . . SET
0120 30 0a         10: . . . . SEQUENCE
0122 06 03          3: . . . . . OID 2.5.4.10: O
                     : 55 04 0a
0127 13 03          3: . . . . . PrintableString  'gov'
                     : 67 6f 76
0132 31 0d         13: . . . SET
0134 30 0b         11: . . . . SEQUENCE
0136 06 03          3: . . . . . OID 2.5.4.11: OU
                     : 55 04 0b
0141 13 04          4: . . . . . PrintableString  'nist'
                     : 6e 69 73 74
0147 30 82 01 b4  436: . . SEQUENCE
0151 30 82 01 29  297: . . . SEQUENCE
```

```
0155 06 07         7: . . . . OID 1.2.840.10040.4.1: dsa
                    : 2a 86 48 ce 38 04 01
0164 30 82 01 1c  284: . . . . SEQUENCE
0168 02 81 80     128: . . . . . INTEGER
                    : d4 38 02 c5 35 7b d5 0b a1 7e 5d 72 59 63 55 d3
                    : 45 56 ea e2 25 1a 6b c5 a4 ab aa 0b d4 62 b4 d2
                    : 21 b1 95 a2 c6 01 c9 c3 fa 01 6f 79 86 83 3d 03
                    : 61 e1 f1 92 ac bc 03 4e 89 a3 c9 53 4a f7 e2 a6
                    : 48 cf 42 1e 21 b1 5c 2b 3a 7f ba be 6b 5a f7 0a
                    : 26 d8 8e 1b eb ec bf 1e 5a 3f 45 c0 bd 31 23 be
                    : 69 71 a7 c2 90 fe a5 d6 80 b5 24 dc 44 9c eb 4d
                    : f9 da f0 c8 e8 a2 4c 99 07 5c 8e 35 2b 7d 57 8d
0299 02 14         20: . . . . . INTEGER
                    : a7 83 9b f3 bd 2c 20 07 fc 4c e7 e8 9f f3 39 83
                    : 51 0d dc dd
0321 02 81 80     128: . . . . . INTEGER
                    : 0e 3b 46 31 8a 0a 58 86 40 84 e3 a1 22 0d 88 ca
                    : 90 88 57 64 9f 01 21 e0 15 05 94 24 82 e2 10 90
                    : d9 e1 4e 10 5c e7 54 6b d4 0c 2b 1b 59 0a a0 b5
                    : a1 7d b5 07 e3 65 7c ea 90 d8 8e 30 42 e4 85 bb
                    : ac fa 4e 76 4b 78 0e df 6c e5 a6 e1 bd 59 77 7d
                    : a6 97 59 c5 29 a7 b3 3f 95 3e 9d f1 59 2d f7 42
                    : 87 62 3f f1 b8 6f c7 3d 4b b8 8d 74 c4 ca 44 90
                    : cf 67 db de 14 60 97 4a d1 f7 6d 9e 09 94 c4 0d
0452 03 81 84     132: . . . BIT STRING  (0 unused bits)
                    : 02 81 80 aa 98 ea 13 94 a2 db f1 5b 7f 98 2f 78
                    : e7 d8 e3 b9 71 86 f6 80 2f 40 39 c3 da 3b 4b 13
                    : 46 26 ee 0d 56 c5 a3 3a 39 b7 7d 33 c2 6b 5c 77
                    : 92 f2 55 65 90 39 cd 1a 3c 86 e1 32 eb 25 bc 91
                    : c4 ff 80 4f 36 61 bd cc e2 61 04 e0 7e 60 13 ca
                    : c0 9c dd e0 ea 41 de 33 c1 f1 44 a9 bc 71 de cf
                    : 59 d4 6e da 44 99 3c 21 64 e4 78 54 9d d0 7b ba
                    : 4e f5 18 4d 5e 39 30 bf e0 d1 f6 f4 83 25 4f 14
                    : aa 71 e1
0587 a3 32         50: . . [3]
0589 30 30         48: . . . SEQUENCE
0591 30 0f          9: . . . . SEQUENCE
0593 06 03          3: . . . . . OID 2.5.29.19: basicConstraints
                    : 55 1d 13
0598 01 01          1: . . . . . TRUE
                    : ff
0601 04 05          5: . . . . . OCTET STRING
                    : 30 03 01 01 ff
0608 30 1d         29: . SEQUENCE
0610 06 03          3: . . . . . OID 2.5.29.14: subjectKeyIdentifier
                    : 55 1d 0e
0615 04 16         22: . . . . . OCTET STRING
                    : 04 14 e7 26 c5 54 cd 5b a3 6f 35 68 95 aa d5 ff
```

```
                       : 1c 21 e4 22 75 d6
0639 30 09          9: . SEQUENCE
0641 06 07          7: . . OID 1.2.840.10040.4.3: dsa-with-sha
                       : 2a 86 48 ce 38 04 03
0650 03 2f         47: . BIT STRING  (0 unused bits)
                       : 30 2c 02 14 a0 66 c1 76 33 99 13 51 8d 93 64 2f
                       : ca 13 73 de 79 1a 7d 33 02 14 5d 90 f6 ce 92 4a
                       : bf 29 11 24 80 28 a6 5a 8e 73 b6 76 02 68
```

D.2 Certificate

   This section contains an annotated hex dump of a 730 byte version 3
   certificate.  The certificate contains the following information:
   (a) the serial number is 18 (12 hex);
   (b) the certificate is signed with DSA and the SHA-1 hash algorithm;
   (c) the issuer's distinguished name is OU=nist; O=gov; C=US
   (d) and the subject's distinguished name is CN=Tim Polk; OU=nist;
   O=gov; C=US
   (e) the certificate was valid from July 30, 1997 through December 1,
   1997;
   (f) the certificate contains a 1024 bit DSA public key;
   (g) the certificate is an end entity certificate, as the basic
   constraints extension is not present;
   (h) the certificate contains an authority key identifier extension;
   and
   (i) the certificate includes one alternative name - an RFC 822
   address.

```
0000 30 82 02 d6  726: SEQUENCE
0004 30 82 02 96  662: . SEQUENCE
0008 a0 03          3: . . [0]
0010 02 01          1: . . . INTEGER 2
                       : 02
0013 02 01          1: . . INTEGER 18
                       : 12
0016 30 09          9: . . SEQUENCE
0018 06 07          7: . . . OID 1.2.840.10040.4.3: dsa-with-sha
                       : 2a 86 48 ce 38 04 03
0027 30 2a         42: . . SEQUENCE
0029 31 0b         11: . . . SET
0031 30 09          9: . . . . SEQUENCE
0033 06 03          3: . . . . . OID 2.5.4.6: C
                       : 55 04 06
0038 13 02          2: . . . . . PrintableString  'US'
                       : 55 53
0042 31 0c         12: . . . SET
0044 30 0a         10: . . . . SEQUENCE
0046 06 03          3: . . . . . OID 2.5.4.10: O
```

```
                            : 55 04 0a
0051 13 03          3: . . . . . PrintableString  'gov'
                            : 67 6f 76
0056 31 0d         13: . . . SET
0058 30 0b         11: . . . . SEQUENCE
0060 06 03          3: . . . . . OID 2.5.4.11: OU
                            : 55 04 0b
0065 13 04          4: . . . . . PrintableString  'nist'
                            : 6e 69 73 74
0071 30 1e         30: . . SEQUENCE
0073 17 0d         13: . . . UTCTime  '970730000000Z'
                            : 39 37 30 37 33 30 30 30 30 30 30 30 5a
0088 17 0d         13: . . . UTCTime  '971201000000Z'
                            : 39 37 31 32 30 31 30 30 30 30 30 30 5a
0103 30 3d         61: . . SEQUENCE
0105 31 0b         11: . . . SET
0107 30 09          9: . . . . SEQUENCE
0109 06 03          3: . . . . . OID 2.5.4.6: C
                            : 55 04 06
0114 13 02          2: . . . . . PrintableString  'US'
                            : 55 53
0118 31 0c         12: . . . SET
0120 30 0a         10: . . . . SEQUENCE
0122 06 03          3: . . . . . OID 2.5.4.10: O
                            : 55 04 0a
0127 13 03          3: . . . . . PrintableString  'gov'
                            : 67 6f 76
0132 31 0d         13: . . . SET
0134 30 0b         11: . . . . SEQUENCE
0136 06 03          3: . . . . . OID 2.5.4.11: OU
                            : 55 04 0b
0141 13 04          4: . . . . . PrintableString  'nist'
                            : 6e 69 73 74
0147 31 11         17: . . . SET
0149 30 0f         15: . . . . SEQUENCE
0151 06 03          3: . . . . . OID 2.5.4.3: CN
                            : 55 04 03
0156 13 08          8: . . . . . PrintableString  'Tim Polk'
                            : 54 69 6d 20 50 6f 6c 6b
0166 30 82 01 b4  436: . . SEQUENCE
0170 30 82 01 29  297: . . . SEQUENCE
0174 06 07          7: . . . . OID 1.2.840.10040.4.1: dsa
                            : 2a 86 48 ce 38 04 01
0183 30 82 01 1c  284: . . . . SEQUENCE
0187 02 81 80     128: . . . . . INTEGER
                            : d4 38 02 c5 35 7b d5 0b a1 7e 5d 72 59 63 55 d3
                            : 45 56 ea e2 25 1a 6b c5 a4 ab aa 0b d4 62 b4 d2
                            : 21 b1 95 a2 c6 01 c9 c3 fa 01 6f 79 86 83 3d 03
```

```
                             : 61 e1 f1 92 ac bc 03 4e 89 a3 c9 53 4a f7 e2 a6
                             : 48 cf 42 1e 21 b1 5c 2b 3a 7f ba be 6b 5a f7 0a
                             : 26 d8 8e 1b eb ec bf 1e 5a 3f 45 c0 bd 31 23 be
                             : 69 71 a7 c2 90 fe a5 d6 80 b5 24 dc 44 9c eb 4d
                             : f9 da f0 c8 e8 a2 4c 99 07 5c 8e 35 2b 7d 57 8d
0318 02 14           20: . . . . . INTEGER
                             : a7 83 9b f3 bd 2c 20 07 fc 4c e7 e8 9f f3 39 83
                             : 51 0d dc dd
0340 02 81 80       128: . . . . . INTEGER
                             : 0e 3b 46 31 8a 0a 58 86 40 84 e3 a1 22 0d 88 ca
                             : 90 88 57 64 9f 01 21 e0 15 05 94 24 82 e2 10 90
                             : d9 e1 4e 10 5c e7 54 6b d4 0c 2b 1b 59 0a a0 b5
                             : a1 7d b5 07 e3 65 7c ea 90 d8 8e 30 42 e4 85 bb
                             : ac fa 4e 76 4b 78 0e df 6c e5 a6 e1 bd 59 77 7d
                             : a6 97 59 c5 29 a7 b3 3f 95 3e 9d f1 59 2d f7 42
                             : 87 62 3f f1 b8 6f c7 3d 4b b8 8d 74 c4 ca 44 90
                             : cf 67 db de 14 60 97 4a d1 f7 6d 9e 09 94 c4 0d
0471 03 81 84       132: . . . BIT STRING  (0 unused bits)
                             : 02 81 80 a8 63 b1 60 70 94 7e 0b 86 08 93 0c 0d
                             : 08 12 4a 58 a9 af 9a 09 38 54 3b 46 82 fb 85 0d
                             : 18 8b 2a 77 f7 58 e8 f0 1d d2 18 df fe e7 e9 35
                             : c8 a6 1a db 8d 3d 3d f8 73 14 a9 0b 39 c7 95 f6
                             : 52 7d 2d 13 8c ae 03 29 3c 4e 8c b0 26 18 b6 d8
                             : 11 1f d4 12 0c 13 ce 3f f1 c7 05 4e df e1 fc 44
                             : fd 25 34 19 4a 81 0d dd 98 42 ac d3 b6 91 0c 7f
                             : 16 72 a3 a0 8a d7 01 7f fb 9c 93 e8 99 92 c8 42
                             : 47 c6 43
0606 a3 3e           62: . . [3]
0608 30 3c           60: . . . SEQUENCE
0610 30 19           25: . . . . SEQUENCE
0612 06 03            3: . . . . . OID 2.5.29.17: subjectAltName
                             : 55 1d 11
0617 04 12           18: . . . . . OCTET STRING
                             : 30 10 81 0e 77 70 6f 6c 6b 40 6e 69 73 74 2e 67
                             : 6f 76
0637 30 1f           31: . . . . SEQUENCE
0639 06 03            3: . . . . . OID 2.5.29.35: subjectAltName
                             : 55 1d 23
0644 04 18           24: . . . . . OCTET STRING
                             : 30 16 80 14 e7 26 c5 54 cd 5b a3 6f 35 68 95 aa
                             : d5 ff 1c 21 e4 22 75 d6
0670 30 09            9: . SEQUENCE
0672 06 07            7: . . OID 1.2.840.10040.4.3: dsa-with-sha
                             : 2a 86 48 ce 38 04 03
0681 03 2f           47: . BIT STRING  (0 unused bits)
                             : 30 2c 02 14 3c 02 e0 ab d9 5d 05 77 75 15 71 58
                             : 92 29 48 c4 1c 54 df fc 02 14 5b da 53 98 7f c5
                             : 33 df c6 09 b2 7a e3 6f 97 70 1e 14 ed 94
```

D.3 End-Entity Certificate Using RSA

   This section contains an annotated hex dump of a 675 byte version 3
   certificate.  The certificate contains the following information:
   (a) the serial number is 256;
   (b) the certificate is signed with RSA and the MD2 hash algorithm;
   (c) the issuer's distinguished name is OU=Dept. Arquitectura de
   Computadors; O=Universitat Politecnica de Catalunya; C=ES
   (d) and the subject's distinguished name is CN=Francisco Jordan;
   OU=Dept. Arquitectura de Computadors; O=Universitat Politecnica de
   Catalunya; C=ES
   (e) the certificate was issued on May 21, 1996 and expired on May 21,
   1997;
   (f) the certificate contains a 768 bit RSA public key;
   (g) the certificate is an end entity certificate (not a CA
   certificate);
   (h) the certificate includes an alternative subject name and an
   alternative issuer name - bothe are URLs;
   (i) the certificate include an authority key identifier and
   certificate policies extensions; and
   (j) the certificate includes a critical key usage extension
   specifying the public is intended for generation of digital
   signatures.

```
0000 30 80           : SEQUENCE   (size undefined)
0002 30 82 02 40  576: . SEQUENCE
0006 a0 03          3: . . [0]
0008 02 01          1: . . . INTEGER 2
                     : 02
0011 02 02          2: . . INTEGER 256
                     : 01 00
0015 30 0d         13: . . SEQUENCE
0017 06 09          9: . . . OID 1.2.840.113549.1.1.2:
                              MD2WithRSAEncryption
                     : 2a 86 48 86 f7 0d 01 01 02
0028 05 00          0: . . . NULL
0030 30 68         88: . . SEQUENCE
0032 31 0b         11: . . . SET
0034 30 09          9: . . . . SEQUENCE
0036 06 03          3: . . . . . OID 2.5.4.6: C
                     : 55 04 06
0041 13 02          2: . . . . . PrintableString  'ES'
                     : 45 53
0045 31 2d         45: . . . SET
0047 30 2b         43: . . . . SEQUENCE
0049 06 03          3: . . . . . OID 2.5.4.10: O
                     : 55 04 0a
0054 13 24         36: . . . . . PrintableString
```

```
                           'Universitat Politecnica de Catalunya'
                           : 55 6e 69 76 65 72 73 69 74 61 74 20 50 6f 6c 69
                           : 74 65 63 6e 69 63 61 20 64 65 20 43 61 74 61 6c
                           : 75 6e 79 61
0092 31 2a         42: . . . SET
0094 30 28         40: . . . . SEQUENCE
0096 06 03          3: . . . . . OID 2.5.4.11: OU
                           : 55 04 0b
0101 13 21         33: . . . . . PrintableString
                           'OU=Dept. Arquitectura de Computadors'
                           : 44 65 70 74 2e 20 41 72 71 75 69 74 65 63 74 75
                           : 72 61 20 64 65 20 43 6f 6d 70 75 74 61 64 6f 72
                           : 73
0136 30 1e         30: . . SEQUENCE
0138 17 0d         13: . . . UTCTime  '960521095826Z'
                           : 39 36 30 37 32 32 31 37 33 38 30 32 5a
0153 17 0d         13: . . . UTCTime  '979521095826Z'
                           : 39 37 30 37 32 32 31 37 33 38 30 32 5a
0168 30 81 83     112: . . SEQUENCE
0171 31 0b         11: . . . SET
0173 30 09          9: . . . . SEQUENCE
0175 06 03          3: . . . . . OID 2.5.4.6: C
                           : 55 04 06
0180 13 02          2: . . . . . PrintableString  'ES'
                           : 45 53
0184 31 2d         12: . . . SET
0186 30 2b         16: . . . . SEQUENCE
0188 06 03          3: . . . . . OID 2.5.4.10: O
                           : 55 04 0a
0193 13 24         36: . . . . . PrintableString
                           'Universitat Politecnica de Catalunya'
                           : 55 6e 69 76 65 72 73 69 74 61 74 20 50 6f 6c 69
                           : 74 65 63 6e 69 63 61 20 64 65 20 43 61 74 61 6c
                           : 75 6e 79 61
0231 31 2a         42: . . . SET
0233 30 28         40: . . . . SEQUENCE
0235 06 03          3: . . . . . OID 2.5.4.11: OU
                           : 55 04 0b
0240 13 21         33: . . . . . PrintableString
                           'Dept. Arquitectura de Computadors'
                           : 44 65 70 74 2e 20 41 72 71 75 69 74 65 63 74 75
                           : 72 61 20 64 65 20 43 6f 6d 70 75 74 61 64 6f 72
                           : 73
0275 31 19         22: . . . SET
0277 30 17         20: . . . . SEQUENCE
0279 06 03          3: . . . . . OID 2.5.4.3: CN
                           : 55 04 03
0284 13 10         16: . . . . . PrintableString 'Francisco Jordan'
```

```
                          : 46 72 61 6e 63 69 73 63 6f 20 4a 6f 72 64 61 6e
0302 30 7c           2: . . SEQUENCE
0304 30 0d          13: . . . SEQUENCE
0306 06 09           9: . . . . OID 1.2.840.113549.1.1.1: RSAEncryption
                          : 2a 86 48 86 f7 0d 01 01 01
0317 05 00           0: . . . . NULL
0319 03 6b         107: . . . BIT STRING
                          : 00   (0 unused bits)
                          : 30 68 02 61 00 be aa 8b 77 54 a3 af ca 77 9f 2f
                          : b0 cf 43 88 ff a6 6d 79 55 5b 61 8c 68 ec 48 1e
                          : 8a 86 38 a4 fe 19 b8 62 17 1d 9d 0f 47 2c ff 63
                          : 8f 29 91 04 d1 52 bc 7f 67 b6 b2 8f 74 55 c1 33
                          : 21 6c 8f ab 01 95 24 c8 b2 73 93 9d 22 61 50 a9
                          : 35 fb 9d 57 50 32 ef 56 52 50 93 ab b1 88 94 78
                          : 56 15 c6 1c 8b 02 03 01 00 01
0428 a3 81 97      151: . . [3]
0431 30 3c          60: . . . SEQUENCE
0433 30 1f          31: . . . . SEQUENCE
0435 06 03           3: . . . . . OID 2.5.29.35: authorityKeyIdentifier
                          : 55 1d 23
0440 04 14          22: . . . . . OCTET STRING
                          : 30 12 80 10 0e 6b 3a bf 04 ea 04 c3 0e 6b 3a bf
                          : 04 ea 04 c3
0464 30 19          25: . . . . SEQUENCE
0466 06 03           3: . . . . . OID 2.5.29.15: keyUsage
                          : 55 1d 0f
0471 01 01           1: . . . . . TRUE
0474 04 04           4: . . . . . OCTET STRING
                          : 03 02 07 80
0480 30 19          25: . . . . SEQUENCE
0482 06 03           3: . . . . . OID 2.5.29.32: certificatePolicies
                          : 55 1d 20
0487 04 21          33: . . . . . OCTET STRING
                          : 30 1f 30 1d 06 04 2a 84 80 00 30 15 30 07 06 05
                          : 2a 84 80 00 01 30 0a 06 05 2a 84 80 00 02 02 01
                          : 0a
0522 30 1c          28: . . . . SEQUENCE
0524 06 03           3: . . . . . OID 2.5.29.17: subjectAltName
                          : 55 1d 11
0529 04 15          21: . . . . . OCTET STRING
                          : 30 13 86 11 68 74 74 70 3a 2f 2f 61 63 2e 75 70
                          : 63 2e 65 73 2f
0552 30 19          25: . . . . SEQUENCE
0554 06 03           3: . . . . . OID 2.5.29.18: issuerAltName
                          : 55 1d 12
0559 04 12          18: . . . . . OCTET STRING
                          : 30 14 86 12 68 74 74 70 3a 2f 2f 77 77 77 2e 75
                          : 70 63 2e 65
```

```
0579 30 80             : . SEQUENCE (indefinite length)
0581 06 07           7: . . OID
0583 05 00           0: . . NULL
0585 00 00           0: . . end of contents marker
0587 03 81 81       47: . BIT STRING
                     : 00      (0 unused bits)
                     : 5c 01 bd b5 41 88 87 7a 0e d3 0e 6b 3a bf 04 ea
                     : 04 cb 5f 61 72 3c a3 bd 78 f5 66 17 fe 37 3a ab
                     : eb 67 bf b7 da a8 38 f6 33 15 71 75 2f b9 8c 91
                     : a0 e4 87 ba 4b 43 a0 22 8f d3 a9 86 43 89 e6 50
                     : 5c 01 bd b5 41 88 87 7a 0e d3 0e 6b 3a bf 04 ea
                     : 04 cb 5f 61 72 3c a3 bd 78 f5 66 17 fe 37 3a ab
                     : eb 67 bf b7 da a8 38 f6 33 15 71 75 2f b9 8c 91
                     : a0 e4 87 ba 4b 43 a0 22 8f d3 a9 86 43 89 e6 50
0637 00 00           0: . . end of contents marker
```

D.4 Certificate Revocation List

   This section contains an annotated hex dump of a version 2 CRL with
   one extension (cRLNumber). The CRL was issued by OU=nist;O=gov;C=us
   on July 7, 1996; the next scheduled issuance was August 7, 1996.  The
   CRL includes one revoked certificates: serial number 18 (12 hex).
   The CRL itself is number 18, and it was signed with DSA and SHA-1.

```
0000 30 81 ba      186: SEQUENCE
0003 30 7c         124: . SEQUENCE
0005 02 01           1: . . INTEGER 1
                      : 01
0008 30 09           9: . . SEQUENCE
0010 06 07           7: . . . OID 1.2.840.10040.4.3: dsa-with-sha
                      : 2a 86 48 ce 38 04 03
0019 30 2a          42: . . SEQUENCE
0021 31 0b          11: . . . SET
0023 30 09           9: . . . . SEQUENCE
0025 06 03           3: . . . . . OID 2.5.4.6: C
                      : 55 04 06
0030 13 02           2: . . . . . PrintableString  'US'
                      : 55 53
0034 31 0c          12: . . . SET
0036 30 0a          10: . . . . SEQUENCE
0038 06 03           3: . . . . . OID 2.5.4.10: O
                      : 55 04 0a
0043 13 03           3: . . . . . PrintableString  'gov'
                      : 67 6f 76
0048 31 0d          13: . . . SET
0050 30 0b          11: . . . . SEQUENCE
0052 06 03           3: . . . . . OID 2.5.4.11: OU
                      : 55 04 0b
```

```
0057 13 04          4: . . . . . PrintableString 'nist'
                     : 6e 69 73 74
0063 17 0d         13: . . UTCTime '970801000000Z'
                     : 39 37 30 38 30 31 30 30 30 30 30 30 5a
0078 17 0d         13: . . UTCTime '970808000000Z'
                     : 39 37 30 38 30 38 30 30 30 30 30 30 5a
0093 30 22         34: . . SEQUENCE
0095 30 20         32: . . . SEQUENCE
0097 02 01          1: . . . . INTEGER 18
                     : 12
0100 17 0d         13: . . . . UTCTime '970731000000Z'
                     : 39 37 30 37 33 31 30 30 30 30 30 30 5a
0115 30 0c         12: . . . . SEQUENCE
0117 30 0a         10: . . . . . SEQUENCE
0119 06 03          3: . . . . . . OID 2.5.29.21: reasonCode
                     : 55 1d 15
0124 04 03          3: . . . . . . OCTET STRING
                     : 0a 01 01
0129 30 09          9: . SEQUENCE
0131 06 07          7: . . OID 1.2.840.10040.4.3: dsa-with-sha
                     : 2a 86 48 ce 38 04 03
0140 03 2f         47: . BIT STRING  (0 unused bits)
                     : 30 2c 02 14 9e d8 6b c1 7d c2 c4 02 f5 17 84 f9
                     : 9f 46 7a ca cf b7 05 8a 02 14 9e 43 39 85 dc ea
                     : 14 13 72 93 54 5d 44 44 e5 05 fe 73 9a b2
```

Appendix E. Authors' Addresses

    Russell Housley
    SPYRUS
    381 Elden Street
    Suite 1120
    Herndon, VA 20170
    USA

    EMail: housley@spyrus.com


    Warwick Ford
    VeriSign, Inc.
    One Alewife Center
    Cambridge, MA 02140
    USA

    EMail: wford@verisign.com


    Tim Polk
    NIST
    Building 820, Room 426
    Gaithersburg, MD 20899
    USA

    EMail: wpolk@nist.gov


    David Solo
    Citicorp
    666 Fifth Ave, 3rd Floor
    New York, NY 10103
    USA

    EMail: david.solo@citicorp.com

Appendix F.  Full Copyright Statement

   Copyright (C) The Internet Society (1999).  All Rights Reserved.

   This document and translations of it may be copied and furnished to
   others, and derivative works that comment on or otherwise explain it
   or assist in its implementation may be prepared, copied, published
   and distributed, in whole or in part, without restriction of any
   kind, provided that the above copyright notice and this paragraph are
   included on all such copies and derivative works.  However, this
   document itself may not be modified in any way, such as by removing
   the copyright notice or references to the Internet Society or other
   Internet organizations, except as needed for the purpose of
   developing Internet standards in which case the procedures for
   copyrights defined in the Internet Standards process must be
   followed, or as required to translate it into languages other than
   English.

   The limited permissions granted above are perpetual and will not be
   revoked by the Internet Society or its successors or assigns.

   This document and the information contained herein is provided on an
   "AS IS" basis and THE INTERNET SOCIETY AND THE INTERNET ENGINEERING
   TASK FORCE DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING
   BUT NOT LIMITED TO ANY WARRANTY THAT THE USE OF THE INFORMATION
   HEREIN WILL NOT INFRINGE ANY RIGHTS OR ANY IMPLIED WARRANTIES OF
   MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

# EXHIBIT 10

```
Network Working Group                                    S. Farrell
Request for Comments: 3281                     Baltimore Technologies
Category: Standards Track                               R. Housley
                                                    RSA Laboratories
                                                       April 2002
```

                    An Internet Attribute Certificate
                        Profile for Authorization

Status of this Memo

   This document specifies an Internet standards track protocol for the
   Internet community, and requests discussion and suggestions for
   improvements.  Please refer to the current edition of the "Internet
   Official Protocol Standards" (STD 1) for the standardization state
   and status of this protocol.  Distribution of this memo is unlimited.

Copyright Notice

   Copyright (C) The Internet Society (2002).  All Rights Reserved.

Abstract

   This specification defines a profile for the use of X.509 Attribute
   Certificates in Internet Protocols.  Attribute certificates may be
   used in a wide range of applications and environments covering a
   broad spectrum of interoperability goals and a broader spectrum of
   operational and assurance requirements.  The goal of this document is
   to establish a common baseline for generic applications requiring
   broad interoperability as well as limited special purpose
   requirements.  The profile places emphasis on attribute certificate
   support for Internet electronic mail, IPSec, and WWW security
   applications.

Table of Contents

   1. Introduction................................................  2
        1.1  Delegation and AC chains.............................  4
        1.2  Attribute Certificate Distribution ("push" vs. "pull").  4
        1.3  Document Structure...................................  6
   2. Terminology.................................................  6
   3. Requirements................................................  7
   4. Attribute Certificate Profile...............................  7
        4.1  X.509 Attribute Certificate Definition...............  8
        4.2  Profile of Standard Fields........................... 10
             4.2.1  Version........................................ 10
             4.2.2  Holder......................................... 11

```
      4.2.3  Issuer.......................................... 12
      4.2.4  Signature....................................... 12
      4.2.5  Serial Number................................... 12
      4.2.6  Validity Period................................. 13
      4.2.7  Attributes...................................... 13
      4.2.8  Issuer Unique Identifier........................ 14
      4.2.9  Extensions...................................... 14
    4.3  Extensions.......................................... 14
      4.3.1  Audit Identity.................................. 14
      4.3.2  AC Targeting.................................... 15
      4.3.3  Authority Key Identifier........................ 17
      4.3.4  Authority Information Access.................... 17
      4.3.5  CRL Distribution Points......................... 17
      4.3.6  No Revocation Available......................... 18
    4.4  Attribute Types..................................... 18
      4.4.1  Service Authentication Information.............. 19
      4.4.2  Access Identity................................. 19
      4.4.3  Charging Identity............................... 20
      4.4.4  Group........................................... 20
      4.4.5  Role............................................ 20
      4.4.6  Clearance....................................... 21
    4.5  Profile of AC issuer's PKC.......................... 22
  5. Attribute Certificate Validation....................... 23
  6. Revocation............................................. 24
  7. Optional Features...................................... 25
    7.1  Attribute Encryption................................ 25
    7.2  Proxying............................................ 27
    7.3  Use of ObjectDigestInfo............................. 28
    7.4  AA Controls......................................... 29
  8. Security Considerations................................ 30
  9. IANA Considerations.................................... 32
  10. References........................................... 32
  Appendix A: Object Identifiers........................... 34
  Appendix B: ASN.1 Module................................. 35
  Author's Addresses....................................... 39
  Acknowledgements......................................... 39
  Full Copyright Statement................................. 40
```

## 1. Introduction

The key words "MUST", "MUST NOT", "REQUIRED", "SHALL", "SHALL NOT",
"SHOULD", "SHOULD NOT", "RECOMMENDED", "MAY", and "OPTIONAL" in this
document are to be interpreted as described in BCP 14, RFC 2119.

X.509 public key certificates (PKCs) [X.509-1997, X.509-2000,
PKIXPROF] bind an identity and a public key.  An attribute
certificate (AC) is a structure similar to a PKC; the main difference
being that the AC contains no public key.  An AC may contain

attributes that specify group membership, role, security clearance,
or other authorization information associated with the AC holder.
The syntax for the AC is defined in Recommendation X.509, making the
term "X.509 certificate" ambiguous.

Some people constantly confuse PKCs and ACs.  An analogy may make the
distinction clear.  A PKC can be considered to be like a passport: it
identifies the holder, tends to last for a long time, and should not
be trivial to obtain.  An AC is more like an entry visa: it is
typically issued by a different authority and does not last for as
long a time.  As acquiring an entry visa typically requires
presenting a passport, getting a visa can be a simpler process.

Authorization information may be placed in a PKC extension or placed
in a separate attribute certificate (AC).  The placement of
authorization information in PKCs is usually undesirable for two
reasons.  First, authorization information often does not have the
same lifetime as the binding of the identity and the public key.
When authorization information is placed in a PKC extension, the
general result is the shortening of the PKC useful lifetime.  Second,
the PKC issuer is not usually authoritative for the authorization
information.  This results in additional steps for the PKC issuer to
obtain authorization information from the authoritative source.

For these reasons, it is often better to separate authorization
information from the PKC.  Yet, authorization information also needs
to be bound to an identity.  An AC provides this binding; it is
simply a digitally signed (or certified) identity and set of
attributes.

An AC may be used with various security services, including access
control, data origin authentication, and non-repudiation.

PKCs can provide an identity to access control decision functions.
However, in many contexts the identity is not the criterion that is
used for access control decisions, rather the role or group-
membership of the accessor is the criterion used.  Such access
control schemes are called role-based access control.

When making an access control decision based on an AC, an access
control decision function may need to ensure that the appropriate AC
holder is the entity that has requested access.  One way in which the
linkage between the request or identity and the AC can be achieved is
the inclusion of a reference to a PKC within the AC and the use of
the private key corresponding to the PKC for authentication within
the access request.

ACs may also be used in the context of a data origin authentication
service and a non-repudiation service.  In these contexts, the
attributes contained in the AC provide additional information about
the signing entity.  This information can be used to make sure that
the entity is authorized to sign the data.  This kind of checking
depends either on the context in which the data is exchanged or on
the data that has been digitally signed.

## 1.1 Delegation and AC chains

The X.509 standard [X.509-2000] defines authorization as the
"conveyance of privilege from one entity that holds such privilege,
to another entity".  An AC is one authorization mechanism.

An ordered sequence of ACs could be used to verify the authenticity
of a privilege asserter's privilege.  In this way, chains or paths of
ACs could be employed to delegate authorization.

Since the administration and processing associated with such AC
chains is complex and the use of ACs in the Internet today is quite
limited, this specification does NOT RECOMMEND the use of AC chains.
Other (future) specifications may address the use of AC chains.  This
specification deals with the simple cases, where one authority issues
all of the ACs for a particular set of attributes.  However, this
simplification does not preclude the use of several different
authorities, each of which manages a different set of attributes.
For example, group membership may be included in one AC issued by one
authority, and security clearance may be included in another AC
issued by another authority.

This means that conformant implementations are only REQUIRED to be
able to process a single AC at a time.  Processing of more than one
AC, one after another, may be necessary.  Note however, that
validation of an AC MAY require validation of a chain of PKCs, as
specified in [PKIXPROF].

## 1.2 Attribute Certificate Distribution ("push" vs. "pull")

As discussed above, ACs provide a mechanism to securely provide
authorization information to, for example, access control decision
functions.  However, there are a number of possible communication
paths for ACs.

In some environments, it is suitable for a client to "push" an AC to
a server.  This means that no new connections between the client and
server are required.  It also means that no search burden is imposed
on servers, which improves performance and that the AC verifier is

3/22/20

only presented with what it "needs to know."  The "push" model is
especially suitable in inter-domain cases where the client's rights
should be assigned within the client's "home" domain.

In other cases, it is more suitable for a client to simply
authenticate to the server and for the server to request or "pull"
the client's AC from an AC issuer or a repository.  A major benefit
of the "pull" model is that it can be implemented without changes to
the client or to the client-server protocol.  The "pull" model is
especially suitable for inter-domain cases where the client's rights
should be assigned within the server's domain, rather than within the
client's domain.

There are a number of possible exchanges involving three entities:
the client, the server, and the AC issuer.  In addition, a directory
service or other repository for AC retrieval MAY be supported.

Figure 1 shows an abstract view of the exchanges that may involve
ACs.  This profile does not specify a protocol for these exchanges.



```
+--------------+
|              |       Server Acquisition
| AC issuer    +----------------------------+
|              |                            |
+--+-----------+                            |
   |                                        |
   | Client                                 |
   | Acquisition                            |
   |                                        |
+--+-----------+                    +--+-----------+
|              |       AC "push"    |  |           |
|  Client      +------------------------+  Server  |
|              | (part of app. protocol) |         |
+--+-----------+                    +--+-----------+
   |                                   |
   | Client                            | Server
   | Lookup         +--------------+   | Lookup
   |                |              |   |
   +---------------+  Repository  +---------+
                    |              |
                    +--------------+
```

Figure 1: AC Exchanges

https://tools.ietf.org/html/rfc3281

### 1.3 Document Structure

Section 2 defines some terminology.  Section 3 specifies the
requirements that this profile is intended to meet.  Section 4
contains the profile of the X.509 AC.  Section 5 specifies rules for
AC validation.  Section 6 specifies rules for AC revocation checks.
Section 7 specifies optional features which MAY be supported;
however, support for these features is not required for conformance
to this profile.  Finally, appendices contain the list of OIDs
required to support this specification and an ASN.1 module.

### 2. Terminology

For simplicity, we use the terms client and server in this
specification.  This is not intended to indicate that ACs are only to
be used in client-server environments.  For example, ACs may be used
in the S/MIME v3 context, where the mail user agent would be both a
"client" and a "server" in the sense the terms are used here.

| Term | Meaning |
|------|---------|
| AA | Attribute Authority, the entity that issues the AC, synonymous in this specification with "AC issuer" |
| AC | Attribute Certificate |
| AC user | any entity that parses or processes an AC |
| AC verifier | any entity that checks the validity of an AC and then makes use of the result |
| AC issuer | the entity which signs the AC, synonymous in this specification with "AA" |
| AC holder | the entity indicated (perhaps indirectly) in the holder field of the AC |
| Client | the entity which is requesting the action for which authorization checks are to be made |
| Proxying | In this specification, Proxying is used to mean the situation where an application server acts as an application client on behalf of a user. Proxying here does not mean granting of authority. |
| PKC | Public Key Certificate - uses the type ASN.1 Certificate defined in X.509 and profiled in RFC 2459.  This (non-standard) acronym is used in order to avoid confusion about the term "X.509 certificate". |
| Server | the entity which requires that the authorization checks are made |

3/22/2017                    RFC 3281 - An Internet Attribute Certificate Profile for Authorization

## 3. Requirements

This AC profile meets the following requirements.

Time/Validity requirements:

1. Support for short-lived as well as long-lived ACs.  Typical
   short-lived validity periods might be measured in hours, as
   opposed to months for PKCs.  Short validity periods allow ACs to
   be useful without a revocation mechanism.

Attribute Types:

2. Issuers of ACs should be able to define their own attribute types
   for use within closed domains.

3. Some standard attribute types, which can be contained within ACs,
   should be defined.  Examples include "access identity," "group,"
   "role," "clearance," "audit identity," and "charging identity."

4. Standard attribute types should be defined in a manner that
   permits an AC verifier to distinguish between uses of the same
   attribute in different domains.  For example, the "Administrators
   group" as defined by Baltimore and the "Administrators group" as
   defined by SPYRUS should be easily distinguished.

Targeting of ACs:

5. It should be possible to "target" an AC at one, or a small number
   of, servers.  This means that a trustworthy non-target server will
   reject the AC for authorization decisions.

Push vs. Pull

6. ACs should be defined so that they can either be "pushed" by the
   client to the server, or "pulled" by the server from a repository
   or other network service, including an online AC issuer.

## 4. Attribute Certificate Profile

ACs may be used in a wide range of applications and environments
covering a broad spectrum of interoperability goals and a broader
spectrum of operational and assurance requirements.  The goal of this
document is to establish a common baseline for generic applications
requiring broad interoperability and limited special purpose

https://tools.ietf.org/html/rfc3281                                          7/41

requirements.  In particular, the emphasis will be on supporting the
use of attribute certificates for informal Internet electronic mail,
IPSec, and WWW applications.

This section presents a profile for ACs that will foster
interoperability.  This section also defines some private extensions
for the Internet community.

While the ISO/IEC/ITU documents use the 1993 (or later) version of
ASN.1, this document uses the 1988 ASN.1 syntax, as has been done for
PKCs [PKIXPROF].  The encoded certificates and extensions from either
ASN.1 version are bit-wise identical.

Where maximum lengths for fields are specified, these lengths refer
to the DER encoding and do not include the ASN.1 tag or length
fields.

Conforming implementations MUST support the profile specified in this
section.

## 4.1 X.509 Attribute Certificate Definition

X.509 contains the definition of an AC given below.  All types that
are not defined in this document can be found in [PKIXPROF].

```
        AttributeCertificate ::= SEQUENCE {
            acinfo              AttributeCertificateInfo,
            signatureAlgorithm  AlgorithmIdentifier,
            signatureValue      BIT STRING
        }

        AttributeCertificateInfo ::= SEQUENCE {
            version             AttCertVersion -- version is v2,
            holder              Holder,
            issuer              AttCertIssuer,
            signature           AlgorithmIdentifier,
            serialNumber        CertificateSerialNumber,
            attrCertValidityPeriod   AttCertValidityPeriod,
            attributes          SEQUENCE OF Attribute,
            issuerUniqueID      UniqueIdentifier OPTIONAL,
            extensions          Extensions OPTIONAL
        }

        AttCertVersion ::= INTEGER { v2(1) }
        Holder ::= SEQUENCE {
            baseCertificateID  [0] IssuerSerial OPTIONAL,
                    -- the issuer and serial number of
                    -- the holder's Public Key Certificate
```

```
            entityName          [1] GeneralNames OPTIONAL,
                    -- the name of the claimant or role
            objectDigestInfo    [2] ObjectDigestInfo OPTIONAL
                    -- used to directly authenticate the holder,
                    -- for example, an executable
        }

        ObjectDigestInfo ::= SEQUENCE {
            digestedObjectType  ENUMERATED {
                    publicKey          (0),
                    publicKeyCert      (1),
                    otherObjectTypes   (2) },
                         -- otherObjectTypes MUST NOT
                         -- be used in this profile
            otherObjectTypeID   OBJECT IDENTIFIER OPTIONAL,
            digestAlgorithm     AlgorithmIdentifier,
            objectDigest        BIT STRING
        }

        AttCertIssuer ::= CHOICE {
            v1Form   GeneralNames,  -- MUST NOT be used in this
                                    -- profile
            v2Form   [0] V2Form     -- v2 only
        }

        V2Form ::= SEQUENCE {
            issuerName           GeneralNames  OPTIONAL,
            baseCertificateID    [0] IssuerSerial  OPTIONAL,
            objectDigestInfo     [1] ObjectDigestInfo  OPTIONAL
              -- issuerName MUST be present in this profile
              -- baseCertificateID and objectDigestInfo MUST NOT
              -- be present in this profile
        }

        IssuerSerial  ::=  SEQUENCE {
            issuer          GeneralNames,
            serial          CertificateSerialNumber,
            issuerUID       UniqueIdentifier OPTIONAL
        }

        AttCertValidityPeriod  ::= SEQUENCE {
            notBeforeTime  GeneralizedTime,
            notAfterTime   GeneralizedTime
        }
```

Although the Attribute syntax is defined in [PKIXPROF], we repeat
the definition here for convenience.

```
        Attribute ::= SEQUENCE {
             type      AttributeType,
             values    SET OF AttributeValue
               -- at least one value is required
        }

        AttributeType ::= OBJECT IDENTIFIER

        AttributeValue ::= ANY DEFINED BY AttributeType
```

Implementers should note that the DER encoding (see [X.509-
1988],[X.208-1988]) of the SET OF values requires ordering of the
encodings of the values.  Though this issue arises with respect to
distinguished names, and has to be handled by [PKIXPROF]
implementations, it is much more significant in this context, since
the inclusion of multiple values is much more common in ACs.

## 4.2 Profile of Standard Fields

GeneralName offers great flexibility.  To achieve interoperability,
in spite of this flexibility, this profile imposes constraints on the
use of GeneralName.

Conforming implementations MUST be able to support the dNSName,
directoryName, uniformResourceIdentifier, and iPAddress options.
This is compatible with the GeneralName requirements in [PKIXPROF]
(mainly in section 4.2.1.7).

Conforming implementations MUST NOT use the x400Address,
ediPartyName, or registeredID options.

Conforming implementations MAY use the otherName option to convey
name forms defined in Internet Standards.  For example, Kerberos
[KRB] format names can be encoded into the otherName, using a
Kerberos 5 principal name OID and a SEQUENCE of the Realm and the
PrincipalName.

### 4.2.1   Version

The version field MUST have the value of v2.  That is, the version
field is present in the DER encoding.

Note: This version (v2) is not backwards compatible with the previous
attribute certificate definition (v1) from the 1997 X.509 standard
[X.509-1997], but is compatible with the v2 definition from X.509
(2000) [X.509-2000].

### 4.2.2  Holder

The Holder field is a SEQUENCE allowing three different (optional)
syntaxes: baseCertificateID, entityName and objectDigestInfo.  Where
only one option is present, the meaning of the Holder field is clear.
However, where more than one option is used, there is a potential for
confusion as to which option is "normative", which is a "hint" etc.
Since the correct position is not clear from [X.509-2000], this
specification RECOMMENDS that only one of the options be used in any
given AC.

For any environment where the AC is passed in an authenticated
message or session and where the authentication is based on the use
of an X.509 PKC, the holder field SHOULD use the baseCertificateID.

With the baseCertificateID option, the holder's PKC serialNumber and
issuer MUST be identical to the AC holder field.  The PKC issuer MUST
have a non-empty distinguished name which is to be present as the
single value of the holder.baseCertificateID.issuer construct in the
directoryName field.  The AC holder.baseCertificateID.issuerUID field
MUST only be used if the holder's PKC contains an issuerUniqueID
field.  If both the AC holder.baseCertificateID.issuerUID and the PKC
issuerUniqueID fields are present, the same value MUST be present in
both fields.  Thus, the baseCertificateID is only usable with PKC
profiles (like [PKIXPROF]) which mandate that the PKC issuer field
contain a non-empty distinguished name value.

Note: An empty distinguished name is a distinguished name where the
SEQUENCE OF relative distinguished names is of zero length.  In a DER
encoding, this has the value '3000'H.

If the holder field uses the entityName option and the underlying
authentication is based on a PKC, the entityName MUST be the same as
the PKC subject field or one of the values of the PKC subjectAltName
field extension (if present).  Note that [PKIXPROF] mandates that the
subjectAltName extension be present if the PKC subject is an empty
distinguished name.  See the security considerations section which
mentions some name collision problems that may arise when using the
entityName option.

In any other case where the holder field uses the entityName option,
only one name SHOULD be present.

Implementations conforming to this profile are not required to
support the use of the objectDigest field.  However, section 7.3
specifies how this optional feature MAY be used.

Any protocol conforming to this profile SHOULD specify which AC
holder option is to be used and how this fits with the supported
authentication schemes defined in that protocol.

### 4.2.3   Issuer

ACs conforming to this profile MUST use the v2Form choice, which MUST
contain one and only one GeneralName in the issuerName, which MUST
contain a non-empty distinguished name in the directoryName field.
This means that all AC issuers MUST have non-empty distinguished
names.  ACs conforming to this profile MUST omit the
baseCertificateID and objectDigestInfo fields.

Part of the reason for the use of the v2Form containing only an
issuerName is that it means that the AC issuer does not have to know
which PKC the AC verifier will use for it (the AC issuer).  Using the
baseCertificateID field to reference the AC issuer would mean that
the AC verifier would have to trust the PKC that the AC issuer chose
(for itself) at AC creation time.

### 4.2.4   Signature

Contains the algorithm identifier used to validate the AC signature.

This MUST be one of the signing algorithms defined in [PKIXALGS].
Conforming implementations MUST honor all MUST/SHOULD/MAY signing
algorithm statements specified in [PKIXALGS].

### 4.2.5   Serial Number

For any conforming AC, the issuer/serialNumber pair MUST form a
unique combination, even if ACs are very short-lived.

AC issuers MUST force the serialNumber to be a positive integer, that
is, the sign bit in the DER encoding of the INTEGER value MUST be
zero - this can be done by adding a leading (leftmost) '00'H octet if
necessary.  This removes a potential ambiguity in mapping between a
string of octets and an integer value.

Given the uniqueness and timing requirements above, serial numbers
can be expected to contain long integers.  AC users MUST be able to
handle serialNumber values longer than 4 octets.  Conformant ACs MUST
NOT contain serialNumber values longer than 20 octets.

3/22/20 Case 1:15-cv-01170-GMS   Document 160-1   Filed 03/31/17   Page 180 of 468 PageID #: 7389

There is no requirement that the serial numbers used by any AC issuer
follow any particular ordering.  In particular, they need not be
monotonically increasing with time.  Each AC issuer MUST ensure that
each AC that it issues contains a unique serial number.

### 4.2.6   Validity Period

The attrCertValidityPeriod (a.k.a. validity) field specifies the
period for which the AC issuer certifies that the binding between the
holder and the attributes fields will be valid.

The generalized time type, GeneralizedTime, is a standard ASN.1 type
for variable precision representation of time.  The GeneralizedTime
field can optionally include a representation of the time
differential between the local time zone and Greenwich Mean Time.

For the purposes of this profile, GeneralizedTime values MUST be
expressed in Coordinated universal time (UTC) (also known as
Greenwich Mean Time or Zulu)) and MUST include seconds (i.e., times
are YYYYMMDDHHMMSSZ), even when the number of seconds is zero.
GeneralizedTime values MUST NOT include fractional seconds.

(Note: this is the same as specified in [PKIXPROF], section
4.1.2.5.2.)

AC users MUST be able to handle an AC which, at the time of
processing, has parts of its validity period or all its validity
period in the past or in the future (a post-dated AC).  This is valid
for some applications, such as backup.

### 4.2.7   Attributes

The attributes field gives information about the AC holder.  When the
AC is used for authorization, this will often contain a set of
privileges.

The attributes field contains a SEQUENCE OF Attribute.  Each
Attribute MAY contain a SET OF values.  For a given AC, each
AttributeType OBJECT IDENTIFIER in the sequence MUST be unique.  That
is, only one instance of each attribute can occur in a single AC, but
each instance can be multi-valued.

AC users MUST be able to handle multiple values for all attribute
types.

An AC MUST contain at least one attribute.  That is, the SEQUENCE OF
Attributes MUST NOT be of zero length.

https://tools.ietf.org/html/rfc3281          13/41

Some standard attribute types are defined in section 4.4.

### 4.2.8   Issuer Unique Identifier

This field MUST NOT be used unless it is also used in the AC issuer's
PKC, in which case it MUST be used.  Note that [PKIXPROF] states that
this field SHOULD NOT be used by conforming CAs, but that
applications SHOULD be able to parse PKCs containing the field.

### 4.2.9   Extensions

The extensions field generally gives information about the AC as
opposed to information about the AC holder.

An AC that has no extensions conforms to the profile; however,
section 4.3 defines the extensions that MAY be used with this
profile, and whether or not they may be marked critical.  If any
other critical extension is used, the AC does not conform to this
profile.  However, if any other non-critical extension is used, the
AC does conform to this profile.

The extensions defined for ACs provide methods for associating
additional attributes with holders.  This profile also allows
communities to define private extensions to carry information unique
to those communities.  Each extension in an AC may be designated as
critical or non-critical.  An AC using system MUST reject an AC if it
encounters a critical extension it does not recognize; however, a
non-critical extension may be ignored if it is not recognized.
Section 4.3 presents recommended extensions used within Internet ACs
and standard locations for information.  Communities may elect to use
additional extensions; however, caution should be exercised in
adopting any critical extensions in ACs which might prevent use in a
general context.

### 4.3 Extensions

### 4.3.1   Audit Identity

In some circumstances, it is required (e.g. by data protection/data
privacy legislation) that audit trails not contain records which
directly identify individuals.  This circumstance may make the use of
the AC holder field unsuitable for use in audit trails.

To allow for such cases, an AC MAY contain an audit identity
extension.  Ideally it SHOULD be infeasible to derive the AC holder's
identity from the audit identity value without the cooperation of the
AC issuer.

The value of the audit identity, along with the AC issuer/serial,
SHOULD then be used for audit/logging purposes.  If the value of the
audit identity is suitably chosen, a server/service administrator can
use audit trails to track the behavior of an AC holder without being
able to identify the AC holder.

The server/service administrator in combination with the AC issuer
MUST be able to identify the AC holder in cases where misbehavior is
detected.  This means that the AC issuer MUST be able to determine
the actual identity of the AC holder from the audit identity.

Of course, auditing could be based on the AC issuer/serial pair;
however, this method does not allow tracking of the same AC holder
with multiple ACs.  Thus, an audit identity is only useful if it
lasts for longer than the typical AC lifetime.  Auditing could also
be based on the AC holder's PKC issuer/serial; however, this will
often allow the server/service administrator to identify the AC
holder.

As the AC verifier might otherwise use the AC holder or some other
identifying value for audit purposes, this extension MUST be critical
when used.

Protocols that use ACs will often expose the identity of the AC
holder in the bits on-the-wire.  In such cases, an opaque audit
identity does not make use of the AC anonymous; it simply ensures
that the ensuing audit trails do not contain identifying information.

The value of an audit identity MUST be longer than zero octets.  The
value of an audit identity MUST NOT be longer than 20 octets.

```
    name           id-pe-ac-auditIdentity
    OID            { id-pe 4 }
    syntax         OCTET STRING
    criticality    MUST be TRUE
```

### 4.3.2   AC Targeting

To target an AC, the target information extension, imported from
[X.509-2000], MAY be used to specify a number of servers/services.
The intent is that the AC SHOULD only be usable at the specified
servers/services.  An (honest) AC verifier who is not amongst the
named servers/services MUST reject the AC.

If this extension is not present, the AC is not targeted and may be
accepted by any server.

In this profile, the targeting information simply consists of a list
of named targets or groups.

The following syntax is used to represent the targeting information:

```
        Targets ::= SEQUENCE OF Target

        Target  ::= CHOICE {
          targetName        [0] GeneralName,
          targetGroup       [1] GeneralName,
          targetCert        [2] TargetCert
        }

        TargetCert  ::= SEQUENCE {
          targetCertificate   IssuerSerial,
          targetName          GeneralName OPTIONAL,
          certDigestInfo      ObjectDigestInfo OPTIONAL
        }
```

The targetCert CHOICE within the Target structure is only present to
allow future compatibility with [X.509-2000] and MUST NOT be used.

The targets check passes if the current server (recipient) is one of
the targetName fields in the Targets SEQUENCE, or if the current
server is a member of one of the targetGroup fields in the Targets
SEQUENCE.  In this case, the current server is said to "match" the
targeting extension.

How the membership of a target within a targetGroup is determined is
not defined here.  It is assumed that any given target "knows" the
names of the targetGroups to which it belongs or can otherwise
determine its membership.  For example, the targetGroup specifies a
DNS domain, and the AC verifier knows the DNS domain to which it
belongs.  For another example, the targetGroup specifies "PRINTERS,"
and the AC verifier knows whether or not it is a printer or print
server.

Note: [X.509-2000] defines the extension syntax as a "SEQUENCE OF
Targets".  Conforming AC issuer implementations MUST only produce one
"Targets" element.  Confirming AC users MUST be able to accept a
"SEQUENCE OF Targets".  If more than one Targets element is found in
an AC, the extension MUST be treated as if all Target elements had
been found within one Targets element.

```
    name          id-ce-targetInformation
    OID           { id-ce 55 }
    syntax        SEQUENCE OF Targets
    criticality   MUST be TRUE
```

### 4.3.3   Authority Key Identifier

The authorityKeyIdentifier extension, as profiled in [PKIXPROF], MAY
be used to assist the AC verifier in checking the signature of the
AC.  The [PKIXPROF] description should be read as if "CA" meant "AC
issuer."  As with PKCs, this extension SHOULD be included in ACs.

Note: An AC, where the issuer field used the baseCertificateID
CHOICE, would not need an authorityKeyIdentifier extension, as it is
explicitly linked to the key in the referred certificate.  However,
as this profile states (in section 4.2.3), ACs MUST use the v2Form
with issuerName CHOICE, this duplication does not arise.

```
    name         id-ce-authorityKeyIdentifier
    OID          { id-ce 35 }
    syntax       AuthorityKeyIdentifier
    criticality  MUST be FALSE
```

### 4.3.4   Authority Information Access

The authorityInformationAccess extension, as defined in [PKIXPROF],
MAY be used to assist the AC verifier in checking the revocation
status of the AC.  Support for the id-ad-caIssuers accessMethod is
NOT REQUIRED by this profile since AC chains are not expected.

The following accessMethod is used to indicate that revocation status
checking is provided for this AC, using the OCSP protocol defined in
[OCSP]:

```
    id-ad-ocsp OBJECT IDENTIFIER ::= { id-ad 1 }
```

The accessLocation MUST contain a URI, and the URI MUST contain an
HTTP URL [URL] that specifies the location of an OCSP responder.  The
AC issuer MUST, of course, maintain an OCSP responder at this
location.

```
    name         id-ce-authorityInfoAccess
    OID          { id-pe 1 }
    syntax       AuthorityInfoAccessSyntax
    criticality  MUST be FALSE
```

### 4.3.5   CRL Distribution Points

The crlDistributionPoints extension, as profiled in [PKIXPROF], MAY
be used to assist the AC verifier in checking the revocation status
of the AC.  See section 6 for details on revocation.

RFC 3281            An Internet Attribute Certificate          April 2002

     If the crlDistributionPoints extension is present, then exactly one
     distribution point MUST be present.  The crlDistributionPoints
     extension MUST use the DistributionPointName option, which MUST
     contain a fullName, which MUST contain a single name form.  That name
     MUST contain either a distinguished name or a URI.  The URI MUST be
     either an HTTP URL or an LDAP URL [URL].

          name            id-ce-cRLDistributionPoints
          OID             { id-ce 31 }
          syntax          CRLDistPointsSyntax
          criticality     MUST be FALSE

### 4.3.6   No Revocation Available

     The noRevAvail extension, defined in [X.509-2000], allows an AC
     issuer to indicate that no revocation information will be made
     available for this AC.

     This extension MUST be non-critical.  An AC verifier that does not
     understand this extension might be able to find a revocation list
     from the AC issuer, but the revocation list will never include an
     entry for the AC.

          name            id-ce-noRevAvail
          OID             { id-ce 56 }
          syntax          NULL (i.e. '0500'H is the DER encoding)
          criticality     MUST be FALSE

### 4.4 Attribute Types

     Some of the attribute types defined below make use of the
     IetfAttrSyntax type, also defined below.  The reasons for using this
     type are:

     1. It allows a separation between the AC issuer and the attribute
        policy authority.  This is useful for situations where a single
        policy authority (e.g. an organization) allocates attribute
        values, but where multiple AC issuers are deployed for performance
        or other reasons.

     2. The syntaxes allowed for values are restricted to OCTET STRING,
        OBJECT IDENTIFIER, and UTF8String, which significantly reduces the
        complexity associated with matching more general syntaxes.  All
        multi-valued attributes using this syntax are restricted so that
        each value MUST use the same choice of value syntax.  For example,
        AC issuers must not use one value with an oid and a second value
        with a string.

Farrell & Housley          Standards Track                   [Page 18]

```
                 IetfAttrSyntax ::= SEQUENCE {
                     policyAuthority [0] GeneralNames    OPTIONAL,
                     values              SEQUENCE OF CHOICE {
                                 octets     OCTET STRING,
                                 oid        OBJECT IDENTIFIER,
                                 string    UTF8String
                     }
                 }
```

In the descriptions below, each attribute type is either tagged
"Multiple Allowed" or "One Attribute value only; multiple values
within the IetfAttrSyntax".  This refers to the SET OF
AttributeValues; the AttributeType still only occurs once, as
specified in section 4.2.7.

### 4.4.1   Service Authentication Information

The SvceAuthInfo attribute identifies the AC holder to the
server/service by a name, and the attribute MAY include optional
service specific authentication information.  Typically this will
contain a username/password pair for a "legacy" application.

This attribute provides information that can be presented by the AC
verifier to be interpreted and authenticated by a separate
application within the target system.  Note that this is a different
use to that intended for the accessIdentity attribute in 4.4.2 below.

This attribute type will typically be encrypted when the authInfo
field contains sensitive information, such as a password.

```
    name       id-aca-authenticationInfo
    OID        { id-aca 1 }
    Syntax     SvceAuthInfo
    values:    Multiple allowed

        SvceAuthInfo ::=    SEQUENCE {
            service    GeneralName,
            ident      GeneralName,
            authInfo  OCTET STRING OPTIONAL
        }
```

### 4.4.2  Access Identity

The accessIdentity attribute identifies the AC holder to the
server/service.  For this attribute the authInfo field MUST NOT be
present.

This attribute is intended to be used to provide information about
the AC holder, that can be used by the AC verifier (or a larger
system of which the AC verifier is a component) to authorize the
actions of the AC holder within the AC verifier's system.  Note that
this is a different use to that intended for the svceAuthInfo
attribute described in 4.4.1 above.

```
    name       id-aca-accessIdentity
    OID        { id-aca 2 }
    syntax     SvceAuthInfo
    values:    Multiple allowed
```

### 4.4.3   Charging Identity

The chargingIdentity attribute identifies the AC holder for charging
purposes.  In general, the charging identity will be different from
other identities of the holder.  For example, the holder's company
may be charged for service.

```
    name       id-aca-chargingIdentity
    OID        { id-aca 3 }
    syntax     IetfAttrSyntax
    values:    One Attribute value only; multiple values within the
               IetfAttrSyntax
```

### 4.4.4   Group

The group attribute carries information about group memberships of
the AC holder.

```
    name       id-aca-group
    OID        { id-aca 4 }
    syntax     IetfAttrSyntax
    values:    One Attribute value only; multiple values within the
               IetfAttrSyntax
```

### 4.4.5   Role

The role attribute, specified in [X.509-2000], carries information
about role allocations of the AC holder.

The syntax used for this attribute is:

```
        RoleSyntax ::= SEQUENCE {
                roleAuthority   [0] GeneralNames OPTIONAL,
                roleName        [1] GeneralName
        }
```

The roleAuthority field MAY be used to specify the issuing authority
for the role specification certificate.  There is no requirement that
a role specification certificate necessarily exists for the
roleAuthority.  This differs from [X.500-2000], where the
roleAuthority field is assumed to name the issuer of a role
specification certificate.  For example, to distinguish the
administrator role as defined by "Baltimore" from that defined by
"SPYRUS", one could put the value "urn:administrator" in the roleName
field and the value "Baltimore" or "SPYRUS" in the roleAuthority
field.

The roleName field MUST be present, and roleName MUST use the
uniformResourceIdentifier CHOICE of the GeneralName.

```
    name       id-at-role
    OID        { id-at 72 }
    syntax     RoleSyntax
    values:    Multiple allowed
```

### 4.4.6   Clearance

The clearance attribute, specified in [X.501-1993], carries clearance
(associated with security labeling) information about the AC holder.

The policyId field is used to identify the security policy to which
the clearance relates.  The policyId indicates the semantics of the
classList and securityCategories fields.

This specification includes the classList field exactly as it is
specified in [X.501-1993].  Additional security classification
values, and their position in the classification hierarchy, may be
defined by a security policy as a local matter or by bilateral
agreement.  The basic security classification hierarchy is, in
ascending order: unmarked, unclassified, restricted, confidential,
secret, and top-secret.

An organization can develop its own security policy that defines
security classification values and their meanings.  However, the BIT
STRING positions 0 through 5 are reserved for the basic security
classification hierarchy.

If present, the SecurityCategory field provides further authorization
information.  The security policy identified by the policyId field
indicates the syntaxes that are allowed to be present in the
securityCategories SET.  An OBJECT IDENTIFIER identifies each of the
allowed syntaxes.  When one of these syntaxes is present in the
securityCategories SET, the OBJECT IDENTIFIER associated with that
syntax is carried in the SecurityCategory.type field.

```
          Clearance  ::=  SEQUENCE {
              policyId  [0] OBJECT IDENTIFIER,
              classList [1] ClassList DEFAULT {unclassified},
              securityCategories
                        [2] SET OF SecurityCategory OPTIONAL
          }

          ClassList  ::=  BIT STRING {
              unmarked        (0),
              unclassified    (1),
              restricted      (2)
              confidential    (3),
              secret          (4),
              topSecret       (5)
          }

          SecurityCategory ::= SEQUENCE {
              type      [0]  IMPLICIT OBJECT IDENTIFIER,
              value     [1]  ANY DEFINED BY type
          }

          -- This is the same as the original syntax which was defined
          -- using the MACRO construct, as follows:
          -- SecurityCategory ::= SEQUENCE {
          --     type      [0]  IMPLICIT SECURITY-CATEGORY,
          --     value     [1]  ANY DEFINED BY type
          -- }
          --
          -- SECURITY-CATEGORY MACRO  ::=
          -- BEGIN
          -- TYPE NOTATION ::= type | empty
          -- VALUE NOTATION ::= value (VALUE OBJECT IDENTIFIER)
          -- END


      name      { id-at-clearance }
      OID       { joint-iso-ccitt(2) ds(5) module(1)
                    selected-attribute-types(5) clearance (55) }
      syntax    Clearance - imported from [X.501-1993]
      values    Multiple allowed
```

## 4.5 Profile of AC issuer's PKC

   The AC issuer's PKC MUST conform to [PKIXPROF], and the keyUsage
   extension in the PKC MUST NOT explicitly indicate that the AC
   issuer's public key cannot be used to validate a digital signature.
   In order to avoid confusion regarding serial numbers and revocations,

Farrell & Housley          Standards Track          [Page 22]

RFC 3281          An Internet Attribute Certificate          April 2002

an AC issuer MUST NOT also be a PKC Issuer.  That is, an AC issuer
cannot be a CA as well.  So, the AC issuer's PKC MUST NOT have a
basicConstraints extension with the cA BOOLEAN set to TRUE.

## 5. Attribute Certificate Validation

This section describes a basic set of rules that all valid ACs MUST
satisfy.  Some additional checks are also described which AC
verifiers MAY choose to implement.

To be valid an AC MUST satisfy all of the following:

1. Where the holder uses a PKC to authenticate to the AC verifier,
   the AC holder's PKC MUST be found, and the entire certification
   path of that PKC MUST be verified in accordance with [PKIXPROF].
   As noted in the security considerations section, if some other
   authentication scheme is used, AC verifiers need to be very
   careful mapping the identities (authenticated identity, holder
   field) involved.

2. The AC signature must be cryptographically correct, and the AC
   issuer's entire PKC certification path MUST be verified in
   accordance with [PKIXPROF].

3. The AC issuer's PKC MUST also conform to the profile specified in
   section 4.5 above.

4. The AC issuer MUST be directly trusted as an AC issuer (by
   configuration or otherwise).

5. The time for which the AC is being evaluated MUST be within the AC
   validity.  If the evaluation time is equal to either notBeforeTime
   or notAfterTime, then the AC is timely and this check succeeds.
   Note that in some applications, the evaluation time MAY not be the
   same as the current time.

6. The AC targeting check MUST pass as specified in section 4.3.2.

7. If the AC contains an unsupported critical extension, the AC MUST
   be rejected.

Support for an extension in this context means:

1. The AC verifier MUST be able to parse the extension value.

2. Where the extension value SHOULD cause the AC to be rejected, the
   AC verifier MUST reject the AC.

Additional Checks:

1. The AC MAY be rejected on the basis of further AC verifier
   configuration.  For example, an AC verifier may be configured to
   reject ACs which contain or lack certain attributes.

2. If the AC verifier provides an interface that allows applications
   to query the contents of the AC, then the AC verifier MAY filter
   the attributes from the AC on the basis of configured information.
   For example, an AC verifier might be configured not to return
   certain attributes to certain servers.

## 6. Revocation

In many environments, the validity period of an AC is less than the
time required to issue and distribute revocation information.
Therefore, short-lived ACs typically do not require revocation
support.  However, long-lived ACs and environments where ACs enable
high value transactions MAY require revocation support.

Two revocation schemes are defined, and the AC issuer should elect
the one that is best suited to the environment in which the AC will
be employed.

"Never revoke" scheme:

   ACs may be marked so that the relying party understands that no
   revocation status information will be made available.  The
   noRevAvail extension is defined in section 4.3.6, and the
   noRevAvail extension MUST be present in the AC to indicate use of
   this scheme.

   Where no noRevAvail is present, the AC issuer is implicitly
   stating that revocation status checks are supported, and some
   revocation method MUST be provided to allow AC verifiers to
   establish the revocation status of the AC.

"Pointer in AC" scheme:

   ACs may "point" to sources of revocation status information, using
   either an authorityInfoAccess extension or a crlDistributionPoints
   extension within the AC.

For AC users, the "never revoke" scheme MUST be supported, and the
"pointer in AC" scheme SHOULD be supported.  If only the "never
revoke" scheme is supported, then all ACs that do not contain a
noRevAvail extension, MUST be rejected.

For AC issuers, the "never revoke" scheme MUST be supported.  If all
ACs that will ever be issued by that AC issuer, contains a noRevAvail
extension, the "pointer in AC" scheme need not be supported.  If any
AC can be issued that does not contain the noRevAvail extension, the
"pointer in AC" scheme MUST be supported.

An AC MUST NOT contain both a noRevAvail and a "pointer in AC".

An AC verifier MAY use any source for AC revocation status
information.

## 7. Optional Features

This section specifies features that MAY be implemented.  Conformance
to this profile does NOT require support for these features; however,
if these features are offered, they MUST be offered as described
below.

## 7.1 Attribute Encryption

Where an AC will be carried in clear within an application protocol
or where an AC contains some sensitive information like a legacy
application username/password, then encryption of AC attributes MAY
be needed.

When a set of attributes are to be encrypted within an AC, the
Cryptographic Message Syntax, EnvelopedData structure [CMS] is used
to carry the ciphertext and associated per-recipient keying
information.

This type of attribute encryption is targeted.  Before the AC is
signed, the attributes are encrypted for a set of predetermined
recipients.

The AC then contains the ciphertext inside its signed data.  The
EnvelopedData (id-envelopedData) ContentType is used, and the content
field will contain the EnvelopedData type.

The ciphertext is included in the AC as the value of an encAttrs
attribute.  Only one encAttrs attribute can be present in an AC;
however, the encAttrs attribute MAY be multi-valued, and each of its
values will contain an independent EnvelopedData.

Each value can contain a set of attributes (each possibly a multi-
valued attribute) encrypted for a set of predetermined recipients.

The cleartext that is encrypted has the type:

```
ACClearAttrs ::= SEQUENCE {
     acIssuer  GeneralName,
     acSerial  INTEGER,
     attrs     SEQUENCE OF Attribute
}
```

The DER encoding of the ACClearAttrs structure is used as the
encryptedContent field of the EnvelopedData.  The DER encoding MUST
be embedded in an OCTET STRING.

The acIssuer and acSerial fields are present to prevent ciphertext
stealing.  When an AC verifier has successfully decrypted an
encrypted attribute, it MUST then check that the AC issuer and
serialNumber fields contain the same values.  This prevents a
malicious AC issuer from copying ciphertext from another AC (without
knowing its corresponding plaintext).

The procedure for an AC issuer when encrypting attributes is
illustrated by the following (any other procedure that gives the same
result MAY be used):

1.   Identify the sets of attributes that are to be encrypted for
     each set of recipients.
2.   For each attribute set which is to be encrypted:
   2.1. Create an EnvelopedData structure for the data for this
        set of recipients.
   2.2. Encode the ContentInfo containing the EnvelopedData as a
        value of the encAttrs attribute.
   2.3. Ensure the cleartext attributes are not present in the
        to-be-signed AC.
3.   Add the encAttrs (with its multiple values) to the AC.

Note that there may be more than one attribute of the same type (the
same OBJECT IDENTIFIER) after decryption.  That is, an AC MAY contain
the same attribute type both in clear and in encrypted form (and
indeed several times if the same recipient is associated with more
than one EnvelopedData).  One approach implementers may choose, would
be to merge attribute values following decryption in order to re-
establish the "once only" constraint.

```
name     id-aca-encAttrs
OID      { id-aca 6}
Syntax   ContentInfo
values   Multiple Allowed
```

RFC 3281          An Internet Attribute Certificate          April 2002

If an AC contains attributes, apparently encrypted for the AC
verifier, the decryption process MUST not fail.  If decryption does
fail, the AC MUST be rejected.

## 7.2 Proxying

When a server acts as a client for another server on behalf of the AC
holder, the server MAY need to proxy an AC.  Such proxying MAY have
to be done under the AC issuer's control, so that not every AC is
proxiable and so that a given proxiable AC can be proxied in a
targeted fashion.  Support for chains of proxies (with more than one
intermediate server) MAY also be required.  Note that this does not
involve a chain of ACs.

In order to meet this requirement we define another extension,
ProxyInfo, similar to the targeting extension.

When this extension is present, the AC verifier must check that the
entity from which the AC was received was allowed to send it and that
the AC is allowed to be used by this verifier.

The proxying information consists of a set of proxy information, each
of which is a set of targeting information.  If the verifier and the
sender of the AC are both named in the same proxy set, the AC can
then be accepted (the exact rule is given below).

The effect is that the AC holder can send the AC to any valid target
which can then only proxy to targets which are in one of the same
proxy sets as itself.

The following data structure is used to represent the
targeting/proxying information.

        ProxyInfo ::= SEQUENCE OF Targets

As in the case of targeting, the targetCert CHOICE MUST NOT be used.

A proxy check succeeds if either one of the conditions below is met:

1. The identity of the sender, as established by the underlying
   authentication service, matches the holder field of the AC, and
   the current server "matches" any one of the proxy sets.  Recall
   that "matches" is as defined section 4.3.2.

   2. The identity of the sender, as established by the underlying
      authentication service, "matches" one of the proxy sets (call it
      set "A"), and the current server is one of the targetName fields
      in the set "A", or the current server is a member of one of the
      targetGroup fields in set "A".

   When an AC is proxied more than once, a number of targets will be on
   the path from the original client, which is normally, but not always,
   the AC holder.  In such cases, prevention of AC "stealing" requires
   that the AC verifier MUST check that all targets on the path are
   members of the same proxy set.  It is the responsibility of the AC-
   using protocol to ensure that a trustworthy list of targets on the
   path is available to the AC verifier.

      name            id-pe-ac-proxying
      OID             { id-pe 10 }
      syntax          ProxyInfo
      criticality     MUST be TRUE

## 7.3 Use of ObjectDigestInfo

   In some environments, it may be required that the AC is not linked
   either to an identity (via entityName) or to a PKC (via
   baseCertificateID).  The objectDigestInfo CHOICE in the holder field
   allows support for this requirement.

   If the holder is identified with the objectDigestInfo field, then the
   AC version field MUST contain v2 (the integer 1).

   The idea is to link the AC to an object by placing a hash of that
   object into the holder field of the AC.  For example, this allows
   production of ACs that are linked to public keys rather than names.
   It also allows production of ACs which contain privileges associated
   with an executable object such as a Java class.  However, this
   profile only specifies how to use a hash over a public key or PKC.
   That is, conformant ACs MUST NOT use the otherObjectTypes value for
   the digestedObjectType.

   To link an AC to a public key, the hash must be calculated over the
   representation of that public key which would be present in a PKC,
   specifically, the input for the hash algorithm MUST be the DER
   encoding of a SubjectPublicKeyInfo representation of the key.  Note:
   This includes the AlgorithmIdentifier as well as the BIT STRING.  The
   rules given in [PKIXPROF] for encoding keys MUST be followed.  In
   this case, the digestedObjectType MUST be publicKey and the
   otherObjectTypeID field MUST NOT be present.

Note that if the public key value used as input to the hash function
has been extracted from a PKC, it is possible that the
SubjectPublicKeyInfo from that PKC is NOT the value which should be
hashed.  This can occur if DSA Dss-parms are inherited as described
in section 7.3.3 of [PKIXPROF].  The correct input for hashing in
this context will include the value of the parameters inherited from
the CA's PKC, and thus may differ from the SubjectPublicKeyInfo
present in the PKC.

Implementations which support this feature MUST be able to handle the
representations of public keys for the algorithms specified in
section 7.3 of [PKIXPROF].  In this case, the digestedObjectType MUST
be publicKey and the otherObjectTypeID field MUST NOT be present.

In order to link an AC to a PKC via a digest, the digest MUST be
calculated over the DER encoding of the entire PKC, including the
signature value.  In this case the digestedObjectType MUST be
publicKeyCert and the otherObjectTypeID field MUST NOT be present.

## 7.4 AA Controls

During AC validation a relying party has to answer the question: is
this AC issuer trusted to issue ACs containing this attribute?  The
AAControls PKC extension MAY be used to help answer the question.
The AAControls extension is intended to be used in CA and AC issuer
PKCs.

```
        id-pe-aaControls OBJECT IDENTIFIER ::= { id-pe 6 }

        AAControls ::= SEQUENCE {
            pathLenConstraint   INTEGER (0..MAX) OPTIONAL,
            permittedAttrs      [0] AttrSpec OPTIONAL,
            excludedAttrs       [1] AttrSpec OPTIONAL,
            permitUnSpecified   BOOLEAN DEFAULT TRUE
        }

        AttrSpec::= SEQUENCE OF OBJECT IDENTIFIER
```

The AAControls extension is used as follows:

The pathLenConstraint, if present, is interpreted as in [PKIXPROF].
It restricts the allowed distance between the AA CA (a CA directly
trusted to include AAControls in its PKCs), and the AC issuer.

The permittedAttrs field specifies a set of attribute types that any
AC issuer below this AA CA is allowed to include in ACs.  If this
field is not present, it means that no attribute types are explicitly
allowed.

The excludedAttrs field specifies a set of attribute types that no AC
issuer is allowed to include in ACs.  If this field is not present,
it means that no attribute types are explicitly disallowed.

The permitUnSpecified field specifies how to handle attribute types
which are not present in either the permittedAttrs or excludedAttrs
fields.  TRUE (the default) means that any unspecified attribute type
is allowed in ACs; FALSE means that no unspecified attribute type is
allowed.

When AAControls are used, the following additional checks on an AA's
PKC chain MUST all succeed for the AC to be valid:

1. Some CA on the ACs certificate path MUST be directly trusted to
   issue PKCs which precede the AC issuer in the certification path;
   call this CA the "AA CA".

2. All PKCs on the path from the AA CA, down to and including the AC
   issuer's PKC, MUST contain an AAControls extension; however, the
   AA CA's PKC need not contain this extension.

3. Only those attributes in the AC which are allowed, according to
   all of the AAControls extension values in all of the PKCs from the
   AA CA to the AC issuer, may be used for authorization decisions;
   all other attributes MUST be ignored.  This check MUST be applied
   to the set of attributes following attribute decryption, and the
   id-aca-encAttrs type MUST also be checked.

      name           id-pe-aaControls
      OID            { id-pe 6 }
      syntax         AAControls
      criticality    MAY be TRUE

## 8. Security Considerations

The protection afforded for private keys is a critical factor in
maintaining security.  Failure of AC issuers to protect their private
keys will permit an attacker to masquerade as them, potentially
generating false ACs or revocation status.  Existence of bogus ACs
and revocation status will undermine confidence in the system.  If
the compromise is detected, all ACs issued by the AC issuer MUST be
revoked.  Rebuilding after such a compromise will be problematic, so
AC issuers are advised to implement a combination of strong technical
measures (e.g., tamper-resistant cryptographic modules) and
appropriate management procedures (e.g., separation of duties) to
avoid such an incident.

3/22/20                 RFC 3281 - An Internet Attribute Certificate Profile for Authorization

Loss of an AC issuer's private signing key may also be problematic.
The AC issuer would not be able to produce revocation status or
perform AC renewal.  AC issuers are advised to maintain secure backup
for signing keys.  The security of the key backup procedures is a
critical factor in avoiding key compromise.

The availability and freshness of revocation status will affect the
degree of assurance that should be placed in a long-lived AC.  While
long-lived ACs expire naturally, events may occur during its natural
lifetime which negate the binding between the AC holder and the
attributes.  If revocation status is untimely or unavailable, the
assurance associated with the binding is clearly reduced.

The binding between an AC holder and attributes cannot be stronger
than the cryptographic module implementation and algorithms used to
generate the signature.  Short key lengths or weak hash algorithms
will limit the utility of an AC.  AC issuers are encouraged to note
advances in cryptology so they can employ strong cryptographic
techniques.

Inconsistent application of name comparison rules may result in
acceptance of invalid targeted or proxied ACs, or rejection of valid
ones.  The X.500 series of specifications defines rules for comparing
distinguished names.  These rules require comparison of strings
without regard to case, character set, multi-character white space
substrings, or leading and trailing white space.  This specification
and [PKIXPROF] relaxes these requirements, requiring support for
binary comparison at a minimum.

AC issuers MUST encode the distinguished name in the AC
holder.entityName field identically to the distinguished name in the
holder's PKC.  If different encodings are used, implementations of
this specification may fail to recognize that the AC and PKC belong
to the same entity.

If an attribute certificate is tied to the holder's PKC using the
baseCertificateID component of the Holder field and the PKI in use
includes a rogue CA with the same issuer name specified in the
baseCertificateID component, this rogue CA could issue a PKC to a
malicious party, using the same issuer name and serial number as the
proper holder's PKC.  Then the malicious party could use this PKC in
conjunction with the AC.  This scenario SHOULD be avoided by properly
managing and configuring the PKI so that there cannot be two CAs with
the same name.  Another alternative is to tie ACs to PKCs using the
publicKeyCert type in the ObjectDigestInfo field.  Failing this, AC
verifiers have to establish (using other means) that the potential
collisions cannot actually occur, for example, the CPSs of the CAs
involved may make it clear that no such name collisions can occur.

Implementers MUST ensure that following validation of an AC, only
attributes that the issuer is trusted to issue are used in
authorization decisions.  Other attributes, which MAY be present MUST
be ignored.  Given that the AA controls PKC extension is optional to
implement, AC verifiers MUST be provided with this information by
other means.  Configuration information is a likely alternative
means.  This becomes very important if an AC verifier trusts more
than one AC issuer.

There is often a requirement to map between the authentication
supplied by a particular security protocol (e.g. TLS, S/MIME) and the
AC holder's identity.  If the authentication uses PKCs, then this
mapping is straightforward.  However, it is envisaged that ACs will
also be used in environments where the holder may be authenticated
using other means.  Implementers SHOULD be very careful in mapping
the authenticated identity to the AC holder.

## 9. IANA Considerations

Attributes and attribute certificate extensions are identified by
object identifiers (OIDs).  Many of the OIDs used in this document
are copied from X.509 [X.509-2000].  Other OIDs were assigned from an
arc delegated by the IANA.  No further action by the IANA is
necessary for this document or any anticipated updates.

## 10. References

[CMC]        Myers, M., Liu, X., Schaad, J. and J. Weinstein,
             "Certificate Management Messages over CMS", RFC 2797,
             April 2000.

[CMP]        Adams, C. and S. Farrell, "Internet X.509 Public Key
             Infrastructure - Certificate Management Protocols", RFC
             2510, March 1999.

[CMS]        Housley, R., "Cryptographic Message Syntax", RFC 2630,
             June 1999.

[ESS]        Hoffman, P., "Enhanced Security Services for S/MIME",
             RFC 2634, June 1999.

[KRB]        Kohl, J. and C. Neuman, "The Kerberos Network
             Authentication Service (V5)", RFC 1510, September 1993.

[LDAP]       Wahl, M., Howes, T. and S. Kille, "Lightweight Directory
             Access Protocol (v3)", RFC 2251, December 1997.

[OCSP]        Myers, M., Ankney, R., Malpani, A., Galperin, S. and C.
              Adams, "X.509 Internet Public Key Infrastructure -
              Online Certificate Status Protocol - OCSP", RFC 2560,
              June 1999.

[PKIXALGS]    Bassham, L., Polk, W. and R. Housley, "Algorithms and
              Identifiers for the Internet X.509 Public Key
              Infrastructure Certificate and Certificate Revocation
              Lists CRL Profile", RFC 3279, April 2002.

[PKIXPROF]    Housley, R., Polk, T, Ford, W. and Solo, D., "Internet
              X.509 Public Key Infrastructure Certificate and
              Certificate Revocation List (CRL) Profile", RFC 3280,
              April 2002.

[RFC2026]     Bradner, S., "The Internet Standards Process -- Revision
              3", BCP 9, RFC 2026, October 1996.

[RFC2119]     Bradner, S., "Key words for use in RFCs to Indicate
              Requirement Levels", BCP 14, RFC 2119, March 1997.

[URL]         Berners-Lee, T., Masinter L. and M. McCahill, "Uniform
              Resource Locators (URL)", RFC 1738, December 1994.

[X.208-1988] CCITT Recommendation X.208: Specification of Abstract
              Syntax Notation One (ASN.1). 1988.

[X.209-88]   CCITT Recommendation X.209: Specification of Basic
              Encoding Rules for Abstract Syntax Notation One (ASN.1).
              1988.

[X.501-88]   CCITT Recommendation X.501: The Directory - Models.
              1988.

[X.501-1993] ITU-T Recommendation X.501 : Information Technology -
              Open Systems Interconnection - The Directory: Models,
              1993.

[X.509-1988] CCITT Recommendation X.509: The Directory -
              Authentication Framework.  1988.

[X.509-1997] ITU-T Recommendation X.509: The Directory -
              Authentication Framework.  1997.

[X.509-2000] ITU-T Recommendation X.509: The Directory - Public-Key
              and Attribute Certificate Frameworks.  2000

RFC 3281          An Internet Attribute Certificate          April 2002

Appendix A: Object Identifiers

    This (normative) appendix lists the new object identifiers which are
    defined in this specification.  Some of these are required only for
    support of optional features and are not required for conformance to
    this profile.  This specification mandates support for OIDs which
    have arc elements with values that are less than 2^32, (i.e. they
    MUST be between 0 and 4,294,967,295 inclusive) and SHOULD be less
    than 2^31 (i.e. less than or equal to 2,147,483,647).  This allows
    each arc element to be represented within a single 32 bit word.
    Implementations MUST also support OIDs where the length of the dotted
    decimal (see [LDAP], section 4.1.2) string representation can be up
    to 100 bytes (inclusive).  Implementations MUST be able to handle
    OIDs with up to 20 elements (inclusive).  AA's SHOULD NOT issue ACs
    which contain OIDs that breach these requirements.

    The following OIDs are imported from [PKIXPROF]:

        id-pkix OBJECT IDENTIFIER ::= { iso(1) identified-organization(3)
                dod(6) internet(1) security(5) mechanisms(5) pkix(7) }
        id-mod  OBJECT IDENTIFIER ::= { id-pkix 0 }
        id-pe   OBJECT IDENTIFIER ::= { id-pkix 1 }
        id-ad   OBJECT IDENTIFIER ::= { id-pkix 48 }
        id-at   OBJECT IDENTIFIER ::= { joint-iso-ccitt(2) ds(5) 4 }
        id-ce   OBJECT IDENTIFIER ::= { joint-iso-ccitt(2) ds(5) 29 }

    The following new ASN.1 module OID is defined:

        id-mod-attribute-cert       OBJECT IDENTIFIER ::= { id-mod 12 }

    The following AC extension OIDs are defined:

        id-pe-ac-auditIdentity      OBJECT IDENTIFIER ::= { id-pe 4 }
        id-pe-ac-proxying           OBJECT IDENTIFIER ::= { id-pe 10 }
        id-ce-targetInformation     OBJECT IDENTIFIER ::= { id-ce 55 }

    The following PKC extension OIDs are defined:

        id-pe-aaControls            OBJECT IDENTIFIER ::= { id-pe 6 }

Farrell & Housley          Standards Track                  [Page 34]

The following attribute OIDs are defined:

```
    id-aca                      OBJECT IDENTIFIER ::= { id-pkix 10 }
    id-aca-authenticationInfo   OBJECT IDENTIFIER ::= { id-aca 1 }
    id-aca-accessIdentity       OBJECT IDENTIFIER ::= { id-aca 2 }
    id-aca-chargingIdentity     OBJECT IDENTIFIER ::= { id-aca 3 }
    id-aca-group                OBJECT IDENTIFIER ::= { id-aca 4 }
    id-aca-encAttrs             OBJECT IDENTIFIER ::= { id-aca 6 }
    id-at-role                  OBJECT IDENTIFIER ::= { id-at 72 }
    id-at-clearance             OBJECT IDENTIFIER ::=
                  { joint-iso-ccitt(2) ds(5) module(1)
                    selected-attribute-types(5) clearance (55) }
```

Appendix B: ASN.1 Module

```
   PKIXAttributeCertificate {iso(1) identified-organization(3) dod(6)
                internet(1) security(5) mechanisms(5) pkix(7) id-mod(0)
                id-mod-attribute-cert(12)}

       DEFINITIONS IMPLICIT TAGS ::=

       BEGIN

       -- EXPORTS ALL --

       IMPORTS

           -- IMPORTed module OIDs MAY change if [PKIXPROF] changes
           -- PKIX Certificate Extensions
             Attribute, AlgorithmIdentifier, CertificateSerialNumber,
             Extensions, UniqueIdentifier,
             id-pkix, id-pe, id-kp, id-ad, id-at
             FROM PKIX1Explicit88 {iso(1) identified-organization(3)
                    dod(6) internet(1) security(5) mechanisms(5)
                    pkix(7) id-mod(0) id-pkix1-explicit-88(1)}

             GeneralName, GeneralNames, id-ce
             FROM PKIX1Implicit88 {iso(1) identified-organization(3)
                    dod(6) internet(1) security(5) mechanisms(5)
                    pkix(7) id-mod(0) id-pkix1-implicit-88(2)} ;

    id-pe-ac-auditIdentity    OBJECT IDENTIFIER ::= { id-pe 4 }
    id-pe-aaControls          OBJECT IDENTIFIER ::= { id-pe 6 }
    id-pe-ac-proxying         OBJECT IDENTIFIER ::= { id-pe 10 }
    id-ce-targetInformation   OBJECT IDENTIFIER ::= { id-ce 55 }

    id-aca                    OBJECT IDENTIFIER ::= { id-pkix 10 }
```

```
id-aca-authenticationInfo     OBJECT IDENTIFIER ::= { id-aca 1 }
id-aca-accessIdentity         OBJECT IDENTIFIER ::= { id-aca 2 }
id-aca-chargingIdentity       OBJECT IDENTIFIER ::= { id-aca 3 }
id-aca-group                  OBJECT IDENTIFIER ::= { id-aca 4 }
-- { id-aca 5 } is reserved
id-aca-encAttrs               OBJECT IDENTIFIER ::= { id-aca 6 }

id-at-role                    OBJECT IDENTIFIER ::= { id-at 72}
id-at-clearance               OBJECT IDENTIFIER ::=
            { joint-iso-ccitt(2) ds(5) module(1)
              selected-attribute-types(5) clearance (55) }

        -- Uncomment this if using a 1988 level ASN.1 compiler
        -- UTF8String ::= [UNIVERSAL 12] IMPLICIT OCTET STRING

        AttributeCertificate ::= SEQUENCE {
              acinfo              AttributeCertificateInfo,
              signatureAlgorithm  AlgorithmIdentifier,
              signatureValue      BIT STRING
        }

        AttributeCertificateInfo ::= SEQUENCE {
            version         AttCertVersion  -- version is v2,
            holder          Holder,
            issuer          AttCertIssuer,
            signature       AlgorithmIdentifier,
            serialNumber    CertificateSerialNumber,
            attrCertValidityPeriod   AttCertValidityPeriod,
            attributes      SEQUENCE OF Attribute,
            issuerUniqueID UniqueIdentifier OPTIONAL,
            extensions      Extensions      OPTIONAL
        }

        AttCertVersion ::= INTEGER { v2(1) }

        Holder ::= SEQUENCE {
              baseCertificateID   [0] IssuerSerial OPTIONAL,
                        -- the issuer and serial number of
                        -- the holder's Public Key Certificate
              entityName          [1] GeneralNames OPTIONAL,
                        -- the name of the claimant or role
              objectDigestInfo    [2] ObjectDigestInfo OPTIONAL
                        -- used to directly authenticate the
                        -- holder, for example, an executable
        }
```

RFC 3281            An Internet Attribute Certificate            April 2002

```
ObjectDigestInfo   ::= SEQUENCE {
    digestedObjectType  ENUMERATED {
        publicKey           (0),
        publicKeyCert       (1),
        otherObjectTypes    (2) },
                -- otherObjectTypes MUST NOT
                -- MUST NOT be used in this profile
    otherObjectTypeID   OBJECT IDENTIFIER  OPTIONAL,
    digestAlgorithm     AlgorithmIdentifier,
    objectDigest        BIT STRING
}

AttCertIssuer ::= CHOICE {
    v1Form   GeneralNames,  -- MUST NOT be used in this
                            -- profile
    v2Form   [0] V2Form     -- v2 only
}

V2Form ::= SEQUENCE {
    issuerName          GeneralNames  OPTIONAL,
    baseCertificateID   [0] IssuerSerial  OPTIONAL,
    objectDigestInfo    [1] ObjectDigestInfo  OPTIONAL
        -- issuerName MUST be present in this profile
        -- baseCertificateID and objectDigestInfo MUST
        -- NOT be present in this profile
}

IssuerSerial  ::=  SEQUENCE {
    issuer      GeneralNames,
    serial      CertificateSerialNumber,
    issuerUID   UniqueIdentifier OPTIONAL
}

AttCertValidityPeriod  ::= SEQUENCE {
    notBeforeTime  GeneralizedTime,
    notAfterTime   GeneralizedTime
}

Targets ::= SEQUENCE OF Target

Target  ::= CHOICE {
    targetName    [0] GeneralName,
    targetGroup   [1] GeneralName,
    targetCert    [2] TargetCert
}
```

```
            TargetCert  ::= SEQUENCE {
                 targetCertificate  IssuerSerial,
                 targetName         GeneralName OPTIONAL,
                 certDigestInfo     ObjectDigestInfo OPTIONAL
            }

            IetfAttrSyntax ::= SEQUENCE {
                 policyAuthority[0] GeneralNames    OPTIONAL,
                 values            SEQUENCE OF CHOICE {
                                   octets    OCTET STRING,
                                   oid       OBJECT IDENTIFIER,
                                   string    UTF8String
                    }
            }

            SvceAuthInfo ::=    SEQUENCE {
                 service         GeneralName,
                 ident           GeneralName,
                 authInfo        OCTET STRING OPTIONAL
            }

            RoleSyntax ::= SEQUENCE {
                 roleAuthority  [0] GeneralNames OPTIONAL,
                 roleName       [1] GeneralName
            }

            Clearance  ::=  SEQUENCE {
                 policyId       [0] OBJECT IDENTIFIER,
                 classList      [1] ClassList DEFAULT {unclassified},
                 securityCategories
                                [2] SET OF SecurityCategory  OPTIONAL
            }

            ClassList  ::=  BIT STRING {
                 unmarked       (0),
                 unclassified   (1),
                 restricted     (2),
                 confidential   (3),
                 secret         (4),
                 topSecret      (5)
            }

            SecurityCategory ::= SEQUENCE {
                 type     [0]  IMPLICIT OBJECT IDENTIFIER,
                 value    [1]  ANY DEFINED BY type
            }
```

RFC 3281            An Internet Attribute Certificate            April 2002

```
            AAControls ::= SEQUENCE {
                    pathLenConstraint INTEGER (0..MAX) OPTIONAL,
                    permittedAttrs   [0] AttrSpec OPTIONAL,
                    excludedAttrs    [1] AttrSpec OPTIONAL,
                    permitUnSpecified BOOLEAN DEFAULT TRUE
            }

            AttrSpec::= SEQUENCE OF OBJECT IDENTIFIER

            ACClearAttrs ::= SEQUENCE {
                    acIssuer         GeneralName,
                    acSerial         INTEGER,
                    attrs            SEQUENCE OF Attribute
            }

            ProxyInfo ::= SEQUENCE OF Targets

      END
```

Author's Addresses

    Stephen Farrell
    Baltimore Technologies
    39/41 Parkgate Street
    Dublin 8
    IRELAND

    EMail: stephen.farrell@baltimore.ie

    Russell Housley
    RSA Laboratories
    918 Spring Knoll Drive
    Herndon, VA 20170
    USA

    EMail: rhousley@rsasecurity.com

Acknowledgements

    Russ Housley thanks the management at SPYRUS, who supported the
    development of this specification while he was employed at SPYRUS.
    Russ Housley also thanks the management at RSA Laboratories, who
    supported the completion of the specification after a job change.

Case 1:15-cv-01170-GMS   Document 160-1   Filed 03/31/17   Page 207 of 468 PageID #: 7416

Full Copyright Statement

    Copyright (C) The Internet Society (2002).  All Rights Reserved.

    This document and translations of it may be copied and furnished to
    others, and derivative works that comment on or otherwise explain it
    or assist in its implementation may be prepared, copied, published
    and distributed, in whole or in part, without restriction of any
    kind, provided that the above copyright notice and this paragraph are
    included on all such copies and derivative works.  However, this
    document itself may not be modified in any way, such as by removing
    the copyright notice or references to the Internet Society or other
    Internet organizations, except as needed for the purpose of
    developing Internet standards in which case the procedures for
    copyrights defined in the Internet Standards process must be
    followed, or as required to translate it into languages other than
    English.

    The limited permissions granted above are perpetual and will not be
    revoked by the Internet Society or its successors or assigns.

    This document and the information contained herein is provided on an
    "AS IS" basis and THE INTERNET SOCIETY AND THE INTERNET ENGINEERING
    TASK FORCE DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING
    BUT NOT LIMITED TO ANY WARRANTY THAT THE USE OF THE INFORMATION
    HEREIN WILL NOT INFRINGE ANY RIGHTS OR ANY IMPLIED WARRANTIES OF
    MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Acknowledgement

    Funding for the RFC Editor function is currently provided by the
    Internet Society.

# EXHIBIT 11

# 1st Annual PKI Research Workshop Proceedings

www.cs.dartmouth.edu/~pki02/

August 2002

Gaithersburg, Maryland, USA
April 24-25, 2002





1st Annual PKI Research Workshop---Proceedings

## Organizers

*General Chair:* Ken Klingenstein, University of Colorado.

*Program Chair:* Sean Smith, Dartmouth College.

*Stipends Chair:* Neal McBurnett, Internet2.

*WIP Chair:* Peter Honeyman, University of Michigan.

*Local Arrangements Chair:* Nelson Hastings, NIST.

*Scribe:* Ben Chinowsky, Internet2.

*Program Committee:*

Peter Alterman, NIH.
Steve Bellovin, AT&T Labs Research.
Stefan Brands, McGill University.
Bill Burr, NIST.
Carl Ellison, Intel.
Stephen Farrell, Baltimore Technologies.
Richard Guida, Johnson and Johnson.
Peter Honeyman, University of Michigan.
Ken Klingenstein, University of Colorado.
Larry Landweber, University of Wisconsin.
Neal McBurnett, Internet2.
Clifford Neuman, USC.
Sean Smith, Dartmouth College.
Steve Tuecke, Argonne National Laboratory.


*Additional thanks to:* Renee Frost, Tim Polk, Jim Rees, Ellen Vaughan, and Jiaying Zhang.

# Contents

*Preface.*                                                                                      *vii*

## Summaries

*Workshop Summary.*                                                             *3*

*Dueling Theologies.*                                                             *7*

*XKMS Panel.*                                                                       *9*

*Work-in-Progress Session.*                                                  *11*

## Refereed Papers

*NOVOMODO:Scalable Certificate Validation and Simplified PKI Management.*          *15*
Silvio Micali.

*Validity Management in SPKI.*                                                  *27*
Yki Kortesniemi.

*Extended Validation Models in PKI: Alternatives and Implications.*          *37*
Marc Branchaud, John Linn.

*Trust Assertion XML Infrastructure.*                                      *45*
Phillip Hallam-Baker.

*Making Certificates Programmable.*                                      *57*
John DeTreville.

*A Distributed Credential Management System for SPKI-based Delegation Systems.*          *65*
Oscar Canovas, Antonio F. Gomez.

*Scalability Issues in PMI Delegation.*                                      *77*
Scott Knight, Chris Grandy.

*Password-Enabled PKI: Virtual Smartcards versus Virtual Soft Tokens.*          *89*
Ravi Sandhu, Mihir Bellare, Ravi Ganesan.

*Delegated Cryptography, Online Trusted Third Parties, and PKI*          *97*
Trevor Perrin, Logan Bruns, Jahan Moreh, Terry Olkin.

*Security Characteristics of Cryptographic Mobility Solutions.*          *117*
Sarbari Gupta.

*A Note on SPKI's Authorization Syntax.*                                  *127*
Olav Bandmann, Mads Dam.

*Public-key Support for Collaborative Groups.*                          *139*
Steve Dohrmann, Carl Ellison.

*Authorization Policy in a PKI Environment.*                                            *149*
Mary Thompson, Srilekha Mudumbai, Abdelilah Essiari, Willie Chin.

## Invited Talks and Experience Reports

*Improvements on Conventional PKI Wisdom.*                                              *165*
Carl Ellison.

*Report: EDUCAUSE - NIH PKI Interoperability Pilot Project.*                            *177*
Peter Alterman, Russel Weiser, Michael Gettes, Kenneth Stillson, Deborah Blanchard, James Fisher, Robert Brentrup,
Eric Norman

*Experiences Establishing an Experimental International Coalition Public Key Infrastructure.*   *193*
Glenn Fink, Shawn Raiszadeh, Timothy Dean.

## Position Papers

*PKI Trust Models.*                                                                     *209*
Yassir Elley.

*How Things Look from the Trenches.*                                                    *211*
William F. Flanigan, Jr., Deborah M. Mitchell.

*Impediments to Deployment of PKI from the Perspective of Grid Computing.*              *215*
Marty Humphrey.

*Novel Schemes for Certificate Management in Public-Key Infrastructure.*               *217*
Ravi Mukkamala.

# Preface

Since its discovery three decades ago, public-key cryptography has excited computer scientists and practitioners alike, because of its potential to enable trusted information services between parties who do not share secrets *a priori*. Public-key infrastructure—the technology to make this cryptography work in practice—would appear to be critical in the emerging information infrastructure, which replete with boundaries—organizational, temporal, and many others—that separate parties and make sharing difficult or impossible.

However, public-key cryptography has not fully achieved this vision. Some would assert that "PKI has not happened yet"; others believe it is happening, but more slowly than anticipated. Researchers also exist with more extreme viewpoints.

We convened this workshop to address the gap between this vision and the current state of PKI, and attracted a critical mass of participants from government, industry, and academia, and representing a full spectrum of approaches and opinions.

This volume contains a written record of the result: the formal refereed papers and experience reports of the conference, as well as summaries of the panels and discussions, and position papers submitted by some attendees.

On behalf of the entire organizing team, I thank all the participants. We hope that this is the first in a series of conferences that helps our community achieve the long-term vision of PKI.

*Sean Smith, Program Chair*
*Dartmouth College*
*Hanover, New Hampshire USA*

sws@cs.dartmouth.edu

# Summaries

1st Annual PKI Research Workshop---Proceedings

# Report: EDUCAUSE – NIH PKI Interoperability Pilot Project

Peter Alterman, Russel Weiser, Michael Gettes, Kenneth Stillson, Deborah Blanchard, James
Fisher, Robert Brentrup, Eric Norman

## Background

Under mandate to adopt broad electronic business methods by October 2003, Federal Agencies are working hard to figure out ways to put their business on-line in a way that is secure.  A leading contender to make e-government secure and trustworthy is public key cryptography.  At the same time, far-sighted institutions of higher education have been busy deploying PKIs and issuing digital certificates to their faculties and staffs to enable secure, electronic business with the government and with each other.  These institutions wish to use their locally-issued digital credentials to do electronic business with the government securely.  The NIH, in turn, wishes to be able to rely on business partner-issued digital credentials, thereby avoiding the cost and administrative burden of issuing and managing electronic credentials.   NIH and EDUCAUSE jointly constructed a PKI interoperability pilot project that demonstrated the ability of the Federal Government to receive electronic forms signed with digital certificates issued by institutions of higher education.

## Description of Project

In order to address this situation, NIH and EDUCAUSE conceived a research project that would demonstrate a simplified approach to submitting digitally signed electronic grant applications to NIH.  Although the project used an electronic grant form, in reality any form could have been used; the point being that the project's approach is applicable to any electronic form or file.  The explicit goals of the interoperability project were to:

- Receive grant applications as digital forms signed with two different, validated, digital certificates each (an NIH business process requirement);
- Use digital certificates issued by three (later changed to five) participating academic institutions;
- Demonstrate interoperability among different CA vendors' products, including PKI service providers.

A key consideration in the design was that NIH would be a relying party with respect to the digital credentials used to sign the electronic grant applications.  This is important for several reasons.  For privacy and resources reasons, NIH would like to avoid issuing digital credentials to individuals and institutions.  Experience trying to maintain an up-to-date, accurate inventory of research faculty and staff has demonstrated to NIH the futility of a government-centric, centralized approach to issuing and maintaining credentials of faculty engaged in government-sponsored biomedical and biobehavioral research.   On the other hand, academic institutions have a much easier time of keeping track of their faculty and graduate students – so long as they wish to continue to receive paychecks.

Many academic institutions are in the process of deploying PKIs and issuing digital certificates to faculty, staff and students to facilitate e-business on campus, and these schools have voiced a clear desire to use their locally issued digital credentials for doing business with the Federal government.  Thus, the logical design plan was to encourage deployment of institutional PKIs.

To support the work of the project, NIH and EDUCAUSE contracted with Digital Signature Trust (DST) and Mitretek Systems to complete key portions of the work. Fundamental work resolving directory issues was done by Georgetown University.

NIH provided the participating institutions with a Microsoft Word Template version of the *PHS-398, Application for Research Grant* form, to be used as the model for this pilot.  The form was made available for download at an NIH web site. (Although not selected by any participant, a PDF version of the PHS-398 was made available to all institutions for the pilot.)  This was done to provide the institutions with an electronic document that could be manipulated locally by common desktop software applications.  Desktop signing of the Word templates was accomplished using Assured Office (now ProSigner) software, a Microsoft Office Suite

plug-in and standalone application developed by E-Lock (now Lexign).  ProSigner, however, only works on the Microsoft Windows platform.

Phase One of the project incorporated the following assumptions and features:

- **A form that could be shared between the Principal Investigator and the Authorized Official of Record (AOR) at the research institution.** The PHS-398 is completed by PIs and the AORs, also known as Institutional Representatives (IR) in recognition of the fact that NIH funds institutions, not individuals. The form must allow for completion by multiple users, although only one of these users will submit the form to NIH.

- **A form that could be digitally signed with multiple digital signatures.** Both the PI and an IR sign the PHS 398.  Both digital signatures need to be validated, that is, checked to verify they are good, when the form is submitted to NIH.  The PI is typically part of a research operation of an organization.  The institutional representative is an administrator, typically called the Authorized Official of Record (AOR) or IR.  The two may be hundreds or thousands of miles apart. Bringing these people into a room at a single moment is often not feasible. Further, the AOR or IR may be handling numerous forms at a single time, related to many different investigators.

- **A form that could be completed with virtually no additional software requirements for the PI and IR/AOR.** In order to allow for maximum scalability, the team decided that the adopted solution should have as small a client footprint as possible, not only because of difficulties in downloading and installing products, but also because Information Technology (IT) departments are averse to installation of software that is not part of the standard configuration supported by the Institution's IT environment. This concern arises from added cost and support (which also translates to cost) requirements.

- **A form that could utilize commercial-off-the-shelf (COTS) digital signing products.** Based on our analysis of COTS digital signing software, the product that we recommended, E-Lock Web-Signer (now Lexign ProSigner), would sign not only portable document format

(PDF) files, but also generally any other file type.  Due to the number of users participating in this pilot, it was more cost effective to use the per-user-priced Assured Office (ProSigner) rather than the recommended Web-Signer, which is priced on a server basis.

Research into the capabilities of Adobe Acrobat reader revealed that the reader software supported verification of signatures, but did not support digital signing or digital certificate validation natively.  Additionally, Adobe Acrobat software, as distributed by the manufacturer, requires additional software plug-ins to be added to the desktop to allow it to function with PKI certificates that would be applicable to the project requirements.  By using a COTS product that worked correctly with any file format, including Word templates, a separate plug-in for Adobe did not need to be created.

- **Form could be digitally signed and sent as an email attachment, requiring no changes to the NIH mail server.**  In order to best meet the needs of the constituents of the pilot, e.g., the research institutions and NIH, the Word template needed to be completed, digitally signed, and emailed as an attachment to the NIH OER recipient.  This allows for easier submission of the form, requiring no changes to the NIH email server or to current database or web servers.  Furthermore, it greatly simplified the submission process for the institutions.  The fact that their email systems logged the sending of the message as proof of date and time of submission was a serendipitous extra benefit.

## PKI Bridges

To allow NIH to successfully validate the digital certificates affixed to the electronic grant applications, EDUCAUSE deployed a Higher Education Bridge Certification Authority (HEBCA) prototype structurally similar to the Federal Bridge Certification Authority (FBCA) prototype.  With the support and approval of the Federal PKI Steering Committee, which included a generous grant, the two bridges were cross-to-certified and currently interoperate at the test level of assurance. Participating institutions' PKIs cross-certified with the Higher Ed Bridge while a proxy NIH CA cross-certified with the Federal Bridge.  Thus, a trust path was created between NIH and the institutions

through the bridge-bridge infrastructure created to support the project.

Trust path discovery and validation for the bridge infrastructure model required use of specialized software. Mitretek Systems modified the Certificate Arbitration Module (CAM) originally created for the GSA Access Certificates for Electronic Services (ACES) program (an umbrella contract mechanism allowing the Government a acquire a broad range of PKI services) and added DAVE. The CAM/DAVE became the validation service used by Assured Office to validate the digital signatures affixed to the completed MS Word templates. How this worked will be explained further on in this paper.

Significant issues were encountered in attempting to link the different directories that supported the institutional PKIs. To resolve them successfully, the team found it necessary to use an Internet 2-supported "registry of directories," described below, developed by Michael Gettes of Georgetown University.

## Interoperability

In addition to brokering trust among discrete PKIs, the Federal and Higher Education bridges also supported Certificate Authority (CA) product interoperability. The University of Alabama at Birmingham used the DST TrustID certificate service (RSA technology); the University of Wisconsin-Madison used the Netscape iPlanet CA and Dartmouth College used the Entrust CA. The University of California Office of the President and the University of Texas – Houston Health Science Center used the VeriSign On-Site CA service. (The latter has not yet been demonstrated to operate successfully in the pilot, but is expected to be operational shortly.)

By using interoperating bridges, the overall number of cross-certifications required within the community of interest was reduced. Policy mapping decisions were offloaded to the Bridge policy authorities. This model allowed disparate PKI communities to be "bridged" together. Its disadvantages were also evident: liability issues arose by offloading policy mapping functions to a Bridge policy authority; it was heavily dependent on a distributed directory system that was vulnerable to failure in a number of locations. Certificate path construction was complex, and there were disparities between the underlying directories, e.g.,

X.500 vs. LDAP. If proper certificate constraints were not used, then security issues were destined to erode the trust in the infrastructure. Depending on the policies of the Bridge Policy Authority, peer-to-peer cross-certification of CAs still could be required.

## University CA Issues

As part of this project, university participants utilized their own CA software. The University of Wisconsin, for one, utilized the iPlanet CMS as its CA for university personnel certificates. This was one of the most challenging experiences – especially for the directory services. Their CA came integrated with the iPlanet LDAP directory in its default configuration, which assumed the CA would be used for an enterprise PKI in which users existed within the directory prior to obtaining the end entity certificate.

Because of this assumption, cross certifying with the HEBCA took some effort, specifically obtaining a PKCS#10 certificate request of the University of Wisconsin's root. This was found to be written as a file, instead of provided to the administrator. The publication of the cross certificate pair to the iPlanet directory had to be performed manually. The iPlanet software came with the *CertificationAuthority* object class and included *CrossCertificatePair* as one of the attributes. Using the *LDAPModify* command from the command line, the CrossCertificatePair could be published the directory

## The Certificate Arbitration Module (CAM)

The CAM is an application-level router that efficiently and consistently routes certificates from relying party programs to the issuing certificate authorities (CAs) for validation. By interfacing directly with the CAM, a relying party application can interact seamlessly with multiple CAs. CAM is also flexible; it allows RSA-based certificates to be validated with the Certification Authority. The CAM runs as a separate process within the agency's security domain, allowing the agency to manage the resources and controls necessary to support the validation processing at the enterprise level. Applications interact with the CAM through a simple validation API that communicates over TCP/IP or by using a Microsoft ActiveX control.



Phase 2 of the NIH-EDUCAUSE Interoperability Pilot Project with FBCA and HEBCA

When a digital signature and the corresponding signer's certificate are presented to a PKI-aware application and the application does not recognize it, the application submits the certificate to the CAM. The CAM parses the certificate, verifies that it has not expired and checks to see that the certificate issuer trusted by the application. The CAM then either uses stored instructions or looks at the Authority Information Access (AIA) extension within the certificate to obtain the location of the OCSP validation service cited by the issuing CA. The CAM then builds an OCSP request, digitally signs it with a certificate issued to the CAM, and submits it to the OCSP server for validation.

When DAVE is incorporated, the issuing CA no longer needs to be known *a priori* (via configuration) and trusted by the CAM. Instead, DAVE's trust anchor is known *a priori*, and DAVE performs the steps of trust path discovery and validation, the latter typically via Certificate Revocation Lists (CRLs).

The CAM *Validate Request* message contains three parameters: a message type, an Application ID string, and the DER-encoded certificate to validate. CAM then performs certificate validation on behalf

of the application and returns a response message back to the application. The *Validation Response* message contains five parameters: message type, certificate status, an ACES profile check code (not used in this project), an ASCII representation of the parsed certificate, and the binary digitally-signed validation response message received by the CAM from the CA's validation service.

As the application-to-CAM communication utilizes TCP/IP, an Intranet (or Internet) connection must exist between the application and the CAM. The validation request response messages are transmitted in "Little Endian" byte order, so applications integrating with the CAM must take this into account and translate the messages if they are <u>not</u> running on a non-Intel platform. The NIH and many of the academic institutions used Intel platforms, so this was not an issue for them during the pilot project, but it was noted that a significant Macintosh users are part of the NIH client base.

The CAM receives the signed OCSP response from the issuing CA's Responder, verifies the signature, and parses the response to obtain the certificate status. The CAM logs the response (providing an audit trail) and packages the status along with additional information in the *Validation Response* message, as discussed above. While the

functionality of each CAM is limited to a single security domain, it is also ideal for a one-stop gateway or portal architecture.

Enabling applications to utilize the CAM for validation is a fairly straightforward task. Several key points must be taken into consideration, though (See CAM Communications Specifications - Version 3.1.0 at http://cam.mitretek.org/cam):

The original design requirements assumed that the CAM and the application are running in the same security domain, that is, the protocol between the application and the CAM itself were not currently authenticated:

- The CAM server runs on a Microsoft NT 4.0 or Windows 2000 platform;
- The CAM utilizes TCP/IP to transport the validation request, responses to and from the CAM;
- The CAM trust model, when not extended by DAVE, is that the CAM is authoritative; only certificates issued from a CA explicitly trusted by the CAM are validated, hence applications have no need for further validation.

## CAM Implementation

To date, the CAM has been deployed successfully in a number of instances within the Federal Government. Although not in broad use today, this growth trend should continue over time. Examples:

1. The SSA is in the third year of its "Annual Wage Reporting" (AWR) pilot and the second year of utilizing the CAM as a signature validation service for electronic AWR filings. This year's pilot includes the use of a simplified signing control, "simple sign" to calculate the signature hash, sign the signature hash, and submit the filing to the SSA services. There, the signature is validated through the CAM validation server. Not only is SSA accepting signatures through the ACES program, it has added the State of Washington PKI as a trusted issuer within their CAM trust list;

2. FEMA utilizes the CAM validation service in several programs; first, to provide certificate-based access control to several critical databases available to emergency personal during disasters; second (deployed since the September 11th attacks), a government assistance program for local government agencies that are applying for FEMA assistance. This application allows electronic submission of

grant applications as well as certificate-based access to check on the status of the application by the applicant;

3. NIST has developed an electronic grant application submission and review workflow to support its research grants program. This program utilizes both ACES and NIST-issued certificates and handles signature validation via the CAM;

4. NTIS has enabled its labor union wage reporting system, utilizing CAM for signature validation of union officials when union wage reports are filed with the NTIS servers. The reports are then accepted and the information fields verified and fed into the Agency's back-end workflow system;

5. The EPA ran a pilot, "CDX," that enabled digital signing of pollution reports by reporting agencies and businesses. The program has recently incorporated a full-blown reporting exchange that includes the digital signatures, submitted reports, and their validation at the point of acceptance.

## Discovery And Validation Engine (DAVE)

DAVE is an open-source software package that provides X.509 certificate trust path discovery and validation services as a TCP/IP accessible Microsoft Windows NT/2000 service. DAVE may be used as an add-on to the CAM, extending CAM-enabled applications to hierarchical and cross-certified PKI domains.

Configuration settings for DAVE include:

- A certificate corresponding to the "trust anchor." All trust-paths end at this "most trusted CA;"
- An LDAP server name and port to use for retrieval of certificates and CRLs and/or ARLs.

The incoming request protocol used by DAVE is the same as that used by the CAM. Starting with CAM version 3.6a, the "CAM-linking" and "default CA" capabilities may be used to defer validation to DAVE for CAs not specifically listed on the CAM trust list. The outgoing request protocol for certificate path discovery and for CRL retrieval is LDAP, both for certificate path discovery and CRL retrieval. OCSP-based validation may be added at a later time. CAM already provides OCSP support, but only for directly trusted CAs, not ones located by path discovery.

DAVE applies multiple techniques to construct the certificate path.  When the location of the issuer's certificate is given in the AIA field of the certificate in question, DAVE contacts that specified LDAP or X.500 directory directly.  When explicit locations are not conveyed in the AIA field, or when a complete trust path has not yet been constructed, DAVE switches to a second technique, issuing LDAP "read" requests to its default LDAP server which, in turn, discovers and queries the correct directories.  Such discovery is made by way of hierarchical CA certificates and cross-certificates.  The explicit steps taken are: (1) read the issuer field from the certificate in question and call this the target domain name (DN), and (2) do an LDAP read for the target DN, asking for the return of both all *cACertificate* and *crossCertificatPair* attribute values.

This places two requirements on the directory infrastructure DAVE utilizes:

1.  PKI objects (certificates, cross-certificates, and CRLs / ARLs) must be properly stored in a part of the Directory Information Tree (DIT) with a DN equal to the subject field of the object(s);
2.  The LDAP server to which DAVE connects must know of and be able to retrieve any intermediate certificates or CRLs / ARLs along the constructible paths.  This generally implies directory chaining agreements or an LDAP referral arrangement.

Internally, much of DAVE's functionality is provided by other open-source packages:

- The Certificate Management Library (CML) v2 provides path construction logic and certificate validation functions;
- Crypto++ provides cryptographic functions for signature verification;
- Netscape LDAP SDK DLL (in object form; no source available) provides referral-enabled LDAP client functions;
- S/MIME Freeware Library (SFL) provides MIME processing functions, and an abstraction for Crypto++;
- Certificate Arbitrator Module (CAM) code is taken from CAM for NT service abstraction and

basic core library functions that provide thread safety, safe memory allocation, logging, etc.

## DAVE Status

Initial development of DAVE is completed, and the source-code will be freely available shortly.  DAVE has been tested in a number of trust topologies, with a variety of certificates issued by different CA product vendors.

## Interoperability Pilot Test Environment

NIH is a participant in the Federal Bridge CA (FBCA) prototype and has a CA cross-certified with the FBCA prototype.  The universities are participants in the Higher Education Bridge CA (HEBCA) prototype and their CAs are cross-certified with HEBCA.  When a certificate is validated in this test environment, it demonstrates a trust path that traverses hierarchical and cross-certificate-based PKI domains, multiple bridges, multiple CA product vendors, and both LDAP networking mechanisms, directory chaining agreements for the FBCA, and an LDAP referral-based directory networking for the universities.

The pilot project test environment pictured above involved two users at three of the universities sending "dual signed" grant request forms using certificates issued by their respective CAs (DST/RSA, iPlanet, Entrust).  The digitally signed forms were sent as attachments via standard e-mail to a user at the National Institutes of Health (NIH).

The NIH user received the e-mail message and used the CAM-enabled Lexign ProSigner application to validate the attached, signed form.  ProSigner was configured to contact NIH's CAM, which contained a single-item trust list, deferring validation to DAVE.  DAVE was configured with NIH's self-signed CA as it's trust anchor, and an LDAP meta-directory (referral-based) as its LDAP starting-point.  On an initial run, this system was able to validate both signatures on the form within 20 seconds.  On a second test run, when DAVE had automatically cached the certificates of the path, validation took place in under 5 seconds.



Pilot Project Description, highlighting positioning of CAM and DAVE in the trust discovery path

## Directory Overview

Currently, the FBCA environment relies heavily on the use of X.500 directory standards to facilitate path discovery and path processing. This is partially due to the Federal Government's extensive experience with X.500 directories. Although the FBCA does utilized the LDAP v3 protocol as the primary protocol to the bridge directory, another X.500 based protocol is utilized to connect transparently to a distributed mesh of directories. Certificates that make up a full path may reside in external directories that are connected to the bridge directory transparently. The FBCA environment relies on the X.500 DSP protocol to chain automatically to the external distributed directories to retrieve the CA certificates, CRLs, and ARLs that are needed to perform path processing. The DSP protocol is managed through the use of 'Chaining Agreements' that manage authentication and retrieval of attributes and values that reside on these external directories. This environment has been tested in small scale by the FBCA with several directory and CA products.

## Directory Issues

The FBCA model presents two fundamental challenges to the development of a HEBCA world. First, the FBCA was constructed under the assumption that X.500 directory services would be used for both the bridge and the agency directories, and the location for publishing certificates (including objects containing client, CA, CRL and ARL information) would be known *a priori*. Second, using directory request chaining to resolve requests for X.509 objects which the X.500 standard supports presents difficulties for LDAP implementations, since LDAP does not have a uniform mechanism for chaining requests and not all LDAP clients understand LDAP referrals. In the Higher Education computing environment, as in the marketplace, the use of X.500 directory servers is quite limited and LDAP is the predominant directory server technology employed for enterprise-class directory-enabled services. Since directory chaining is not one of the X.500 capabilities brought forward into the LDAP specification, the project team developed techniques for getting around these limitations.

Fundamental to the Federal BCA model is the notion that a request for an object associated with a *SubjectName* (Subject or Signer) is performed directly and not by issuing search requests. An application simply calls the "getDN" function and the directory infrastructure resolves the DN for the application.

It is also important to note that without an *AIA* extension in the certificate, the issues related to chaining and locating objects become significant. Very little software makes use of *AIA*, however, DAVE and CAM both use the *AIA* extension if it is present. If an HTTP URL form is present, DAVE will bypass directory lookups and use HTTP directly. If an LDAP URI form is presented to DAVE, the module directly queries the given LDAP server for the given DN; if it is a DN-only form, DAVE queries the default LDAP server using the DN from the *AIA* field, not the DN from the issuer/subject fields. The same logic applies for CDP fields when getting CRLs.

## Chaining

This paper does not attempt to describe all aspects of chaining per the X.500 specification, but simply makes note of some of the reasons for choosing the X.500 chaining methodology and presents challenges for an LDAP equivalent methodology.

What typically transpires in the BCA model is that an application receives a form or document with an affixed certificate. To validate that certificate, the CRL associated with the issuer of the certificate must be queried to see if the received certificate is still valid. The application (or an associated certificate-handling module) extracts the *Issuer Subject Name* from the certificate and requests the DN that is the Issuer *SubjectName* from a locally defined and -configured directory service. In the X.500 context, the DSA has the responsibility for performing any name mapping and for chasing down the DSA that houses the object associated with the DN. Since this involves accessing other directories, the authentication credentials are appropriately passed to other directories for proper access control to required information. This places the burden of translation and location on the DSA, and the application has to know little of the "magic behind the curtain." This "magic" is commonly referred to as "knowledge references" and there are various types to describe and implement different behaviors. One reference describes a chaining agreement between two DSAs. Another reference describes a referral, which is returned to the

application to be handled as the application sees fit. From an application perspective, this is a reasonable mechanism.

In the LDAP world, however, chaining doesn't exist formally. It is relatively easy to implement a simplified version of chaining using LDAP, but there is no standard defined for the activity. In the pilot project, the application has to chase the DSA associated with an issuer DN. While applications usually call library functions, this model potentially increases the complexity for the applications, depending upon which LDAP libraries are used. In the case of the open-source *OpenLDAP* implementation, a derivative of the University of Michigan SLAPD implementation, the libraries handle referral chasing rather well. Nevertheless, for both referral and chaining, there is still work that must be done at the DSA to define knowledge references (and, of course, to test those references). Thus, in LDAP-based models, applications must know more about the process of certificate validation, calling library functions and performing the work, but this type of activity is commonplace for LDAP-enabled applications. If handled properly, the X.500 model and the LDAP model are equally transparent to the application.

One important lesson from the FBCA work is that chaining agreements between different vendors of X.500 DSAs is quite problematic - to the point that a workaround was required for successful demonstration of the project proof of concept. Not every institution has the same Certificate Authority product or directory service product, and if they do have the same products, they might be different versions that are incompatible. This last situation particularly caused problems at the Dartmouth College PKI Lab, both with the CA and the directory (which had to be upgraded to the latest version, and even then had numerous directory chaining issues though it was an X.500 directory). Finally, the DSP protocol is time-dependent and hence two directories that are tied by chaining agreements require time synchronization in order to operate correctly.

## Resolving Objects via LDAP: Registry of Directories

Given that LDAP has no inherent chaining capability, a knowledge reference service was developed that the LDAP-enabled, BCA-aware applications utilized. This service is a Registry of Directories (RoD). The RoD is an LDAP directory

utilized to provide "smart referrals" for CAs which are cross certified with the HEBCA, but which do not have X.500 directories that support the DSP chaining protocol. The RoD provides DN entries for the organization CA and an LDAP-based URI referral to the organization's directory, where the CA certificate, CRLs and ARLs actually reside. This allows DAVE to access the directory of the institution quickly and to retrieve the CA certificate, CRLs and ARLs in order to perform the path development and processing needed to bridge a trusted path with generic LDAP read and LDAP search operations. This is not much different from the FBCA concept, except that multiple directories are accessed via LDAP by the path processing software as opposed to being accessed by a single bridge directory, which then chains to the distributed directories of the participating CAs. The advantage of this is the simplicity of management of the RoD, as opposed to establishing separate chaining agreements across numerous distributed directories. This is particularly important given the sheer number of institutions, and the diversity of their infrastructures and needs.

The project created the RoD on a test system (dodhe.internet2.edu) using different ports to simulate a federated administration model of this registry. Our first implementation required the application be configured with the top of the registry service defined - or pointed to - any DSA associated with the RoD service. Each RoD DSA was configured with a superior reference, which meant that any DN requested that was not managed by the current DSA yielded a referral to the top of the RoD. The RoD figure below shows an expansion of the RoD hierarchy for this phase of the project. For each root, we configured a new RoD hierarchy. We defined two roots for this part of the project, one for c=US and one for dc=edu. Only the c=US branch is shown below, since this presents the FBCA test environment, as well as the HEBCA test environment.



Registry of Directory hierarchy for Phase Two of the pilot

Note the referrals shown in the above figure at:

    c=US
    o=U.S. Government
    ou=NIH
    ou=FBCA
    o=University of Wisconsin
    o-dartmouth college pki lab

The RSA_FBCA Certificate Authority was also selected in the above figure and shows the object contents to the right, revealing the CRL, *crossCertificatePair*, and *caCertificate* attributes that would be utilized in path validation and discovery. An application requesting the associated data with this object would, starting at the top, receive one referral for *c=US*, then another referral for *o=U.S. Government*, then one more referral for *ou=fbca*. The DN of this object is: *cn=RSA_FBCA, ou=fbca, o=U.S. Government, c=US.*
Referrals within the RoD service may exist at any level as appropriate for the administration of the namespace being referred. This offers flexibility to delegate administration out to the true owners of the namespace in the "global" DIT space.

## Open Issues for the Registry of Directories

- Resource discovery seems to be a daunting and, as of yet, unsolved problem. Configuring client software (email clients, web servers and so on) with a local (or remote) DSA that is part of the RoD service is not desirable. Software should have a mechanism for locating the global service only if there is not a locally defined service. Using DNS SRV records and even poking at the DNS hierarchy within the local domain seem appropriate until an RoD Service SRV record is located. This will allow the starting point to be locally defined and will provide an escape route from the global hierarchy for special arrangements or alternative hierarchies depending on the commercial climate of namespace providers. DNS security is not an issue here since the objects being located will be digitally signed and will be, therefore, "self-secure" with respect to the certificate being validated.

- It is not clear which approach is better: getting an object or searching for an object. If certificates contain *AIA* extensions that lead directly to the object associated with the issuer, this is clearly the best approach. However, not all methodologies associated with *AIA* are

understood by all software. If one has to locate the issuer object, then how is that accomplished? Do we search on the DN in question or simply get it? Currently, there is quite a bit of discussion within the IETF-PKIX community as to which approach is best, and even discussions regarding the representation of a certificate in a directory. Do we provide new attributes that represent the contents of certificates and search those attributes (since X.509 certificates are stored as binary blobs) or do we search using special filters and matching items that allow for searching inside the binary X.509 blobs? These questions are not yet resolved, but the FBCA model will likely have to incorporate some new set of techniques to work with new, PKI-aware applications developed in response to the results of the IETF deliberations.

- The referral URI used in the smart referrals of the RoD must be pre-escaped, meaning the URI definition rules must be adhered to such that space characters must be translated to the %20 in the URI.

- Utilizing the LDAP standard port definitions of 389 or 636 simplifies the setup, since the firewalls usually are already open for other LDAP services. The X.500 chaining agreement setup requires special ports to be opened, which can lead to time delays and further security concerns by IT staff.

- In the case of X.500 directory chaining, chaining agreements are required in both directories. This requires a coordinated effort and substantial amount of administrative time to initially setup, and test proper chaining. The LDAP referral method was found to be easily set up and tested without the need for tightly coordinated effort and without the number of schema restrictions of chaining.

- Directory availability and security are critical issues associated with the deployment of this type of PKI. There exist many issues and solutions to yield high levels of both availability and security. The Federal model advocates use of a "border directory" which is essentially a public view of data originating from internal directories or databases that likely reside behind a firewall. There are other issues associated with directory-enabled applications that also require consideration that we will not attempt to discuss here. For more information,

refer to the Internet2 Middleware Initiative web site and the LDAP-Recipe at http://middleware.internet2.edu.

Border directories are specialized directories exposed to the world that contain a partial replica of proprietary information in the enterprise directory information tree of an institution or enterprise.  This allows the border directory to supply public information to the bridge environment, thereby reducing the need for directory access controls and simplifying directory administration. The concept of the border directory is part of the FBCA architectural design to provide agency-based directories that expose only information needed for the FBCA to perform the path discovery and path processing. Institutions participating in the HEBCA will probably find this same concept to be a useful data security measure.  Within the FBCA, the directories and border directories may be considered critical infrastructure systems and therefore require redundancy. This adds to the setup time and testing of the X.500 chaining agreements for both the bridge directory and the border directories. The HEBCA and the participating institutions could also be considered critical systems, but it is much easier to set up and test the smart referrals in the RoD than it is to ensure redundancy on all parts of the directory architecture.

- Firewalls and access controls to the directories within the institutions and the HEBCA will always need to be considered, although the referral mechanisms of the RoD simplify these issues because of LDAP's use of standard ports 389 or 636, as mentioned above.

- Anywhere that X.500 DSP is utilized, the administration of chaining agreements will require continuous checking, as well as synchronized time supplied, adding complexity to the infrastructure.

- Referral management will require institutional administrators to be aware of changes to the local directory tree that could affect RoD smart referrals.  The LDAP Browser/Editor version 2.8.2 by Jarek Gawor was utilized for the creation of the smart referrals in the RoD as the native administration interface of the directory server was found to be cumbersome.

- Dartmouth College cross certified an Entrust Authority CA with the HEBCA.  The Critical Path (previously PeerLogic) X.500 directory product was used with the Entrust Authority CA in this installation.  The X.500 product needed to be upgraded to version 8A3 to resolve problems with directory chaining.  The cross-certification exchange of certificates did not complete properly because of a still-unresolved incompatibility in the RSA product's response to the Entrust product.  This issue was worked around by manually installing the cross certificates in the Dartmouth directory.  A shadow DSA was created to avoid potential issues resulting from the manual certificate storage operation.  Since additional hardware was not readily available to support the shadow DSA at Dartmouth, the team initially attempted to use a non-standard port for the shadow directory's LDAP connection.  The Mitretek firewall, however, was only open for port 389 traffic.  To work around this issue, the shadow directory was subsequently hosted on a server inside the Mitretek firewall.  In addition, the update frequency for the CRL was extended to simplify synchronization with the shadow directory.

# Desktop Service – Lexign ProSigner (E-Lock Assured Office)

ProSigner is a Public Key Enabled (PKE) application, allowing any PC-based documents to be digitally signed and encrypted. ProSigner is fully integrated with Microsoft Word, Microsoft Excel, and Adobe PDF enabling users to sign and encrypt documents quickly.

- Provides ease of use through a point-and-click tool bar that integrates with Microsoft Word, Excel, and Adobe Acrobat;
- Enables document encryption, so only specified people can view the content of a document;
- Provides centralized security including signing, encryption, verification, and certificate validation;
- Manages multiple signatures and creates an audit trail of documents as they flow through the signature cycle;
- Supports any X.509 digital certificate and works seamlessly with certificates issued by Digital Signature Trust, Entrust, RSA Security, VeriSign and others;
- Policy definition, enforcement and auditing insure simple workflow requirements.

## Usage

ProSigner version 4.2 was utilized as a desktop service enabling the university partners to sign the Microsoft Word template PHS-398 form. To enable the signing, NIH translated its research grant workflow rules into Lexign policy that defines the two signatures be applied to the PHS-398 form.

The use of ProSigner, Microsoft Word and the PHS-398 allowed the researchers to fill out the electronic grant application form offline, wherever they were located. The researchers simply utilized Word to add the pertinent information into the PHS-398 document. Once all the information was completed, the researchers used the ProSigner controls in Microsoft Word to select their personal signing certificate to sign the application, then they attached it to an email to the institutional signing authority. The signing authority then reviewed the document, verified that it was signed by the researcher, and digitally signed it with his/her own signing certificate. Once both signatures were attached to the PHS-398, it was submitted to NIH simply by attaching it to an email and sending it to the OER email server.

The NIH recipient then opened the email and opened the attached PHS-398 with WORD and ProSigner. The NIH officer's ProSigner was configured to validate all certificates against a local CAM/DAVE validation service. When the PHS-398 was opened, signature validation was requested via the *Validate* API. If the certificate was within the trust list of the CAM, then standard ACES-level OCSP validation was performed. Since the certificates were issued from CAs not in the CAM trust list, validation was passed to DAVE and its configured default CA, the FBCA - HEBCA bridge infrastructure, to perform path discovery and path processing. When both certificates were verified through the CAM/DAVE service, the NIH officer then verified all the proper information was completed for the applications and disseminated it to referral and data entry.

As mentioned before, currently, ProSigner users must mange participating institutions' root certificates since the application still needs to see them in the Microsoft certificate store as trusted CA issuers in order to operate properly, even though it is CAM-aware.

Since Entrust software uses a proprietary client-side certificate store, it was necessary for Dartmouth's

PKI Lab to use the Entrust-specific version of ProSigner to sign the sample NIH PHS-398 form with Entrust-generated certificates. Other pilot project participants used the Internet Explorer version. The now-current version of Entrust supports key/certificate export to the Microsoft Crypto-API, which should allow use of the IE version of ProSigner in the future. With these issues resolved, signatures and remote verification at NIH were successful.

## Outstanding Desktop Application Issues To Be Resolved

The ProSigner version 4.2 utilized in the pilot project contained several problems that were worked around and should be fixed in later versions. Following is a brief list of these problems, followed by further explanation.

1. Explicit Trust in the CAM/DAVE validation without attempting to verify the CA within the local browser root store: ProSigner has been designed so that its certificate validation supported CRLs, OCSP, and CAM validation. In the case of CRL and OCSP based validations, the explicit validation of the CA required that the issuing CA root certificate was in the local browser root store and that the certificate being validated was valid within the validity period of the issuing CA's certificate.

2. The CAM response interpretation: Currently, the CAM validation API utilized by ProSigner returns several components to the *validate* API response message. Two of these parameters are important to the operation of the bridge-bridge model: the first is the CAM status code, which is the authoritative status of the certificate being validated and the second is the binary response message received by the CAM from the CA. Traditionally, this has been an OCSP response message from the issuing CAs validation service that may be used for long-term validation or archival proof of the certificate validation.

The addition of DAVE means that an OCSP response message is not sufficient to contain the path information and its validation response to be stored with the document, allowing for the long-term interpretation of the document signatures. The addition of another signed binary response is an issue. Also, the signed

binary response from DAVE that encapsulates the path and validation information has not been standardized to provide a clear standard for developers to utilize. Although several IETF drafts provide options into which this information may be put, they are still subject to change. This is an area that needs further development. The first viable IETF Standard RFC to defined response information that includes path and validation information should be incorporated into DAVE. Of course, determining which IETF standard is viable can be problematic.

3. The CAM's application-to-CAM API has no security provisioning built into the *validate* API. This may be a limiting factor of the CAM's acceptance as a general validation service. An unexpected finding of the interoperability pilot project was the desire of researchers to use ProSigner and the CAM/DAVE validation service across institutional boundaries. This could allow a researcher to share critical research information securely utilizing ProSigner. The recipients then would need to verify the source of the signed documents electronically and would require that a public validation service such as CAM be deployed with new APIs providing security to the educational institutions.

4. Verification and Timestamp Issues. ProSigner stores audit information along with the signed document as signatures are verified. The timestamp of the verification is associated with the signature and with the document. However, if a document is signed and verified on 4/1/2002 at 12:01AM and then again on 4/15/2002 at11: 59PM, the timestamp is set to 4/15/2002 and not the original signing and validation date o 4/1/2002. Although not a direct issue for the pilot project, long-term audit information is highly important as proof of when a valid signature is applied to a document over time. It has been suggested that an initial validation timestamp and last validated timestamp should both be associated with digitally signed documents. This would facilitate creation of a minimal long-term archive of signed documents like the PHS-398.

5. When a document that has been signed and validated with the validation response stored with the document, then the document's signature hash is broken with a debugger, ProSigner does not report a invalid hash when using offline validation. This problem was reported as a defect to Lexign and should be fixed in the next release of ProSigner.

## Policy Issues

The CAs that are part of the Interoperability Project issued certificates at the test level of assurance. To do business electronically, some form of policy needs to be created that addresses trust. Within the commercial X.509 PKI community, this is understood to require creation of a Certificate Policy (CP) in RFC2527 format that formulates the policies and procedures for issuing X.509 certificates at stated levels of assertion of identity and security. It also requires creation of a Certification Practices Statement (CPS) that describes in detail how the CA is to be operated to comply with the Certificate Policy. The degree to which a certificate user can trust the binding embodied in a certificate depends on several factors. These factors include the practices followed by the certification authority (CA) in authenticating the subject; the CA's operating policy, procedures, and security controls; the subject's obligations (for example, in protecting the private key); and the stated undertakings and legal obligations of the CA (for example, warranties and limitations on liability).

Beyond the strictly formal policy and procedures requirement, however, the organization issuing digital credentials needs to develop trust policies that address the questions implicit in establishing secure electronic business processes, for example: which credentials are good enough to satisfy trust requirements for a given transaction? What must be done to satisfy the business objectives, legal requirements, and culture of the organization issuing digital certificates?

## Lessons Learned

**Client Applications** Client applications that rely on a Bridge CA have to know how to handle the certificate of each CA in the Bridge or to rely on the server-based certificate validation. Certificate repositories may not be accessible to the client applications. Client applications tend to not be able to handle complicated certificate hierarchies that may use cross certificates. Finally, client applications must be able to utilize the policy mappings of the different CAs in the bridge. This tends to be too much processing for client applications to handle.

**Applications and Certificate Path Processing** Server- based applications need to be able to handle the complexities involved to support certificate path processing and validation of the trust domains. In the implementation of the HEBCA, the CAM was enhanced to use an add-on discovery and validation engine (DAVE) module to facilitate certificate path processing and to validate the trust domains.

**Trusted Servers** Organizations are moving towards solutions that leverage trusted servers to do the hard work associated with certificate processing, rather than have the client do all the work. Hence solutions like CAM and OCSP or even plug-in modules such as DAVE are designed to perform discovery of a certificate path for processing to be used for validation.

**Cross Certification** In the Bridge approaches previously mentioned, cross certification can only be obtained with self-signed root certificates. Numerous commercial PKIs are designed such that subordinate CAs within the hierarchy are designated as the trust anchor for specific policies. This leads to the need to cross certify subordinate CAs with the bridge environment.

**Directory Implementations** In the Bridge approaches previously mentioned X.500 directory and border directory implementations need to further embrace LDAP. As mentioned in the implementation of the HEBCA, a registry of directories and smart referrals were utilized to address interoperability across a diverse community of directory technologies.

**Using a Bridge CA** The cost for many agencies or institutions to operate and run their own PKI is more than these organizations can budget or afford. These organizations need to consider that *in order to use a BCA, the agency or institution must have their own PKI*. An organization is oftentimes best served to utilize a trust model or PKI that is already in existence, such as ACES or a trusted third party (TTP).

**Areas for improvement in the current application-to-CAM communications protocol**: first, the lack of security within the protocol. Although not an original design requirement of the CAM, there are now use cases where the CAM and PKI implementation would benefit by the addition of authentication and confidentiality features to allow validation of the messages sent and received across the Internet. This would protect the transactions against denial of service (DOS) attacks and against replay attacks. Second, as noted above, the TCP/IP messages between the application and CAM utilize a nonstandard packet byte ordering, that is, Microsoft byte ordering instead of standard network byte ordering. Special attention should be paid to this when integrating applications to the CAM. The CAM source AA_TEST application, which is used for initial testing of a CAM installation, is a good starting point for integrators implementing the *validate* API.

## Continuing Work

As more agencies and organizations adopt and participate in the BCA approach, more work needs to be done to ensure their success. Some of the immediate needs are identified below.

- Create a cookbook or document that identifies the minimal requirements and contents of the cross certificates and the directories; Given the lessons learned and discoveries made for all the components, a cookbook or document needs to be formally written that identifies the minimal requirements for certificates, directories and applications.
- Complete the cross-certification of Dartmouth by resolving the incompatibility with the RSA Keon CA product and Entrust;
- Continue to work with Verisign to complete the cross-certification of the University of California-Office of the President and University of Texas-Houston Health Science Center;
- Split the registry of directories to enhance performance across the infrastructure;
- Analyze and determine a more general solution for DAVE to perform directory discovery. It may be advantageous for DAVE to speak OCSP, for example;
- An investigation into multiple smart referrals to provide two different URIs to verify the enablement of redundancy for critical infrastructure cases. This would include teaching DAVE to try a secondary URI if the first did not return a response. If the AIA extension were mandated for any CA that wants to operate in a bridge environment, that would be a good beginning. Then, require an RoD entry for all participants of a bridge environment so the software would look at the AIA extension or the RoD to locate the issuer.

## Summary/Conclusions

Given the disparate and many PKIs that are in use within the Federal Government and within other communities of interest, research institutions and Federal Government need to begin understanding how they can best leverage and work with the PKI environments that are underway.  We need to come to an understanding and agreement that there will never be a single open PKI for everything.  Rather, each major industry will determine its own solution, and the other industries that have a requirement to interoperate with other industries will need to figure out how to interoperate.  An example is in the credit card world.  The Federal Government did not define its own credit card standard.  Rather, it evolved its payment processes to include the use American Express (AMEX) cards by Federal employees.  The same is true for PKI.  As an example, the higher education community will define its solution, and if the higher education community and the Federal Government want to interoperate, these two diverse communities will need to determine the best method of interoperability or continue to participate in the development of the infrastructure for each community.

## Acknowledgements

Grateful appreciation for their participation in the pilot project and in the preparation of this manuscript is acknowledged to: Clair Goldsmith, University of Alabama at Birmingham; Jill Gemmill, University of Alabama at Birmingham; Keith Hazelton, University of Wisconsin-Madison; Eric Norman, University of Wisconsin-Madison Robert Brentrup, Dartmouth College; Ed Feustel, Dartmouth College; Michael Gettes, Georgetown University; David Wasley, University of California Office of the President; Bill Weems, University of Texas – Houston Health Science Center; Mark Luker, EDUCAUSE; Steve Worona, EDUCAUSE; Deb Blanchard, Digital Signature Trust; Monette Respress, Mitretek Systems; Jim Fisher, Mitretek Systems; Ken Stillson, Mitretek Systems; Russ Weiser, Digital Signature Trust; Jack Kirivong, Lexign; Andrew Lehfeldt, RSA Security; Andrew Lins, Mitretek Systems; Cheryl Jenkins, Federal Bridge Certification Authority; Judy Spencer, Chair, Federal PKI Steering Committee.

## References

LDAP-Recipe: A Recipe for Configuring and Operating LDAP Directories, Michael R Gettes, Georgetown University, February 2001 & April 2002

Bridge Validation Authority, Ambarish Malpani, ValiCert, Inc., December 2001

Planning for PKI, Best Practices Guide for Deploying Public Key Infrastructure, Russ Housley, Tim Polk, John Wiley and Sons, Inc., 2001

Federal Grant Streamlining Program, Department of Health and Human Services Response to RFI-4-02-HHS-OS, Digital Signature Trust, February 2002

Final Report – Phase 1, Prepared for National Institutes of Health (NIH) Office of Extramural Research (OER), Under Contract No. GS00T99ALD0006, Digital Signature Trust, February 2002

Report of Federal Bridge Certification Authority Initiative and Demonstration Electronic Messaging Association Challenge 2000, October 2000, Mitretek Systems

PKI, Implementing and Managing E-Security, Nash, Duane, Joseph, and Brink, RSA Press, McGraw Hill, 2001

Educause Review, "A "Bridge" for Trusted Electronic Commerce," Mark A. Luker, January/February, 2002, Volume 37, Number 1

The Evolving Federal Public Key Infrastructure, Federal Public Key Infrastructure Steering Committee and Federal Chief Information Officers Council, June, 2000

Internet2 Middleware Initiative Web Site, http://middleware.internet2.edu, Middleware Architecture Committee for Education (MACE), et. al.

# EXHIBIT 12



REC-xml-19980210

# Extensible Markup Language (XML) 1.0

## W3C Recommendation 10-February-1998

**This version:**
> http://www.w3.org/TR/1998/REC-xml-19980210
> http://www.w3.org/TR/1998/REC-xml-19980210.xml
> http://www.w3.org/TR/1998/REC-xml-19980210.html
> http://www.w3.org/TR/1998/REC-xml-19980210.pdf
> http://www.w3.org/TR/1998/REC-xml-19980210.ps

**Latest version:**
> http://www.w3.org/TR/REC-xml

**Previous version:**
> http://www.w3.org/TR/PR-xml-971208

**Editors:**
> Tim Bray (Textuality and Netscape) <tbray@textuality.com>
> Jean Paoli (Microsoft) <jeanpa@microsoft.com>
> C. M. Sperberg-McQueen (University of Illinois at Chicago) <cmsmcq@uic.edu>

## Abstract

The Extensible Markup Language (XML) is a subset of SGML that is completely described in this document. Its goal is to enable generic SGML to be served, received, and processed on the Web in the way that is now possible with HTML. XML has been designed for ease of implementation and for interoperability with both SGML and HTML.

## Status of this document

This document has been reviewed by W3C Members and other interested parties and has been endorsed by the Director as a W3C Recommendation. It is a stable document and may be used as reference material or cited as a normative reference from another document. W3C's role in making the Recommendation is to draw attention to the specification and to promote its widespread deployment. This enhances the functionality and interoperability of the Web.

This document specifies a syntax created by subsetting an existing, widely used international text processing standard (Standard Generalized Markup Language, ISO 8879:1986(E) as amended and corrected) for use on the World Wide Web. It is a product of the W3C XML Activity, details of which can be found at http://www.w3.org/XML. A list of current W3C Recommendations and other technical documents can be found at http://www.w3.org/TR.

This specification uses the term URI, which is defined by [Berners-Lee et al.], a work in progress expected to update [IETF RFC1738] and [IETF RFC1808].

The list of known errors in this specification is available at http://www.w3.org/XML/xml-19980210-errata.

Please report errors in this document to xml-editor@w3.org.

# Extensible Markup Language (XML) 1.0

## Table of Contents

1. Introduction
   1.1 Origin and Goals

1.2 Terminology

2. Documents
   2.1 Well-Formed XML Documents
   2.2 Characters
   2.3 Common Syntactic Constructs
   2.4 Character Data and Markup
   2.5 Comments
   2.6 Processing Instructions
   2.7 CDATA Sections
   2.8 Prolog and Document Type Declaration
   2.9 Standalone Document Declaration
   2.10 White Space Handling
   2.11 End-of-Line Handling
   2.12 Language Identification

3. Logical Structures
   3.1 Start-Tags, End-Tags, and Empty-Element Tags
   3.2 Element Type Declarations
      3.2.1 Element Content
      3.2.2 Mixed Content
   3.3 Attribute-List Declarations
      3.3.1 Attribute Types
      3.3.2 Attribute Defaults
      3.3.3 Attribute-Value Normalization
   3.4 Conditional Sections

4. Physical Structures
   4.1 Character and Entity References
   4.2 Entity Declarations
      4.2.1 Internal Entities
      4.2.2 External Entities
   4.3 Parsed Entities
      4.3.1 The Text Declaration
      4.3.2 Well-Formed Parsed Entities
      4.3.3 Character Encoding in Entities
   4.4 XML Processor Treatment of Entities and References
      4.4.1 Not Recognized
      4.4.2 Included
      4.4.3 Included If Validating
      4.4.4 Forbidden
      4.4.5 Included in Literal
      4.4.6 Notify
      4.4.7 Bypassed
      4.4.8 Included as PE
   4.5 Construction of Internal Entity Replacement Text
   4.6 Predefined Entities
   4.7 Notation Declarations
   4.8 Document Entity

5. Conformance
   5.1 Validating and Non-Validating Processors
   5.2 Using XML Processors

6. Notation

## Appendices

A. References
   A.1 Normative References
   A.2 Other References
B. Character Classes

C. XML and SGML (Non-Normative)
D. Expansion of Entity and Character References (Non-Normative)
E. Deterministic Content Models (Non-Normative)
F. Autodetection of Character Encodings (Non-Normative)
G. W3C XML Working Group (Non-Normative)

# 1. Introduction

Extensible Markup Language, abbreviated XML, describes a class of data objects called XML documents and partially describes the behavior of computer programs which process them. XML is an application profile or restricted form of SGML, the Standard Generalized Markup Language [ISO 8879]. By construction, XML documents are conforming SGML documents.

XML documents are made up of storage units called entities, which contain either parsed or unparsed data. Parsed data is made up of characters, some of which form character data, and some of which form markup. Markup encodes a description of the document's storage layout and logical structure. XML provides a mechanism to impose constraints on the storage layout and logical structure.

A software module called an **XML processor** is used to read XML documents and provide access to their content and structure. It is assumed that an XML processor is doing its work on behalf of another module, called the **application**. This specification describes the required behavior of an XML processor in terms of how it must read XML data and the information it must provide to the application.

## 1.1 Origin and Goals

XML was developed by an XML Working Group (originally known as the SGML Editorial Review Board) formed under the auspices of the World Wide Web Consortium (W3C) in 1996. It was chaired by Jon Bosak of Sun Microsystems with the active participation of an XML Special Interest Group (previously known as the SGML Working Group) also organized by the W3C. The membership of the XML Working Group is given in an appendix. Dan Connolly served as the WG's contact with the W3C.

The design goals for XML are:

1. XML shall be straightforwardly usable over the Internet.
2. XML shall support a wide variety of applications.
3. XML shall be compatible with SGML.
4. It shall be easy to write programs which process XML documents.
5. The number of optional features in XML is to be kept to the absolute minimum, ideally zero.
6. XML documents should be human-legible and reasonably clear.
7. The XML design should be prepared quickly.
8. The design of XML shall be formal and concise.
9. XML documents shall be easy to create.
10. Terseness in XML markup is of minimal importance.

This specification, together with associated standards (Unicode and ISO/IEC 10646 for characters, Internet RFC 1766 for language identification tags, ISO 639 for language name codes, and ISO 3166 for country name codes), provides all the information necessary to understand XML Version 1.0 and construct computer programs to process it.

This version of the XML specification may be distributed freely, as long as all text and legal notices remain intact.

## 1.2 Terminology

The terminology used to describe XML documents is defined in the body of this specification. The terms defined in the following list are used in building those definitions and in describing the actions of an XML processor:

**may**

Conforming documents and XML processors are permitted to but need not behave as described.

**must**

Conforming documents and XML processors are required to behave as described; otherwise they are in error.

**error**

A violation of the rules of this specification; results are undefined. Conforming software may detect and report an error and may recover from it.

**fatal error**

An error which a conforming XML processor must detect and report to the application. After encountering a fatal error, the processor may continue processing the data to search for further errors and may report such errors to the application. In order to support correction of errors, the processor may make unprocessed data from the document (with intermingled character data and markup) available to the application. Once a fatal error is detected, however, the processor must not continue normal processing (i.e., it must not continue to pass character data and information about the document's logical structure to the application in the normal way).

**at user option**

Conforming software may or must (depending on the modal verb in the sentence) behave as described; if it does, it must provide users a means to enable or disable the behavior described.

**validity constraint**

A rule which applies to all valid XML documents. Violations of validity constraints are errors; they must, at user option, be reported by validating XML processors.

**well-formedness constraint**

A rule which applies to all well-formed XML documents. Violations of well-formedness constraints are fatal errors.

**match**

(Of strings or names:) Two strings or names being compared must be identical. Characters with multiple possible representations in ISO/IEC 10646 (e.g. characters with both precomposed and base+diacritic forms) match only if they have the same representation in both strings. At user option, processors may normalize such characters to some canonical form. No case folding is performed. (Of strings and rules in the grammar:) A string matches a grammatical production if it belongs to the language generated by that production. (Of content and content models:) An element matches its declaration when it conforms in the fashion described in the constraint "Element Valid".

**for compatibility**

A feature of XML included solely to ensure that XML remains compatible with SGML.

**for interoperability**

A non-binding recommendation included to increase the chances that XML documents can be processed by the existing installed base of SGML processors which predate the WebSGML Adaptations Annex to ISO 8879.

# 2. Documents

A data object is an **XML document** if it is well-formed, as defined in this specification. A well-formed XML document may in addition be valid if it meets certain further constraints.

Each XML document has both a logical and a physical structure. Physically, the document is composed of units called entities. An entity may refer to other entities to cause their inclusion in the document. A document begins in a "root" or document entity. Logically, the document is composed of declarations, elements, comments, character references, and processing instructions, all of which are indicated in the document by explicit markup. The logical and physical structures must nest properly, as described in "4.3.2 Well-Formed Parsed Entities".

## 2.1 Well-Formed XML Documents

A textual object is a well-formed XML document if:

1. Taken as a whole, it matches the production labeled `document`.
2. It meets all the well-formedness constraints given in this specification.
3. Each of the parsed entities which is referenced directly or indirectly within the document is well-formed.

| **Document** |
|---|
| [1]  document ::= <u>prolog</u> <u>element</u> <u>Misc</u>* |

Matching the <u>document</u> production implies that:

1. It contains one or more <u>elements</u>.
2. There is exactly one element, called the **root**, or document element, no part of which appears in the <u>content</u> of any other element. For all other elements, if the start-tag is in the content of another element, the end-tag is in the content of the same element. More simply stated, the elements, delimited by start- and end-tags, nest properly within each other.

As a consequence of this, for each non-root element `c` in the document, there is one other element `p` in the document such that `c` is in the content of `p`, but is not in the content of any other element that is in the content of `p`. `p` is referred to as the **parent** of `c`, and `c` as a **child** of `p`.

## 2.2 Characters

A parsed entity contains **text**, a sequence of <u>characters</u>, which may represent markup or character data. A **character** is an atomic unit of text as specified by ISO/IEC 10646 [<u>ISO/IEC 10646</u>]. Legal characters are tab, carriage return, line feed, and the legal graphic characters of Unicode and ISO/IEC 10646. The use of "compatibility characters", as defined in section 6.8 of [<u>Unicode</u>], is discouraged.

| **Character Range** |
|---|
| [2]  Char ::= #x9 \| #xA \| #xD \| [#x20-#xD7FF]       /* any Unicode character, excluding <br>             \| [#xE000-#xFFFD] \| [#x10000-#x10FFFF]     the surrogate blocks, FFFE, and <br>                                                       FFFF. */ |

The mechanism for encoding character code points into bit patterns may vary from entity to entity. All XML processors must accept the UTF-8 and UTF-16 encodings of 10646; the mechanisms for signaling which of the two is in use, or for bringing other encodings into play, are discussed later, in "<u>4.3.3 Character Encoding in Entities</u>".

## 2.3 Common Syntactic Constructs

This section defines some symbols used widely in the grammar.
<u>S</u> (white space) consists of one or more space (#x20) characters, carriage returns, line feeds, or tabs.

| **White Space** |
|---|
| [3]  S ::= (#x20 \| #x9 \| #xD \| #xA)+ |

Characters are classified for convenience as letters, digits, or other characters. Letters consist of an alphabetic or syllabic base character possibly followed by one or more combining characters, or of an ideographic character. Full definitions of the specific characters in each class are given in "<u>B. Character Classes</u>".

A **Name** is a token beginning with a letter or one of a few punctuation characters, and continuing with letters, digits, hyphens, underscores, colons, or full stops, together known as name characters. Names beginning with the string `"xml"`, or any string which would match `(('X'|'x') ('M'|'m') ('L'|'l'))`, are reserved for standardization in this or future versions of this specification.

**Note:** The colon character within XML names is reserved for experimentation with name spaces. Its meaning is expected to be standardized at some future point, at which point those documents using the colon for experimental purposes may need to be updated. (There is no guarantee that any name-space mechanism adopted for XML will in fact use the colon as a name-space delimiter.) In practice, this means that authors should not use the colon in XML names except as part of name-space experiments, but that XML processors should accept the colon as a name character.

An <u>Nmtoken</u> (name token) is any mixture of name characters.

| **Names and Tokens** |
|---|

```
[4] NameChar ::= Letter | Digit | '.' | '-' | '_' | ':' | CombiningChar | Extender
[5]     Name ::= (Letter | '_' | ':') (NameChar)*
[6]    Names ::= Name (S Name)*
[7] Nmtoken ::= (NameChar)+
[8] Nmtokens ::= Nmtoken (S Nmtoken)*
```

Literal data is any quoted string not containing the quotation mark used as a delimiter for that string. Literals are used for specifying the content of internal entities (EntityValue), the values of attributes (AttValue), and external identifiers (SystemLiteral). Note that a SystemLiteral can be parsed without scanning for markup.

**Literals**

```
 [9]    EntityValue ::= '"' ([^%&"] | PEReference | Reference)* '"'
                    |  "'" ([^%&'] | PEReference | Reference)* "'"
[10]      AttValue ::= '"' ([^<&"] | Reference)* '"'
                    |  "'" ([^<&'] | Reference)* "'"
[11] SystemLiteral ::= ('"' [^"]* '"') | ("'" [^']* "'")
[12]  PubidLiteral ::= '"' PubidChar* '"' | "'" (PubidChar - "'")* "'"
[13]     PubidChar ::= #x20 | #xD | #xA | [a-zA-Z0-9] | [-'()+,./:=?;!*#@$_%]
```

## 2.4 Character Data and Markup

Text consists of intermingled character data and markup. **Markup** takes the form of start-tags, end-tags, empty-element tags, entity references, character references, comments, CDATA section delimiters, document type declarations, and processing instructions.

All text that is not markup constitutes the **character data** of the document.

The ampersand character (&) and the left angle bracket (<) may appear in their literal form *only* when used as markup delimiters, or within a comment, a processing instruction, or a CDATA section. They are also legal within the literal entity value of an internal entity declaration; see "4.3.2 Well-Formed Parsed Entities". If they are needed elsewhere, they must be escaped using either numeric character references or the strings "&amp;" and "&lt;" respectively. The right angle bracket (>) may be represented using the string "&gt;", and must, for compatibility, be escaped using "&gt;" or a character reference when it appears in the string "]]>" in content, when that string is not marking the end of a CDATA section.

In the content of elements, character data is any string of characters which does not contain the start-delimiter of any markup. In a CDATA section, character data is any string of characters not including the CDATA-section-close delimiter, "]]>".

To allow attribute values to contain both single and double quotes, the apostrophe or single-quote character (') may be represented as "&apos;", and the double-quote character (") as "&quot;".

**Character Data**

```
[14] CharData ::= [^<&]* - ([^<&]* ']]>' [^<&]*)
```

## 2.5 Comments

**Comments** may appear anywhere in a document outside other markup; in addition, they may appear within the document type declaration at places allowed by the grammar. They are not part of the document's character data; an XML processor may, but need not, make it possible for an application to retrieve the text of comments. For compatibility, the string "--" (double-hyphen) must not occur within comments.

**Comments**

```
[15] Comment ::= '<!--' ((Char - '-') | ('-' (Char - '-')))* '-->'
```

An example of a comment:

```
<!-- declarations for <head> & <body> -->
```

## 2.6 Processing Instructions

**Processing instructions** (PIs) allow documents to contain instructions for applications.

| Processing Instructions |
|---|
| [16]        PI ::= '<?' PITarget (S (Char* - (Char* '?>' Char*)))? '?>' |
| [17] PITarget ::= Name - (('X' | 'x') ('M' | 'm') ('L' | 'l')) |

PIs are not part of the document's character data, but must be passed through to the application. The PI begins with a target (PITarget) used to identify the application to which the instruction is directed. The target names "XML", "xml", and so on are reserved for standardization in this or future versions of this specification. The XML Notation mechanism may be used for formal declaration of PI targets.

## 2.7 CDATA Sections

**CDATA sections** may occur anywhere character data may occur; they are used to escape blocks of text containing characters which would otherwise be recognized as markup. CDATA sections begin with the string "<![CDATA[" and end with the string "]]>":

| CDATA Sections |
|---|
| [18]  CDSect ::= CDStart CData CDEnd |
| [19] CDStart ::= '<![CDATA[' |
| [20]    CData ::= (Char* - (Char* ']]>' Char*)) |
| [21]   CDEnd ::= ']]>' |

Within a CDATA section, only the CDEnd string is recognized as markup, so that left angle brackets and ampersands may occur in their literal form; they need not (and cannot) be escaped using "&lt;" and "&amp;". CDATA sections cannot nest.

An example of a CDATA section, in which "<greeting>" and "</greeting>" are recognized as character data, not markup:

```
<![CDATA[<greeting>Hello, world!</greeting>]]>
```

## 2.8 Prolog and Document Type Declaration

XML documents may, and should, begin with an **XML declaration** which specifies the version of XML being used. For example, the following is a complete XML document, well-formed but not valid:

```
<?xml version="1.0"?>
<greeting>Hello, world!</greeting>
```

and so is this:

```
<greeting>Hello, world!</greeting>
```

The version number "1.0" should be used to indicate conformance to this version of this specification; it is an error for a document to use the value "1.0" if it does not conform to this version of this specification. It is the intent of the XML working group to give later versions of this specification numbers other than "1.0", but this intent does not indicate a commitment to produce any future versions of XML, nor if any are produced, to use any particular numbering scheme. Since future versions are not ruled out, this construct is provided as a means to allow the possibility of automatic version recognition, should it become necessary. Processors may signal an error if they receive documents labeled with versions they do not support.

The function of the markup in an XML document is to describe its storage and logical structure and to associate attribute-value pairs with its logical structures. XML provides a mechanism, the document type declaration, to define constraints on the logical structure and to support the use of predefined storage units. An XML document is **valid** if it has an associated document type declaration and if the document complies with

the constraints expressed in it.

The document type declaration must appear before the first <u>element</u> in the document.

---

**Prolog**

```
[22]        prolog ::= XMLDecl? Misc* (doctypedecl Misc*)?
[23]     XMLDecl ::= '<?xml' VersionInfo EncodingDecl? SDDecl? S? '?>'
[24] VersionInfo ::= S 'version' Eq (' VersionNum ' | " VersionNum ")
[25]         Eq ::= S? '=' S?
[26]  VersionNum ::= ([a-zA-Z0-9_.:] | '-')+
[27]       Misc ::= Comment | PI | S
```

---

The XML **document type declaration** contains or points to <u>markup declarations</u> that provide a grammar for a class of documents. This grammar is known as a document type definition, or **DTD**. The document type declaration can point to an external subset (a special kind of <u>external entity</u>) containing markup declarations, or can contain the markup declarations directly in an internal subset, or can do both. The DTD for a document consists of both subsets taken together.

A **markup declaration** is an <u>element type declaration</u>, an <u>attribute-list declaration</u>, an <u>entity declaration</u>, or a <u>notation declaration</u>. These declarations may be contained in whole or in part within <u>parameter entities</u>, as described in the well-formedness and validity constraints below. For fuller information, see "<u>4. Physical Structures</u>".

---

**Document Type Definition**

```
[28] doctypedecl ::= '<!DOCTYPE' S Name (S ExternalID)? S? ('['   [ VC: Root Element Type
                     (markupdecl | PEReference | S)* ']' S?)? '>'   ]
[29]  markupdecl ::= elementdecl | AttlistDecl | EntityDecl      [ VC: Proper
                     | NotationDecl | PI | Comment                Declaration/PE Nesting
                                                                  ]
                                                                [ WFC: PEs in Internal
                                                                  Subset ]
```

---

The markup declarations may be made up in whole or in part of the <u>replacement text</u> of <u>parameter entities</u>. The productions later in this specification for individual nonterminals (`elementdecl`, `AttlistDecl`, and so on) describe the declarations *after* all the parameter entities have been <u>included</u>.

**Validity Constraint: Root Element Type**

The `Name` in the document type declaration must match the element type of the <u>root element</u>.

**Validity Constraint: Proper Declaration/PE Nesting**

Parameter-entity <u>replacement text</u> must be properly nested with markup declarations. That is to say, if either the first character or the last character of a markup declaration (`markupdecl` above) is contained in the replacement text for a <u>parameter-entity reference</u>, both must be contained in the same replacement text.

**Well-Formedness Constraint: PEs in Internal Subset**

In the internal DTD subset, <u>parameter-entity references</u> can occur only where markup declarations can occur, not within markup declarations. (This does not apply to references that occur in external parameter entities or to the external subset.)

Like the internal subset, the external subset and any external parameter entities referred to in the DTD must consist of a series of complete markup declarations of the types allowed by the non-terminal symbol `markupdecl`, interspersed with white space or <u>parameter-entity references</u>. However, portions of the contents of the external subset or of external parameter entities may conditionally be ignored by using the <u>conditional section</u> construct; this is not allowed in the internal subset.

---

**External Subset**

```
[30]    extSubset ::= TextDecl? extSubsetDecl
[31] extSubsetDecl ::= ( markupdecl | conditionalSect | PEReference | S )*
```

---

The external subset and external parameter entities also differ from the internal subset in that in them, <u>parameter-entity references</u> are permitted *within* markup declarations, not only *between* markup declarations.

An example of an XML document with a document type declaration:

```
<?xml version="1.0"?>
<!DOCTYPE greeting SYSTEM "hello.dtd">
<greeting>Hello, world!</greeting>
```

The system identifier `hello.dtd` gives the URI of a DTD for the document.

The declarations can also be given locally, as in this example:

```
<?xml version="1.0" encoding="UTF-8" ?>
<!DOCTYPE greeting [
  <!ELEMENT greeting (#PCDATA)>
]>
<greeting>Hello, world!</greeting>
```

If both the external and internal subsets are used, the internal subset is considered to occur before the external subset. This has the effect that entity and attribute-list declarations in the internal subset take precedence over those in the external subset.

## 2.9 Standalone Document Declaration

Markup declarations can affect the content of the document, as passed from an XML processor to an application; examples are attribute defaults and entity declarations. The standalone document declaration, which may appear as a component of the XML declaration, signals whether or not there are such declarations which appear external to the document entity.

**Standalone Document Declaration**

```
[32] SDDecl ::= S 'standalone' Eq (("'" ('yes' | 'no') "'")     [ VC: Standalone Document
                | ('"' ('yes' | 'no') '"'))                              Declaration ]
```

In a standalone document declaration, the value `"yes"` indicates that there are no markup declarations external to the document entity (either in the DTD external subset, or in an external parameter entity referenced from the internal subset) which affect the information passed from the XML processor to the application. The value `"no"` indicates that there are or may be such external markup declarations. Note that the standalone document declaration only denotes the presence of external *declarations*; the presence, in a document, of references to external *entities*, when those entities are internally declared, does not change its standalone status.

If there are no external markup declarations, the standalone document declaration has no meaning. If there are external markup declarations but there is no standalone document declaration, the value `"no"` is assumed.

Any XML document for which `standalone="no"` holds can be converted algorithmically to a standalone document, which may be desirable for some network delivery applications.

**Validity Constraint: Standalone Document Declaration**

The standalone document declaration must have the value `"no"` if any external markup declarations contain declarations of:

- attributes with default values, if elements to which these attributes apply appear in the document without specifications of values for these attributes, or
- entities (other than amp, lt, gt, apos, quot), if references to those entities appear in the document, or
- attributes with values subject to normalization, where the attribute appears in the document with a value which will change as a result of normalization, or
- element types with element content, if white space occurs directly within any instance of those types.

An example XML declaration with a standalone document declaration:

```
<?xml version="1.0" standalone='yes'?>
```

## 2.10 White Space Handling

In editing XML documents, it is often convenient to use "white space" (spaces, tabs, and blank lines, denoted by the nonterminal s in this specification) to set apart the markup for greater readability. Such white space is typically not intended for inclusion in the delivered version of the document. On the other hand, "significant" white space that should be preserved in the delivered version is common, for example in poetry and source code.

An XML processor must always pass all characters in a document that are not markup through to the

application. A validating XML processor must also inform the application which of these characters constitute white space appearing in element content.

A special attribute named `xml:space` may be attached to an element to signal an intention that in that element, white space should be preserved by applications. In valid documents, this attribute, like any other, must be declared if it is used. When declared, it must be given as an enumerated type whose only possible values are "`default`" and "`preserve`". For example:

```
<!ATTLIST poem   xml:space (default|preserve) 'preserve'>
```

The value "`default`" signals that applications' default white-space processing modes are acceptable for this element; the value "`preserve`" indicates the intent that applications preserve all the white space. This declared intent is considered to apply to all elements within the content of the element where it is specified, unless overriden with another instance of the `xml:space` attribute.

The root element of any document is considered to have signaled no intentions as regards application space handling, unless it provides a value for this attribute or the attribute is declared with a default value.

## 2.11 End-of-Line Handling

XML parsed entities are often stored in computer files which, for editing convenience, are organized into lines. These lines are typically separated by some combination of the characters carriage-return (#xD) and line-feed (#xA).

To simplify the tasks of applications, wherever an external parsed entity or the literal entity value of an internal parsed entity contains either the literal two-character sequence "#xD#xA" or a standalone literal #xD, an XML processor must pass to the application the single character #xA. (This behavior can conveniently be produced by normalizing all line breaks to #xA on input, before parsing.)

## 2.12 Language Identification

In document processing, it is often useful to identify the natural or formal language in which the content is written. A special attribute named `xml:lang` may be inserted in documents to specify the language used in the contents and attribute values of any element in an XML document. In valid documents, this attribute, like any other, must be declared if it is used. The values of the attribute are language identifiers as defined by [IETF RFC 1766], "Tags for the Identification of Languages":

**Language Identification**

| | |
|---|---|
| [33] | LanguageID ::= Langcode ('-' Subcode)* |
| [34] | Langcode ::= ISO639Code \| IanaCode \| UserCode |
| [35] | ISO639Code ::= ([a-z] \| [A-Z]) ([a-z] \| [A-Z]) |
| [36] | IanaCode ::= ('i' \| 'I') '-' ([a-z] \| [A-Z])+ |
| [37] | UserCode ::= ('x' \| 'X') '-' ([a-z] \| [A-Z])+ |
| [38] | Subcode ::= ([a-z] \| [A-Z])+ |

The Langcode may be any of the following:

- a two-letter language code as defined by [ISO 639], "Codes for the representation of names of languages"
- a language identifier registered with the Internet Assigned Numbers Authority [IANA]; these begin with the prefix "`i-`" (or "`I-`")
- a language identifier assigned by the user, or agreed on between parties in private use; these must begin with the prefix "`x-`" or "`X-`" in order to ensure that they do not conflict with names later standardized or registered with IANA

There may be any number of Subcode segments; if the first subcode segment exists and the Subcode consists of two letters, then it must be a country code from [ISO 3166], "Codes for the representation of names of countries." If the first subcode consists of more than two letters, it must be a subcode for the language in question registered with IANA, unless the Langcode begins with the prefix "`x-`" or "`X-`".

It is customary to give the language code in lower case, and the country code (if any) in upper case. Note that these values, unlike other names in XML documents, are case insensitive.

For example:

```
<p xml:lang="en">The quick brown fox jumps over the lazy dog.</p>
<p xml:lang="en-GB">What colour is it?</p>
<p xml:lang="en-US">What color is it?</p>
<sp who="Faust" desc='leise' xml:lang="de">
  <l>Habe nun, ach! Philosophie,</l>
  <l>Juristerei, und Medizin,</l>
  <l>und leider auch Theologie</l>
  <l>durchaus studiert mit heißem Bemüh'n.</l>
  </sp>
```

The intent declared with `xml:lang` is considered to apply to all attributes and content of the element where it is specified, unless overridden with an instance of `xml:lang` on another element within that content.

A simple declaration for `xml:lang` might take the form

```
xml:lang  NMTOKEN  #IMPLIED
```

but specific default values may also be given, if appropriate. In a collection of French poems for English students, with glosses and notes in English, the xml:lang attribute might be declared this way:

```
    <!ATTLIST poem   xml:lang NMTOKEN 'fr'>
    <!ATTLIST gloss  xml:lang NMTOKEN 'en'>
    <!ATTLIST note   xml:lang NMTOKEN 'en'>
```

# 3. Logical Structures

Each XML document contains one or more **elements**, the boundaries of which are either delimited by start-tags and end-tags, or, for empty elements, by an empty-element tag. Each element has a type, identified by name, sometimes called its "generic identifier" (GI), and may have a set of attribute specifications. Each attribute specification has a name and a value.

| Element |
| --- |
| [39] element ::= EmptyElemTag<br>           \| STag content ETag [ WFC: Element Type Match ]<br>                            [ VC: Element Valid ] |

This specification does not constrain the semantics, use, or (beyond syntax) names of the element types and attributes, except that names beginning with a match to `(('X'|'x')('M'|'m')('L'|'l'))` are reserved for standardization in this or future versions of this specification.

**Well-Formedness Constraint: Element Type Match**

The `Name` in an element's end-tag must match the element type in the start-tag.

**Validity Constraint: Element Valid**

An element is valid if there is a declaration matching `elementdecl` where the `Name` matches the element type, and one of the following holds:

1. The declaration matches `EMPTY` and the element has no content.
2. The declaration matches `children` and the sequence of child elements belongs to the language generated by the regular expression in the content model, with optional white space (characters matching the nonterminal `S`) between each pair of child elements.
3. The declaration matches `Mixed` and the content consists of character data and child elements whose types match names in the content model.
4. The declaration matches `ANY`, and the types of any child elements have been declared.

## 3.1 Start-Tags, End-Tags, and Empty-Element Tags

The beginning of every non-empty XML element is marked by a **start-tag**.

| Start-tag |
| --- |
| [40]        STag ::= '<' Name (S Attribute)* S? '>' [ WFC: Unique Att Spec ] |
| [41] Attribute ::= Name Eq AttValue                [ VC: Attribute Value Type ] |

```
                                          [ WFC: No External Entity References ]
                                          [ WFC: No < in Attribute Values ]
```

The Name in the start- and end-tags gives the element's **type**. The Name-AttValue pairs are referred to as the **attribute specifications** of the element, with the Name in each pair referred to as the **attribute name** and the content of the AttValue (the text between the ' or " delimiters) as the **attribute value**.

**Well-Formedness Constraint: Unique Att Spec**

No attribute name may appear more than once in the same start-tag or empty-element tag.

**Validity Constraint: Attribute Value Type**

The attribute must have been declared; the value must be of the type declared for it. (For attribute types, see "3.3 Attribute-List Declarations".)

**Well-Formedness Constraint: No External Entity References**

Attribute values cannot contain direct or indirect entity references to external entities.

**Well-Formedness Constraint: No < in Attribute Values**

The replacement text of any entity referred to directly or indirectly in an attribute value (other than "&lt;") must not contain a <.

An example of a start-tag:

```
<termdef id="dt-dog" term="dog">
```

The end of every element that begins with a start-tag must be marked by an **end-tag** containing a name that echoes the element's type as given in the start-tag:

**End-tag**

```
[42]  ETag ::= '</' Name S? '>'
```

An example of an end-tag:

```
</termdef>
```

The text between the start-tag and end-tag is called the element's **content**:

**Content of Elements**

```
[43]  content ::= (element | CharData | Reference | CDSect | PI | Comment)*
```

If an element is **empty**, it must be represented either by a start-tag immediately followed by an end-tag or by an empty-element tag. An **empty-element tag** takes a special form:

**Tags for Empty Elements**

```
[44]  EmptyElemTag ::= '<' Name (S Attribute)* S? '/>' [ WFC: Unique Att Spec ]
```

Empty-element tags may be used for any element which has no content, whether or not it is declared using the keyword EMPTY. For interoperability, the empty-element tag must be used, and can only be used, for elements which are declared EMPTY.

Examples of empty elements:

```
<IMG align="left"
 src="http://www.w3.org/Icons/WWW/w3c_home" />
<br></br>
<br/>
```

## 3.2 Element Type Declarations

The element structure of an XML document may, for validation purposes, be constrained using element type and attribute-list declarations. An element type declaration constrains the element's content.

Element type declarations often constrain which element types can appear as children of the element. At user option, an XML processor may issue a warning when a declaration mentions an element type for which no declaration is provided, but this is not an error.

An **element type declaration** takes the form:

---

**Element Type Declaration**

```
[45] elementdecl ::= '<!ELEMENT' S Name S contentspec    [ VC: Unique Element Type
                     S? '>'                                     Declaration ]

[46] contentspec ::= 'EMPTY' | 'ANY' | Mixed | children
```

where the Name gives the element type being declared.

**Validity Constraint: Unique Element Type Declaration**

No element type may be declared more than once.

Examples of element type declarations:

```
<!ELEMENT br EMPTY>
<!ELEMENT p (#PCDATA|emph)* >
<!ELEMENT %name.para; %content.para; >
<!ELEMENT container ANY>
```

## 3.2.1 Element Content

An element type has **element content** when elements of that type must contain only child elements (no character data), optionally separated by white space (characters matching the nonterminal s). In this case, the constraint includes a content model, a simple grammar governing the allowed types of the child elements and the order in which they are allowed to appear. The grammar is built on content particles (cps), which consist of names, choice lists of content particles, or sequence lists of content particles:

**Element-content Models**

```
[47] children ::= (choice | seq) ('?' | '*' | '+')?

[48]       cp ::= (Name | choice | seq) ('?' | '*' | '+')?

[49]   choice ::= '(' S? cp ( S? '|' S? cp )* S? ')'    [ VC: Proper Group/PE Nesting ]

[50]      seq ::= '(' S? cp ( S? ',' S? cp )* S? ')'    [ VC: Proper Group/PE Nesting ]
```

where each Name is the type of an element which may appear as a child. Any content particle in a choice list may appear in the element content at the location where the choice list appears in the grammar; content particles occurring in a sequence list must each appear in the element content in the order given in the list. The optional character following a name or list governs whether the element or the content particles in the list may occur one or more (+), zero or more (*), or zero or one times (?). The absence of such an operator means that the element or content particle must appear exactly once. This syntax and meaning are identical to those used in the productions in this specification.

The content of an element matches a content model if and only if it is possible to trace out a path through the content model, obeying the sequence, choice, and repetition operators and matching each element in the content against an element type in the content model. For compatibility, it is an error if an element in the document can match more than one occurrence of an element type in the content model. For more information, see "E. Deterministic Content Models".

**Validity Constraint: Proper Group/PE Nesting**

Parameter-entity replacement text must be properly nested with parenthetized groups. That is to say, if either of the opening or closing parentheses in a choice, seq, or Mixed construct is contained in the replacement text for a parameter entity, both must be contained in the same replacement text. For interoperability, if a parameter-entity reference appears in a choice, seq, or Mixed construct, its replacement text should not be empty, and neither the first nor last non-blank character of the replacement text should be a connector (| or ,).

Examples of element-content models:

```
<!ELEMENT spec (front, body, back?)>
<!ELEMENT div1 (head, (p | list | note)*, div2*)>
<!ELEMENT dictionary-body (%div.mix; | %dict.mix;)*>
```

## 3.2.2 Mixed Content

An element type has **mixed content** when elements of that type may contain character data, optionally interspersed with child elements. In this case, the types of the child elements may be constrained, but not their

order or their number of occurrences:

---

**Mixed-content Declaration**

```
[51] Mixed ::= '(' S? '#PCDATA' (S? '|' S? Name)* S? ')*'
             | '(' S? '#PCDATA' S? ')'              [ VC: Proper Group/PE Nesting ]
                                                    [ VC: No Duplicate Types ]
```

---

where the Names give the types of elements that may appear as children.

**Validity Constraint: No Duplicate Types**

The same name must not appear more than once in a single mixed-content declaration.

Examples of mixed content declarations:

---

```
<!ELEMENT p (#PCDATA|a|ul|b|i|em)*>
<!ELEMENT p (#PCDATA | %font; | %phrase; | %special; | %form;)* >
<!ELEMENT b (#PCDATA)>
```

---

## 3.3 Attribute-List Declarations

Attributes are used to associate name-value pairs with elements. Attribute specifications may appear only within start-tags and empty-element tags; thus, the productions used to recognize them appear in "3.1 Start-Tags, End-Tags, and Empty-Element Tags". Attribute-list declarations may be used:

- To define the set of attributes pertaining to a given element type.
- To establish type constraints for these attributes.
- To provide default values for attributes.

**Attribute-list declarations** specify the name, data type, and default value (if any) of each attribute associated with a given element type:

---

**Attribute-list Declaration**

```
[52] AttlistDecl ::= '<!ATTLIST' S Name AttDef* S? '>'
[53]      AttDef ::= S Name S AttType S DefaultDecl
```

---

The Name in the AttlistDecl rule is the type of an element. At user option, an XML processor may issue a warning if attributes are declared for an element type not itself declared, but this is not an error. The Name in the AttDef rule is the name of the attribute.

When more than one AttlistDecl is provided for a given element type, the contents of all those provided are merged. When more than one definition is provided for the same attribute of a given element type, the first declaration is binding and later declarations are ignored. For interoperability, writers of DTDs may choose to provide at most one attribute-list declaration for a given element type, at most one attribute definition for a given attribute name, and at least one attribute definition in each attribute-list declaration. For interoperability, an XML processor may at user option issue a warning when more than one attribute-list declaration is provided for a given element type, or more than one attribute definition is provided for a given attribute, but this is not an error.

### 3.3.1 Attribute Types

XML attribute types are of three kinds: a string type, a set of tokenized types, and enumerated types. The string type may take any literal string as a value; the tokenized types have varying lexical and semantic constraints, as noted:

---

**Attribute Types**

```
[54]      AttType ::= StringType | TokenizedType
                    | EnumeratedType
[55]   StringType ::= 'CDATA'
[56] TokenizedType ::= 'ID'                         [ VC: ID ]
```

---

```
                                                [ VC: One ID per Element
                                                  Type ]
                                                [ VC: ID Attribute Default
                                                  ]
               |  'IDREF'                       [ VC: IDREF ]
               |  'IDREFS'                       [ VC: IDREF ]
               |  'ENTITY'                       [ VC: Entity Name ]
               |  'ENTITIES'                     [ VC: Entity Name ]
               |  'NMTOKEN'                      [ VC: Name Token ]
               |  'NMTOKENS'                     [ VC: Name Token ]
```

**Validity Constraint: ID**

Values of type ID must match the Name production. A name must not appear more than once in an XML document as a value of this type; i.e., ID values must uniquely identify the elements which bear them.

**Validity Constraint: One ID per Element Type**

No element type may have more than one ID attribute specified.

**Validity Constraint: ID Attribute Default**

An ID attribute must have a declared default of #IMPLIED or #REQUIRED.

**Validity Constraint: IDREF**

Values of type IDREF must match the Name production, and values of type IDREFS must match Names; each Name must match the value of an ID attribute on some element in the XML document; i.e. IDREF values must match the value of some ID attribute.

**Validity Constraint: Entity Name**

Values of type ENTITY must match the Name production, values of type ENTITIES must match Names; each Name must match the name of an unparsed entity declared in the DTD.

**Validity Constraint: Name Token**

Values of type NMTOKEN must match the Nmtoken production; values of type NMTOKENS must match Nmtokens.

**Enumerated attributes** can take one of a list of values provided in the declaration. There are two kinds of enumerated types:

**Enumerated Attribute Types**

```
[57] EnumeratedType ::= NotationType | Enumeration
[58]   NotationType ::= 'NOTATION' S '(' S? Name (S? '|' S?       [ VC: Notation
                        Name)* S? ')'                               Attributes ]
[59]    Enumeration ::= '(' S? Nmtoken (S? '|' S? Nmtoken)* S?    [ VC: Enumeration ]
                        ')'
```

A NOTATION attribute identifies a notation, declared in the DTD with associated system and/or public identifiers, to be used in interpreting the element to which the attribute is attached.

**Validity Constraint: Notation Attributes**

Values of this type must match one of the notation names included in the declaration; all notation names in the declaration must be declared.

**Validity Constraint: Enumeration**

Values of this type must match one of the Nmtoken tokens in the declaration.

For interoperability, the same Nmtoken should not occur more than once in the enumerated attribute types of a single element type.

### 3.3.2 Attribute Defaults

An attribute declaration provides information on whether the attribute's presence is required, and if not, how an XML processor should react if a declared attribute is absent in a document.

**Attribute Defaults**

```
[60] DefaultDecl ::= '#REQUIRED' | '#IMPLIED'
                   | (('#FIXED' S)? AttValue) [ VC: Required Attribute ]
                                              [ VC: Attribute Default Legal ]
                                              [ WFC: No < in Attribute Values ]
```

| [ VC: Fixed Attribute Default ] |
| --- |

In an attribute declaration, #REQUIRED means that the attribute must always be provided, #IMPLIED that no default value is provided. If the declaration is neither #REQUIRED nor #IMPLIED, then the AttValue value contains the declared **default** value; the #FIXED keyword states that the attribute must always have the default value. If a default value is declared, when an XML processor encounters an omitted attribute, it is to behave as though the attribute were present with the declared default value.

**Validity Constraint: Required Attribute**

If the default declaration is the keyword #REQUIRED, then the attribute must be specified for all elements of the type in the attribute-list declaration.

**Validity Constraint: Attribute Default Legal**

The declared default value must meet the lexical constraints of the declared attribute type.

**Validity Constraint: Fixed Attribute Default**

If an attribute has a default value declared with the #FIXED keyword, instances of that attribute must match the default value.

Examples of attribute-list declarations:

```
<!ATTLIST termdef
          id       ID       #REQUIRED
          name     CDATA    #IMPLIED>
<!ATTLIST list
          type     (bullets|ordered|glossary)   "ordered">
<!ATTLIST form
          method   CDATA    #FIXED "POST">
```

### 3.3.3 Attribute-Value Normalization

Before the value of an attribute is passed to the application or checked for validity, the XML processor must normalize it as follows:

- a character reference is processed by appending the referenced character to the attribute value
- an entity reference is processed by recursively processing the replacement text of the entity
- a whitespace character (#x20, #xD, #xA, #x9) is processed by appending #x20 to the normalized value, except that only a single #x20 is appended for a "#xD#xA" sequence that is part of an external parsed entity or the literal entity value of an internal parsed entity
- other characters are processed by appending them to the normalized value

If the declared value is not CDATA, then the XML processor must further process the normalized attribute value by discarding any leading and trailing space (#x20) characters, and by replacing sequences of space (#x20) characters by a single space (#x20) character.

All attributes for which no declaration has been read should be treated by a non-validating parser as if declared CDATA.

## 3.4 Conditional Sections

**Conditional sections** are portions of the document type declaration external subset which are included in, or excluded from, the logical structure of the DTD based on the keyword which governs them.

**Conditional Section**

| [61] | conditionalSect ::= includeSect \| ignoreSect |
| --- | --- |
| [62] | includeSect ::= '<![' S? 'INCLUDE' S? '[' extSubsetDecl ']]>' |
| [63] | ignoreSect ::= '<![' S? 'IGNORE' S? '[' ignoreSectContents* ']]>' |
| [64] | ignoreSectContents ::= Ignore ('<![' ignoreSectContents ']]>' Ignore)* |
| [65] | Ignore ::= Char* - (Char* ('<![' \| ']]>') Char*) |

Like the internal and external DTD subsets, a conditional section may contain one or more complete declarations, comments, processing instructions, or nested conditional sections, intermingled with white space.

If the keyword of the conditional section is INCLUDE, then the contents of the conditional section are part of

the DTD. If the keyword of the conditional section is `IGNORE`, then the contents of the conditional section are not logically part of the DTD. Note that for reliable parsing, the contents of even ignored conditional sections must be read in order to detect nested conditional sections and ensure that the end of the outermost (ignored) conditional section is properly detected. If a conditional section with a keyword of `INCLUDE` occurs within a larger conditional section with a keyword of `IGNORE`, both the outer and the inner conditional sections are ignored.

If the keyword of the conditional section is a parameter-entity reference, the parameter entity must be replaced by its content before the processor decides whether to include or ignore the conditional section.

An example:

```
<!ENTITY % draft 'INCLUDE' >
<!ENTITY % final 'IGNORE' >

<![%draft;[
<!ELEMENT book (comments*, title, body, supplements?)>
]]>
<![%final;[
<!ELEMENT book (title, body, supplements?)>
]]>
```

# 4. Physical Structures

An XML document may consist of one or many storage units. These are called **entities**; they all have **content** and are all (except for the document entity, see below, and the external DTD subset) identified by **name**. Each XML document has one entity called the document entity, which serves as the starting point for the XML processor and may contain the whole document.

Entities may be either parsed or unparsed. A **parsed entity's** contents are referred to as its replacement text; this text is considered an integral part of the document.

An **unparsed entity** is a resource whose contents may or may not be text, and if text, may not be XML. Each unparsed entity has an associated notation, identified by name. Beyond a requirement that an XML processor make the identifiers for the entity and notation available to the application, XML places no constraints on the contents of unparsed entities.

Parsed entities are invoked by name using entity references; unparsed entities by name, given in the value of `ENTITY` or `ENTITIES` attributes.

**General entities** are entities for use within the document content. In this specification, general entities are sometimes referred to with the unqualified term *entity* when this leads to no ambiguity. Parameter entities are parsed entities for use within the DTD. These two types of entities use different forms of reference and are recognized in different contexts. Furthermore, they occupy different namespaces; a parameter entity and a general entity with the same name are two distinct entities.

## 4.1 Character and Entity References

A **character reference** refers to a specific character in the ISO/IEC 10646 character set, for example one not directly accessible from available input devices.

| Character Reference |
| --- |
| [66] CharRef ::= '&#' [0-9]+ ';'<br>             \| '&#x' [0-9a-fA-F]+ ';' [ WFC: Legal Character ] |

**Well-Formedness Constraint: Legal Character**

Characters referred to using character references must match the production for Char.

If the character reference begins with "`&#x`", the digits and letters up to the terminating `;` provide a hexadecimal representation of the character's code point in ISO/IEC 10646. If it begins just with "`&#`", the digits up to the terminating `;` provide a decimal representation of the character's code point.

An **entity reference** refers to the content of a named entity. References to parsed general entities use ampersand (`&`) and semicolon (`;`) as delimiters. **Parameter-entity references** use percent-sign (`%`) and semicolon (`;`) as delimiters.

| Entity Reference |
| --- |

```
[67]    Reference ::= EntityRef | CharRef
[68]    EntityRef ::= '&' Name ';'          [ WFC: Entity Declared ]

                                            [ VC: Entity Declared ]
                                            [ WFC: Parsed Entity ]
                                            [ WFC: No Recursion ]
[69]    PEReference ::= '%' Name ';'        [ VC: Entity Declared ]
                                            [ WFC: No Recursion ]
                                            [ WFC: In DTD ]
```

**Well-Formedness Constraint: Entity Declared**

In a document without any DTD, a document with only an internal DTD subset which contains no parameter entity references, or a document with "standalone='yes'", the Name given in the entity reference must match that in an entity declaration, except that well-formed documents need not declare any of the following entities: amp, lt, gt, apos, quot. The declaration of a parameter entity must precede any reference to it. Similarly, the declaration of a general entity must precede any reference to it which appears in a default value in an attribute-list declaration. Note that if entities are declared in the external subset or in external parameter entities, a non-validating processor is not obligated to read and process their declarations; for such documents, the rule that an entity must be declared is a well-formedness constraint only if standalone='yes'.

**Validity Constraint: Entity Declared**

In a document with an external subset or external parameter entities with "standalone='no'", the Name given in the entity reference must match that in an entity declaration. For interoperability, valid documents should declare the entities amp, lt, gt, apos, quot, in the form specified in "4.6 Predefined Entities". The declaration of a parameter entity must precede any reference to it. Similarly, the declaration of a general entity must precede any reference to it which appears in a default value in an attribute-list declaration.

**Well-Formedness Constraint: Parsed Entity**

An entity reference must not contain the name of an unparsed entity. Unparsed entities may be referred to only in attribute values declared to be of type ENTITY or ENTITIES.

**Well-Formedness Constraint: No Recursion**

A parsed entity must not contain a recursive reference to itself, either directly or indirectly.

**Well-Formedness Constraint: In DTD**

Parameter-entity references may only appear in the DTD.

Examples of character and entity references:

```
Type <key>less-than</key> (&#x3C;) to save options.
This document was prepared on &docdate; and
is classified &security-level;.
```

Example of a parameter-entity reference:

```
<!-- declare the parameter entity "ISOLat2"... -->
<!ENTITY % ISOLat2
         SYSTEM "http://www.xml.com/iso/isolat2-xml.entities" >
<!-- ... now reference it. -->
%ISOLat2;
```

## 4.2 Entity Declarations

Entities are declared thus:

**Entity Declaration**

```
[70] EntityDecl ::= GEDecl | PEDecl
[71]    GEDecl ::= '<!ENTITY' S Name S EntityDef S? '>'
[72]    PEDecl ::= '<!ENTITY' S '%' S Name S PEDef S? '>'
[73] EntityDef ::= EntityValue | (ExternalID NDataDecl?)
[74]    PEDef ::= EntityValue | ExternalID
```

The Name identifies the entity in an entity reference or, in the case of an unparsed entity, in the value of an ENTITY or ENTITIES attribute. If the same entity is declared more than once, the first declaration encountered is

binding; at user option, an XML processor may issue a warning if entities are declared multiple times.

### 4.2.1 Internal Entities

If the entity definition is an `EntityValue`, the defined entity is called an **internal entity**. There is no separate physical storage object, and the content of the entity is given in the declaration. Note that some processing of entity and character references in the literal entity value may be required to produce the correct replacement text: see "4.5 Construction of Internal Entity Replacement Text".

An internal entity is a parsed entity.

Example of an internal entity declaration:

```
<!ENTITY Pub-Status "This is a pre-release of the
specification.">
```

### 4.2.2 External Entities

If the entity is not internal, it is an **external entity**, declared as follows:

**External Entity Declaration**

```
[75] ExternalID ::= 'SYSTEM' S SystemLiteral

              | 'PUBLIC' S PubidLiteral S SystemLiteral
[76] NDataDecl ::= S 'NDATA' S Name              [ VC: Notation Declared ]
```

If the `NDataDecl` is present, this is a general unparsed entity; otherwise it is a parsed entity.

**Validity Constraint: Notation Declared**

The `Name` must match the declared name of a notation.

The `SystemLiteral` is called the entity's **system identifier**. It is a URI, which may be used to retrieve the entity. Note that the hash mark (#) and fragment identifier frequently used with URIs are not, formally, part of the URI itself; an XML processor may signal an error if a fragment identifier is given as part of a system identifier. Unless otherwise provided by information outside the scope of this specification (e.g. a special XML element type defined by a particular DTD, or a processing instruction defined by a particular application specification), relative URIs are relative to the location of the resource within which the entity declaration occurs. A URI might thus be relative to the document entity, to the entity containing the external DTD subset, or to some other external parameter entity.

An XML processor should handle a non-ASCII character in a URI by representing the character in UTF-8 as one or more bytes, and then escaping these bytes with the URI escaping mechanism (i.e., by converting each byte to %HH, where HH is the hexadecimal notation of the byte value).

In addition to a system identifier, an external identifier may include a **public identifier**. An XML processor attempting to retrieve the entity's content may use the public identifier to try to generate an alternative URI. If the processor is unable to do so, it must use the URI specified in the system literal. Before a match is attempted, all strings of white space in the public identifier must be normalized to single space characters (#x20), and leading and trailing white space must be removed.

Examples of external entity declarations:

```
<!ENTITY open-hatch
         SYSTEM "http://www.textuality.com/boilerplate/OpenHatch.xml">
<!ENTITY open-hatch
         PUBLIC "-//Textuality//TEXT Standard open-hatch boilerplate//EN"
         "http://www.textuality.com/boilerplate/OpenHatch.xml">
<!ENTITY hatch-pic
         SYSTEM "../grafix/OpenHatch.gif"
         NDATA gif >
```

## 4.3 Parsed Entities

### 4.3.1 The Text Declaration

External parsed entities may each begin with a **text declaration**.

> **Text Declaration**
>
> [77]  TextDecl ::= '<?xml' VersionInfo? EncodingDecl S? '?>'

The text declaration must be provided literally, not by reference to a parsed entity. No text declaration may appear at any position other than the beginning of an external parsed entity.

### 4.3.2 Well-Formed Parsed Entities

The document entity is well-formed if it matches the production labeled document. An external general parsed entity is well-formed if it matches the production labeled extParsedEnt. An external parameter entity is well-formed if it matches the production labeled extPE.

> **Well-Formed External Parsed Entity**
>
> [78]  extParsedEnt ::= TextDecl? content
>
> [79]        extPE ::= TextDecl? extSubsetDecl

An internal general parsed entity is well-formed if its replacement text matches the production labeled content. All internal parameter entities are well-formed by definition. A consequence of well-formedness in entities is that the logical and physical structures in an XML document are properly nested; no start-tag, end-tag, empty-element tag, element, comment, processing instruction, character reference, or entity reference can begin in one entity and end in another.

### 4.3.3 Character Encoding in Entities

Each external parsed entity in an XML document may use a different encoding for its characters. All XML processors must be able to read entities in either UTF-8 or UTF-16.

Entities encoded in UTF-16 must begin with the Byte Order Mark described by ISO/IEC 10646 Annex E and Unicode Appendix E (the ZERO WIDTH NO-BREAK SPACE character, #xFEFF). This is an encoding signature, not part of either the markup or the character data of the XML document. XML processors must be able to use this character to differentiate between UTF-8 and UTF-16 encoded documents.

Although an XML processor is required to read only entities in the UTF-8 and UTF-16 encodings, it is recognized that other encodings are used around the world, and it may be desired for XML processors to read entities that use them. Parsed entities which are stored in an encoding other than UTF-8 or UTF-16 must begin with a text declaration containing an encoding declaration:

> **Encoding Declaration**
>
> [80]  EncodingDecl ::= S 'encoding' Eq ('"' EncName '"'
>                        | "'" EncName "'" )
>
> [81]      EncName ::= [A-Za-z] ([A-Za-z0-9._] | '-')*    /* Encoding name contains only
>                                                             Latin characters */

In the document entity, the encoding declaration is part of the XML declaration. The EncName is the name of the encoding used.

In an encoding declaration, the values "UTF-8", "UTF-16", "ISO-10646-UCS-2", and "ISO-10646-UCS-4" should be used for the various encodings and transformations of Unicode / ISO/IEC 10646, the values "ISO-8859-1", "ISO-8859-2", ... "ISO-8859-9" should be used for the parts of ISO 8859, and the values "ISO-2022-JP", "Shift_JIS", and "EUC-JP" should be used for the various encoded forms of JIS X-0208-1997. XML processors may recognize other encodings; it is recommended that character encodings registered (as *charsets*) with the Internet Assigned Numbers Authority [IANA], other than those just listed, should be referred to using their registered names. Note that these registered names are defined to be case-insensitive, so processors wishing to match against them should do so in a case-insensitive way.

In the absence of information provided by an external transport protocol (e.g. HTTP or MIME), it is an error for an entity including an encoding declaration to be presented to the XML processor in an encoding other than that named in the declaration, for an encoding declaration to occur other than at the beginning of an external entity, or for an entity which begins with neither a Byte Order Mark nor an encoding declaration to use an encoding other than UTF-8. Note that since ASCII is a subset of UTF-8, ordinary ASCII entities do not strictly

need an encoding declaration.

It is a fatal error when an XML processor encounters an entity with an encoding that it is unable to process.

Examples of encoding declarations:

```
<?xml encoding='UTF-8'?>
<?xml encoding='EUC-JP'?>
```

## 4.4 XML Processor Treatment of Entities and References

The table below summarizes the contexts in which character references, entity references, and invocations of unparsed entities might appear and the required behavior of an XML processor in each case. The labels in the leftmost column describe the recognition context:

**Reference in Content**

as a reference anywhere after the start-tag and before the end-tag of an element; corresponds to the nonterminal content.

**Reference in Attribute Value**

as a reference within either the value of an attribute in a start-tag, or a default value in an attribute declaration; corresponds to the nonterminal AttValue.

**Occurs as Attribute Value**

as a Name, not a reference, appearing either as the value of an attribute which has been declared as type ENTITY, or as one of the space-separated tokens in the value of an attribute which has been declared as type ENTITIES.

**Reference in Entity Value**

as a reference within a parameter or internal entity's literal entity value in the entity's declaration; corresponds to the nonterminal EntityValue.

**Reference in DTD**

as a reference within either the internal or external subsets of the DTD, but outside of an EntityValue or AttValue.

| | Entity Type | | | | |
| --- | --- | --- | --- | --- | --- |
| | Parameter | Internal General | External Parsed General | Unparsed | Character |
| Reference in Content | Not recognized | Included | Included if validating | Forbidden | Included |
| Reference in Attribute Value | Not recognized | Included in literal | Forbidden | Forbidden | Included |
| Occurs as Attribute Value | Not recognized | Forbidden | Forbidden | Notify | Not recognized |
| Reference in EntityValue | Included in literal | Bypassed | Bypassed | Forbidden | Included |
| Reference in DTD | Included as PE | Forbidden | Forbidden | Forbidden | Forbidden |

### 4.4.1 Not Recognized

Outside the DTD, the % character has no special significance; thus, what would be parameter entity references in the DTD are not recognized as markup in content. Similarly, the names of unparsed entities are not recognized except when they appear in the value of an appropriately declared attribute.

### 4.4.2 Included

An entity is **included** when its replacement text is retrieved and processed, in place of the reference itself, as though it were part of the document at the location the reference was recognized. The replacement text may contain both character data and (except for parameter entities) markup, which must be recognized in the usual way, except that the replacement text of entities used to escape markup delimiters (the entities amp, lt, gt, apos, quot) is always treated as data. (The string "AT&amp;T;" expands to "AT&T;" and the remaining ampersand is not recognized as an entity-reference delimiter.) A character reference is **included** when the indicated character is processed in place of the reference itself.

### 4.4.3 Included If Validating

When an XML processor recognizes a reference to a parsed entity, in order to validate the document, the processor must include its replacement text. If the entity is external, and the processor is not attempting to validate the XML document, the processor may, but need not, include the entity's replacement text. If a non-validating parser does not include the replacement text, it must inform the application that it recognized, but did not read, the entity.

This rule is based on the recognition that the automatic inclusion provided by the SGML and XML entity mechanism, primarily designed to support modularity in authoring, is not necessarily appropriate for other applications, in particular document browsing. Browsers, for example, when encountering an external parsed entity reference, might choose to provide a visual indication of the entity's presence and retrieve it for display only on demand.

### 4.4.4 Forbidden

The following are forbidden, and constitute fatal errors:

- the appearance of a reference to an unparsed entity.
- the appearance of any character or general-entity reference in the DTD except within an `EntityValue` or `AttValue`.
- a reference to an external entity in an attribute value.

### 4.4.5 Included in Literal

When an entity reference appears in an attribute value, or a parameter entity reference appears in a literal entity value, its replacement text is processed in place of the reference itself as though it were part of the document at the location the reference was recognized, except that a single or double quote character in the replacement text is always treated as a normal data character and will not terminate the literal. For example, this is well-formed:

```
<!ENTITY % YN '"Yes"' >
<!ENTITY WhatHeSaid "He said &YN;" >
```

while this is not:

```
<!ENTITY EndAttr "27'" >
<element attribute='a-&EndAttr;>
```

### 4.4.6 Notify

When the name of an unparsed entity appears as a token in the value of an attribute of declared type ENTITY or ENTITIES, a validating processor must inform the application of the system and public (if any) identifiers for both the entity and its associated notation.

### 4.4.7 Bypassed

When a general entity reference appears in the `EntityValue` in an entity declaration, it is bypassed and left as is.

### 4.4.8 Included as PE

Just as with external parsed entities, parameter entities need only be included if validating. When a parameter-entity reference is recognized in the DTD and included, its replacement text is enlarged by the attachment of one leading and one following space (#x20) character; the intent is to constrain the replacement text of parameter entities to contain an integral number of grammatical tokens in the DTD.

## 4.5 Construction of Internal Entity Replacement Text

In discussing the treatment of internal entities, it is useful to distinguish two forms of the entity's value. The **literal entity value** is the quoted string actually present in the entity declaration, corresponding to the non-terminal `EntityValue`. The **replacement text** is the content of the entity, after replacement of character references and parameter-entity references.

The literal entity value as given in an internal entity declaration (`EntityValue`) may contain character, parameter-entity, and general-entity references. Such references must be contained entirely within the literal entity value. The actual replacement text that is included as described above must contain the *replacement text* of any parameter entities referred to, and must contain the character referred to, in place of any character references in the literal entity value; however, general-entity references must be left as-is, unexpanded. For example, given the following declarations:

```
<!ENTITY % pub    "&#xc9;ditions Gallimard" >
<!ENTITY   rights "All rights reserved" >
<!ENTITY   book   "La Peste: Albert Camus,
&#xA9; 1947 %pub;. &rights;" >
```

then the replacement text for the entity "`book`" is:

```
La Peste: Albert Camus,
© 1947 Éditions Gallimard. &rights;
```

The general-entity reference "`&rights;`" would be expanded should the reference "`&book;`" appear in the document's content or an attribute value.

These simple rules may have complex interactions; for a detailed discussion of a difficult example, see "D. Expansion of Entity and Character References".

## 4.6 Predefined Entities

Entity and character references can both be used to **escape** the left angle bracket, ampersand, and other delimiters. A set of general entities (`amp`, `lt`, `gt`, `apos`, `quot`) is specified for this purpose. Numeric character references may also be used; they are expanded immediately when recognized and must be treated as character data, so the numeric character references "`&#60;`" and "`&#38;`" may be used to escape < and & when they occur in character data.

All XML processors must recognize these entities whether they are declared or not. For interoperability, valid XML documents should declare these entities, like any others, before using them. If the entities in question are declared, they must be declared as internal entities whose replacement text is the single character being escaped or a character reference to that character, as shown below.

```
<!ENTITY lt    "&#38;#60;">
<!ENTITY gt    "&#62;">
<!ENTITY amp   "&#38;#38;">
<!ENTITY apos  "&#39;">
<!ENTITY quot  "&#34;">
```

Note that the < and & characters in the declarations of "`lt`" and "`amp`" are doubly escaped to meet the requirement that entity replacement be well-formed.

## 4.7 Notation Declarations

**Notations** identify by name the format of unparsed entities, the format of elements which bear a notation attribute, or the application to which a processing instruction is addressed.

**Notation declarations** provide a name for the notation, for use in entity and attribute-list declarations and in attribute specifications, and an external identifier for the notation which may allow an XML processor or its client application to locate a helper application capable of processing data in the given notation.

**Notation Declarations**

```
[82]  NotationDecl ::= '<!NOTATION' S Name S (ExternalID  |  PublicID) S? '>'
[83]       PublicID ::= 'PUBLIC' S PubidLiteral
```

XML processors must provide applications with the name and external identifier(s) of any notation declared and referred to in an attribute value, attribute definition, or entity declaration. They may additionally resolve the external identifier into the system identifier, file name, or other information needed to allow the application to call a processor for data in the notation described. (It is not an error, however, for XML documents to declare and refer to notations for which notation-specific applications are not available on the system where the XML processor or application is running.)

## 4.8 Document Entity

The **document entity** serves as the root of the entity tree and a starting-point for an XML processor. This specification does not specify how the document entity is to be located by an XML processor; unlike other entities, the document entity has no name and might well appear on a processor input stream without any identification at all.

# 5. Conformance

## 5.1 Validating and Non-Validating Processors

Conforming XML processors fall into two classes: validating and non-validating.

Validating and non-validating processors alike must report violations of this specification's well-formedness constraints in the content of the document entity and any other parsed entities that they read.

**Validating processors** must report violations of the constraints expressed by the declarations in the DTD, and failures to fulfill the validity constraints given in this specification. To accomplish this, validating XML processors must read and process the entire DTD and all external parsed entities referenced in the document.

Non-validating processors are required to check only the document entity, including the entire internal DTD subset, for well-formedness. While they are not required to check the document for validity, they are required to **process** all the declarations they read in the internal DTD subset and in any parameter entity that they read, up to the first reference to a parameter entity that they do *not* read; that is to say, they must use the information in those declarations to normalize attribute values, include the replacement text of internal entities, and supply default attribute values. They must not process entity declarations or attribute-list declarations encountered after a reference to a parameter entity that is not read, since the entity may have contained overriding declarations.

## 5.2 Using XML Processors

The behavior of a validating XML processor is highly predictable; it must read every piece of a document and report all well-formedness and validity violations. Less is required of a non-validating processor; it need not read any part of the document other than the document entity. This has two effects that may be important to users of XML processors:

- Certain well-formedness errors, specifically those that require reading external entities, may not be detected by a non-validating processor. Examples include the constraints entitled Entity Declared, Parsed Entity, and No Recursion, as well as some of the cases described as forbidden in "4.4 XML Processor Treatment of Entities and References".
- The information passed from the processor to the application may vary, depending on whether the processor reads parameter and external entities. For example, a non-validating processor may not normalize attribute values, include the replacement text of internal entities, or supply default attribute values, where doing so depends on having read declarations in external or parameter entities.

For maximum reliability in interoperating between different XML processors, applications which use non-validating processors should not rely on any behaviors not required of such processors. Applications which require facilities such as the use of default attributes or internal entities which are declared in external entities should use validating XML processors.

## 6. Notation

The formal grammar of XML is given in this specification using a simple Extended Backus-Naur Form (EBNF) notation. Each rule in the grammar defines one symbol, in the form

```
symbol ::= expression
```

Symbols are written with an initial capital letter if they are defined by a regular expression, or with an initial lower case letter otherwise. Literal strings are quoted.

Within the expression on the right-hand side of a rule, the following expressions are used to match strings of one or more characters:

`#xN`

> where N is a hexadecimal integer, the expression matches the character in ISO/IEC 10646 whose canonical (UCS-4) code value, when interpreted as an unsigned binary number, has the value indicated. The number of leading zeros in the #xN form is insignificant; the number of leading zeros in the corresponding code value is governed by the character encoding in use and is not significant for XML.

`[a-zA-Z], [#xN-#xN]`

> matches any character with a value in the range(s) indicated (inclusive).

`[^a-z], [^#xN-#xN]`

> matches any character with a value *outside* the range indicated.

`[^abc], [^#xN#xN#xN]`

> matches any character with a value not among the characters given.

`"string"`

> matches a literal string matching that given inside the double quotes.

`'string'`

> matches a literal string matching that given inside the single quotes.

These symbols may be combined to match more complex patterns as follows, where A and B represent simple expressions:

`(expression)`

> expression is treated as a unit and may be combined as described in this list.

`A?`

> matches A or nothing; optional A.

`A B`

> matches A followed by B.

`A | B`

> matches A or B but not both.

`A - B`

> matches any string that matches A but does not match B.

`A+`

> matches one or more occurrences of A.

`A*`

> matches zero or more occurrences of A.

Other notations used in the productions are:

`/* ... */`

> comment.

`[ wfc: ... ]`

> well-formedness constraint; this identifies by name a constraint on well-formed documents associated with a production.

`[ vc: ... ]`

> validity constraint; this identifies by name a constraint on valid documents associated with a production.

# Appendices

# A. References

## A.1 Normative References

**IANA**

(Internet Assigned Numbers Authority) *Official Names for Character Sets*, ed. Keld Simonsen et al. See [ftp://ftp.isi.edu/in-notes/iana/assignments/character-sets](ftp://ftp.isi.edu/in-notes/iana/assignments/character-sets).

**IETF RFC 1766**

IETF (Internet Engineering Task Force). *RFC 1766: Tags for the Identification of Languages*, ed. H. Alvestrand. 1995.

**ISO 639**

(International Organization for Standardization). *ISO 639:1988 (E). Code for the representation of names of languages*. [Geneva]: International Organization for Standardization, 1988.

**ISO 3166**

(International Organization for Standardization). *ISO 3166-1:1997 (E). Codes for the representation of names of countries and their subdivisions -- Part 1: Country codes* [Geneva]: International Organization for Standardization, 1997.

**ISO/IEC 10646**

ISO (International Organization for Standardization). *ISO/IEC 10646-1993 (E). Information technology -- Universal Multiple-Octet Coded Character Set (UCS) -- Part 1: Architecture and Basic Multilingual Plane*. [Geneva]: International Organization for Standardization, 1993 (plus amendments AM 1 through AM 7).

**Unicode**

The Unicode Consortium. *The Unicode Standard, Version 2.0*. Reading, Mass.: Addison-Wesley Developers Press, 1996.

## A.2 Other References

**Aho/Ullman**

Aho, Alfred V., Ravi Sethi, and Jeffrey D. Ullman. *Compilers: Principles, Techniques, and Tools*. Reading: Addison-Wesley, 1986, rpt. corr. 1988.

**Berners-Lee et al.**

Berners-Lee, T., R. Fielding, and L. Masinter. *Uniform Resource Identifiers (URI): Generic Syntax and Semantics*. 1997. (Work in progress; see updates to RFC1738.)

**Brüggemann-Klein**

Brüggemann-Klein, Anne. *Regular Expressions into Finite Automata*. Extended abstract in I. Simon, Hrsg., LATIN 1992, S. 97-98. Springer-Verlag, Berlin 1992. Full Version in Theoretical Computer Science 120: 197-213, 1993.

**Brüggemann-Klein and Wood**

Brüggemann-Klein, Anne, and Derick Wood. *Deterministic Regular Languages*. Universität Freiburg, Institut für Informatik, Bericht 38, Oktober 1991.

**Clark**

James Clark. Comparison of SGML and XML. See [http://www.w3.org/TR/NOTE-sgml-xml-971215](http://www.w3.org/TR/NOTE-sgml-xml-971215).

**IETF RFC1738**

IETF (Internet Engineering Task Force). *RFC 1738: Uniform Resource Locators (URL)*, ed. T. Berners-Lee, L. Masinter, M. McCahill. 1994.

**IETF RFC1808**

IETF (Internet Engineering Task Force). *RFC 1808: Relative Uniform Resource Locators*, ed. R. Fielding. 1995.

**IETF RFC2141**

IETF (Internet Engineering Task Force). *RFC 2141: URN Syntax*, ed. R. Moats. 1997.

**ISO 8879**

ISO (International Organization for Standardization). *ISO 8879:1986(E). Information processing -- Text and Office Systems -- Standard Generalized Markup Language (SGML)*. First edition -- 1986-10-15. [Geneva]: International Organization for Standardization, 1986.

**ISO/IEC 10744**

ISO (International Organization for Standardization). *ISO/IEC 10744-1992 (E). Information technology*

*-- Hypermedia/Time-based Structuring Language (HyTime)*. [Geneva]: International Organization for Standardization, 1992. *Extended Facilities Annexe*. [Geneva]: International Organization for Standardization, 1996.

# B. Character Classes

Following the characteristics defined in the Unicode standard, characters are classed as base characters (among others, these contain the alphabetic characters of the Latin alphabet, without diacritics), ideographic characters, and combining characters (among others, this class contains most diacritics); these classes combine to form the class of letters. Digits and extenders are also distinguished.

---

**Characters**

---

[84]        Letter ::= [BaseChar](#) | [Ideographic](#)

[85]        BaseChar ::= [#x0041-#x005A] | [#x0061-#x007A] | [#x00C0-#x00D6]
                | [#x00D8-#x00F6] | [#x00F8-#x00FF] | [#x0100-#x0131]
                | [#x0134-#x013E] | [#x0141-#x0148] | [#x014A-#x017E]
                | [#x0180-#x01C3] | [#x01CD-#x01F0] | [#x01F4-#x01F5]
                | [#x01FA-#x0217] | [#x0250-#x02A8] | [#x02BB-#x02C1] | #x0386
                | [#x0388-#x038A] | #x038C | [#x038E-#x03A1] | [#x03A3-#x03CE]
                | [#x03D0-#x03D6] | #x03DA | #x03DC | #x03DE | #x03E0
                | [#x03E2-#x03F3] | [#x0401-#x040C] | [#x040E-#x044F]
                | [#x0451-#x045C] | [#x045E-#x0481] | [#x0490-#x04C4]
                | [#x04C7-#x04C8] | [#x04CB-#x04CC] | [#x04D0-#x04EB]
                | [#x04EE-#x04F5] | [#x04F8-#x04F9] | [#x0531-#x0556] | #x0559
                | [#x0561-#x0586] | [#x05D0-#x05EA] | [#x05F0-#x05F2]
                | [#x0621-#x063A] | [#x0641-#x064A] | [#x0671-#x06B7]
                | [#x06BA-#x06BE] | [#x06C0-#x06CE] | [#x06D0-#x06D3] | #x06D5
                | [#x06E5-#x06E6] | [#x0905-#x0939] | #x093D | [#x0958-#x0961]
                | [#x0985-#x098C] | [#x098F-#x0990] | [#x0993-#x09A8]
                | [#x09AA-#x09B0] | #x09B2 | [#x09B6-#x09B9] | [#x09DC-#x09DD]
                | [#x09DF-#x09E1] | [#x09F0-#x09F1] | [#x0A05-#x0A0A]
                | [#x0A0F-#x0A10] | [#x0A13-#x0A28] | [#x0A2A-#x0A30]
                | [#x0A32-#x0A33] | [#x0A35-#x0A36] | [#x0A38-#x0A39]
                | [#x0A59-#x0A5C] | #x0A5E | [#x0A72-#x0A74] | [#x0A85-#x0A8B]
                | #x0A8D | [#x0A8F-#x0A91] | [#x0A93-#x0AA8] | [#x0AAA-#x0AB0]
                | [#x0AB2-#x0AB3] | [#x0AB5-#x0AB9] | #x0ABD | #x0AE0
                | [#x0B05-#x0B0C] | [#x0B0F-#x0B10] | [#x0B13-#x0B28]
                | [#x0B2A-#x0B30] | [#x0B32-#x0B33] | [#x0B36-#x0B39] | #x0B3D
                | [#x0B5C-#x0B5D] | [#x0B5F-#x0B61] | [#x0B85-#x0B8A]
                | [#x0B8E-#x0B90] | [#x0B92-#x0B95] | [#x0B99-#x0B9A] | #x0B9C
                | [#x0B9E-#x0B9F] | [#x0BA3-#x0BA4] | [#x0BA8-#x0BAA]
                | [#x0BAE-#x0BB5] | [#x0BB7-#x0BB9] | [#x0C05-#x0C0C]
                | [#x0C0E-#x0C10] | [#x0C12-#x0C28] | [#x0C2A-#x0C33]
                | [#x0C35-#x0C39] | [#x0C60-#x0C61] | [#x0C85-#x0C8C]
                | [#x0C8E-#x0C90] | [#x0C92-#x0CA8] | [#x0CAA-#x0CB3]
                | [#x0CB5-#x0CB9] | #x0CDE | [#x0CE0-#x0CE1] | [#x0D05-#x0D0C]
                | [#x0D0E-#x0D10] | [#x0D12-#x0D28] | [#x0D2A-#x0D39]
                | [#x0D60-#x0D61] | [#x0E01-#x0E2E] | #x0E30 | [#x0E32-#x0E33]
                | [#x0E40-#x0E45] | [#x0E81-#x0E82] | #x0E84 | [#x0E87-#x0E88]
                | #x0E8A | #x0E8D | [#x0E94-#x0E97] | [#x0E99-#x0E9F]
                | [#x0EA1-#x0EA3] | #x0EA5 | #x0EA7 | [#x0EAA-#x0EAB]
                | [#x0EAD-#x0EAE] | #x0EB0 | [#x0EB2-#x0EB3] | #x0EBD
                | [#x0EC0-#x0EC4] | [#x0F40-#x0F47] | [#x0F49-#x0F69]
                | [#x10A0-#x10C5] | [#x10D0-#x10F6] | #x1100 | [#x1102-#x1103]
                | [#x1105-#x1107] | #x1109 | [#x110B-#x110C] | [#x110E-#x1112]
                | #x113C | #x113E | #x1140 | #x114C | #x114E | #x1150
                | [#x1154-#x1155] | #x1159 | [#x115F-#x1161] | #x1163 | #x1165
                | #x1167 | #x1169 | [#x116D-#x116E] | [#x1172-#x1173] | #x1175
                | #x119E | #x11A8 | #x11AB | [#x11AE-#x11AF] | [#x11B7-#x11B8]
                | #x11BA | [#x11BC-#x11C2] | #x11EB | #x11F0 | #x11F9
                | [#x1E00-#x1E9B] | [#x1EA0-#x1EF9] | [#x1F00-#x1F15]
                | [#x1F18-#x1F1D] | [#x1F20-#x1F45] | [#x1F48-#x1F4D]
                | [#x1F50-#x1F57] | #x1F59 | #x1F5B | #x1F5D | [#x1F5F-#x1F7D]
                | [#x1F80-#x1FB4] | [#x1FB6-#x1FBC] | #x1FBE | [#x1FC2-#x1FC4]
                | [#x1FC6-#x1FCC] | [#x1FD0-#x1FD3] | [#x1FD6-#x1FDB]
                | [#x1FE0-#x1FEC] | [#x1FF2-#x1FF4] | [#x1FF6-#x1FFC] | #x2126
                | [#x212A-#x212B] | #x212E | [#x2180-#x2182] | [#x3041-#x3094]
                | [#x30A1-#x30FA] | [#x3105-#x312C] | [#xAC00-#xD7A3]

---

```
[86]    Ideographic ::= [#x4E00-#x9FA5] | #x3007 | [#x3021-#x3029]

[87] CombiningChar ::= [#x0300-#x0345] | [#x0360-#x0361] | [#x0483-#x0486]
                     | [#x0591-#x05A1] | [#x05A3-#x05B9] | [#x05BB-#x05BD] | #x05BF
                     | [#x05C1-#x05C2] | #x05C4 | [#x064B-#x0652] | #x0670
                     | [#x06D6-#x06DC] | [#x06DD-#x06DF] | [#x06E0-#x06E4]
                     | [#x06E7-#x06E8] | [#x06EA-#x06ED] | [#x0901-#x0903] | #x093C
                     | [#x093E-#x094C] | #x094D | [#x0951-#x0954] | [#x0962-#x0963]
                     | [#x0981-#x0983] | #x09BC | #x09BE | #x09BF | [#x09C0-#x09C4]
                     | [#x09C7-#x09C8] | [#x09CB-#x09CD] | #x09D7 | [#x09E2-#x09E3]
                     | #x0A02 | #x0A3C | #x0A3E | #x0A3F | [#x0A40-#x0A42]
                     | [#x0A47-#x0A48] | [#x0A4B-#x0A4D] | [#x0A70-#x0A71]
                     | [#x0A81-#x0A83] | #x0ABC | [#x0ABE-#x0AC5] | [#x0AC7-#x0AC9]
                     | [#x0ACB-#x0ACD] | [#x0B01-#x0B03] | #x0B3C | [#x0B3E-#x0B43]
                     | [#x0B47-#x0B48] | [#x0B4B-#x0B4D] | [#x0B56-#x0B57]
                     | [#x0B82-#x0B83] | [#x0BBE-#x0BC2] | [#x0BC6-#x0BC8]
                     | [#x0BCA-#x0BCD] | #x0BD7 | [#x0C01-#x0C03] | [#x0C3E-#x0C44]
                     | [#x0C46-#x0C48] | [#x0C4A-#x0C4D] | [#x0C55-#x0C56]
                     | [#x0C82-#x0C83] | [#x0CBE-#x0CC4] | [#x0CC6-#x0CC8]
                     | [#x0CCA-#x0CCD] | [#x0CD5-#x0CD6] | [#x0D02-#x0D03]
                     | [#x0D3E-#x0D43] | [#x0D46-#x0D48] | [#x0D4A-#x0D4D] | #x0D57
                     | #x0E31 | [#x0E34-#x0E3A] | [#x0E47-#x0E4E] | #x0EB1
                     | [#x0EB4-#x0EB9] | [#x0EBB-#x0EBC] | [#x0EC8-#x0ECD]
                     | [#x0F18-#x0F19] | #x0F35 | #x0F37 | #x0F39 | #x0F3E | #x0F3F
                     | [#x0F71-#x0F84] | [#x0F86-#x0F8B] | [#x0F90-#x0F95] | #x0F97
                     | [#x0F99-#x0FAD] | [#x0FB1-#x0FB7] | #x0FB9 | [#x20D0-#x20DC]
                     | #x20E1 | [#x302A-#x302F] | #x3099 | #x309A

[88]       Digit ::= [#x0030-#x0039] | [#x0660-#x0669] | [#x06F0-#x06F9]
                     | [#x0966-#x096F] | [#x09E6-#x09EF] | [#x0A66-#x0A6F]
                     | [#x0AE6-#x0AEF] | [#x0B66-#x0B6F] | [#x0BE7-#x0BEF]
                     | [#x0C66-#x0C6F] | [#x0CE6-#x0CEF] | [#x0D66-#x0D6F]
                     | [#x0E50-#x0E59] | [#x0ED0-#x0ED9] | [#x0F20-#x0F29]

[89]    Extender ::= #x00B7 | #x02D0 | #x02D1 | #x0387 | #x0640 | #x0E46 | #x0EC6
                     | #x3005 | [#x3031-#x3035] | [#x309D-#x309E] | [#x30FC-#x30FE]
```

The character classes defined here can be derived from the Unicode character database as follows:

- Name start characters must have one of the categories Ll, Lu, Lo, Lt, Nl.
- Name characters other than Name-start characters must have one of the categories Mc, Me, Mn, Lm, or Nd.
- Characters in the compatibility area (i.e. with character code greater than #xF900 and less than #xFFFE) are not allowed in XML names.
- Characters which have a font or compatibility decomposition (i.e. those with a "compatibility formatting tag" in field 5 of the database -- marked by field 5 beginning with a "<") are not allowed.
- The following characters are treated as name-start characters rather than name characters, because the property file classifies them as Alphabetic: [#x02BB-#x02C1], #x0559, #x06E5, #x06E6.
- Characters #x20DD-#x20E0 are excluded (in accordance with Unicode, section 5.14).
- Character #x00B7 is classified as an extender, because the property list so identifies it.
- Character #x0387 is added as a name character, because #x00B7 is its canonical equivalent.
- Characters ':' and '_' are allowed as name-start characters.
- Characters '-' and '.' are allowed as name characters.

# C. XML and SGML (Non-Normative)

XML is designed to be a subset of SGML, in that every valid XML document should also be a conformant SGML document. For a detailed comparison of the additional restrictions that XML places on documents beyond those of SGML, see [Clark].

# D. Expansion of Entity and Character References (Non-Normative)

This appendix contains some examples illustrating the sequence of entity- and character-reference recognition and expansion, as specified in "4.4 XML Processor Treatment of Entities and References".

If the DTD contains the declaration

```
<!ENTITY example "<p>An ampersand (&#38;#38;) may be escaped
numerically (&#38;#38;#38;) or with a general entity
(&amp;amp;).</p>" >
```

then the XML processor will recognize the character references when it parses the entity declaration, and resolve them before storing the following string as the value of the entity "`example`":

```
<p>An ampersand (&#38;) may be escaped
numerically (&#38;#38;) or with a general entity
(&amp;amp;).</p>
```

A reference in the document to "`&example;`" will cause the text to be reparsed, at which time the start- and end-tags of the "`p`" element will be recognized and the three references will be recognized and expanded, resulting in a "`p`" element with the following content (all data, no delimiters or markup):

```
An ampersand (&) may be escaped
numerically (&#38;) or with a general entity
(&amp;).
```

A more complex example will illustrate the rules and their effects fully. In the following example, the line numbers are solely for reference.

```
1 <?xml version='1.0'?>
2 <!DOCTYPE test [
3 <!ELEMENT test (#PCDATA) >
4 <!ENTITY % xx '&#37;zz;'>
5 <!ENTITY % zz '&#60;!ENTITY tricky "error-prone" >' >
6 %xx;
7 ]>
8 <test>This sample shows a &tricky; method.</test>
```

This produces the following:

- in line 4, the reference to character 37 is expanded immediately, and the parameter entity "`xx`" is stored in the symbol table with the value "`%zz;`". Since the replacement text is not rescanned, the reference to parameter entity "`zz`" is not recognized. (And it would be an error if it were, since "`zz`" is not yet declared.)
- in line 5, the character reference "`&#60;`" is expanded immediately and the parameter entity "`zz`" is stored with the replacement text "`<!ENTITY tricky "error-prone" >`", which is a well-formed entity declaration.
- in line 6, the reference to "`xx`" is recognized, and the replacement text of "`xx`" (namely "`%zz;`") is parsed. The reference to "`zz`" is recognized in its turn, and its replacement text ("`<!ENTITY tricky "error-prone" >`") is parsed. The general entity "`tricky`" has now been declared, with the replacement text "`error-prone`".
- in line 8, the reference to the general entity "`tricky`" is recognized, and it is expanded, so the full content of the "`test`" element is the self-describing (and ungrammatical) string *This sample shows a error-prone method.*

# E. Deterministic Content Models (Non-Normative)

For compatibility, it is required that content models in element type declarations be deterministic.

SGML requires deterministic content models (it calls them "unambiguous"); XML processors built using SGML systems may flag non-deterministic content models as errors.

For example, the content model `((b, c) | (b, d))` is non-deterministic, because given an initial `b` the parser cannot know which `b` in the model is being matched without looking ahead to see which element follows the `b`. In this case, the two references to `b` can be collapsed into a single reference, making the model read `(b, (c | d))`. An initial `b` now clearly matches only a single name in the content model. The parser doesn't need to look ahead to see what follows; either `c` or `d` would be accepted.

More formally: a finite state automaton may be constructed from the content model using the standard algorithms, e.g. algorithm 3.5 in section 3.9 of Aho, Sethi, and Ullman [Aho/Ullman]. In many such algorithms, a follow set is constructed for each position in the regular expression (i.e., each leaf node in the syntax tree for the regular expression); if any position has a follow set in which more than one following position is labeled with the same element type name, then the content model is in error and may be reported as an error.

Algorithms exist which allow many but not all non-deterministic content models to be reduced automatically to equivalent deterministic models; see Brüggemann-Klein 1991 [Brüggemann-Klein].

# F. Autodetection of Character Encodings (Non-Normative)

The XML encoding declaration functions as an internal label on each entity, indicating which character encoding is in use. Before an XML processor can read the internal label, however, it apparently has to know what character encoding is in use--which is what the internal label is trying to indicate. In the general case, this is a hopeless situation. It is not entirely hopeless in XML, however, because XML limits the general case in two ways: each implementation is assumed to support only a finite set of character encodings, and the XML encoding declaration is restricted in position and content in order to make it feasible to autodetect the character encoding in use in each entity in normal cases. Also, in many cases other sources of information are available in addition to the XML data stream itself. Two cases may be distinguished, depending on whether the XML entity is presented to the processor without, or with, any accompanying (external) information. We consider the first case first.

Because each XML entity not in UTF-8 or UTF-16 format *must* begin with an XML encoding declaration, in which the first characters must be `'<?xml'`, any conforming processor can detect, after two to four octets of input, which of the following cases apply. In reading this list, it may help to know that in UCS-4, `'<'` is `"#x0000003C"` and `'?'` is `"#x0000003F"`, and the Byte Order Mark required of UTF-16 data streams is `"#xFEFF"`.

- `00 00 00 3C`: UCS-4, big-endian machine (1234 order)
- `3C 00 00 00`: UCS-4, little-endian machine (4321 order)
- `00 00 3C 00`: UCS-4, unusual octet order (2143)
- `00 3C 00 00`: UCS-4, unusual octet order (3412)
- `FE FF`: UTF-16, big-endian
- `FF FE`: UTF-16, little-endian
- `00 3C 00 3F`: UTF-16, big-endian, no Byte Order Mark (and thus, strictly speaking, in error)
- `3C 00 3F 00`: UTF-16, little-endian, no Byte Order Mark (and thus, strictly speaking, in error)
- `3C 3F 78 6D`: UTF-8, ISO 646, ASCII, some part of ISO 8859, Shift-JIS, EUC, or any other 7-bit, 8-bit, or mixed-width encoding which ensures that the characters of ASCII have their normal positions, width, and values; the actual encoding declaration must be read to detect which of these applies, but since all of these encodings use the same bit patterns for the ASCII characters, the encoding declaration itself may be read reliably
- `4C 6F A7 94`: EBCDIC (in some flavor; the full encoding declaration must be read to tell which code page is in use)
- other: UTF-8 without an encoding declaration, or else the data stream is corrupt, fragmentary, or enclosed in a wrapper of some kind

This level of autodetection is enough to read the XML encoding declaration and parse the character-encoding identifier, which is still necessary to distinguish the individual members of each family of encodings (e.g. to tell UTF-8 from 8859, and the parts of 8859 from each other, or to distinguish the specific EBCDIC code page in use, and so on).

Because the contents of the encoding declaration are restricted to ASCII characters, a processor can reliably read the entire encoding declaration as soon as it has detected which family of encodings is in use. Since in practice, all widely used character encodings fall into one of the categories above, the XML encoding declaration allows reasonably reliable in-band labeling of character encodings, even when external sources of information at the operating-system or transport-protocol level are unreliable.

Once the processor has detected the character encoding in use, it can act appropriately, whether by invoking a separate input routine for each case, or by calling the proper conversion function on each character of input.

Like any self-labeling system, the XML encoding declaration will not work if any software changes the entity's character set or encoding without updating the encoding declaration. Implementors of character-encoding routines should be careful to ensure the accuracy of the internal and external information used to label the entity.

The second possible case occurs when the XML entity is accompanied by encoding information, as in some file systems and some network protocols. When multiple sources of information are available, their relative priority and the preferred method of handling conflict should be specified as part of the higher-level protocol used to deliver XML. Rules for the relative priority of the internal label and the MIME-type label in an external

header, for example, should be part of the RFC document defining the text/xml and application/xml MIME types. In the interests of interoperability, however, the following rules are recommended.

- If an XML entity is in a file, the Byte-Order Mark and encoding-declaration PI are used (if present) to determine the character encoding. All other heuristics and sources of information are solely for error recovery.
- If an XML entity is delivered with a MIME type of text/xml, then the `charset` parameter on the MIME type determines the character encoding method; all other heuristics and sources of information are solely for error recovery.
- If an XML entity is delivered with a MIME type of application/xml, then the Byte-Order Mark and encoding-declaration PI are used (if present) to determine the character encoding. All other heuristics and sources of information are solely for error recovery.

These rules apply only in the absence of protocol-level documentation; in particular, when the MIME types text/xml and application/xml are defined, the recommendations of the relevant RFC will supersede these rules.

## G. W3C XML Working Group (Non-Normative)

This specification was prepared and approved for publication by the W3C XML Working Group (WG). WG approval of this specification does not necessarily imply that all WG members voted for its approval. The current and former members of the XML WG are:

Jon Bosak, Sun (Chair); James Clark (Technical Lead); Tim Bray, Textuality and Netscape (XML Co-editor); Jean Paoli, Microsoft (XML Co-editor); C. M. Sperberg-McQueen, U. of Ill. (XML Co-editor); Dan Connolly, W3C (W3C Liaison); Paula Angerstein, Texcel; Steve DeRose, INSO; Dave Hollander, HP; Eliot Kimber, ISOGEN; Eve Maler, ArborText; Tom Magliery, NCSA; Murray Maloney, Muzmo and Grif; Makoto Murata, Fuji Xerox Information Systems; Joel Nava, Adobe; Conleth O'Connell, Vignette; Peter Sharpe, SoftQuad; John Tigue, DataChannel

Copyright © 1998 W3C (MIT, INRIA, Keio ), All Rights Reserved. W3C liability, trademark, document use and software licensing rules apply.